UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| | ) | |
| **WORLDWIDE DIRECT, INC., et al.,** | ) | **Case Nos. 99-108 to -127 (MFW)** |
| | ) | |
| Debtors. | ) | |
| | ) | **Jointly Administered** |
| | ) | |

### APPENDIX OF DEPOSITION TESTIMONY

PLEASE TAKE NOTICE Hennigan, Bennett & Dorman hereby lodges deposition excerpts in support of its Reply to the Liquidating Trust's Objection to the Final Fee Application.

### DECLARATION OF AUTHENTICITY OF DEPOSITION TRANSCRIPTS

I, LAURA LINDGREN, declare as follows:

1. I am a member of Hennigan, Bennett & Dorman, counsel for the Debtors in the above-captioned matter. I was admitted pro hac vice on behalf of the Debotrs in the case entitled In Re Worldwide Direct, Inc., et al., Case Nos. 99-00108 (MFW) through 99-00127 (MFW) in the United States Bankruptcy Court for the District of Delaware. The matters stated herein are true of my own personal knowledge.

2. I attended the following depositions and attached hereto are true and correct copies of excerpts from the following deposition transcripts:

        a.  Skyler Altland, 2/13/02

        b.  James Johnston, 2/20/02

        c.  John Marquess, 2/12/02

d.  David Pauker, 2/26/02

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

15th day of March at Los Angeles, California.

Laura Lindgren
HENNIGAN, BENNETT & DORMAN
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234

148775\v1

**SKYLER ALTLAND**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 99-108(MFW) through 99-127

Jointly Administered

Chapter 11

In Re:

WORLDWIDE DIRECT, INC., et al.

Debtors

COPY

DEPOSITION OF SKYLER ALTLAND

Newark, New Jersey

Wednesday, February 13, 2002

Reported by:
Linda M. Schaal
Certified Shorthand Reporter

JOB No. 6911



www.attysweb.com

46 Corporate Park, Suite 100      445 South Figueroa St., Suite 2900
Irvine, CA 92606                  Los Angeles, CA 90071

phone 877.955.3855
fax 877.250.0777

SARNOFF
Court Reporters and
Legal Technologies

Altland, Page 1

```
1                          Altland
2    used; is that right?
3         A.      That's correct.
4         Q.      With respect to the Hennigan
5    report, are there potential codes that were not
6    utilized in connection with the report?
7         A.      Oh, yes.
8         Q.      Now, is it correct that you would
9    run queries with respect to the data in order to
10   determine which entries would be fit into which
11   particular code?
12        A.      In some cases.
13        Q.      And in other cases where you didn't
14   run queries, how would you determine which
15   entries would go in?
16        A.      That would be a review, a
17   line-by-line review, actual reading of the
18   entries.
19        Q.      In connection with the Hennigan
20   report, did you then generate a draft of entries
21   into various codes and supply those to
22   Mr. Marquess?
23            MR. LANGENDORFER:  Excuse me, could
24        I have that read back.
25            MS. LINDGREN:  Do you want me to
```

1                          Altland

2         rephrase the question?

3                   MR. LANGENDORFER:  If you want or the

4         reporter can read it back.  I didn't hear it.

5         Q.      In connection with the Hennigan report

6    did you generate a draft that put different

7    entries into different categories and supply

8    that to Mr. Marquess?

9         A.      Yes.  It would be the same type of

10   charts that you would see in the report that are

11   attached to the report.

12        Q.      Did Mr. Marquess then make changes

13   to some of those draft charts?

14        A.      Yes.

15        Q.      Do you know if he made -- well,

16   perhaps we should go into each one.  That might

17   be better.

18                Was there anything else that you

19   did in connection with the Hennigan report?

20        A.      Other than work with -- I think

21   there may have been some specific charting

22   contained within the report such as rate

23   increases, things like that that I probably

24   would have generated.

25        Q.      I'd like to go through -- I believe

```
 1                        Altland
 2    you have in front of you a copy of the Legal
 3    Cost Control report.
 4         A.     Yes.
 5         Q.     I'd like to go through some of the
 6    exhibits and ask you some questions about that.
 7         A.     Okay.
 8         Q.     Before I do that, when you would
 9    run queries in connection with generating
10    various charts, did you keep a record of the
11    queries that you ran?
12         A.     No, because those are different
13    depending on what pattern we see in the bills.
14         Q.     If we could take a look at the
15    first chart, which is Exhibit 2, to the report.
16    That one is entitled blocked/grouped
17    description.
18         A.     I have that.
19         Q.     Did you do the initial version of
20    this chart?
21         A.     Yes.
22         Q.     Do you recall what queries you ran
23    to generate the entries in this chart?
24         A.     Just to clarify, the charts aren't
25    necessarily generated by queries.  This may have
```

12

```
 1                        Altland
 2    had some queries run to bring up certain items
 3    for review, but queries aren't necessarily
 4    relied on to generate the report.
 5         Q.    Yesterday Mr. Marquess said he
 6    believed in connection with this that there were
 7    certain possible queries that were used.
 8         A.    Possible queries, yes.  There would
 9    be possible queries that I would have used to
10    generate that, but that's not necessarily the
11    only criteria.
12         Q.    I understand that.
13               Do you recall if one of the queries
14    that was utilized was whether or not the entry
15    had a semi colon in it?
16         A.    That's very likely.  That's very
17    likely that would be used on a blocked and
18    grouped, but that wouldn't be the only criteria.
19         Q.    I believe Mr. Marquess said another
20    query that would have been run was any
21    description that was in excess of a certain
22    number of words.  Do you know if that was a
23    query that was used in connection with this
24    chart?
25         A.    I don't believe so.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Altland, Page 5

```
1                        Altland

2         Q.      Can you recall any other queries

3    that were utilized in connection with generating

4    this chart, at least an initial version of it?

5         A.      To my recollection probably only a

6    semi colon search.

7         Q.      Can you remember any other criteria

8    that were used in selecting entries for this

9    particular chart?

10        A.      Well, whether more than one

11   activity was taking place in the entry, which

12   that would require an actual reading of the

13   entry.  That entry may not have a semi colon

14   just because of a typographical error, but still

15   may contain more than one activity.

16        Q.      How did you make that

17   determination?  Did you use any computer

18   assistance in making that determination?

19        A.      No, that would require an actual

20   reading of the entry.

21        Q.      So you read through every single

22   entry on every single bill you personally?

23        A.      Yes, I believe so.

24        Q.      From reading through every single

25   entry did you then add additional entries to the
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Altland, Page 6

```
1                          Altland
2        A.      No.
3        Q.      You just supersede them on the
4   computer?
5        A.      Yes, that's correct.  I try not to
6   print out bunches of charts for editing
7   purposes.
8        Q.      I'd like to go to Exhibit 3 in the
9   report.  That particular chart is entitled
10  inadequate description.
11       A.      Uh-huh.
12       Q.      Do you recall what queries, if any,
13  that you utilized in creating this chart?
14       A.      No, not specifically.
15       Q.      Do you recall if you ran a query
16  utilizing the word prepare in order to assist in
17  generating Exhibit 3?
18       A.      From looking at it it would appear
19  that I probably did.
20       Q.      From looking at it can you
21  determine any other queries you may have run in
22  order to generate it?
23       A.      It looks just like variations on
24  prepare.  I see words like prep, that sort of
25  thing.
```

16

```
1                          Altland
2          Q.     Right.
3                 Does anything else come to mind
4      from looking at it?
5          A.     No.  Maybe in light of the other
6      entries, the other entries in total in the
7      billing there may have been some other queries,
8      but nothing is coming to mind from just looking
9      at the chart here other than prepare, variations
10     on that.
11         Q.     Other than running queries do you
12     recall any other steps you took to identify
13     entries to place into this chart?
14         A.     Actual reading of entries, we would
15     read through the billing, entries, other entries
16     that would come up.
17         Q.     Did you do that personally?
18         A.     Yes.
19         Q.     Do you recall if Mr. Marquess
20     eliminated any items from your draft of Exhibit
21     3?
22         A.     No, I don't recall that.
23         Q.     I'd like to now turn to Exhibit 4,
24     which is entitled inadequate descriptions -
25     meeting or hearing.
```

17

```
1                       Altland

2          A.     All right.

3          Q.     Do you recall if one of the queries

4    that you ran to generate the entries on this

5    chart were appear or a variation of the word

6    appear?

7          A.     Most likely.

8          Q.     Do you recall any other queries?

9    For example, I see the word attend.  Do you know

10   if you ran a query utilizing the word attend in

11   order to generate some of these entries?

12         A.     Yes, attend and appear are general

13   queries we would normally run.

14         Q.     Do you recall any other queries

15   that you ran to assist in generating Exhibit 4?

16         A.     Not that I specifically recall, no.

17         Q.     Do you recall if Mr. Marquess

18   removed any entries from the Exhibit 4 chart

19   that you created?

20         A.     No, I do not.

21         Q.     Physically when the report was

22   generated in its entirety, was that done by you

23   or was that done by the Legal Cost Control

24   office in New Jersey?

25         A.     That would have been done by Legal
```

18

```
 1                        Altland
 2    appearance, for example, or for a deposition?
 3         A.      The entries don't reflect that.
 4         Q.      In connection with your work on
 5    this project, did you look at any invoices
 6    underlying any of the billings?
 7         A.      By invoices what do you mean?  Do
 8    you mean --
 9         Q.      Invoices from the vendor or
10    invoices, for example, reflecting the travel or
11    the transportation.
12         A.      No, I don't believe those were
13    available.
14         Q.      Did you look at any of the work
15    product of the firm?
16         A.      No.  Other than the fee
17    applications, no.
18         Q.      So you didn't look at any of the
19    underlying work?
20         A.      No.
21         Q.      Did you look at any of the court
22    pleadings?
23         A.      Other than fee applications, I
24    don't believe so.
25         Q.      Did you interview anyone about the
```

Altland, Page 10

```
1                          Altland
2    work that was performed?
3         A.     You mean at your law firm?
4         Q.     At the law firm or at the debtor or
5    anywhere else?
6         A.     No.
7         Q.     Now, in reports that you've worked
8    on in the past for auditing legal bills have you
9    ever looked at the underlying invoices?
10        A.     You mean the firm's billing or
11   prebilling?  Is that what you mean?
12        Q.     No.  For example, for costs have
13   you ever looked at invoices that a firm has paid
14   other than fee bills?
15        A.     Yes.
16        Q.     Have you ever looked at any of the
17   work product generated by the firm?
18        A.     Yes.
19        Q.     Have you ever interviewed attorneys
20   who work at the firm to question them about the
21   work that's reflected in the billings?
22        A.     Yes.
23        Q.     Have you ever interviewed the
24   client to question them about what work was
25   being generated?
```

Altland, Page 11

1                              Altland

2          A.      Yes.

3          Q.      You took those steps to determine

4     whether or not the fee applications were

5     appropriate?

6          A.      Yes, in an audit situation, yes.

7          Q.      Are there any other steps that you

8     can think of that you've undertaken with respect

9     to other cases to determine whether or not the

10    fees were proper other than looking at invoices,

11    work product interviews, anything you can think

12    of that you've done in the past?

13         A.      The only thing I would add to that

14    list would be guidelines, whether client or

15    court imposed guidelines on billings.

16         Q.      Going back now to this Hennigan

17    report, did you look at the retainer agreement

18    with the client?

19         A.      No.

20         Q.      Did you ever ask talk to anyone at

21    Goldin about this assignment?

22         A.      I did have a conversation with

23    someone.  I don't recall exactly who, but it was

24    only in regards to when a report would be

25    available.

**JAMES JOHNSTON**

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    )
WORLDWIDE DIRECT, INC., et al.,           )   Chapter 11
                                          )   Case No. 99-108(MFW)
            Debtors.                      )
_____)


DEPOSITION OF:

JAMES JOHNSTON

WEDNESDAY, FEBRUARY 20, 2002

9:14 A.M.



JILIO
& ASSOCIATES

CERTIFIED COURT REPORTERS
& DOCUMENT DEPOSITORY

```
1         Q     Who?

2         A     Shawna Ballard.

3         Q     Could we have all the documents produced that

4    relate to payments to experts in the Fletcher litigation

5    and all documents that support the payment of

6    professional fees for 147,000.

7         MS. LINDGREN:  I believe those were included in the

8    documents that have been produced.

9         MR. DE FILIPPO:  Well, do you have a schedule of

10   Bates numbers that --

11        MS. LINDGREN:  No.  We didn't produce them with

12   Bates numbers.  We gave you all of our files, and you

13   copied selected portions.

14        MR. DE FILIPPO:  Do we have them?

15        MS. KARDOS:  I don't know if we have them with us.

16   BY MR. DE FILIPPO:

17        Q     Do you remember the names of the experts who

18   did financial analysis in Fletcher?

19        A     To clarify, I don't know if it was more than

20   one expert.

21        Q     Do you remember the name of any expert that

22   did financial analysis?

23        A     No.

24        Q     Did the firm have a contract with any of the

25   experts it used in that case?
```

135

```
 1                        CERTIFICATE

 2                            OF

 3                 CERTIFIED SHORTHAND REPORTER

 4

 5

 6              The undersigned Certified Shorthand Reporter

 7     and deposition Officer of the State of California

 8     does hereby certify:

 9              That the foregoing Deposition was taken before

10     me at the time and place therein set forth, at which time

11     the Witness was duly sworn by me:

12              That the testimony of the Witness and all

13     objections made at the time of the Deposition were

14     recorded Stenographically by me and was thereafter

15     transcribed, said transcript being a true and correct

16     copy of the proceedings thereof.

17              In witness whereof, I have subscribed my name

18     this date: _____ FEB 2 5 2002 _____.

19

20

21

22

23                            Certificate No. 11078

24

25
```

**JOHN MARQUESS**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 99-108(MFW) through 99-127

Jointly Administered

Chapter 11

In Re:

WORLDWIDE DIRECT, INC., et al

Debtors

---

DEPOSITION OF JOHN J. MARQUESS

Newark, New Jersey

Tuesday, February 12, 2002

Reported by:
Jeanne Marie Marucci
Certified Shorthand Reporter

JOB No. 6909

www.attysweb.com
46 Corporate Park, Suite 100    445 South Figueroa St., Suite 2950
Irvine, CA 92606               Los Angeles, CA 90071
phone 877.955.3855
fax 877.230.0777



SARNOFF
Court Reporters and
Legal Technologies

Marquess, Page 1

```
1    2000.
2         Q.      After the merger, did you continue
3    practicing when you did practice in the areas
4    that you've just described?
5         A.      I did personally.  The firm's
6    practice was a little broader.
7         Q.      Are you associated with any law
8    firm today?
9         A.      I -- myself.  My own firm.
10        Q.      What's the location of --
11        A.      Haddonfield, New Jersey.
12        Q.      Do you have any experience in
13   bankruptcy law?
14        A.      No.  You mean practicing experience
15   I assume.
16        Q.      Correct.
17        A.      No.
18        Q.      In your private practice, did you
19   have occasion to appear in court on behalf of
20   clients?
21        A.      Yes.
22        Q.      Did you charge your clients for the
23   time that you appeared in court on their behalf?
24        A.      Yes, I did.
25        Q.      When you went to court to argue
```

9

1    motions, did you prepare to argue those motions?

2         A.     Yes.

3         Q.     And did you charge your clients for

4    that time?

5         A.     Yes.

6         Q.     Now, at some point, did you form a

7    company called Legal Cost Control?

8         A.     I did not form the company.

9    Someone else formed it.

10        Q.     At some point, did you become

11   associated with Legal Cost Control?

12        A.     Yes.

13        Q.     What year was that?

14        A.     I believe that would have been

15   October 1st of 1998.

16        Q.     So prior to October 1, 1998, your

17   full time was devoted to the practice of law as

18   far as your work areas?

19        A.     No.

20        Q.     What else did you do during that

21   time you were practicing law prior to '98?

22        A.     Okay.  From October 1st of 1988

23   through September 30, 1996, I was with Legalgard

24   Incorporated, L-e-g-a-l-g-a-r-d, Incorporated.

25        Q.     And between Legalgard, Inc. and the

Marquess, Page *3*

1    A.    He -- he prepared the draft of the

2    charts, the exhibits that were attached.

3    Q.    Is it fair to say that you were the

4    one in charge of the report?

5    A.    Yes.

6    Q.    And you oversaw all the work on the

7    report?

8    A.    Yes.

9    Q.    What's Mr. Altland's background?

10   A.    He's been a fee auditor for I guess

11   12 -- 12 or so -- 12 or 13 years at this point.

12   Prior to that time, he was an auditor in other

13   areas including energy and utilities and things

14   like that.

15   Q.    So his background is auditing --

16   A.    Yes.

17   Q.    -- public auditing?

18   A.    Yes.

19   Q.    In addition, did Mr. Patrick Woods

20   work on the report?

21   A.    He didn't work on the actual

22   report.

23   Q.    What did he do?

24   A.    His job was to ensure that the data

25   that went in and came out was accurate and

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Marquess, Page 4

1    given specifics or not.

2         Q.    Did she tell you whether Goldin

3    Associates had already engaged in any

4    negotiations with respect to any of the fee

5    applications?

6         A.    No, she didn't.

7         Q.    And prior to beginning your

8    assignment, were you given any background

9    information about the SmartTalk bankruptcy

10   proceeding?

11        A.    No.

12             MS. LINDGREN:  I'd like to have

13        marked as Exhibit 1 a copy of a document.

14        It's a brochure entitled "Legal Cost Control,

15        Legal Cost Solutions."

16             (Exhibit 1, Brochure entitled "Legal

17        Cost Control, Legal Cost Solutions," Marked

18        for Identification, as of This Date.)

19        Q.    Is this a Legal Cost Control brochure

20   describing services performed by the company?

21        A.    It appears to be.

22        Q.    And did you provide this to

23   Goldin & Associates in connection with

24   discussions about whether they were going to

25   retain your firm?

1          A.        Probably.  I believe we would have.

2          Q.        Can you take a look at the fifth

3    page of the brochure which is entitled "Legal

4    firm auditing" or excuse me, it's entitled "Law

5    Firm Auditing."

6          A.        Okay.

7          Q.        Can you take a look at the second

8    and third paragraphs of that page.  The first

9    one begins "Legal Cost Control provides."

10              Do you see that?

11         A.        Yes.

12         Q.        Is this the methodology utilized by

13   Legal Cost Control to audit legal fees, what's

14   described on this page?

15         A.        If we're auditing -- if it's a law

16   firm audit where we're going to the law firm to

17   look at work product, to interview the law firm

18   and to interview the firm and to check

19   disbursements, this would be the process that we

20   would use.

21              MS. LINDGREN:  I'd like to next

22         have marked as Exhibit 2 a copy of a page

23         from the Legal Cost Control website.

24              (Exhibit 2, copy of a page from the

25·        Legal Cost Control website, Marked for

18

1    A.    No.  I don't agree with that at
2  all.
3    Q.    What authoritative board has
4  promulgated or adopted these Generally Accepted
5  Legal Auditing Principles?
6    A.    Any case law that exists in the
7  area of fees, legal fees or professional fees
8  are a part of GALAP.
9    Q.    Is this thing that you call GALAP
10  published anywhere?
11    A.    No.  Correction.  We -- is GALAP
12  published anywhere or are the standards
13  published anywhere?  What's your question?
14    Q.    Is what you call here Generally
15  Accepted Legal Auditing Principles, are those
16  published anywhere?
17    A.    The principles that constitute
18  GALAP are published, yes.
19    Q.    And where are they published?
20    A.    If you look at Professor William
21  Ross' law review article at the Rutgers law
22  review back in I believe 1991 and also his book.
23    Q.    Now, when this refers to something
24  that's been copyrighted, apparently by Legal
25  Cost Control, is there a book or a publication

1     that sets them out in a way that a third party
2     could look at these principles?
3          A.     Is there a published book?  That's
4     what you're asking me, correct?
5          Q.     Yes.
6          A.     No.
7          Q.     Do you have anything printed up at
8     Legal Cost Control that sets out these
9     principles?
10         A.     I'm not sure how to answer that.
11                There's nothing printed in a book,
12     in booklet form.
13         Q.     Is there anything printed at all
14     where I could look at it and say here's
15     principle No. 1, for example, principle No. 2?
16         A.     No.  They're not set out that way.
17     No.
18         Q.     Is there an internal publication at
19     Legal Cost Control that sets out these Generally
20     Accepted Legal Auditing Principles?
21                THE WITNESS:  Read back the
22            question.
23                (Requested portion of record read.)
24         A.     When you say "publication," I would
25     have to say no.  You're talking about a booklet

```
 1   again, I think.

 2        Q.      Or an internal guidance or

 3   something written that sets out these

 4   principles.

 5        A.      Yes.

 6        Q.      What is that?

 7        A.      It would be the materials that we

 8   would use for training and education.

 9        Q.      What kind of materials are those?

10        A.      They would be printed materials.

11        Q.      Have those been produced?

12        A.      No.

13        Q.      Are you willing to produce those?

14        A.      No.

15        Q.      On what basis?

16        A.      They're proprietary.

17        Q.      So if someone were being audited by

18   Legal Cost Control, they would not be able to

19   look at something to determine what principles

20   were being utilized for the audit, then; is that

21   right?

22        A.      If they looked at the report that

23   was generated, they would see whether the audit

24   report was based upon strictly GALAP, upon

25   client guidelines, upon local rules of court.
```

24

1      Q.      Are you aware of these GALAP

2   principles being subject to any peer review?

3      A.      Who do you mean as a peer review?

4      Q.      For example, anyone in the

5   accounting or legal profession, had they looked

6   at these GALAP standards copyrighted by Legal

7   Cost Control, commented on them?

8      A.      In the sense of somebody reviewing

9   them on behalf of Legal Cost Control?  Is that

10  what you mean?

11     Q.      No.  Someone reviewing them just

12  generally for -- similar to the --

13     A.      Okay.  Any firm or professional

14  who's ever been subject to a fee review or a fee

15  audit would have the report.  Any issues about

16  their fees would be stated in the report and the

17  basis for those issues, and those firms have had

18  the right to comment, object, clarify, whatever

19  they wanted.

20     Q.      Let's talk about an authorized

21  party, for example, an accounting standards

22  board.

23             Has any type of accounting

24  standards board ever reviewed these GALAP

25  principles and commented on them?

1          A.      I don't know if they've reviewed

2    them.  If they've commented, they haven't

3    commented to me.

4          Q.      And are you aware of any --

5          A.      You said an accounting firm?

6          Q.      Any accounting board.  Any type of

7    accounting board.

8          A.      No.

9          Q.      Has any accounting board reviewed

10   them and commented?

11         A.      Again, I don't know that they

12   reviewed them.  If there's been comments, it's

13   never come to my attention.

14         Q.      Do you know if any independent body

15   representing any legal authority has ever

16   reviewed these GALAP principles and commented on

17   them?

18         A.      I have heard over the years that

19   the ABA has reviewed auditing guidelines and

20   standards.  No one's ever commented to me about

21   that.

22         Q.      Has the ABA ever reviewed what you

23   refer to here as GALAP?

24         A.      Not that I know of, other than in

25   the context of reports, audit reports that were

11

1   No. 32 from the United States Bankruptcy Court
2   for the District of Delaware.
3           A.      Standing order 32, that's correct.
4           Q.      So in addition to the five
5   applications, the standing order and the sixth
6   fee application, were there any other documents
7   reviewed by Legal Cost Control in connection
8   with the preparation of your report?
9           A.      I don't believe so.
10          Q.      In connection with --
11          A.      Go ahead.
12          Q.      In connection with the preparation
13  of your report, did you interview anyone?
14          A.      You mean anyone outside of Legal
15  Cost Control or anyone --
16          Q.      Yes.
17          A.      No.
18          Q.      So, for example --
19          A.      Including Goldin.  We did not
20  interview anyone at Goldin, no.
21          Q.      So is it correct, then, that Goldin
22  did not provide you with any background
23  information?
24          A.      None.
25          Q.      And then it would also be correct

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Marquess, Page 12

1   that you didn't interview anyone at the debtor

2   or the creditor's committee?

3         A.      That's true.

4         Q.      Did you discuss any of the issues

5   raised in the SmartTalk bankruptcy proceeding

6   with anyone outside of Legal Cost Control?

7         A.      No.

8         Q.      Did you review any of the court

9   files or pleadings in the SmartTalk proceeding

10  in connection with the preparation of your

11  report?

12        A.      You mean other than the fee

13  applications and supporting materials?

14        Q.      Correct.

15        A.      No.

16        Q.      Do you know what the significant

17  legal issues were raised by the bankruptcy?

18        A.      No.

19        Q.      Do you know if there are any novel

20  issues of law raised in the proceeding?

21        A.      No.

22        Q.      Do you know what adversary

23  proceedings were conducted in connection with

24  the SmartTalk bankruptcy?

25        A.      No.

1      Q.      Do you know if any summary judgment

2   motions were filed in connection with any of the

3   adversary proceedings?

4      A.      No.

5      Q.      Would you expect that in connection

6   with issuing rulings, that the bankruptcy court

7   familiarized itself with the factual and legal

8   issues raised in those proceedings?

9              THE WITNESS:  Can you read back

10        that question?

11             (Requested portion of record read.)

12      A.      I expect the bankruptcy court.  That's

13   your question.

14      Q.      Yes.

15      A.      Yes.

16      Q.      So would you agree that the

17   bankruptcy court was more familiar with the

18   factual and legal issues raised in the SmartTalk

19   proceeding than the people at Legal Cost

20   Control?

21      A.      I would hope that the court would

22   be more familiar.

23      Q.      Did you review any transcripts from

24   any proceedings in front of the SmartTalk

25   bankruptcy court?

1      A.     No.

2      Q.     Do you know how many proofs of

3  claim were filed in the SmartTalk bankruptcy

4  proceeding?

5      A.     No.

6      Q.     Do you know the dollar amount of

7  the  precept claim filed in the bankruptcy

8  proceeding?

9      A.     No.

10     Q.     Did Legal Cost Control create any

11  work papers in connection with the report?

12     A.     Other than what's contained in the

13  four corners of a report and the attachments,

14  no.

15     Q.     Was one of the steps taken by Legal

16  Cost Control after it received the assignment,

17  was to input each of the individual time entries

18  into a computer?

19     A.     Yes.

20     Q.     Was anything else input into the

21  computer besides the individual time entries?

22     A.     Meaning what?  I'm not sure --

23     Q.     Any other information from --

24     A.     From the fee apps you mean?

25     Q.     Yes.

```
 1          A.     Individual timekeepers at Hennigan?
 2          Q.     No.  People at Legal Cost Control.
 3   For example, yourself or Mr. Altland.
 4          A.     No, no.
 5          Q.     No one keeps time records?
 6          A.     No.
 7          Q.     So would it be possible for you to
 8   estimate, for example, how much of your time was
 9   spent on the report for Hennigan, Mercer &
10   Bennett?
11          A.     I can tell you that the -- I would
12   estimate that the time expended by LCC personnel
13   was in the hundreds of hours.
14          Q.     And do you know approximately how
15   much of your individual time was included in
16   that?
17          A.     Approximately 300 hours.  Could be
18   500 hours.  I'm estimating.
19          Q.     Do you know or can you estimate how
20   much of Mr. Altland's time was spent on the
21   report?
22          A.     No, but I would -- I would estimate
23   it would be at least the same amount of time,
24   more or less.
25          Q.     Was most of your communication with
```

1     Q.     So the computer selects entries,

2   and then you review them after that selection?

3     A.     And also review to ensure that the

4   computer didn't miss any entries.  Again,

5   computer assisted.

6     Q.     Was the query to the computer with

7   respect to Exhibit 2 a query as to any entries

8   with a semicolon?

9     A.     Could have been one of the queries.

10    Q.     Can you recall any other query with

11  respect to Exhibit 2?

12    A.     The query would be any entry that's

13  more than six words, any entry that's more than

14  eight, any entry that's more than fourteen,

15  anything that gives more than two sentences.  I

16  mean, there are various levels of

17  sophistication, again, without getting into

18  proprietary practices.

19    Q.     Which queries were actually run in

20  this case?  Was it all of those?

21    A.     You would have to ask Skyler that

22  question, but I believe all of those would have

23  been run because that's the typical practice, to

24  do that, in addition to actually reviewing them,

25  myself and also Skyler reviewing them himself to

Marquess, Page 17

1   of the report that corresponds to Exhibit 4, and

2   the title is "Inadequate Description - Meeting

3   or Hearing."

4           A.      Okay.

5           Q.      Was one of the queries run to come

6   up with the questionable entries in Exhibit 4

7   whether an entry had the word appear in it?

8           A.      It could have been appear.  It

9   could have been appear and attend, appear or

10  attend.  Again, Skyler would know specifically

11  which queries he crafted for this.

12          Q.      Do you intend to opine that any

13  time an attorney charged time for appearing at

14  court on behalf of the debtor, that that

15  attorney did not actually appear in court?

16          A.      Sorry.  What was that question?

17          Q.      As far as you're aware, any time an

18  attorney wrote down a time description that they

19  appeared in court, do you have any reason to

20  believe that that attorney did not actually

21  appear in court on behalf of the debtor?

22          A.      No.

23          Q.      Do you believe that when an

24  attorney represents a client at a court hearing,

25  that it is appropriate for the attorney to bill

1    charged at cost.  I don't have any reason to

2    think that they weren't, but I would want to see

3    some of the receipts.

4        Q.    And as you sit here today, do you

5    intend to opine that any of this copying was not

6    necessary in the SmartTalk action?

7        A.    Because I don't know what it is, I

8    don't know whether it was necessary or not.

9        Q.    So you don't know one way or the

10    other.

11        A.    That's correct.

12        Q.    Do you know how many documents were

13    produced in this action?

14        A.    A lot.  I don't know the exact

15    number.

16        Q.    Do you know how many documents were

17    provided by SmartTalk to other parties to

18    litigation or to the creditor's committee?

19        A.    No.

20        Q.    And do you believe that insofar as

21    SmartTalk was required to provide those

22    documents or to obtain copies of documents, that

23    it is appropriate to charge for that copying?

24        A.    Yes.

25        Q.    While we're on the photocopy issue,

1       Q.      What's the basis for your asserting

2   that they should be reduced from the firm's

3   compensation?

4       A.      What's the rest of the sentence?

5       Q.      I'll read it to you.

6       A.      Okay.

7       Q.      "LCC recommends that the amount

8   above be reduced from the firm's compensation

9   absent adequate explanation or correction by the

10  firm."

11      A.      Okay.  A, who are they; B, what

12  they were doing; C, what are the qualifications;

13  D, why did they not track their time on an

14  hourly basis, and therefore, E, what is the

15  basis of the charge.

16      Q.      So you believe that if the firm

17  hired, for example, a firm or a company to

18  provide these temporary personnel, that each of

19  the individuals should have kept a time record

20  that was submitted to the firm and that they

21  should be identified?

22      A.      Well, perhaps, but not necessarily.

23  Was it a flat-fee contract?  Is it a per diem?

24  Maybe it's all reasonable.  It's not stated.

25      Q.      And you haven't looked at the

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Marquess, Page 20

1    underlying invoices; is that correct?

2        A.    No.

3        Q.    I'd like next to go to your entry

4    that is entitled "Unspecified Computer-Assisted

5    Legal Research," and it corresponds to Exhibit

6    24 to your report.

7             Have you listed in Exhibit 24 all

8    computerized legal research?

9        A.    I believe so.

10       Q.    And do you agree that the court

11   does allow reimbursement for computerized legal

12   research?

13       A.    So long as the research complies

14   with the court rule, stating Order 32, the court

15   could allow that.

16       Q.    And what under 32 do you believe

17   the court would need to know?

18       A.    If you look at Exhibit 24, the

19   computer research is the monthly charge.  It

20   does not correlate back to the activity

21   description.

22       Q.    Did your firm do any analysis to

23   determine what research was conducted by the

24   attorneys in any particular month that would

25   correspond to the computerized legal research?

1          A.      Yes.   You would try to go back and
2    forth from the fee app to the bill entry to the
3    actual charges that were actually on here, and
4    since there are no receipts available to review,
5    it's tough to correlate because, for example,
6    the April 30, 1999 entry for $21,000 could have
7    related to research that was done that month,
8    the month before, two, three months before that
9    depending on how they received the billing from
10   Lexus or Westlaw or whomever it might be.
11   Again, it's a multiple-layer question.  A, is it
12   submitted without a mark  -- with a mark-up or
13   without a markup; B, how do you correlate the
14   research to the time in the billing which is
15   what the local rule says to do.
16          Q.      And it's correct that you haven't
17   reviewed any of the actual billings from Lexus;
18   is that right?
19          A.      I don't recall seeing them, no.
20          Q.      Now, the second paragraph of your
21   narrative says, "It is LCC's position that
22   computerized legal research expense is not a
23   reimbursable disbursement."
24              Do you see that?
25          A.      That's right.

1        A.        Right.

2        Q.        The next entry in your report is

3   entitled "Out-of-Town Travel Expense."  That

4   corresponds to Exhibit 26.

5        A.        Yes.

6        Q.        How did you select these particular

7   entries from the bills to be listed here?

8        A.        After -- I'm sure after reviewing

9   the fee applications and the billings and seeing

10  this decided to code these up and inquire about

11  them since we don't know what they are.

12       Q.        Did you review any invoices related

13  to these expenses?

14       A.        You mean the actual travel

15  receipts?

16       Q.        Yes.

17       A.        No.

18       Q.        Did you review any documents that

19  reflected, for example, that the travel was

20  incurred to appear in court in Delaware or

21  incurred to go to a deposition or such

22  information?

23       A.        As we indicate in the report, the

24  primary difficulty was identifying the type of

25  charge, whether it was a hotel, a car rental, a

1                    C E R T I F I C A T E

2

3

4              I, JEANNE MARIE MARUCCI, a

5    Certified Shorthand Reporter and Notary Public

6    within and for the States of New Jersey and New

7    York, do hereby certify:

8              That JOHN J. MARQUESS, the witness

9    whose deposition is hereinbefore set forth, was

10   duly sworn by me and that such deposition is a

11   true record of the testimony given by the

12   witness.

13             I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage, and that I am in no way

16   interested in the outcome of this matter.

17

18

19

20          _____Jeanne Marie Marucci_____

21          JEANNE MARIE MARUCCI, CSR

22

23

24

25

**DAVID PAUKER**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In Re:

WORLDWIDE DIRECT, INC., et al.,


                    Debtors.



                Tuesday, February 26, 2002
                9:45 a.m. - 12:20 p.m.


        DEPOSITION of DAVID PAUKER, held at

    the offices of Gibbons, Del Deo, Dolan,

    Griffinger & Vecchione, 125 West 55th

    Street, New York, New York, before Francine

    Sky, a Notary Public of the State of New

    York.



JOB NO. 7091A



www.attysweb.com
46 Corporate Park, Suite 100     445 South Figueroa St., Suite 2950
Irvine, CA 92606                 Los Angeles, CA 90071
            phone 877.955.3855
            fax 877.230.0777

SARNOFF
Court Reporters and
Legal Technologies

Pauker, Page __1__

```
 1    settlement that hasn't been obtained.
 2        Q.    Is that Howrey & Simon?
 3        A.    Yes.
 4        Q.    Was a similar letter or was the same
 5    memorandum sent to Howrey & Simon?
 6        A.    I don't recall.
 7        Q.    Can you take a look at the second
 8    page of the memorandum, the first full
 9    paragraph.
10        A.    Yes.
11        Q.    It says, if you look down towards the
12    middle:  "The offer of a voluntary fee reduction
13    is based on an initial review of the
14    professional fee applications and is not based
15    on a thorough and detailed examination of each."
16    Was that a correct statement?
17        A.    Where?
18             MR. DeFILIPPO:  Second page.
19        Q.    First full paragraph on the second
20    page.  It's the sentence beginning "The offer of
21    a voluntary fee reduction."  Do you see that?
22        A.    Yes.
23        Q.    Is that a correct statement?
24        A.    Yes.  We had not conducted a thorough
25    detailed examination of the applications at that
```

Pauker, Page 2

24

1    time.

2         Q.    At some point, is it correct that

3    Goldin retained Legal Cost Control to perform an

4    analysis?

5         A.    That's correct.

6         Q.    Setting aside what Legal Cost Control

7    may have done, did Goldin Associates itself ever

8    perform a thorough and detailed examination of

9    any of the professional fee applications?

10        A.    My understanding is that Goldin

11   Associates reviewed the work of Legal Cost

12   Control and consulted with counsel.  I would

13   imagine reviewed such portions of the

14   applications as were appropriate and related to

15   those consultations.

16        Q.    You imagine that.  Do you know for a

17   fact that happened?

18        A.    I do not.

19        Q.    You personally didn't do that?

20        A.    No.

21        Q.    Is it correct that you personally did

22   not conduct any analysis of any of the

23   particular fee applications?

24        A.    That's correct.

25        Q.    Is it fair to say that Goldin

Pauker, Page _3_

25

1      A.      In several regards.  When I say, "my

2   understanding," it has to be understood as I was

3   not responsible for the reviews of the

4   application within the firm.  When I say I did

5   not, or what I think someone did, I am only

6   giving you my understanding.  This was not an

7   area of responsibility of mine.

8      Q.      Was it Mr. Slane's responsibility?

9      A.      That's correct.

10     Q.      Mr. Slane is sitting here now?

11     A.      That's correct.

12     Q.      With respect to the bills from the

13  Hennigan firm, did you actually look at any of

14  the billings or fee applications submitted by

15  the Hennigan firm?

16     A.      I don't recall.

17     Q.      You don't recall doing that?

18     A.      I don't recall doing that.

19     Q.      Do you have any reason to believe

20  that any of the work reflected on those bills

21  was not actually performed?

22          MR. DeFILIPPO:  Objection.  He just

23      said he didn't look at them.

24          Let me finish.  How could he possibly

25      know?

```
 1                (Pauker Exhibit 7, Copy of 1-27-01
 2         letter to Goldin Associates from Gibbons,
 3         Del Deo, marked for identification, as of
 4         this date.)
 5         Q.     Is this a copy of the retention
 6   letter?
 7         A.     I believe it is.
 8         Q.     Did you believe that the terms of
 9   this retention were appropriate?
10         A.     I don't recall reviewing it
11   specifically.  I may have.  I see Mr. Slane
12   signed it.
13         Q.     As far as you're aware, these are the
14   terms that Goldin Associates agreed to for the
15   representation by the Gibbons, Del Deo firm?
16         A.     Yes.
17         Q.     Take a look at the third page of this
18   retention letter.  The top portion.
19         A.     The first paragraph?
20         Q.     Yes, the first paragraph.
21   Specifically the sentences that says:  "Our
22   rates are reviewed periodically to consider
23   adjustments based upon advancing experience,
24   capabilities and seniority of attorneys,
25   changing market conditions and general economic
```

Pauker, Page 5

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1   factors.   The hourly rates of the personnel may,

2   therefore, be increased at the time the firm

3   makes its review.   We will provide you with

4   those rates when they become available."   Do you

5   see that?

6        A.     Yes.

7        Q.     Was it your understanding that, from

8   time to time, the Gibbons, Del Deo firm might

9   raise the rates of the attorney during the

10  engagement?

11       A.     It would be my understanding from

12  reading this.   I don't specifically recall what

13  I would have thought at the time.

14       Q.     That's your understanding from what

15  it says here today?

16       A.     Yes.   That what it says, the rates

17  may be increased.   It means that the rates may

18  be increased.

19       Q.     Can you take a look at the first full

20  paragraph.   It says:   "We will provide the

21  client with a detailed bill of the time value of

22  our services rendered on a monthly basis,

23  including our fees, charges and expenses

24  incurred by us, including, but not limited to

25  charges for serving and filing papers, courier

Pauker, Page _6_

1   or messenger services, recording and certifying

2   documents, long distance telephone calls,

3   copying materials, travel expenses and other

4   than ordinary mail postage." Do you see that?

5        A.    Yes.

6        Q.    From reading that, is it your

7   understanding that Goldin Associates agreed that

8   Gibbons, Del Deo would be reimbursed for its

9   expenses?

10       A.    Yes.  That's my understanding.

11       Q.    Are the Gibbons, Del Deo fees being

12  paid by the Trust?

13       A.    Yes, they are.

14             Excuse me, may I consult with my

15  attorney for a second?

16       Q.    Yes.

17             (Attorney and client confer.)

18       A.    I would like to supplement my last

19  answer.

20       Q.    Okay.

21       A.    The fees are being paid consistent

22  with the standing order in the plan that permits

23  us to pay a portion of the fees of professionals

24  on a monthly basis with a balance to be paid

25  upon application.

Pauker, Page _7_

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    objections to the Hennigan application.

2              And were I, subsequent to this, to

3    become more familiar, involved in the process, I

4    may form an opinion on any issues on which I was

5    specifically asked to.

6        Q.    And as of today, you haven't done

7    that; is that right?

8        A.    As of today, I haven't undergone that

9    exercise.

10       Q.    I believe you also told that as of

11   today you haven't read through the fee audit

12   report that was submitted to the court.

13       A.    That's correct.

14       Q.    Have you discussed the fee audit

15   report or any drafts of the fee audit report

16   with anyone at Legal Cost Control?

17       A.    No.

18       Q.    Do you know why it is you've been

19   identified in Interrogatory Answers as a witness

20   at the fee application hearing for the Hennigan

21   bills?

22              MR. DeFILIPPO:  Does he know why he

23        has been identified as a witness?

24              MS. LINDGREN:  Yes.

25       A.    I believe that my testimony with

Pauker, Page 8

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

84

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK      )

4                          : SS.

5    COUNTY OF NEW YORK     )

6

7            I, FRANCINE SKY, a Shorthand

8    Reporter and Notary Public within and for

9    the State of New York, do hereby certify:

10           That DAVID PAUKER, the witness

11   whose deposition is hereinbefore set forth,

12   was duly sworn by me and that such

13   deposition is a true record of the

14   testimony given by the witness.

15           I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I am

18   in no way interested in the outcome of this

19   matter.

20           IN WITNESS WHEREOF, I have hereunto

21   set my hand this 4th day of March, 2002.

22

23

24   _____

25                        FRANCINE SKY