# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| WORLDWIDE DIRECT, INC., et al., | ) Case Nos. 99-108 to -127 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |

### DECLARATION OF SHAWNA BALLARD

I, Shawna Ballard, declare and state as follows:

1.      I am a member of Hennigan, Bennett & Dorman ("HBD"), former counsel for the Debtors in the above captioned case. I am an attorney at law admitted to practice before all courts of the State of California and was admitted pro hac vice on behalf of the Debtors in the case entitled In Re Worldwide Direct, Inc., et al., Case Nos. 99-00108 (MFW) through 99-00127 (MFW) in the United States Bankruptcy Court for the District of Delaware. I submit this declaration in support of "Reply of Hennigan, Bennett & Dorman to the Liquidating Trust's Objection to the Final Fee Application" (the "Reply"). The matters stated herein are true of my own personal knowledge and if called to do so I could and would testify competently thereto.

2.      I oversaw and managed two primary aspects of this case. I oversaw the document collection, management, review and productions and I oversaw the litigation of the $38 million secured claim filed by Fletcher International Limited ("Fletcher").

### Document Collection and Management

3.      Early in the case, both HBD and the Committee realized that this would be a document and litigation intensive matter that would entail the review of voluminous documents and records maintained by the Debtors to prosecute and defend litigation matters and claims disputes and to establish, among other things, the Debtors' insolvency at various points in time and the cause of the Debtors' ultimate financial collapse.

4.      The Committee, however, expressed suspicion regarding maintenance of the Debtors' documents, and the Committee repeatedly demanded that the Debtors adopt a stringent document retention and maintenance plan and that the Debtors adhere to an aggressive schedule for reviewing and producing the documents to the Committee.  These early concerns and demands by the Committee, and the Debtors' response to these concerns, are reflected, in part, in the following communications:

(a) April 19, 1999 memorandum from Thad Bereday, President and General Counsel of SmarTalk, to Joe Wielebinski, the Committee's counsel, and others regarding the Debtors' record retention efforts, a true and correct copy of this memorandum is attached to the Appendix of Exhibits ("Appendix") as Exhibit 27;

(b) May 14, 1999 letter from Jim Johnston to ATT's counsel, Mark Gordon, reminding AT&T of its document retention obligations and the attached letter from the Committee's counsel, Dean Ferguson to Jim Johnston regarding the Committee's document retention concerns, true and correct copies of these letters are attached to the Appendix as Exhibit 2;

(c) May 14, 1999 letter from Jim Johnston to Dean Ferguson, responding to the Committee's document retention concerns, a true and correct copy of this letter is attached to the Appendix as Exhibit 28; and

(d) May 18, 1999 letter from Dean Ferguson to Thad Bereday outlining document collection and retention efforts that the Committee wanted the Debtor's to undertake, a true and correct copy of this letter is attached to the Appendix as Exhibit 29.

5.      In response to the Committee's demands, Mr. Bereday, who at the time was President and General Counsel of SmarTalk, instructed HBD, and me in particular, to oversee a broad-scale document collection, management program, to oversee and manage the document production to the Committee, and to oversee and manage the review of the documents for production and use in pending and contemplated claims for and against the estates.

6.      When asking me to oversee the document management process, Mr. Bereday informed me that the document retention and management issues were significant to the Committee and that he had arranged to lease warehouse space in Dublin, Ohio that would serve as a document repository.  Mr. Bereday instructed me to oversee the creation of a document index of the documents in the repository.

My understanding was that one of the primary purposes of the repository and index was to give the Committee access to all of the estates' documents and to have the documents and boxes indexed in a manner that would assist the Committee in its review process.

7.      As part of the overall collection and management project, I was responsible for (a) overseeing and managing the collection of the Debtors' documents from various sources, locations and former employees, (b) interviewing numerous current and former employees of the Debtors regarding the location and nature of the documents, (c) arranging to have electronic mail and related electronic files preserved and reviewed, (d) setting up a system, per Mr. Bereday's instructions, for indexing the contexts of the boxes so that the Committee and Debtors could locate documents relevant to various issues, (e) setting up a system for tracking any documents checked out of or removed from the repository, (f) overseeing the review of documents for production and use in various pieces of pending and contemplated litigation matters, and (g) analyzing the costs and benefits of utilizing a document imaging and electronic retrieval system and overseeing the selection of higher priority documents to be imaged on such a system.  Linda Kontos, an associate at HBD, provided substantial assistance in the management and oversight of this document management project.

8.      The document collection and management project was expansive.  Ultimately, the project involved the collection and indexing of approximately 1,200 boxes of documents from a wide range of sources.  In addition, HBD oversaw the collection, review and production of extensive electronic email files.

### Document Collection Relating To Debtors' Claims And Analysis of Debtors' Claims

9.      As a result of the sale of virtually all of Debtors' assets and operations to AT&T, one of the primary functions of the ongoing estates was to manage and prosecute significant litigation claims and to defend the more significant claims brought against the estates.  In this regard, in May of 1999, when I first began to work on the document management project, there were  significant shareholder litigation suits pending against SmarTalk directors and officers, and there were over 2,000 claims filed against the estate, including the large claims by Intrine, Fletcher and other so-called "make-whole" claimants.

10.     After the sale of the Debtors' assets to AT&T, the Debtors viewed that some of their most significant assets included claims involving errors made by the Debtors' prepetition accounts, PricewaterhouseCoopers ("PWC") and involving the Debtors' ill-fated acquisition of Worldwide Direct at the advice of Donaldson Lufkin & Jenrette ("DLJ") and the Debtors' sale of their operator services business at the advice of Credit Suisse First Boston Corporation ("CSFB"). Because these claims were viewed by the Debtors as significant assets of the estates, early on in the case, the Debtors instructed HBD to analyze and prepare for the prosecution of these claims.

11.     The numerous pending and potential litigation and claims matters involved varied issues, but most of these matters involved the central question of when SmarTalk became insolvent and what caused SmarTalk's financial collapse. It was, therefore important to get a handle for litigation purposes, as soon as possible, on the facts and documents relevant to these solvency, financial and accounting issues so that the Debtors could develop a consistent litigation strategy and so that the estates could defend and prosecute significant claims as promptly and efficiently as possible.

12.     For example, the Fletcher litigation involved issues regarding what caused the demise of the Debtors' business and the dates of the Debtors' insolvency. These similarly would be critical issues in the cases against PWC and DLJ. Thus, for example, when I and others at HBD met with the experts retained to meet the expert designation and report deadlines in the Fletcher litigation, I and others at HBD had already developed a theme for litigation of the other matters, and in these expert preparation sessions we worked to make sure that the theories developed in each were consistent and coherent.

13.     In order to gain access to documents relevant to the preparation of the estates' significant litigation matters, HBD prepared and obtained Court approval of various requests for authorization to conduct examinations of those entities pursuant to Bankruptcy Rule 2004 and to discover numerous related documents. (One of these requests was discussed in a July 26, 1999 hearing, in which Joe Wielebinski, counsel for the Committee, was present. A true and correct copy of the hearing transcript for this hearing is attached to the Appendix as Exhibit 14.) Thereafter, HBD negotiated protective orders with counsel for the potential defendants and began to receive and review the voluminous documents produced in compliance with the Rule 2004 subpoenas.

14.    In preparation for the prosecution of these significant claims, HBD also conducted extensive factual and legal research (including witness interviews and document review) regarding the potential claims that ultimately could be asserted on behalf of the bankruptcy estates, and HBD began to prepare for litigation with respect to those claims.  Among other things, HBD prepared a comprehensive complaint against DLJ and was prepared to file that complaint by October 1999.  HBD also prepared and delivered to its clients a comprehensive memorandum analyzing the potential causes of action against PWC, and HBD began to draft a complaint to assert those claims.

### The Committee's Decisions Increased The Document Management Expense

15.    The initial stages of the document management process were geared toward promptly identifying documents that were necessary to an analysis of the solvency and other issues that would be central to the PWC, DLJ and Fletcher litigation matters and were focused on responding to the Committee's demands for prompt access to all of the Debtors' documents.  In the process of facilitating this sharing of documents, Jim Johnston of HBD was negotiating a joint defense and prosecution agreement with the Committee so that the Debtors could share documents with the Committee.

16.    Ultimately, however, the Committee decided that it would not enter into the joint defense or prosecution agreement and would not share privileged information under any such agreement.  The Committee's refusal to enter into this joint defense/prosecution agreement meant that the estates would have to bear the significant expense of conducting a privilege review before producing documents to the Committee.  This also meant that the task of screening for documents relevant to directors and officers claims that the Committee intended to bring fell upon HBD instead of the Committees' lawyers at Munsch, Hardt.

17.    Jim Johnston and I were concerned that this decision by the Committee not to review documents would imposed an unnecessary expense upon the estates.  Jim Johnston expressed this concern to the Committee in a letter dated May, 27, 1999, a true and correct copy of which is attached to the Appendix as Exhibit 30.  In this letter, Mr. Johnston informed Mr. Ferguson that:

Without such an agreement [the joint prosecution and defense agreement] SmarTalk will have no choice but to review each and every document prior to disclosure to the Committee and, where appropriate, to create privilege logs and refrain from producing privileged information to the Committee. In addition to making our lives needlessly difficult, such an outcome obviously would increase the administrative expenses of the bankruptcy estates substantially, would delay the provision of information to the Committee, and generally would make adversarial a process that otherwise could be conducted cooperatively.

18.    The Committee nonetheless decided to refuse to enter into a joint defense and prosecution agreement with the Debtors. This increased the scope of HBD's document management and review responsibilities and required a broad-scale and extensive privilege review.

## HBD Set Up A System Designed To Efficiently Collect Documents For All Litigation Matters

19.    Faced with the need (a) to conduct prompt broad-scale privilege and relevance reviews to meet the Committee's document demands, (b) to respond to Fletcher's document demands and (c) to respond to the document requirements posed by other pending and contemplated litigation, my goal was to set up a system that comported with the instructions of Mr. Bereday and that would eliminate the need to go through the approximately 1,200 plus boxes of documents and significant electronic files each time a document request was made in the numerous litigation matters.

20.    Thus, consistent with Mr. Bereday's request for indexing, I set up a system for employees of the estates and temporary personnel retained by the estates to index the boxes collected and maintained in the Ohio warehouse. This index tracked the box inventory number, box source, file name, date range of the documents in each file, and the designation of the categories of documents in the file. This index was put into an electronic searchable format and was housed in both an accel database and excel format. When completed, the printed version of the index was nearly 1,000 pages.

21.    This electronic document index was used by HBD to locate potentially responsive documents to various litigation matters, it was provided to the Debtors' SEC counsel to locate documents responsive to SEC subpoenas, and it was provided to the Committee for its review and use.

22.     In addition, in an effort to avoid unnecessary duplication of time-consuming relevance reviews of the approximately 1,200 boxes of documents, I organized a broad relevance sweep of all documents in the warehouse and later the electronic documents in an effort to locate documents responsive to (a) the broad discovery requests served by Fletcher; (b) the Committee's broad document demands, (c) documents relevant to the contemplated litigation against DLJ, CSFB and PWC, (d) documents relevant to the pending shareholder suits, and (e) documents relevant to claims by Intrine, AudioFax and others.  When sweeping for documents relevant to the contemplated and pending litigation matters, we tagged and forwarded to appropriate HBD attorneys and financial analysts documents relevant to the matters and tagged documents that we believed to be relevant to these contemplated and pending litigation matters.

23.     In order to conduct this relevance review, under my direction and the direction of Ms. Kontos, HBD attorneys and paralegals traveled to the Ohio repository and reviewed and selected documents for relevance.  Box and portions of boxes that contained documents relevant to the litigation matters were checked out of the warehouse and sent to HBD's offices for a more detailed review.

24.     Pursuant to this broad relevance sweep, we selected a master set of approximately 500 boxes of documents (some full and some partially full) and substantial additional electronic documents for production to the Committee and to various litigants.  By creating a master set of documents that could be used as the base production in all litigation matters early on in the case, HBD saved the estates the additional expenses of successive reviews through the entire document repository and electronic database for the many various subsequent productions.

25.     For example, this core group of boxes and electronic files were the basis for productions in numerous litigation matters:

(a)     HBD produced documents from these selected boxes and electronic files to the Committee in phases as privilege reviews were completed, including productions to the Committee at HBD's offices on August 4, 1999, October 13 through 15, 1999, October 26, 1999 through October 29, 1999, and March 21, 200 through March 24, 2000.  Internal HBD memoranda dated October 20, 1999, November 1, 1999 (regarding Document Reviews 10/26-27/99), November 1, 1999 (regarding Document Reviews 10/28-29/99), and March 31, 2000,

and letters from Linda Kontos dated August 3, 1999, October 27, 1999, November 2, 1999, November 18, 1999, and March 30, 2000 memorialize these productions. True and correct copies of these memoranda and letters are attached to the Appendix as Exhibits 31 through 36, and 38 through 39.

(b) HBD produced documents from these selected boxes and electronic files to Fletcher International on November 11, 1999 and December 9, 1999, and December 10, 1999. Internal HBD memoranda dated December 9, 1999 and December 14, 1999. True and correct copies of these memoranda are attached to the Appendix of Exhibits as Exhibits 40 and 41.

(c) HBD produced documents from these selected boxes and electronic files to Heller, Ehrman, counsel for PWC, and Milberg Weiss, counsel for shareholders in shareholder actions, in HBD offices on October 13 through 15, 1999, and October 28 and 29, 1999. Internal HBD memoranda dated October 20, 1999, and November 1, 1999 and correspondence from Linda Kontos dated October 27, 1999, and November 18, 1999 memorialize these productions. True and correct copies of these internal memoranda and letters are attached to the Appendix as Exhibits 31, 32, 35 and 38.

(d) HBD produced documents from these selected boxes and electronic files to The Olsen Law Firm, counsel for shareholders in shareholder actions, during the week of May 23, 2000. A June 12, 2000 letter from Linda Kontos memorializing this production is attached to the Appendix as Exhibit 42.

(e) HBD made documents from these selected boxes and electronic files available to Sachnoff & Weaver, the Debtors SEC counsel, for purposes of preparing for productions to the SEC and HBD assisted in collecting responsive documents for production to the SEC from these source boxes.

26.     The production of these numerous boxes was complicated by the fact that it was necessary, under certain agreements associated with AT&T's asset purchase, to provide AT&T with the opportunity to protect its proprietary interests in documents produced by the Debtors (i.e., AT&T purchased the SmarTalk business and many of the SmarTalk documents contained confidential proprietary information regarding the purchased assets and operations). In order to meet these

obligations to AT&T, HBD was also required to produce documents for AT&T's pre-screening on numerous occasions and HBD thereafter was required to designate documents selected by AT&T as confidential where appropriate. In order to meet these obligations to permit AT&T to protect its proprietary information, HBD produced documents for AT&T's screening and review on October 4 through 7, 1999, November 1 through 2, 1999, and January 24, through 28, 2000. These productions to AT&T are memorialized in internal HBD memoranda dated October 8, 1999, November 3, 1999, and February 4, 2000. True and correct copies of these internal memoranda are attached to the Appendix as Exhibits 43 through 45.

### The Debtors Were Under Tight Time Pressures

27.     Several factors imposed pressure upon HBD to complete the privilege and document review in a time frame that required heavy man-power to complete the relevance and privilege review. First and foremost were the demands by Fletcher and the Committee for documents.

28.     The Fletcher adversary action was filed in early April, 1999, and the Debtors' initial disclosures under Rule 26 of the Federal Rules of Civil Procedure were due mid June, 1999. Attached as Exhibit 47 to the Appendix is a true and correct copy of the Initial Disclosures, which identify a broad category of documents relevant to the issues in the Fletcher litigation.

29.     In mid-June, 1999, Fletcher served broad discovery demands that sought the production of documents relevant to the Debtors' allegations, which included Debtors' allegations of insolvency and financial condition in relevant time frames. A true and correct copy of these document demands are attached to the Appendix as Exhibit 46. At a July 26, 1999 hearing, the Court set the fact discovery cut-off for November 15, 1999, thereby giving Debtors a short time-frame in which to complete the relevance and the extensive privilege review for this production.

30.     Meeting the document production requirements in the Fletcher litigation alone required a large scale privilege review and imposed a production burden upon the estates. The production demands and timing demands by the Committee increased the scope and pace of early phases of the privilege review.

31.     As noted above, the Committee had been pushing for rapid access to the Debtors' documents from early on in the case. These demands for prompt access to documents did not cease

when the Committee decided that it would not enter into a joint defense/prosecution agreement which required HBD to privilege review documents prior to the broad-scale production demanded by the Committee. Instead, the Committee continued to push for a rapid production and privilege review of documents.

32.    I had several conversations with Dean Ferguson, the Committee's lawyer, in which he forcefully demanded that the Debtors initiate and complete its privilege review efforts in a very short time period so that the Committee could gain access to the Debtors' documents as soon as possible. In these conversations with Mr. Ferguson, I informed him that the privilege review process that would be required in the absence of a joint defense/prosecution agreement was a huge undertaking that would be very time-consuming and expensive.

33.    Nonetheless, the Committee continued to push for a rapid and extensive production that required a broad-based privilege review and served a broad 2004 examination request. The following letters and emails memorialize the procedures that HBD put in place to meet the Committee's documents demands and needs: (a) a July 22, 1999 letter from Jim Johnston to Dean Ferguson; (b) a July 29, 1999 internal HBD email; (c) a July 30, 1999 letter from me to Joe Marshall at Munsch Hardt; and (d) August 13, 1999 memorandum from Linda Kontos and me to Dean Ferguson regarding document management and document imaging issues. These documents are attached to the Appendix as Exhibits 48 through 51.

**Temporary Professionals Were Retained To Reduce the Cost to the Estate and to Meet the Time Commitments to the Committee and Imposed By the Fletcher Litigation**

34.    HBD is not a large firm, but is instead a litigation and bankruptcy boutique. The relevance and privilege review was a massive project by any standard. The privilege log alone was over 1,000 pages.

35.    HBD did not have the resources to conduct the broad-based privilege review within the time frame demanded by the Committee and Fletcher without retaining some outside assistance. Moreover, HBD's attorneys are specialized in reorganization and complex litigation matters, and the billing rates and expense associated with using HBD attorneys exclusively for the document review and privilege review project was cost prohibitive. For example, if HBD utilized its regular attorney (at their

rates of $180 and up) and its regular paralegals (at their rates of $140 and up) for the task, the document production costs would have been far more expensive for the bankruptcy estates.

36.     It was, and is, my opinion that the most cost-effective and efficient means for conducting the required privilege review was to utilize temporary contract attorneys to assist with the massive privilege review undertaking. HBD therefore retained temporary attorneys and paralegals to assist with the document production.

37.     HBD oversaw and supervised the work of these temporary attorneys and professionals. These temporary professionals required administrative and clerical resources and support and HBD had to purchase computers to support the functions of some of these professionals. Further, these professionals occupied a significant amount of HBD's office space. For example, while the initial training of the temporary attorneys (which lasted a day or two) took place in a single large conference room, after the first few days and for the bulk of the time in which the temporary attorneys worked on the document review, these temporary attorneys occupied space that in HBD's current office configuration, houses HBD's entire office services department, three paralegal offices, two small conference rooms, one associate office, and several secretarial bays. In addition, the temporary paralegals also occupied various secretarial bays.

38.     From the outset, HBD determined that, given the nature of the services to be rendered by the professionals and the large scope of the project to be undertaken, it would account for and bill the services of the temporary personnel as professionals (rather than as expenses), but it would not use the temporary personnel as a "profit center" (in the words of LCC). Rather, I had conversations with Jack Smith, HBD's Chief Financial Officer, in which I informed Mr. Smith that we should not bill the temporary professionals at a rate designed to reap a profit to HBD. Mr. Smith informed me that there were direct and overhead expenses incurred as a result of housing this large number of temporary professionals retained to complete the document production. It is my understanding that Mr. Smith strove to derive an hourly rate for the temporary personnel that roughly approximated HBD's cost in obtaining and using such personnel (calculated by considering the rates charged to HBD by the temporary personnel services, and then factoring in HBD's expenses in providing parking, computers, office space, meals, and clerical and support services to the temporary professionals). The services from

which HBD contracted for the temporary professionals charged HBD hourly rates ranging averaging $30 for paralegals and $45 for attorneys. After factoring in the direct and overhead costs, HBD ultimately invoiced the Debtors for the temporary paralegals at $60 per hour (subsequently increased to $65 per hour in 2000) and for the temporary attorneys at $71.50 per hour (subsequently increased to $75 per hour in 2000). In contrast, HBD billed other clients its standard rates for some of the very same temporary personnel who worked on this case and that were billed in this case at significantly discounted rates.

39.     As a result, HBD was able to minimize to the fullest extent possible the costs of the document and privilege review project. In fact, it is my understanding that HBD's temporary professionals rendered more than 12,750 hours of service, at a total invoiced cost to the Debtors of approximately $898,500 (approximately $71 per hour). If HBD had used its full-time attorneys and paralegals to perform the work the cost to the estate would have more than doubled.

40.     HBD regularly uses temporary attorneys and paralegals for similar projects for other clients, and HBD subsequently hired as full time professionals three of the temporary professionals who worked on the engagement in this case.

### The Committee Was Aware That HBD Had Employed Temporary Professionals To Assist With The Document Management Process

41.     The Committee was aware that HBD had employed temporary professionals for the document review process. For example, when responding to demands from the Committee's lawyers for prompt production of documents, I informed Mr. Ferguson, counsel for the Committee, that HBD was in the process of retaining temporary attorneys in order to produce documents within a time-frame sought by the Committee. In fact, I discussed HBD's plan to retain temporary attorneys to assist with this project weeks before we had in fact retained such attorneys. In this conversation, Mr. Ferguson and I had a fairly lengthy discussion in which he encouraged HBD to engage temporary attorneys in Ohio for purposes of conducting the broad privilege review in Ohio. (Ultimately, I decided that it was more cost effective to conduct the privilege review in HBD's offices and I decided that conducting the review in HBD's offices gave HBD the ability to exercise tighter oversight and supervision.)

42.    After we had retained the temporary attorneys, I continued to keep the Committee informed of this fact. One such conversation with Mr. Ferguson is memorialized in a letter from Mr. Ferguson dated, July 21, 1999 confirming that I had stated that HBD "has hired five to eight temporary attorneys to conduct the privilege review" necessary to produce the first wave of 60 boxes to the Committee. (True and correct copies of this July 21, 1999 letter from Mr. Ferguson to Mr. Johnston and of Mr. Johnston's July 22, 1999 response letter to Mr. Ferguson are attached to the Appendix as Exhibits 13 and 48).

43.    Then, at a July 26, 1999 hearing in the Fletcher litigation matter, I stated on the record that the Debtors had retained temporary contract attorneys to assist with the document production and privilege review process. (A true and correct copy of this transcript of proceedings is attached to the Appendix as Exhibit 14.) Mr. Wielebinski, counsel for the Committee, was present at that hearing.

44.    At no time did anyone, including anyone representing the Committee, ever inform me that they objected to the hiring of contract professionals for purposes of assisting with the document review process. To the contrary, it was my understanding that the Committee was primarily concerned with expediting the privilege review process so that it could gain access to the Debtors' documents as soon as possible.

### The Obligations of the Debtors To House Documents Has Continued

45.    Contrary to the suggestions of the Liquidating Trustee, the project did not end with completion of the privilege review. Rather, because the Committee refused to accept privileged information or otherwise take control over the documents, HBD was forced to maintain the repository and privilege log and to respond to discovery requests in litigation in which the Committee (and not HBD or the Debtors) was involved. This was memorialized in a few letters including a March 5, 2001, letter countersigned by Committee's counsel, a true and correct copy of which is attached to the Appendix as Exhibit 5. And, it is confirmed in a March 28, 2001, letter in which the Committee's counsel states that "[i]t is understood that all privileged documents and documents that have not yet been reviewed for privilege will be maintained by [HBD] on behalf of the Debtors." A true and correct copy of this letter is attached to the Appendix as Exhibit 52.

**Fletcher Litigation**

46.    I also oversaw the litigation of Fletcher's secured claim of more than $38 million against the Debtors, consisting of a $10.5 million claim for a prepetition loan to the Debtors and a claim for $28.125 million (plus unliquidated amounts) in respect of "make whole" rights under a securities purchase agreement executed prior to the petition date.  HBD commenced an adversary proceeding in objection to Fletcher's claims, particularly the "make whole" claims which HBD believed to be subject to subordination under sections 510(b) and 510(c) of the Bankruptcy Code and believed to be unenforceable under applicable state law.

47.    Under my supervision, HBD litigated discovery issues, and prepared and responded to a number of dispositive motions, including motions for judgment as a matter of law and summary judgment motions in the Fletcher matter.  The Fletcher claims involved novel questions of first impression (including issues regarding whether the "make whole" properly were classified as debt or equity, whether subordination was appropriate, and whether state laws limiting dividends and stock redemptions precluded the claims).

48.    Ultimately, Fletcher sought a settlement of the claims with the Committee.  It was my understanding from conversations with the Committee's attorneys that the Committee desired a settlement rather than litigation because, among other things, the Indenture Trustee sitting on the Committee feared the Debtors' argument that Fletcher's claim was a claim based on "redemption rights," which, if true, would mean that the Indenture Trustee's rights would be subordinate to that of Fletcher.

49.    Ultimately, although we believed that we could have achieved an even more favorable result had we continued to litigate the matter with Fletcher, we agreed with the Committee's recommendation of settlement with Fletcher.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of March, 2002 at Los Angeles, California.

Shawna Ballard

143597\v1