# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) ) ) | Chapter 11 |
| WORLDWIDE DIRECT, INC., et al., | ) ) ) | Case Nos. 99-108 to -127 (MFW) |
| Debtors. | ) ) ) | Jointly Administered |
|  | ) ) |  |

### Hearing:  May 16, 2002, at 1:00 p.m.

### DECLARATION OF LINDA A. KONTOS IN SUPPORT OF OPPOSITION OF HENNIGAN, BENNETT & DORMAN TO THE LIQUIDATING TRUSTEE'S MOTION IN LIMINE TO PRECLUDE EVIDENCE [DOCKET # 2656]

I, Linda A. Kontos, do hereby declare as follows:

1.     I am an associate at Hennigan, Bennett & Dorman ("HBD"), former counsel for the Debtors in the above captioned case.  I am an attorney at law admitted to practice before all courts of the State of California and was admitted pro hac vice on behalf of the Debtors in the case entitled In Re Worldwide Direct, Inc., et al., Case Nos. 99-00108 (MFW) through 99-00127 (MFW) in the United States Bankruptcy Court for the District of Delaware.  I submit this declaration in support of HBD's Opposition to the Liquidating Trustee's Motion in Limine to Preclude Evidence.  I have personal knowledge of the following facts and, if called and sworn as a witness, I would and could competently testify thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the October 1, 2001, memorandum from the Liquidating Trustee to all professionals employed in the above captioned bankruptcy case.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the minutes of the Liquidating Trust Board's September 25, 2001 meeting.

4.      Attached hereto as Exhibit 3 is a true and correct copy of *Cigarrera La Moderna v. Inventory Management Consultant Group, Ltd.*, 1998 U.S. Dist. Lexis 11208 (D.N.J. 1998).

5.      Attached hereto as Exhibit 4 is a true and correct copy of *Herman v. City of Allentown*, 1998 U.S. Dist. Lexis 211 (E.D. Pa. 1998).


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of May, 2002, at Los Angeles, California.


Linda A. Kontos

# EXHIBIT 1

MEMORANDUM

To:    Professionals Retained in the Worldwide Direct/SmarTalk Bankruptcy Cases

From:  Goldin Associates, Liquidating Trustee

Date:  October 1, 2001

Re:    Final Fee Applications

As you know, 15 firms have filed final fee applications for work performed as professionals engaged in these cases. Goldin Associates, while generally familiar with the SmarTalk bankruptcy case and related litigation, did not become directly involved in overseeing these matters until confirmation of the Plan. In light of our lack of direct involvement in many of the matters that are reflected in the final fee applications, and considering the sheer number and volume of those fee applications and the amount of fees and reimbursable expenses at issue, we previously determined to retain a fee examiner to review the final fee applications. The fee examiner will ensure the effective and timely review of final fee applications and address and resolve (hopefully, by agreement) any issues regarding the compensation sought by each applicant. After interviewing a number of candidates, the Trust has engaged as fee examiner Legal Cost Control, Inc., which has extensive experience reviewing fees and billings for all manner of legal services. The firm has been provided with the fee applications and has commenced its review.

The Trust has sought to schedule the hearing date for the final applications so as to provide the fee examiner with sufficient time to conduct its review, raise questions or concerns regarding any application with the applicant and attempt to resolve by agreement any possible objection to the compensation sought by the applicant. The fee hearing is currently scheduled for Friday, November 9.

At a recent meeting of the Liquidating Trust Board, members of the Board suggested and subsequently authorized an alternative to the fee audit process that may be more convenient or otherwise desirable to the professional firms involved.

As an alternative to the fee audit process, a professional firm may elect to accept a voluntary reduction of SEVEN PERCENT (7%) of the amount of final fee compensation sought (i.e., the total fees for the length of the Professional Firm's services up to and including the June 30, 2001 – the Effective Date of the Liquidating Plan). In consideration for such voluntary reduction, the Liquidating Trustee and the Liquidating Trust Board will inform the court that we support the final application of that professional firm (as reduced), together with reimbursement of its expenses. The Trust will dispense with the detailed examination of that particular application and file a comment to the final application with the Bankruptcy Court affirming the voluntary fee

EXHIBIT ___|___  PAGE ___|___

reduction and stipulating to the reasonableness of the reduced fees and expenses sought. Expenses incurred and included in the final application would not be subject to the voluntary reduction and would be paid in full if approved by the Court.

The purpose of this alternative procedure is to permit the Liquidating Trust to obtain the cost savings that it might otherwise obtain from an audit of each professional firms' final fee application, but to do so without having to subject the firm to the cost and inconvenience of having to address issues raised by a fee audit. Any Professional Firm may choose *not* to elect the alternative procedure without prejudice to the consideration of that firm's final fee application. The Liquidating Trustee will, however, go forward with the fee audit process regarding each non-electing professional firm's final fee application. The offer of a voluntary fee reduction is based on an initial review of the professional fee applications and is not based on a thorough and detailed examination of each. Following such review by the fee examiner, the reduction sought may be greater reduction than what is currently proposed. Because of the separate and distinct legal issues presented by administrative applications of members or former members of the creditors committee, the alternative procedure is not available regarding those applications.

To permit the fee examiner adequate time to review final fee applications, we request that any professional firm electing the voluntary fee reduction respond in writing (including e-mail) to us no later than October 3, 2001 at noon, Eastern Time. If we do not receive your written election by that time, we will assume that you have determined *not* to elect to engage in the proposed voluntary fee reduction and will continue with the orderly review process with the fee examiner.

We are mindful of the inconveniences and possible difficulties of this process and the corresponding delay in final awards and want to work with you to reduce their impact. We do not intend for the process to be adversarial. We request and appreciate your timely cooperation in addressing any questions, concerns or issues raised by the fee examiner regarding the compensation and reimbursement sought by your firm.

If you have any questions or concerns, please do not hesitate to contact Jay Goldin, David Pauker or Iris Mix of Goldin Associates at (212) 593-2255. You may contact Joe Wielebinski or Mark Ralston of the Munsch, Hardt law firm respecting the scheduling and conduct of the fee hearing.

**EXHIBIT** 1 **PAGE** 2



# GOLDIN ASSOCIATES, L.L.C.
### 400 Madison Avenue, 10th floor
### New York, New York 10017

Tel: (212) 593-2255                    Fax: (212) 888-2841

| NAMES | COMPANY | FAX NUMBER |
|---|---|---|
| Mr. Ronald Ballschmiede | Arthur Andersen | 312-507-3872 |
| Mr. Andrew Scruton | E&Y Capital Advisors | 212-773-8555 |
| Ms. Frances L. Rayeur, CPA | Ernst & Young LLP | 732-516-4412 |
| Mr. Eugene Davis | Executive Sounding Board | 212-944-0753 |
| Robert J. Lack, Esq. | Friedman Kaplan Seiler & Adelman LLP | 212-355-6401 |
| James Johnston, Esq. | Hennigan, Bennett & Dorman | 213-694-1234 |
| Steve K. Kortanek, Esq. | Klehr, Harrison, Harve, Branzburg and Ellers LLP | 302-426-9193 |
| Jay H. Goldberg CPA | Mintz Rosenfeld & Company LLC | 973-882-1560 |
| Joseph J. Wielebinski, Esq. | Munsch Hardt Kopf & Harr, PC | 214-978-4375 |
| Mark H. Ralson, Esq. | Munsch Hardt Kopf & Harr, PC | 214-978-4376 |
| Sarah R. Wolff, Esq. | Sachnoff & Weaver Ltd. | 312-207-6400 |
| Robert S. Brady, Esq. | Young Conaway Stargatt & Taylor, LLP | 302-571-1253 |

**TOTAL NUMBER OF PAGES INCLUDING COVER 3**

officefaxsheet.doc

EXHIBIT  \       PAGE  3

# EXHIBIT 2

02-22-02    14:27    From-                                    T-892  P.016/064  F-988

# MUNSCH HARDT
## KOPF & HARR, P.C.
### ATTORNEYS & COUNSELORS

# MEMORANDUM

**TO:**    Eli Nhaissi          Marc Kirschner
Frank Fields          Jay Goldin
Peter Levitt          David Pauker
Christopher Mackey    John Lemanski
Steven Audi          Iris Mix

**FROM:**    Joseph J. Wielebinski

**DATE:**    September 25, 2001

**SUBJECT:**    Minutes of Liquidating Trust Board Meeting Commenced September 20, 2001
and Concluded September 24, 2001

**CC:**    Mark H. Ralston
Marvin E. Sprouse

---

The Liquidating Trust Board (the "Board") of the Worldwide Direct Liquidation Trust (the "Trust") convened its meeting at approximately 9:00 a.m. ET on Thursday, September 20, 2001. The following individuals were in attendance:

Eli Nhaissi (Aerotel)              Hal Neier (Friedman, Kaplan)
Frank Fields (Frontier)            Eric Seiler (Friedman, Kaplan)
Peter Levitt (SWB Wireless)        Henry Colvin (Jay Alix)
Christopher Mackey (Comac)         Lois Mannon (Consultant)
Steven Audi (Resurgence)           Greg May (Munsch Hardt)
Marc Kirschner (Resurgence)        Joseph J. Wielebinski (Munsch Hardt)
Jay Goldin (Goldin)                Mark Ralston (Munsch Hardt)
David Pauker (Goldin)
John Lemanski (Goldin)
Iris Mix (Goldin)

A quorum of the members of the Board being present, the Board took up the following matters:

I.    **Minutes of Liquidating Trust Board Meeting held on July 19, 2001.**

- **Proposal.** A motion was made to approve the minutes of the July 19 meeting.

- **Disposition.** The minutes were approved by the Board without dissent.

II.    **Retention of a Fee Auditor.**

- **Proposal.** The Liquidating Trustee proposed that the Board authorize it to engage the services of Legal Cost Control as a fee auditor to review and provide comments concerning the final fee applications filed by those professionals that

EXHIBIT 2    PAGE 1

DEPOSITION
EXHIBIT
Pauker 8
2-26-02

Liquidating Trust Board Minutes
September 25, 2001
Page 2

had been engaged either by the Debtors or by the Official Committee of Unsecured Creditors.

- Alternative Proposal. The following alternative proposal was made:

  - First, the Liquidating Trustee would refrain from engaging the proposed fee auditor for approximately two weeks.

  - Second, the Liquidating Trustee would contact the professional firms offering each firm an alternative to the audit process. Under the alternative, a professional firm would voluntarily reduce its overall fees by seven percent (7%) in consideration for which the firm's final application would *not* be audited and the Liquidating Trustee and the Board would affirmatively support the allowance of the reduced fees and expenses.

  - Third, if any professional firm determined not to elect the voluntary reduction or to make some other acceptable voluntary reduction to its fees, then the Liquidating Trustee would be authorized to retain the fee examiner to complete the audit of the professional firm's final fee application.

  - Fourth, the Liquidating Trustee would be authorized to pay the fee examiner a reasonable sum reflecting work already performed on the final application of any professional firm electing the voluntary fee reduction.

- Disposition. The Board adopted the alternative proposal without dissent.

III.   **Initial Distributions.**

- Proposal. The Liquidating Trustee reviewed its analysis regarding the proposed amount to be reserved for operating expenses and the amount of funds to be made available for distribution on Allowed General Unsecured Claims in the Initial Distribution. Following discussion of the matter by the Board members and other individuals in attendance, the Liquidating Trustee proposed that the Liquidating Trust: (i) fund the operating reserve in the amount of $18 million and (ii) distribute between $40 to $45 million on account of Class 6 claims.

- Disposition.   The Board unanimously adopted the following policy for implementing the Initial Distribution: (i) the Liquidating Trustee is authorized to fund $18 million into operating reserve; (ii) the Liquidating Trustee is authorized to distribute out of remaining funds, after setting reserves as set forth in the confirmed Liquidating Plan and Liquidating Trust Agreement, between $44.7 to $48.7 million; and (iii) if the Liquidating Trustee determines to make any distribution on account of Class 6 claims outside the approved range, the Liquidating Trustee will obtain the written consent to do so by all Board members or will obtain such approval at a subsequently scheduled meeting of the Board.

EXHIBIT    2    PAGE    2

Liquidating Trust Board Minutes
September 25, 2001
Page 3

**IV.    Disbursing Agent.**

- Proposal. The Liquidating Trustee requested authority to engage a disbursing agent for purposes of making the initial distribution and future final distributions.

- Disposition. The proposal was tabled to permit the Liquidating Trustee, upon request by various Board members, to prepare a memorandum describing the process by which the Liquidating Trustee intends to engage a firm and the basis for the Liquidating Trustee's selection of that firm.

**V.    Expedited Review Procedure.**

- Proposal. The Liquidating Trustee proposed that the Board adopt a review and consent procedure which would permit the Board to consent to actions without having to meet by teleconference or otherwise.

- Disposition. After discussion among the Board members concerning this matter, the Board adopted without dissent the following:

  1)    Regarding general matters requiring the Liquidating Trust to obtain prior Board approval or authority to act, approval may be obtained by setting forth the material terms of the matter in a written memorandum and delivering the memorandum to each of the Board members, by e-mail and fax. Approval or authorization for the proposed action is deemed to be granted if four of the five Board members approve, such approval to be made in writing and delivered either by fax or e-mail.

  2)    The "negative notice procedure" adopted at the July 19, 2001 meeting would remain in place and continue to apply regarding preference claims and claim objections (except where the resolution of a general unsecured claim would permit the claimholder to retain a claim in excess of $1,000,000 of the scheduled amount or would permit the holder of a priority proof of claim to retain such priority claim in the amount of $500,000 in excess of the scheduled amount).

  3)    Action by meeting is required for settlement of any claims against (i) Donaldson, Lufkin & Jenrette Securities Corporation and related persons (the "DLJ Defendants"), (ii) PwC, or (iii) the Debtors' former directors and officers (the D&O's).

**VI.    Proposed Policy Regarding Ordinary Course Expenses.**

- Proposal. The Liquidating Trustee requested that the Board approve the written policy attached as _Exhibit I_ to the agenda package setting forth the scope of the Liquidating Trustee's authority to pay ordinary course expenses.

- Disposition. Upon discussion of the policy proposal, the Board approved the policy, with the modification that the amount of ordinary course expenses that the Trust be authorized to pay without Board approval be reduced from $20,000 to

EXHIBIT 2  PAGE 3

Liquidating Trust Board Minutes
September 25, 2001
Page 4

$10,000 per payee. A reformed copy of the policy, as approved by the Board, is attached hereto as *Exhibit A*.

The meeting was adjourned for the day and scheduled to resume on September 24, 2001 at 3:00 p.m. ET. The meeting reconvened at the scheduled time, with the following in attendance:

| | |
|---|---|
| Eli Nhaissi (Aerotel) | Hal Neier (Friedman, Kaplan) |
| Frank Fields (Frontier) | Eric Seiler (Friedman, Kaplan) |
| Peter Levitt (SWB Wireless) | Henry Colvin (Jay Alix) |
| Christopher Mackey (Comac) | Lois Mannon (Consultant) |
| Steven Audi (Resurgence) | Greg May (Munsch Hardt) |
| Marc Kirschner (Resurgence) | Joseph J. Wielebinski (Munsch Hardt) |
| Jay Goldin (Goldin) | Mark Ralston (Munsch Hardt) |
| David Pauker (Goldin) | Jack Lilley (Munsch Hardt) |
| John Lemanski (Goldin) | Phillip Appenzeller (Munsch Hardt) |
| Iris Mix (Goldin) | |

A quorum of the Board being present, the following matters were addressed:

**VII.** **Status of Third-Party Litigation.**

**VIII.** **Claim Objections / Preference Claims.**

The Liquidating Trustee reported on the status of significant pending and unresolved claims asserted against the Liquidation Trust and significant preference claims and cases. Discussion followed.

- Proposal. The Liquidating Trustee requested authority to retain the law firm of Morris, Nichols to serve as lead counsel regarding the proof of claim in the amount of $27.125 million filed by Telemac Corporation against the Liquidation Trust and the related arbitration proceeding pending in San Francisco, California.

- Disposition. The proposal was approved without dissent.

**IX.** **Regularly Scheduled Meetings**

- Proposal. The Liquidating Trustee proposed that the Liquidation Trust Board hold regular monthly teleconference meetings on the second Tuesday of each month commencing at 3:00 p.m. ET, with the understanding that (i) the meeting would commence timely and be concluded or adjourned by 5:00 p.m. ET and (ii) if the Liquidating Trustee determined that no matters needed to be brought before the Board, the Liquidating Trustee would be permitted and authorized to cancel such meeting.

- Disposition. The proposal was approved without dissent.

EXHIBIT    2    PAGE    4

02-22-02   14:28   From-                                    T-892   P.020/064   F-988

Liquidating Trust Board Minutes
September 25, 2001
Page 5

The Board meeting was adjourned at approximately 5:00 p.m. ET.

DALLAS 534979_4  4700.1

4000 FOUNTAIN PLACE  s  1445 ROSS AVENUE  s  DALLAS, TEXAS 75202-2789
TELEPHONE (214) 855-7500  s  FACSIMILE (214) 855-7584  s  Writer's Direct Dial: 214 855 7513  s  E-MAIL: mralston@mwmach.com

EXHIBIT   2   PAGE 5

# EXHIBIT 3

CIGARRERA LA MODERNA, S.A., De C.V., Plaintiff, v. INVENTORY MANAGEMENT CONSULTANT GROUP, LTD., UHK INVESTMENT, INC., GUNTHER S. EBEN andJOAN EBEN, Defendants.
Civil Action No. 95-1788

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

1998 U.S. Dist. LEXIS 11208

July 20, 1998, Decided

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment on the First, Fifth, and Sixth Counts of its Complaint granted; and judgment entered in the amount of One Hundred Fifty-Nine Thousand, Three Hundred Fifty-Four Dollars and No Cents ($159,354.00), but stayed the execution of that judgment; and plaintiff's application for a preliminary injunction denied.

**CORE TERMS:** summary judgment, preliminary injunction, counterclaim, account stated, cigarettes, buyer, owes, Federal Rules of Civil Procedure, conversion, breached, deliver, dollars, entry of judgment, freight charge, discount, genuine issue, unsupported, non-moving, assent, enter judgment, deposition, customers, freight, purview, settle, crate, genuine issue of material fact, debtor and creditor, irreparable harm, purchase price

**COUNSEL:** JOHN F. PARKER, ESQ., RICHARD FAMA, ESQ., COZEN & O'CONNOR, New York, NY, for Plaintiff.

KAREN A. PARKER, ESQ., STEVEN R. KLEIN, ESQ., COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, Hackensack, NJ, for Defendants.

**JUDGES:** ALFRED M. WOLIN, U.S.D.J.

**OPINIONBY:** ALFRED M. WOLIN

**OPINION:** OPINION

WOLIN, District Judge

The facts and legal issues on this motion for summary judgment are narrow and not complex. This case involves a contract dispute between Cigarrera La Moderna, S.A., De C.V. ("CLM"), plaintiff, and Inventory Management Consultant Group, LTD. ("IMC"), defendant. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, CLM moves the Court to enter partial summary judgment against IMC on the issues of breach of contract, conversion, and account stated. CLM also moves for a preliminary injunction. For the reasons stated infra, the[*2] Court will grant CLM's motion for summary judgment and deny the motion for a preliminary injunction. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court has decided this motion without oral argument.

BACKGROUND

In 1986, Gus Eben, defendant, formed IMC to conduct business in exports and imports. In particular, IMC obtains customers who desire specific products, and IMC finds suppliers to satisfy its customers' demands.

In July 1992, IMC and CLM entered into an agreement whereby CLM was to manufacture and sell cigarettes called the "Imperial" to IMC in exchange for $172,800.00. IMC wanted to sell the cigarettes in Russia because it was the registered owner of the name Imperial in Russia. IMC intended to sell the cigarettes in Russia on a long-term basis. CLM agreed to provide the Imperials within forty-five days of receiving an acceptable Letter of Credit. After IMC provided a Letter of Credit, amendments to the Letter of Credit were needed because problems arose with the shipping arrangements.

Even though IMC never supplied the second Letter of Credit, CLM delivered the Imperials. IMC claims that CLM did not deliver the goods on time, and to rectify its[*3] inability to produce the required quantity of Imperials, CLM shipped IMC different cigarettes, namely Bajas and Magnas. The ultimate sale provided IMC with 2,880 master crates of Imperials at a price of sixty dollars per crate, and Bajas worth $100,576.00, which IMC paid to CLM. A problem arose with the freight charge because of the late delivery, and the parties dispute whether the reduction in the price for the Imperials was four or five dollars per crate.

IMC now contends that CLM's breach of its obligations damaged its reputation in Russia and caused it to lose substantial sales and business. IMC, however, accepted

EXHIBIT 3 PAGE 1

the cigarettes and subsequently sold them to its customers in Russia. IMC never paid for the cigarettes.

The most critical piece of evidence is Gus Eden's letter of December 31, 1992. The letter provides in pertinent part:

I am sure that we will be able to settle our monetary differences with [CLM].

. . . .

To make a long story short, the bone of contention is strictly the discount for freight. IMC contends that CLM agreed to five dollars per master case discount in lieu of the freight. However, CLM contends that they only said four dollars per master case[*4] discount. . . . My proposal, hopefully you agree with it, is as follows:

1. IMC . . . enters into a contract with CLM that they would supply us with three to ten containers of IMPERIAL box per month on an on-going basis at present prices.

```
IMC owes CLM (as per above)    USD156,604.00
Trucking
5 trucks £USD550.00 per truck  USD2,750.00
Total owed to CLM              USD159,354.00
```

Joe, if the above scenario and dollars meets with your approval, we will transfer by wire[*5] the USD159,354.00 upon receipt of the duly signed production contract.

The parties hotly contest the intentions of that letter. IMC argues that the letter was a settlement offer with seven points, and that it never agreed to the amount or the validity of the debt. IMC adds that it would not make such a concession when CLM breached the agreement. CLM counters that the letter presents clear evidence as to the amount of money that IMC owes it.

On April 19, 1995, CLM filed a Complaint against IMC with this Court. The Complaint contains six counts: (1) IMC breached its agreement with CLM in the amount of $172,800.00; (2) IMC breached the agreement willfully, knowingly, maliciously, and without just cause or excuse; (3) IMC negligently misrepresented that it would pay the agreed upon amount; (4) IMC fraudulently represented that it would pay the agreed upon amount; (5) IMC improperly converted CLM's goods; and (6) in September 1992, an account was stated in the amount of $172,800.00. Later, CLM amended its Complaint to add Joan Eben, Gus Eben, and UHK Investment, Inc. as defendants in the action. In addition

2. IMC . . . to be able to buy additional house brands manufactured by CLM on a periodic basis.

3. Payments to be done via "acceptable" L/C.

4. The arithmetic is as follows. There were 2,880 M/C of IMPERIAL that were actually shipped at USD55.00 M/C which equals USD158,400.00.

5. There were actually 1796 M/C of Baja box that were shipped at USD55.00 M/C equals USD98,780.00.

6. The above totals USD257,180. We have already paid USD100,576.00. This leaves a balance owed to CLM of USD156,604.00.

7. I know that CLM incurred some trucking expenses to Houston which I said verbally to them I would pay. Our cost for trucking from Monterrey to Houston is USD550.00 per truck. Thus, the math is as follows:

to asserting affirmative defenses, IMC counterclaimed that: (1) CLM breached [*6]the agreement by failing to deliver the total amount of Imperials and by failing to deliver the goods on the agreed upon date; (2) CLM fraudulently misrepresented that it would deliver the Imperials on a given date; and (3) CLM breached its express warranty that it would deliver the goods on a timely basis.

On November 12, 1996, CLM served IMC with its First Request for Admissions, which included a request that IMC admit that Eben's letter was a true and complete copy. IMC did not respond to the request, and on January 13, 1997, CLM's attorney informed IMC's attorney that if IMC failed to respond, the request would be deemed admitted. IMC did not answer CLM's letter, and has never admitted, denied, or objected to the requests for admissions.

IMC ceased its operations over one year ago because it has been unprofitable the last few years. It has no incoming cash flow, and has not had a positive cash flow in a number of years. In October 1997, Eben testified at his deposition that IMC lost money in 1996 and made no profit in 1997. Finally, IMC has one bank account containing $5,000.

EXHIBIT 3   PAGE 2

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, CLM now moves for summary judgment on[*7] the First, Fifth, and Sixth Counts. CLM also asks the Court to preliminarily enjoin IMC from selling any of its assets.

DISCUSSION

I. Relevant Legal Standards

A. Standard for Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. See *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983), cert. dismissed, 465 U.S. 1091, 79 L. Ed. 2d 910, 104 S. Ct. 2144 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir. 1989).

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but[*8] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. See id. If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. See *Anderson*, 477 U.S. at 249-50.

In opposing summary judgment, a non-movant may not "rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), cert. denied, 502 U.S. 940, 116 L. Ed. 2d 327, 112 S. Ct. 376 (1991); *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are[*9] insufficient to repel summary judgment"); see Fed. R. Civ. P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Fedn.*, 497 U.S. 871 at 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 at 3188-89. The "unsupported statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch*, 912 F.2d at 657.

B. Failing to Respond to Requests for Admissions

Rule 36(a) of the Federal Rules of Civil Procedure provides: "The matter is admitted unless, within 30 days after service of the request . . . the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney."

II. Breach of Contract

A. Acceptance of the Goods

The basic facts of the contract are not in dispute and do not warrant a lengthy discussion. IMC and CLM entered into an agreement whereby CLM would provide IMC with certain[*10] cigarettes in exchange for payment by IMC. IMC accepted the goods and then sold them. According to N.J.S.A. 12A:2-607, when a buyer accepts the goods, he must pay the contract rate for the goods he accepted. Accord *Buff v. Giglio*, 124 N.J. Super. 94, 98, 304 A.2d 771 (App. Div. 1973). Thus, the Court must grant CLM's motion for summary judgment on the issue of liability on the contract because no genuine issue of material fact exists as to IMC's breach. The Court notes, however, that damages are still uncertain because IMC has a counterclaim against CLM.

IMC argues that Buff supports its position that summary judgment should not be entered because counterclaims still exist. That argument is incorrect. In Buff, a seller sued a buyer to recover the unpaid balance for the sale of machinery. The buyer counterclaimed that the machinery did not work. The trial court granted the seller's motion to dismiss the buyer's counterclaim. In finding that the trial court erroneously presented the case to the jury, the Appellate Division found that the trial court "should have held defendant liable for the balance of the purchase price as a matter of law" after it determined "that there[*11] was acceptance of the goods by the defendant[] and conversely no effective revocation of that acceptance." *Id.* at 98. The Appellate Division also found that the counterclaim should not have been dismissed because it was for breach of

**EXHIBIT   3   PAGE   3**

warranty, which does not contest the validity of the contract. Id. The panel concluded: "Our determination that plaintiff had made out a case for recovery of the balance of the purchase price does not call for the entry of judgment . . . for that amount. Since the trial court erred in striking defendant's counterclaim . . ., there will have to be a new trial on the . . . counterclaim." Id.

IMC's argument fails because it confuses "entry of judgment" and granting a motion for summary judgment on liability. Like the Appellate Division, this Court has concluded that IMC (buyer) must pay the contract price for the goods that it accepted, but has refrained from entering a judgment for the full value of the contract because the counterclaims might lead to a set off. The Court will, however, enter judgment for an amount less than the contract price for the reason stated infra.

B. The Eden Letter

Rule 408 of the Federal Rules of Evidence[*12] provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. . . . This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose . . . .

Rule 408 applies only to an "actual dispute, or at least an apparent difference of view between the parties concerning the validity or amount of a claim." *Affiliated Mnfs., Inc. v. Aluminum Co. of America, 56 F.3d 521, 526 (3d Cir. 1995)* (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence P 408[01] at 408-12 (1994); Kenneth S. Brown et al., McCormick on Evidence § 266, at 466 (John William Strong ed., 4th ed. 1992)). Rule 408 applies to compromise offers that are made before and during litigation. See *id. at 527.*

IMC argues that a dispute clearly existed[*13] when Eben wrote the letter in December 1992. IMC focuses on the language of "settling the monetary differences," the seven proposals, and the fact that the letter was sent directly to CLM's attorney. CLM counters that the letter does not fall within the purview of Rule 408 because it asks CLM to settle for less than the full value of its claim.

The Court finds that Eden's letter does not fall within the purview of Rule 408 because the letter indicates that the dispute over the claim is only over the freight charge: "To make a long story short, the bone of contention is strictly the discount for freight." Eden then uses IMC's figure for the freight charge and determines that IMC owes CLM $159,354.00, which accounts for certain charges.

The Court finds that the letter provides clear evidence that IMC did not dispute the fact that it owed CLM $159,354.00. The fact that the letter contains proposals does not alter the equation because the letter is a hybrid, i.e., it contains both a settlement offer and an undisputed claim. Furthermore, IMC's failure to answer CLM's Request for Admissions supports the Court's finding because the Court considers IMC's failure to answer CLM's question [*14]regarding the Eden letter as an admission. The Court will not invoke Rule 408 in this instance because IMC has not established the threshold issue that the claim is in dispute.

Moreover, the Advisory Committee's Note provides that "the policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum. Hence, the rule requires that the claim be disputed as to either validity or amount." Fed. R. Evid. 408 advisory committee's note (citation omitted). That Note supports the Court's conclusion because Eden's letter is essentially an offer to settle for less. Eden concedes that IMC owes CLM a sum certain, but he states that IMC will not pay that amount unless CLM continues to do business with IMC. Such an offer does not fall squarely within the purpose behind Rule 408.

The Court's conclusion means that IMC owes CLM $159,354.00. However, CLM is not precluded from attempting to recoup the entire value of the contract, and IMC may still attempt to seek an offset from its counterclaim.

III. Conversion

"Conversion . . . [is] the exercise of any act of dominion in denial of another's[*15] title to the chattels, or inconsistent with such title." *Mueller v. Technical Devices Corp., 8 N.J. 201, 207, 84 A.2d 620 (1951).* "To constitute a conversion of goods there must be some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." *Farrow v. Ocean County Trust Co., 121 N.J.L. 344, 348, 2 A.2d 352 (Sup. Ct. 1938)* (quotation omitted).

EXHIBIT 3 PAGE 4

In this case, IMC took possession of CLM's cigarettes, did not pay for them, and sold them to a third party. IMC's conduct can be equated to exercising dominion over CLM's goods in contravention of CLM's interests. Thus, CLM has established that IMC converted its goods, and the Court will enter summary judgment on this issue.

The Court notes that IMC's argument that a buyer may assert counterclaims when it receives defective goods does not diminish CLM's claim of conversion. The claim and the counterclaim are independent of each other, and a finding in favor of CLM does not preclude IMC from pursuing its counterclaims.

IV. Account Stated

According to the court[*16] in *Harris v. Merlino, 137 N.J.L. 717, 720, 61 A.2d 276* (E. & A. 1948), an account stated occurs when a debtor and creditor come to a mutual agreement as to how much the debtor owes the creditor. Accord Restatement (Second) of Contracts § 282 (1979) ("(1) An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent. (2) The account stated does not itself discharge any duty but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms."). "It is not essential that an account stated be in any particular form. . . . Evidence of assent to an account stated may consist of express statements or inferences from conduct." *Harris, 137 N.J.L. at 720* (citation omitted).

As stated supra, Eden's letter, namely the portion conceding that IMC owes CLM $159,354.00, is admissible into evidence because it does not fall within the purview of Rule 408. Thus, Eden's concession constitutes an account stated [*17]because the two parties agreed that IMC owed CLM at least $159,354.00, depending on how the parties resolved the dispute over the freight charge. As with the other two causes of action, the Court will grant summary judgment in favor of CLM on this issue.

V. Staying the Execution of the Judgment

Rule 54(b) of the Federal Rules of Civil Procedure provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to

one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims[*18] and the rights and liabilities of all the parties.

In this case, Eden's letter shows that IMC is liable for at least $159,354.00. Thus, the Court will enter judgment for that amount, but will stay execution of the judgment because IMC may be entitled to a set off after the counterclaims are resolved.

VI. Preliminary Injunction

"Injunctive relief is an extraordinary remedy [that] should be granted only in limited circumstances." See *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir.1994)* (quotation omitted), cert. denied, *514 U.S. 1103, 115 S. Ct. 1838, 131 L. Ed. 2d 757 (1995).* In assessing whether a preliminary injunction is warranted, the Court must consider: (1) the likelihood that the plaintiff will prevail on the merits; (2) the extent to which the plaintiff will be irreparably harmed if the relief is not granted; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. See, e.g., *Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994); Opticians Ass'n v. Independent Opticians of America, 920 F.2d 187, 191-92 (3d Cir. 1990).*[*19] If plaintiffs fail to establish these elements, the Court must deny the request for a preliminary injunction. See *Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).*

CLM asserts that this Court should issue a preliminary injunction because IMC "is no longer conducting business, has been dissolving its assets, and has been contemplating filing for bankruptcy." CLM concludes that IMC will not be able to satisfy a judgment against it.

Although CLM has prevailed on the merits, the Court will not enter a preliminary injunction because the facts of this case do not compel this Court to grant such extraordinary relief. CLM's application for a preliminary injunction fails because CLM should have sought this Court's assistance earlier. The extraordinary nature of a preliminary injunction demands that a party act with a certain level of alacrity in its pursuit of a preliminary injunction because failing to act quickly implies that the

EXHIBIT 3 PAGE 5

injury is not irreparable. In this case, CLM learned about IMC's financial situation no later then Eden's deposition on October 7, 1997. CLM's failure to seek a preliminary injunction for approximately nine months indicates[*20] that it was not that concerned about its potential irreparable harm. Thus, the Court will deny CLM's motion for a preliminary injunction.

CONCLUSION

For the reasons stated supra, the Court will grant CLM's motion for summary judgment on the First, Fifth, and Sixth Counts of its Complaint. The Court will enter judgment in the amount of $159,354.00, but will stay the execution of that judgment because IMC has a counterclaim that might lead to a set off. Finally, the Court will deny CLM's application for a preliminary injunction.

An appropriate Order is attached.

Dated: July 20, 1998

ALFRED M. WOLIN, U.S.D.J.

ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 20TH day of July, 1998

ORDERED that plaintiff's motion for summary judgment on the First, Fifth, and Sixth Counts of its Complaint is granted; and it is further

ORDERED that judgment is entered in the amount of One Hundred Fifty-Nine Thousand, Three Hundred Fifty-Four Dollars and No Cents ($159,354.00), but will stay the execution of that judgment; and it is further

ORDERED that plaintiff's application for a preliminary injunction is denied.

ALFRED M. WOLIN, U.S.D.J.



# EXHIBIT 4

DAVID B. HERMAN, Plaintiff, v. CITY OF ALLENTOWN, Defendant.
Civil Action No. 96-6942

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFPENNSYLVANIA

1998 U.S. Dist. LEXIS 211

January 15, 1998, Decided
January 15, 1998, Filed, Entered

PRIOR HISTORY: [*1] Original Opinion of November 21, 1997, Reported at: *1997 U.S. Dist. LEXIS 18522.*

DISPOSITION: Defendant's Motion for Post-Trial Relief is DENIED.

CORE TERMS: settlement, settlement agreement, disgusted, drug test, discriminated, new trial, great weight, negotiation, rehire, drug treatment program, public policy, incorrect, cough medicine, post-trial, attend, breach of contract, remember, settle, treatment program, cross-examination, doctor, encouraging settlement, return to work, re-evaluated, technically, admissible, diagnosis, settling, altering, unfair

COUNSEL: FOR DAVID B. HERMAN, PLAINTIFF: HYMAN LOVITZ, LOVITZ & GOLD, P.C., PHILA, PA USA. SIDNEY L. GOLD, LOVITZ & GOLD, PHILADELPHIA, PA USA.

FOR CITY OF ALLENTOWN, DEFENDANT: JOHN W. ASHLEY, FONZONE AND ASHLEY GITTINGER, ALLENTOWN, PA USA.

JUDGES: Franklin S. Van Antwerpen, United States District Judge.

OPINIONBY: Franklin S. Van Antwerpen

OPINION: OPINION AND ORDER

Van Antwerpen, J.

January 15, 1998

I. BACKGROUND

Defendant, City of Allentown ("City"), has filed a motion for post-trial relief asking us to reconsider our decision and grant a new trial in *Herman v. Allentown, 1997 U.S. Dist. LEXIS 18522, 985 F. Supp. 569, 1997 WL 727698, *1 (E.D. Pa. 1997).* We deem this to be a

motion pursuant to Fed. R. Civ. P. 59(a). After a bench trial, this court held that the Defendant discriminated against Plaintiff, in violation of the Americans With Disabilities Act ("ADA"), *42 U.S.C. § 12101* et seq, by failing to rehire the Plaintiff because of the City's erroneous belief that he was abusing drugs. We ordered the City to rehire the Plaintiff and awarded the Plaintiff back pay (with interest) and attorneys [*2]fees. *Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698* at *15-16. Because the facts of this case have been previously discussed in detail, see id. at *1-5, we will not repeat ourselves here.

Defendant asserts that a new trial is needed because this court incorrectly admitted evidence of settlement agreements in violation of Federal Rule of Evidence ("FRE") 408. Defendant's Brief in Support of Post-Trial Motions (hereinafter "Defendant's Post-Trial Brief") at 1-6. Defendant also claims that this court's verdict went against the great weight of the evidence. Defendant's Post-Trial Brief at 7-12. Following a bench trial, a court may grant a new trial when a party seeks the examination of newly discovered evidence or the court made a manifest error of law or fact. See *Eastwick Paper Stock Co., Inc. v. Grill Corporation, 1994 U.S. Dist. LEXIS 17562, Civ. A. No. 93-3277, 1994 WL 689274,* *1, *2 (E.D. Pa. Dec. 5, 1994).* The decision whether or not to grant a new trial is committed almost entirely to the discretion of the district court. Id. For the reasons that follow we will deny Defendant's Motion for Post-Trial Relief.

II. DISCUSSION

A. Federal Rule of Evidence 408

Defendant argues that this court[*3] incorrectly admitted evidence regarding settlement agreements in violation of FRE 408. We disagree.

As we have already discussed in our prior Decision, FRE 408 does not bar the admission of the settlement agreements in this case, when Plaintiff's cause of action

EXHIBIT 4    PAGE 1

stems from the Defendant's breach of the settlement agreements and not from the claim that the agreements were trying to settle. "'Rule 408 codifies the long-standing axiom in federal courts that compromises proposed or accepted are not evidence of an admission of the validity or invalidity of the claim or the amount of damage.'" *Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *9* (quoting 2 JACK. B. WEINSTEIN & MARGARET A. BURGER, WEINSTEIN'S FEDERAL EVIDENCE, § 408.03[1], at 408-10 (2nd ed. 1997)); *see also Affiliated Manufacturers, Inc. v. Aluminum Company of America, 56 F.3d 521, 526 (3d Cir. 1995)* ("Affiliated").

The primary rationale behind FRE 408 "is the obvious public policy interest in encouraging settlement of private disputes." *Lo Bosco v. Kure Engineering Limited, 891 F. Supp. 1035, 1037-38.* (D. N.J. 1995). Thus, in the paradigmatic Rule 408 case, "a plaintiff who slipped and fell outside the defendant's[*4] home would be barred from introducing evidence that the defendant had offered to settle the case for $10,000," since without FRE 408, "the defendant's offer to settle could be parlayed into proof of liability which would discourage the defendant from ever even considering settling the case." *Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *9.*

Plaintiff's case, however, is far from being the traditional type of case barred by FRE 408. Indeed, the admission of the settlement agreements in Plaintiff's case is not barred by the language of the statute, since the settlement agreements are not being admitted to show Defendant's liability for the underlying claims being settled. The settlement agreements settled Plaintiff's claim that he was wrongly fired by the City. Whether or not the City wrongly fired the Plaintiff is not at issue in the Plaintiff's case. In fact, we have already stated that the City had every right to terminate the Plaintiff from the fire department. The issue in Herman is whether the Defendant violated the ADA when it refused to rehire the Plaintiff in breach of the settlement agreements. Thus, technically the admission of the settlement agreements in Herman[*5] are not barred by the language of FRE 408 since Herman does not litigate the claims which the settlement discussions were supposed to settle. Indeed, as Frieman v. USAir Group, Inc. points out, there is ample authority to support the proposition that "Rule 408 only bars evidence of settlement discussions concerning the compromise claim." *1994 U.S. Dist. LEXIS 16994, Civ. A. No. 93-3142, 1994 WL 675221,* *1, *9 (E.D. Pa. Nov. 23, 1994).

For example, in *Vulcan Hart Co. (St. Louis Division) v. NLRB, 718 F.2d 269, 276-77 (8th Cir. 1983),* the NLRB found Vulcan Heart guilty of unfair labor practices, in part for making the reinstatement of an employee after a strike conditional on the employee's resignation from union office. The demand that the employee resign union office arose during negotiations to settle the employee's discharge grievance. The Eighth Circuit held that because "the discharge claim is not at issue in this proceeding," all "statements [Vulcan Heart] made in the course of the negotiations are not excludable under Rule 408." *Id. at 277* (emphasis added).

Defendant tries to distinguish Vulcan Heart by claiming that the reason the court admitted the evidence in that case was[*6] because "the discussions in the contract dealing with [employee's] discharge were not related to the strike and therefore, were admissible in the subsequent suit." Defendant's Post-Trial Brief at 6 (emphasis added). Defendant claims that Vulcan Heart does not apply to Herman where both the settlement agreement and the Plaintiff's case are related because they involve the Plaintiff returning to work. Defendant's attempt to distinguish Vulcan Heart fails for two reasons. First of all, the fact that Vulcan Heart would only rehire the employee after the strike by the union employees if the employee resigned his union leadership position was in fact related to the strike and, more importantly, to the NLRB's suit for unfair labor practices. Second, the court does not focus on whether the two claims are related, but on the fact that "the discharge claim is not at issue in this proceeding." *Vulcan Heart, 718 F.2d at 277.* Thus, the settlement agreement issues in Herman and Vulcan Heart are very similar. Just like the employee's discharge claim in Vulcan Heart was not at issue in the NLRB suit, Plaintiff's claim that he was illegally fired from the[*7] City was not at issue in his ADA suit.

The court in *Broadcort Capital Co. v. Summa Medical Co., 972 F.2d 1183, 1194 (10th Cir. 1992)* (hereinafter "Broadcort"), also held that FRE 408 only applies to bar evidence of settlement discussions concerning the compromise claim. In Broadcort, the Tenth Circuit held that a district court did not err by allowing a witness to testify as to settlement discussion involving a different dispute. Broadcort sued Summa for failing to transfer and register a stock certificate to Broadcort. *Id. at 1185.* Summa claimed that it refused to transfer the shares because they were to be held as collateral for a loan to a Summa subsidiary. Id. At trial, the court allowed the Plaintiff to question a witness about settlement discussions related to a prior loan transaction where share of Summa stock served as collateral. *Id. at 1194.* The defendant, on appeal, argued that the court erred in admitting this evidence in violation of FRE 408. Id. The appellate court held that the evidence was admissible since it "related to an entirely different claim [and] the evidence was not admitted to prove the validity or

EXHIBIT   4   PAGE   2

amount of the 'claim under negotiation.'" [*8] Id. (internal quotation omitted).

Defendant tries to distinguish Broadcort by pointing out that the case involved a "conflict between other parties and a similar pattern of behavior." Defendant's Post-Trial Brief at 3-4. We do not find Defendant's attempt to distinguish Broadcort to be convincing. First, technically speaking, the settlement at issue in Herman involved different parties than the ADA case. The settlement was between the City and the Union; the ADA case was between the City and Mr. Herman. Second, and more important, Broadcort does not explain the inapplicability for FRE 408 by stating that the parties were different. The court focused on the fact that the claim in the settlement was different from the claim at trial. Thus, the reasoning in Broadcort easily applies to Herman where the claims at settlement and the claims at trial are two different claims.

Defendant further argues that we should not follow the reasoning set forth in Vulcan Heart and Broadcort; and that we should instead follow a New Jersey district court's lead in Lo Bosco to read FRE 408 broadly to bar the admission of the settlement agreements in this case, even though[*9] they involve different disputes. We refuse to read FRE 408 broadly in this case because to do so would controvert the policy reason behind Rule 408: encouraging settlement agreements.

As Lo Bosco points out, the primary rationale behind FRE 408 "is the obvious public policy interest in encouraging settlement of private disputes." *Lo Bosco, 891 F. Supp. at 1037-38.* In Lo Bosco, the district judge refused to permit the defendant in breach of employment contract case to admit letters written by the plaintiff to his estranged wife, the defendant's daughter, "offering to drop the lawsuit if it [would] effect a reconciliation of the couple." *891 F. Supp. at 1036-37.* The defendant argued that these letters should be admitted because they "were an attempt to compromise the impending divorce proceeding," a different proceeding than the breach of contract case on trial. *Id. at 1038.* The court disagreed, citing public policy considerations. The court held that the "policy behind Rule 408 may be so strongly implicated in some situations that the spirit of the rule would be violated by allowing evidence of settlement negotiations in a prior case to be admitted into evidence." [*10] *Id. at 1039.* The court cited to cases such as *Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652 (4th Cir. 1988),* and *Williams v. Fermenta Animal Health Co., 984 F.2d 261, 264 (8th Cir. 1993),* which barred the admission of settlement negotiations in cases related to the settlements because the "policy rationale of Rule 408 to promote uninhibited settlement negotiations mandated the exclusion of the [settlement] discussions." *Lo Bosco,*

*891 F. Supp. at 1038.* Thus, the court held that "where cases are related, the better view is that Rule 408 may exclude settlement proposals in one from admission into evidence in another." Id. (emphasis added).

First of all, it should be noted that Lo Bosco did not hold that FRE 408 required the exclusion of the evidence. By stating that the rule "may exclude," and not "must exclude," the court recognized that exclusion in this situation was permissive and not mandatory. Furthermore, the court based its decision on the public policy favoring settlements; a public policy which is not implicated in the Plaintiff's case.

Herman is readily distinguishable from Lo Bosco and the cases which it cites. The divorce settlement[*11] discussions at issue in Lo Bosco involved the very breach of contract case at trial where defendant sought to admit those negotiations. Thus, the public policy concern of promoting settlement was at its zenith in Lo Bosco. The plaintiff would not have likely proposed to drop his breach of contract suit in the divorce action if he thought that his offer would have been admissible in the breach of contract action. n1

n1 FRE 408's policy favoring settlements was also at its highpoint in Fiberglass Insulators and Williams, the cases cited by Lo Bosco to support its conclusion. See *Lo Bosco, 891 F. Supp. at 1038.*

By contrast, barring the settlement agreement in Herman would not support FRE 408's policy in favor of settling lawsuits. In fact, using FRE 408 in Mr. Herman's case would controvert this important public policy. Plaintiff's ADA case is based, in large part, on the Defendant's failure to adhere to the settlement agreement. Barring evidence of the terms of a settlement[*12] agreement in a trial involving the breach of that settlement agreement would make the enforcement of settlement agreements nearly impossible. Such a policy would surely dissuade parties from even entering into settlement agreements. Why should a party enter into a settlement agreement when the other side can breach the agreement with impunity since the terms of the settlement cannot be admitted in the suit involving the breach? Indeed, "it would be patently unfair to preclude the admission of the settlement agreement when the actions that constitute the alleged discrimination arise out of the Defendant's altering of the agreement." *Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698* at *15 n.1.

EXHIBIT    4    PAGE    3

Thus, reading FRE 408 broadly, in a manner that goes beyond the scope of the statue, to bar admission of the settlement agreements in Herman when those agreements are not offered to prove liability for or invalidity of the claim under negotiation, would controvert the very public policy behind Rule 408 itself. Therefore, we stand by our original holding in Herman allowing the Plaintiff to use the unlawful discharge settlement agreements to prove that the City failed to rehire him under the ADA.

B. [*13] The Weight of the Evidence Supports Our Finding for the Plaintiff

Defendant asserts that this court should grant it a new trial because our decision was against the great weight of the evidence. Defendant's Post-Trial Brief at 7. Defendant tries to demonstrate this by attacking ten of the findings of fact made in Herman. Nine of Defendant's attacks have little or no merit. And, while we reluctantly agree with Plaintiff's assertion with regard to Finding of Fact No. 33 -- that the City, and not Ms. Lilly, amended the settlement agreement -- this has no bearing on our determination that the City discriminated against the Plaintiff, Mr. Herman.

Thus, all but one of Defendant's attacks on our findings of fact miss the mark. In any case, attacking any one (or ten) individual findings of fact is not enough to merit a new trial. Defendant must show that the court's ultimate decision goes against the great weight of the evidence. This the City fails to do. We will therefore refuse to grant Defendant a new trial.

1. Finding of Fact No. 13

Defendant attacks Finding of Fact No. 13 by distorting it. The defense claims that this court found that Plaintiff "did not[*14] evidence [sic] any present form of dependency on alcohol or other drug,'" based upon Mr. O'Donnell's first evaluation of the Plaintiff. Defendant's Post-Trial Brief at 7 (quoting Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *2). The City asserts that based upon McDaniel v. Mississippi Baptist Medical Center, 877 F. Supp. 321 (S.D. Miss. 1995), and Baustian v. State of Louisiana, 910 F. Supp. 274 (E.D. La. 1996), Mr. O'Donnell's diagnosis was too close in time to Plaintiff's purported drug use to support a finding that Plaintiff was no longer using drugs. First of all, neither of these other district court cases are controlling on this court. Second, this finding of fact did not, itself, actually hold that Plaintiff was no longer using drugs. It merely stated Mr. O'Donnell's first diagnosis: "13. Mr. O'Donnell, after evaluating Plaintiff on May 12, 1994, found that he 'does not evince any present form of dependency on alcohol or any other drug.'" Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL

727698 at *2. Thus, Defendant distorts this finding by making it seem that the court's determination that Plaintiff was no longer using drugs at the time he was discriminated against was based solely on Mr. O'Donnell's [*15]first diagnosis. This is clearly not the case. We based our finding that Plaintiff was no longer using drugs at the time the City failed to rehire him on the testimony of Dr. Stolz, Defendant's own expert witness (Finding of Fact No. 28, Tr. 9/22/97 at 82), on a second evaluation by Mr. O'Donnell clearing Plaintiff to return to work sometime after February 1, 1995 (Finding of Fact No. 25, Tr. 9/22/97 at 65-67, 97), and on the uncontroverted and believable testimony of Mr. Herman (Finding of Fact No. 14, Tr. 9/22/97 at 10-11, 28-29, 99). Therefore, Finding of Fact No. 13 was supported by sufficient evidence.

2. Finding of Fact No. 24

Defendant asserts that Finding of Fact No. 24, which states that Fire Chief Novosat and Ms. Lilly "were disgusted that Plaintiff tested positive for cough medicine," is not supported by sufficient evidence. Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *3. The evidence clearly shows that Chief Novosat was disgusted with the Plaintiff when he found out that Plaintiff had taken cough medicine. This is demonstrated by Chief Novosat's deposition testimony which was read into the trial record:

Question: All right, why would anybody be disgusted with him because he [*16]tested positive for some kind of cough medicine?

Answer: Well, because I mean you're putting it the same class with Hydracodone (ph.) and everything else and Percocet and whatever because it's a derivative from it.

Question: How do you know that?

Answer: Just through conversations with Jenny Lilly and whatever; we looked in the medical book.

Question: You [looked] an a medical book?

Answer: I didn't, Jenny Lilly did.

Question: So Jenny Lilly was disgusted?

Answer: Jenny Lilly mentioned it to me.

Answer: Who was disgusted-- rather, Question: Who was disgusted?

EXHIBIT 4   PAGE 4

Answer: I was disgusted, as well as, you know, any people that I talked to saying what [is it] with this guy, we're giving him a chance to come back and he's dirty again.

Tr. 9/22/97 at 63-64.

Thus, Chief Novosat plainly admitted that he was disgusted with the Plaintiff. Furthermore, Mr. Novosat testified that Ms. Lilly was disgusted with the Plaintiff as well:

Question: So Jenny Lilly was disgusted?

Answer: Jenny Lilly mentioned it to me.

Tr. 9/22/97 at 64.

And, when asked who was disgusted, Chief Novosat responded that any people he talked to about the subject was disgusted. Chief Novosat said this[*17] immediately after discussing how he and Ms. Lilly had talked about Mr. Herman taking the cough medicine. Therefore, our conclusion that Ms. Lilly was disgusted with the Plaintiff was supported by Chief Novosat's deposition testimony.

We further find that Ms. Lilly's actions in this case support out conclusion that she was disgusted with the Plaintiff. For example, Ms. Lilly told Dr. Stolz that Plaintiff failed a second drug test when one was never given. She also refused Plaintiff's reasonable request to attend a drug program covered by his insurance that the City's own doctor said was substantially similar to Dr. Stolz's program. Therefore, we believe that Finding of Fact No. 24 is supported by the evidence in this case.

3. Finding of Fact No. 25

Defendant further attacks Finding of Fact No. 25, which states that:

After the positive drug test, Ms. Lilly had Plaintiff re-evaluated by Mr. O'Donnell, the Director of the Lehigh County Drug and Alcohol Unit. Tr. 9/22/97 at 64. Mr. O'Donnell had a contract with the City and was called upon to evaluate City employees in connection with its EAP program. As a result of the evaluation, Mr. O'Donnell cleared Plaintiff to go back to[*18] work sometime after February 1, 1995. Tr. 9/22/97 at 65-67, 97.

*Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *3.*

Defendant attacks our finding that Ms. Lilly had the Plaintiff re-evaluated by Mr. O'Donnell in 1995. On

direct examination, Ms. Lilly agreed that "at some time after February of 1995 Mr. Herman was sent to see a Richard O'Donnell." Herman, Tr. 9/22/97 at 65. She then later stated that she was "not sure if we sent him or if he went voluntarily; in any even, he did go." Tr. 9/22/97 at 66. Later on, Ms. Lilly testified that she had asked Mr. O'Donnell to recommend a doctor to evaluate the Plaintiff and that he recommended Dr. Stolz. Tr. 9/22/97 at 100. We concluded, after listening to the testimony, that Plaintiff was indeed sent by the city to be re-evaluated by Mr. O'Donnell in 1995. Even though Ms. Lilly did later backtrack, she did initially testify that the City sent the Plaintiff to see Mr. O'Donnell. Tr. 9/22/97 at 65. Furthermore, the fact that she communicated with Mr. O'Donnell around that same time to get the name of a doctor to evaluate the Plaintiff tends to support the conclusion that she had sent Mr. Herman back to see Mr. O'Donnell.

In any case, even if Defendant[*19] is correct that Plaintiff was not sent to Mr. O'Donnell by the City a second time and that he went to Mr. O'Donnell voluntarily, this fact has no bearing on our decision that the City discriminated against the Plaintiff. We would have reached the same conclusion even if we had held that Plaintiff saw Mr. O'Donnell a second time on his own accord.

4. Finding of Fact No. 26

Defendant attacks Finding of Fact No. 26, which states: "Not satisfied with Mr. O'Donnell's evaluation, Ms. Lilly then referred Plaintiff to be examined by Dr. Ralph Stolz[.]" *Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *3.* Defendant disagrees with our finding that Ms. Lilly was not satisfied with Mr. O'Donnell's evaluation. Defendant's Post-Trial Brief at 8. Defendant asserts that there is no indication that Ms. Lilly was not satisfied with Mr. O'Donnell's evaluation and that the settlement agreement required Plaintiff to be evaluated by a physician. Defendant is correct about the settlement agreement's requirement that Mr. Herman see a doctor. Still, the fact that she sent Plaintiff to see Dr. Stolz, after Mr. O'Donnell had cleared Plaintiff to return to work, suggests that Ms. Lilly was not satisfied to rely on[*20] Mr. O'Donnell's opinion. We feel that our conclusion that Ms. Lilly was not satisfied is a fair implication. In any case, even if Ms. Lilly were satisfied with Mr. O'Donnell's evaluation, this fact would have no bearing on our determination that the City discriminated against the Plaintiff.

5. Finding of Fact No. 30

**EXHIBIT  4    PAGE  5**

Defendant attacks our finding that Ms. Lilly called Dr. Stolz and told him that Plaintiff failed a second drug test when no such drug test was ever given. Defendant correctly points out that Ms. Lilly testified that she never told Dr. Stolz about Plaintiff failing a second drug test. Tr. 9/22/97 at 112. However, after listening to all the testimony in the case we decided to credit the testimony of Dr. Stolz, who stated that Ms. Lilly told him that Plaintiff had failed a second drug test. Dr. Stolz testified, in response to cross-examination:

Q. Then at some time did you get a call that [made] you revise your report?

A. That -- and, again I'm doing this from recall -- that - -

Q. We know that, we don't have any notes.

A. That's correct. That he had a second test and that was also positive.

Q. Well, didn't you know that already . . . .

A. I knew there[*21] had been an initial blood -- an initial drug screen had been done, that was positive, and that what -- what I had referred to was that he refrain, total abstinence from all mood-altering chemicals, which included that cough medication. When I had the phone call from Ms. Lilly, it was my understanding that he had a second urine drug screen, and that one after he had made a visitation to me, and that also was then positive.

Q. And that was told to you by Ms. Lilly?

A. That is correct.

Tr. 9/22/97 at 92.

Defendant tries to characterize Dr. Stolz's testimony as "somewhat uncertain." Defendant's Post-Trial Brief at 10. We do not find that to be the case. Dr. Stolz testified that Ms. Lilly told him that Plaintiff failed a second drug test and that he relied on this information add the requirement that Plaintiff participate in an intensive drug therapy program before he return to work. In deciding to credit Dr. Stolz's testimony over Ms. Lilly's, we took into consideration the fact that Dr. Stolz was the Defendant's own witness, who had no interest in bolstering the Plaintiff's case. Ms. Lilly, on the other hand, was an agent of the Defendant who was personally involved in the[*22] discrimination against the Plaintiff. Therefore, in our mind, Dr. Stolz was the more credible of the two witnesses.

Furthermore, we would have found for the Plaintiff even had we determined that Ms. Lilly did not provide Dr. Stolz inaccurate information regarding a second drug test. We found that Defendant discriminated against Mr. Herman not only by altering the settlement agreement to require Plaintiff to participate in the in-patient drug treatment program, but also by unreasonably refusing to allow him to participate in a program that was covered by his insurance. Whether or not Ms. Lilly imparted information regarding a second drug test to Dr. Stolz has nothing to do with whether the City discriminated against the Plaintiff by refusing to allow him to participate in an alternative treatment program. Therefore, we would have still found for the Plaintiff, even if we had credited Ms. Lilly's testimony regarding the second drug test.

6. Finding of Fact No. 32

Defendant asserts that "Finding of Fact No. 32 seems to indicate that there [were] two items of false information, namely the second drug test as well as the past medical history." Defendant's Post-Trial [*23]  Brief at 10. Defendant misunderstands the court. We did not mean to imply that the information Ms. Lilly gave to Dr. Stolz regarding Plaintiff's medical history was false. The only false information provided by Ms. Lilly was about the nonexistent second drug test.

7. Finding of Fact No. 33

Defendant is correct that it was the City and not Ms. Lilly, personally, who amended the settlement agreement and we deem this finding amended to reflect this fact. However, whether or not Ms. Lilly herself amended the agreement is irrelevant to our decision.

8. Finding of Fact No. 34

Defendant attacks this finding which states that "Plaintiff was willing to submit to the drug treatment program recommended by Dr. Stolz, but for the fact that he could not afford the cost of the program which was approximately $7000." Defendant attacks our conclusion that the cost of the program was $7000 by stating that the evidence regarding the program's cost was inadmissible hearsay for which a proper objection was made. Defendant's Post-Trial Brief at 11. The record shows that Defendant never objected to this evidence:

Q. Do you know why he wasn't reinstated?

A. Yes. [*24]

Q. Why is that?

EXHIBIT  4  PAGE  6

A. He was supposed to attend a counseling program through the Osteopathic Hospital and he had to pay for it which was over $7000 and we didn't have the money to pay for it. And it was not covered under my insurance.

Q. What effect did the City's refusal to reinstate your husband have on your husband, David?

[DEFENSE COUNSEL]: Objection, Your Honor.

A. THE COURT: Sustained.

Tr. 9/22/97 at 13.

It is clear from the transcript that Defendant did not object to Mrs. Herman's statement that the program cost $7000, but to the question which followed it. Therefore, since the Defendant did not object to Mrs. Herman's testimony, we were free to consider it. In any case, the actual cost of the program is irrelevant. What is significant is the Plaintiff told Ms. Lilly that he could not afford to submit to the AMC Drug Treatment Program since it was not covered by his insurance plan. Tr.9/22/97 at 35-37, 58, 110.

9. Finding of Fact No. 36

The City attacks our finding that the drug treatment program that Mr. Herman requested to take was the substantial equivalent to the program offered by Dr. Stolz. Though we did not allow Mr. Herman to testify[*25] that to this fact, Dr. Stolz, the Defense's own witness, testified that Mr. O'Donnell's program was the functional equivalent of Dr. Stolz's program. Tr. 9/22/97 at 93.

10. Finding of Fact No. 38

Defendant attacks our finding that though "Ms. Lilly did find a drug treatment program through Barks County that would have been covered by Plaintiff's insurance . . . she never informed Plaintiff about this program." Herman, 985 F. Supp. 569, 1997 U.S. Dist. LEXIS 18522, 1997 WL 727698 at *4. While Ms. Lilly claims that she mentioned to Plaintiff that such a program existed, Tr. 9/22/97 at 104, she admits that she never informed the Plaintiff that he could actually take this program. Tr. 9/22/07 at 108. When Ms. Lilly was asked on cross-examination why she "just didn't call Mr. Herman and tell him about the Barks County program," her only response was "I really don't remember, I don't remember." Tr. 9/22/97 at 110-11.

Defendant focuses on the fact Ms. Lilly testified that she told the Union that the Barks County program existed and that she did not speak to Mr. Herman

because "by that point the Union was representing him and I was no longer in contact with him." Tr. 9/22/97 at 108. We do not find this testimony credible. [*26]The Union represented the Plaintiff from the beginning regarding his termination. The first settlement agreement, which did not require the Plaintiff to attend an intensive drug therapy program, was between the City and the Union. Thus, to say that the reason she did not tell Plaintiff that he could take the Barks County program was because the Union was now representing him does not hold water: the Union was representing from the beginning. Furthermore, later on in cross-examination, Ms. Lilly abandons this position. As we have stated, when Ms. Lilly was later asked on cross-examination why she "just didn't call Mr. Herman and tell him about the Barks County program," her only response was "I really don't remember, I don't remember." Tr. 9/22/97 at 110-11.

While we do not believe Ms. Lilly's explanation for why the City did not allow Plaintiff to take an alternative drug program, we do credit Mr. Herman's testimony that he spoke with Ms. Lilly about not being able to afford Dr. Stolz's program and that the City "was not willing to accommodate [his] situation [by letting him] go to [the] alternative drug program that [he] could have afforded." Tr. 9/22/97 at 37. Indeed, Plaintiff[*27] called Ms. Lilly on numerous occasions to try and find out why the City refused to rehire him, Tr. 9/22/97 at 38-39, and never once did she tell Plaintiff he could take an alternative treatment program.

Thus, for the above stated reasons, we do not believe that our conclusion that the City unreasonably refused to allow Plaintiff to take an alternative drug treatment program goes against the great weight of the evidence.

11. Defendant Fails to Show that the Court's Decision Went Against the Great Weight of the Evidence

Only one of Defendant's attacks on our findings of fact succeeds. And, the fact that the City, and not Ms. Lilly, amended the settlement agreement does not demonstrate that the Court's finding of discrimination went against the great weight of the evidence. However, even if grand majority of Defendant's attacks on our findings of fact succeeded, the City would still not be entitled to a new trial.

Even if Finding No. 13 were incorrect, this court's decision that Plaintiff was no longer using drugs was not based solely Mr. O'Donnell's report. Our finding was substantiated by the testimony of the Plaintiff and of Dr. Stolz, the Defendant's own witness. [*28]

EXHIBIT 4 PAGE 7

Even if Finding No. 24 were incorrect, and Ms. Lilly was not disgusted with the Plaintiff for taking cough medicine, her actions and the actions of the City still discriminated against Mr. Herman.

Even if Finding No. 25 were incorrect, and Plaintiff was not sent to Mr. O'Donnell a second time by the City, this has no bearing on our conclusion that the City discriminated against the Plaintiff by requiring Mr. Herman to attend an in-patient drug treatment program and by refusing to allow him to attend a program covered by his insurance.

Even if Finding No. 26 were incorrect, and Ms. Lilly was satisfied with Mr. O'Donnell's evaluation of the Plaintiff, this still does not effect our decision that the City discriminated against the Plaintiff.

Even if Finding No. 30 were incorrect, and Ms. Lilly did not impart Dr. Stolz false information about a second drug test, this would have no bearing on our decision since we found that Defendant discriminated against Mr. Herman, not only by altering the settlement agreement to require Plaintiff to participate in the in-patient drug treatment program, but also by unreasonably refusing to allow him to participate in a program that was covered by[*29] his insurance.

And, even if Finding No. 34 were incorrect, and we were not allowed to consider the actual price of Dr. Stolz's treatment program, this would not effect our decision since the actual cost of the program is irrelevant. What is significant is the Plaintiff told Ms. Lilly that he could not afford to submit to Dr. Stolz's treatment program and she refused to allow him to take a functionally equivalent program.

Therefore, for all of the discussed reasons, we find that our decision in Herman did not go against the great weight of the evidence and we refuse to grant the Defendant a new trial.

III. CONCLUSION

Defendant is not entitled to a new trial. This court correctly entered evidence of the two settlement agreements since these agreements did not try to settle the instant case and thus were not barred by FRE 408. Furthermore, Defendant failed to show that the court's decision went against the great weight of the evidence. Defendant's Motion for Post-Trial Relief is denied.

An appropriate Order follows.

ORDER

AND NOW, on this 15th Day of January, 1998, consistent with the foregoing Opinion and upon consideration of the evidence presented during [*30] trial on September 22, 1997; the court's November 21, 1997 Decision and Order; Defendant, City of Allentown's, December 2, 1997 Motion and Brief in support of Post-Trial Relief; and Plaintiff's December 22, 1997 Memorandum of Law in Opposition to Defendant's Motion for Post Trial Relief, it is hereby ordered that Defendant's Motion for Post-Trial Relief is DENIED.

As a technical matter, pursuant with Fed. R. Civ. P. 59(a), we amend Finding of Fact No. 33 to reflect that it was the City and not Ms. Lilly who amended the settlement agreement. This amendment does not change our decision in this matter and we confirm our prior findings, discussion, conclusions and Order in all other respects.

BY THE COURT

Franklin S. Van Antwerpen

United States District Judge

EXHIBIT 4 PAGE 8