# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| WORLDWIDE DIRECT, INC., et al., | ) Case Nos. 99-108 to -127 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF BRUCE BENNETT

I, Bruce Bennett, hereby declare that:

1.     I am a member of Hennigan, Bennett & Dorman ("HBD"), former counsel for the Debtors in the above captioned case.  I am an attorney at law admitted to practice before all courts of the State of California and was admitted pro hac vice on behalf of the Debtors in the case entitled In Re Worldwide Direct, Inc., et al., Case Nos. 99-00108 (MFW) through 99-00127 (MFW) in the United States Bankruptcy Court for the District of Delaware.  I submit this declaration in support of the HBD's Final Fee Application.  I have personal knowledge of the following facts and, if called and sworn as a witness, I would and could competently testify thereto.

### Background

2.     In 1982, I obtained my J.D. from Harvard Law School, and I was admitted to practice law in that same year.  Throughout my practice, I have focused on reorganization and bankruptcy matters.  I am currently a member of the American College of Bankruptcy.  Further, in 1993 through 1995, I served as a Commissioner for the Personal and Small Business Bankruptcy Advisory Commission of the California Board of Legal Specialization.

3.     I am one of the managing members of HBD, and I am the leader of HBD's bankruptcy and reorganization practice.  HBD's reorganization and bankruptcy practice encompasses representation of debtors, secured creditors, unsecured creditors and equity interest holders, and statutory committees and informal or ad hoc committees of bondholders or other creditors.

4.     My bankruptcy and reorganization practice is broad-based.  For example, I recently served as the lead special financing and litigation counsel in a chapter 11 case for LTV Corporation, the third largest integrated steel manufacturer in the United States.  HBD's actions in that case resulted in a $700 million debtor in possession loan to LTV Corporation by lenders that had refused such financing.  Further, I served as lead counsel in a chapter 9 case on behalf of Orange County, California commenced following a $1.7 billion loss in county investment pools and related cash flow crisis.  A Plan of Adjustment that comprehensively resolved the County's financial problems was confirmed and successfully implemented in approximately 18 months. In 1995, I was selected by the National Law Journal as a runner-up for Lawyer of the Year as a result of this representation.  In addition, prior to the Orange County representation, I served as lead counsel for U.S. holding companies in connection with the financial restructuring of Federated Department Stores, Inc. and Allied Stores Corporation and the disposition of Ralphs Grocery Company.  This broad-based practice is described more thoroughly in the HBD firm resume, a true and correct copy of which is attached hereto as Exhibit 78.

## Role at HBD

5.     As a managing member, I oversee all aspects of HBD's business and financial affairs.  I have substantial involvement in establishing budgets, setting rate and fee structures for services rendered by professionals and other personnel, managing expenses, managing cash flows, setting compensation for partners, associates, professionals and all other HBD personnel, handling HBD's financing arrangements, managing hiring policies and decisions, and establishing firm policies and guidelines.

## Role In The SmarTalk Cases

6.    In December 1998, I was retained by SmarTalk TeleServices, Inc. and several of its subsidiaries to assist in the sale of the Debtors' business and assets and to advise the Debtors with respect to corporate reorganization and bankruptcy issues. As part of this role, I regularly consulted with the Debtors and HBD attorneys, including James Johnston and Shawna Ballard, regarding the status of the liquidation, various litigation matters and substantive legal issues and problems confronted by the Debtors and the management of the efforts contributed by HBD to address these issues and problems. As part of my efforts to keep myself informed about the services performed by HBD for the Debtors, I also periodically reviewed fee statements and interim fee applications that HBD provided to the Debtors and other parties in interest in these cases. In the process, I made myself familiar with the personnel who were billing time to the case and the billing practices exercised with respect to the case. For example, from my review of the invoices and discussions with Mr. Johnston, I learned that Mr. Johnston – the partner in charge of preparing the invoices in this case – voluntarily provided the Debtors and the estates with substantial reductions and write-offs of fees and expenses that generally would have been billed to other clients of the firm.

## HBD's Analysis of the Estates' Claims

7.    Towards the end of the sale process conducted with respect to the Debtors' business assets to AT&T, the Debtors' management told me that some of the Debtors' most significant remaining assets consisted of potential claims against third parties, including claims against PricewaterhouseCoopers ("PWC"), Donaldson Lufkin & Jenrette ("DLJ"), and Credit Suisse First Boston Corporation ("CSFB").

8.    In the summer of 1999, I participated in several meetings (some by telephone) with Eugene Davis, Chief Executive Officer, of SmarTalk and Thad Bereday, President and General Counsel of SmarTalk and others, regarding HBD's analysis of potential litigation matters to be asserted against PWC, DLJ and CSFB. Mr. Davis and Mr. Bereday instructed me

DECLARATION OF BRUCE BENNETT IN SUPPORT OF HENNIGAN, BENNETT & DORMAN'S
FINAL FEE APPLICATION

to have HBD analyze possible affirmative causes of action against those entities and, if warranted, to prepare for litigation of those claims.

9.      I told counsel for the Official Committee of Unsecured Creditors (the "Committee") that HBD had been asked to and was analyzing claims against these entities and that HBD was preparing for the prosecution of claims against such entities. In addition, in July of 1999, the Committee was served with the Debtors' requests for authorization to conduct examinations of these entities pursuant to Bankruptcy Rule 2004 and to discover numerous related documents. Further, in August 26, 1999, Richard Gerger, a financial analyst at HBD, and I participated in a meeting with the Committee in New York. At this meeting, HBD presented its case theories for claims against DLJ and PWC to the Committee. A true and correct copy of the materials presented to the Committee at this meeting are attached hereto as Exhibit 56.

10.     The Committee, through its counsel encouraged these efforts by HBD and the Committee directly benefited from them. For example, at one point in the Committee's investigation of particular litigation claims, one or more members of the Committee's law firm, including Mr. May a litigation partner in Munch Hardt, traveled to Los Angeles to meet with J. Michael Hennigan and other litigators at my firm to discuss our impressions of the cases and strategy for pursuing them. In addition, at the request by counsel for the Committee, I assisted in arranging a dialogue between litigation counsel for the SmarTalk board of directors and counsel for the committee to discuss potential settlement and/or potential mediation of the Debtors' claims against the directors. At the Committee counsel's request, I participated in at least one all day meeting with certain members of the Committee, their counsel, certain members of the board of directors and their counsel to discuss facts known by the members of the board relevant to lawsuits then being investigated by both the Debtors and the Committee and to discuss a process for resolving claims against members of the board of directors. There is no basis whatsoever for the Liquidating Trustee's contention that the services rendered by HBD in investigating claims of the estate did not benefit the estates. I believe it is HBD's investigative efforts that initially defined the claims that the Committee would later pursue.

## Temporary Personnel

11.    One of the continuing obligations of the bankruptcy estates after the closing of the sale to AT&T was to manage and prosecute litigation claims and to defend claims asserted against the estates. The management of and prosecution of these litigation matters, as well as the demands by the Committee with respect to access, review, and preservation of the Debtors' documents, imposed large document management and production requirements upon the Debtors and HBD.

12.    For example, I am aware that HBD ultimately had to review more than 1,200 boxes of documents in connection with this case. HBD is a relatively small firm, and we generally employ no more than six regular attorneys at any one time during this case. As a result, HBD did not have the personnel available to manage the document-related tasks in this case efficiently and cost effectively.

13.    As a consequence, HBD utilized temporary professionals to assist with document management and review. As part of my oversight of the case and my responsibilities as a managing member of HBD, I consulted with Ms. Ballard prior to the time that HBD contracted for temporary professionals, and I agreed with her decision to use temporary professionals for various document-related projects in this case. At various times, HBD had over ten temporary professionals in our office performing work on behalf of the Debtors. HBD occupies only two contiguous floors of office space, and I regularly observed the presence of these temporary professionals in several of our conference rooms, file rooms, and other office locations.

14.    As a managing member of HBD, I know that there were direct and overhead expenses incurred as a result of housing the large number of temporary attorneys and paralegals.

15.    HBD generally calculates hourly rates for its professionals in a manner that is intended to recoup the direct and indirect costs associated with the professionals (such as, for example, salary, benefits, support staff, office overhead, and the like) plus a reasonable margin. HBD did not include a profit margin on the temporary professionals. Rather, HBD derived an hourly rate for the temporary personnel that approximated HBD's cost in obtaining and using

HENNIGAN, BENNETT & DORMAN

DECLARATION OF BRUCE BENNETT IN SUPPORT OF HENNIGAN, BENNETT & DORMAN'S
FINAL FEE APPLICATION

168110\v2

such personnel (calculated by considering the rates charged to HBD by the temporary personnel services, and then factoring in HBD's expenses in providing parking, computers, office space, office furniture and fixtures, telephones, utilities, food, beverage and basic medical supplies provided to the firm's entire staff, meals (including, but not limited to breakfast every Friday as provided by HBD for all of its staff), supplies, MIS support services, accounting and bookkeeping services, clerical services and office support services (including personnel used for moving hundreds of boxes whenever and wherever needed)). Some of these expenses were incurred directly in connection with the document management effort, others were incurred more indirectly as a result of the additional burdens placed on the firm and the consumption of firm recourses which were acquired for the use of the entire firm. The allocation of indirect costs necessarily involved some approximation. To make these approximations, HBD used the same techniques it uses to allocate costs incurred by the firm to particular projects or firm functions and which, based upon the experience acquired in my legal practice and in managing a business, are some of the same techniques used by accountants to allocate shared costs in many business settings. Based upon my review of the HBD invoices and my knowledge of HBD's operating and overhead expenses, I believe that the rates ultimately charged by HBD to the Debtors with respect to the temporary personnel fairly reflected HBD's indirect and indirect expenses without providing a profit margin to HBD.

16.     It is this firm's policy to require its professionals to keep contemporaneous time records. This policy applies to all professionals, including the temporary professionals. It is my understanding, based upon, among other things, my review of HBD's business records, that the temporary attorneys and paralegals utilized in this bankruptcy case followed these firm policies, and that these temporary attorneys and paralegals, therefore, recorded the time spent working on matters relating to the Debtors on a daily basis.

17.     The temporary paralegals and temporary attorneys were hired primarily to help manage and review the large volume of the Debtors' documents, and their time descriptions reflect the activities that they performed. Since the temporary attorneys generally performed the

same repetitive tasks, i.e., the review of hundreds of thousands of pages of the Debtors' documents, the descriptions for the temporary personnel's activities did not and should not be expected to vary greatly.

18.     For consistency and clarity, I know based upon my review of the fee statements to the Debtors and conversations with Ms. Ballard and HBD associate Linda Kontos that HBD attempted to ensure that the SmarTalk fee statements contained consistent descriptions of the similar and repetitive work performed by the temporary personnel.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 15th day of May, 2002, at Los Angeles, California.

Bruce Bennett