UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| WORLDWIDE DIRECT, INC., et al., | ) | Case Nos. 99-108 to -127 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

### REVISED DECLARATION OF SHAWNA BALLARD

I, Shawna Ballard, declare and state as follows:

1. I am a member of Hennigan, Bennett & Dorman ("HBD"), former counsel for the Debtors in the above captioned case. I am an attorney at law admitted to practice before all courts of the State of California and was admitted pro hac vice on behalf of the Debtors in the case entitled In Re Worldwide Direct, Inc., et al., Case Nos. 99-00108 (MFW) through 99-00127 (MFW) in the United States Bankruptcy Court for the District of Delaware. I submit this declaration in support of "Reply of Hennigan, Bennett & Dorman to the Liquidating Trust's Objection to the Final Fee Application" (the "Reply"). The matters stated herein are true of my own personal knowledge and if called to do so I could and would testify competently thereto.

2. I oversaw and managed two primary aspects of this case. I oversaw the document collection, management, review and productions and I oversaw the litigation of the $38 million secured claim filed by Fletcher International Limited ("Fletcher").

### Background Regarding Commercial Litigation Experience

3. I have been practicing law since my admission to the California Bar in 1991, at which time I served as a judicial clerk to the Honorable Harlington Wood, Jr., Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit. In the fall of 1992, I became an associate in the Irvine, California office of Gibson, Dunn & Crutcher. During the four years that I practiced law at Gibson, Dunn, I worked on numerous complex commercial litigation matters

including, among others, (a) *Continental Airlines, Inc. v. AMR Corporation and American Airlines, Inc.*, case no. G-92-CV-259, an anti-trust suit filed by Continental and Northwest Airlines in the Southern District of Texas and seeking hundreds of millions of dollars (before trebling) -- Gibson, Dunn, along with other firms, represented American Airlines and obtained a defense verdict in American's favor after a jury trial; and (b) *Ir re Bengt Torsten Hellsten,* filed in the United States Bankruptcy Court for the Central District of California as Case No. LA93-6564VP -- through litigation on behalf of Gibson Dunn's client, Den Norske Bank A/S, the debtor, an international shipping magnate, was denied discharge and several significant assets were foreclosed upon.

      4. In October of 1996, I joined HBD as a litigation associate, and, effective January 1, 1999, I became a partner of HBD. HBD's litigation practice handles complex, commercial litigation matters, and the majority of HBD's litigation matters involve voluminous documents productions. I have been involved in several complex litigation matters and I have managed large volumes of documents and testimony as an essential part of the pre-trial and trial preparation process for many of these matters. For example, upon my arrival in 1996 and 1997, I became the lead associate charged with preparing a case for trial, on behalf of Simon Marketing, Inc. in litigation filed in the District Court for the Central District of California as Case No. SA CV 93-156 AHS. In that action Simon Marketing was both prosecuting claims against Promotional Concepts Group, Inc. and was defending claims seeking in excess of $50 million with respect to the break-up of a video marketing business. HBD was brought in as trial counsel after the close of fact discovery. Hundreds of thousands of pages of documents had been produced in the Simon Marketing case. I was the attorney primarily responsible for the analysis of the documents, the selection of documents for use at trial, and in the developing case strategies based upon this analysis. This matter was resolved in a confidential settlement.

      5. In 1997 and 1998, I was involved in the trial preparation for what resulted in a three month jury trial on behalf of Paragon Homes, Inc. The trial involved Paragon's dispute with its financing partner (Ford and First Nationwide Bank affiliates) regarding the shut down of six residential real estate development projects. Over four hundred thousand pages of documents were produced in the Paragon matter, and tens of millions of dollars are in dispute in the Paragon case.

Although I became involved in this case after the close of the fact discovery, through my trial preparation efforts, I was involved in expert preparation, the selection of exhibits for use at trial, analysis of documents and testimony for use at trial and in the preparation of pre-trial, trial and post-trial motions analyzing the evidence in that case. The court of appeal has remanded portions of this case for retrial.

6. In 1998 and until the matter settled in 1999, I oversaw the defense of a civil enforcement action brought by the Securities and Exchange Commission (the "SEC") asserting insider trading claims against our client. HBD was brought in as litigation counsel after years of extensive SEC investigations. I was charged with completing witness interviews, analyzing the investigative testimony and productions, and preparing the case defense.

7. From 1999 through December of 2001, I was involved in several disputes on behalf of Maguire Partners with respect to a 1,000 acre development project in Los Angeles, California. Ultimately, two of these disputes were litigated in a judicial reference and arbitration proceeding, respectively. Over 170 boxes of documents were produced with respect to the judicial reference/arbitration proceedings. I was responsible for taking the significant depositions in that matter, the preparation of key witnesses, and the significant aspects of the preparation for the judicial reference and arbitration proceedings. In this regard, I was required to assimilate, analyze and select (from the productions) key documents for use at trial. The first arbitration proceeding resulted in a favorable settlement that was ultimately consummated in the summer of 2001 and the second arbitration resulted in a December, 2001 award in our clients' favor on all issues. In 2000 and 2001, I was also involved in pre-trial depositions, pre-trial motion practice and trial preparations for a securities fraud action that was filed before the California Superior Court as Case Number BC 215260. In that case, HBD represented the plaintiffs Oaktree Capital Management and Farallon Capital Partners and their affiliates against PaineWebber, National Westminster Bank and its affiliates, ECT Securities (an Enron affiliate), Steel Dynamics, Inc. and McDonald Securities. That case involved a $500 million bond offering with respect to a Thai Steel mill, and HBD's clients had over a $30 million position in that offering. That case was resolved in a confidential settlement in the month or so before the scheduled trial date.

## Document Collection and Management

8. Early in the SmarTalk bankruptcy case, both HBD and the Committee realized that this would be a document and litigation intensive matter that would entail the review of voluminous documents and records maintained by the Debtors to prosecute and defend litigation matters and claims disputes and to establish, among other things, the Debtors' insolvency at various points in time and the cause of the Debtors' ultimate financial collapse.

9. The Committee, however, expressed suspicion regarding maintenance of the Debtors' documents, and the Committee repeatedly demanded that the Debtors adopt a stringent document retention and maintenance plan and that the Debtors adhere to an aggressive schedule for reviewing and producing the documents to the Committee. These early concerns and demands by the Committee, and the Debtors' response to these concerns, are reflected, in part, in the following communications:

(a) April 19, 1999 memorandum from Thad Bereday, President and General Counsel of SmarTalk, to Joe Wielebinski, the Committee's counsel, and others regarding the Debtors' record retention efforts, a true and correct copy of this memorandum is attached to the Appendix of Exhibits ("Appendix") as Exhibit 27;

(b) May 14, 1999 letter from Jim Johnston to ATT's counsel, Mark Gordon, reminding AT&T of its document retention obligations and the attached letter from the Committee's counsel, Dean Ferguson to Jim Johnston regarding the Committee's document retention concerns, true and correct copies of these letters are attached to the Appendix as Exhibit 2;

(c) May 14, 1999 letter from Jim Johnston to Dean Ferguson, responding to the Committee's document retention concerns, a true and correct copy of this letter is attached to the Appendix as Exhibit 28; and

(d) May 18, 1999 letter from Dean Ferguson to Thad Bereday outlining document collection and retention efforts that the Committee wanted the Debtor's to undertake, a true and correct copy of this letter is attached to the Appendix as Exhibit 29.

10. In response to the Committee's demands, Mr. Bereday, who at the time was President and General Counsel of SmarTalk, instructed HBD, and me in particular, to oversee a broad-scale document collection, management program, to oversee and manage the document production to the

Committee, and to oversee and manage the review of the documents for production and use in pending and contemplated claims for and against the estates.

11. When asking me to oversee the document management process, Mr. Bereday informed me that the document retention and management issues were significant to the Committee and that he had arranged to lease warehouse space in Dublin, Ohio that would serve as a document repository. Mr. Bereday instructed me to oversee the creation of a document index of the documents in the repository. My understanding was that one of the primary purposes of the repository and index was to give the Committee access to all of the estates' documents and to have the documents and boxes indexed in a manner that would assist the Committee in its review process.

12. As part of the overall collection and management project, I was responsible for (a) overseeing and managing the collection of the Debtors' documents from various sources, locations and former employees, (b) interviewing numerous current and former employees of the Debtors regarding the location and nature of the documents, (c) arranging to have electronic mail and related electronic files preserved and reviewed, (d) setting up a system, per Mr. Bereday's instructions, for indexing the contexts of the boxes so that the Committee and Debtors could locate documents relevant to various issues, (e) setting up a system for tracking any documents checked out of or removed from the repository, (f) overseeing the review of documents for production and use in various pieces of pending and contemplated litigation matters, and (g) analyzing the costs and benefits of utilizing a document imaging and electronic retrieval system and overseeing the selection of higher priority documents to be imaged on such a system. Linda Kontos, an associate at HBD, provided substantial assistance in the management and oversight of this document management project.

13. Ultimately, the project involved the collection and indexing of approximately 1,200 boxes of documents from a wide range of sources. In addition, HBD oversaw the collection, review and production of extensive electronic email files.

**Document Collection Relating To Debtors' Claims And Analysis of Debtors' Claims**

14. As a result of the sale of virtually all of Debtors' assets and operations to AT&T, one of the primary functions of the ongoing estates was to manage and prosecute significant litigation claims and to defend the more significant claims brought against the estates. In this regard, in May of 1999,

when I first began to work on the document management project, there were significant shareholder litigation suits pending against SmarTalk directors and officers, and there were over 2,000 claims filed against the estate, including the large claims by Intrine, Fletcher and other so-called "make-whole" claimants.

15.     After the sale of the Debtors' assets to AT&T, the Debtors viewed that some of their most significant assets included claims involving errors made by the Debtors' prepetition accounts, PricewaterhouseCoopers ("<u>PWC</u>") and involving the Debtors' ill-fated acquisition of Worldwide Direct at the advice of Donaldson Lufkin & Jenrette ("<u>DLJ</u>") and the Debtors' sale of their operator services business at the advice of Credit Suisse First Boston Corporation ("<u>CSFB</u>").  Because these claims were viewed by the Debtors as significant assets of the estates, by at least May, 1999, the Debtors instructed HBD to analyze and prepare for the prosecution of these claims.

16.     The numerous pending and potential litigation and claims matters involved varied issues, but most of these matters involved the central question of when SmarTalk became insolvent and what caused SmarTalk's financial collapse.  It was, therefore important to get a handle for litigation purposes, as soon as possible, on the facts and documents relevant to these solvency, financial and accounting issues so that the Debtors could develop a consistent litigation strategy and so that the estates could defend and prosecute significant claims as promptly and efficiently as possible.

17.     For example, the Fletcher litigation involved issues regarding what caused the demise of the Debtors' business and the dates of the Debtors' insolvency.  These similarly would be critical issues in the cases against PWC and DLJ.  Thus, for example, when I and others at HBD met with the experts retained to meet the expert designation and report deadlines in the Fletcher litigation, I and others at HBD had already developed a theme for litigation of the other matters, and in these expert preparation sessions we worked to make sure that the theories developed in each were consistent and coherent.

18.     In order to gain access to documents relevant to the preparation of the estates' significant litigation matters, HBD prepared and obtained Court approval of three requests for authorization to conduct examinations of PWC, DLJ, and CSFB pursuant to Bankruptcy Rule 2004 and to discover numerous related documents. (One of these requests was discussed in a July 26, 1999 hearing, in which Joe Wielebinski, counsel for the Committee, was present.  A true and correct copy of the hearing

transcript for this hearing is attached to the Appendix as Exhibit 14.) Thereafter, HBD began to receive and review the 36 boxes of documents produced in compliance with the Rule 2004 subpoenas.

19.     In preparation for the prosecution of these significant claims, HBD also conducted factual and legal research (including at least five witness interviews by me and document review) regarding the potential claims that ultimately could be asserted on behalf of the bankruptcy estates, and HBD began to prepare for litigation with respect to those claims. Among other things, HBD prepared a comprehensive complaint against DLJ and was prepared to file that complaint by October 1999. HBD also prepared and delivered to its clients a comprehensive memorandum analyzing the potential causes of action against PWC, and HBD began to draft a complaint to assert those claims.

### The Committee's Decisions Increased The Document Management Expense

20.     The initial stages of the document management process were geared toward promptly identifying documents that were necessary to an analysis of the solvency and other issues that would be central to the PWC, DLJ and Fletcher litigation matters and were focused on responding to the Committee's demands for prompt access to all of the Debtors' documents. In the process of facilitating this sharing of documents, Jim Johnston of HBD was negotiating a joint defense and prosecution agreement with the Committee so that the Debtors could share documents with the Committee.

21.     Ultimately, however, the Committee decided that it would not enter into the joint defense or prosecution agreement and would not share privileged information under any such agreement. The Committee's refusal to enter into this joint defense/prosecution agreement meant that the estates would have to bear the significant expense of conducting a privilege review before producing documents to the Committee. This also meant that the task of screening for documents relevant to directors and officers claims that the Committee intended to bring fell upon HBD instead of the Committees' lawyers at Munsch, Hardt.

22.     Jim Johnston and I were concerned that this decision by the Committee not to review documents would imposed an unnecessary expense upon the estates. Jim Johnston expressed this concern to the Committee in a letter dated May, 27, 1999, a true and correct copy of which is attached to the Appendix as Exhibit 30. In this letter, Mr. Johnston informed Mr. Ferguson that:

Without such an agreement [the joint prosecution and defense agreement] SmarTalk will have no choice but to review each and every document prior to disclosure to the Committee and, where appropriate, to create privilege logs and refrain from producing privileged information to the Committee. In addition to making our lives needlessly difficult, such an outcome obviously would increase the administrative expenses of the bankruptcy estates substantially, would delay the provision of information to the Committee, and generally would make adversarial a process that otherwise could be conducted cooperatively.

23. The Committee nonetheless decided to refuse to enter into a joint defense and prosecution agreement with the Debtors. This increased the scope of HBD's document management and review responsibilities and required a broad-scale and extensive privilege review.

### HBD Set Up A System Designed To Efficiently Collect Documents For All Litigation Matters

24. Faced with the need (a) to conduct prompt broad-scale privilege and relevance reviews to meet the Committee's document demands, (b) to respond to Fletcher's document demands and (c) to respond to the document requirements posed by other pending and contemplated litigation, my goal was to set up a system that comported with the instructions of Mr. Bereday and that would eliminate the need to go through the approximately 1,200 plus boxes of documents and significant electronic files each time a document request was made in the numerous litigation matters.

25. Thus, consistent with Mr. Bereday's request for indexing, I set up a system for employees of the estates and temporary personnel retained by the estates to index the boxes collected and maintained in the Ohio warehouse. This index tracked the box inventory number, box source, file name, date range of the documents in each file, and the designation of the categories of documents in the file. This index was put into an electronic searchable format and was housed in both an accel database and excel format. When completed, the printed version of the index was nearly 1,000 pages.

26. This electronic document index was used by HBD to locate potentially responsive documents to various litigation matters, it was provided to the Debtors' SEC counsel to locate documents responsive to SEC subpoenas, and it was provided to the Committee for its review and use.

proprietary information regarding the purchased assets and operations). In order to meet these obligations to AT&T, HBD was also required to produce documents for AT&T's pre-screening on numerous occasions and HBD thereafter was required to designate documents selected by AT&T as confidential where appropriate. In order to meet these obligations to permit AT&T to protect its proprietary information, HBD produced documents for AT&T's screening and review on October 4 through 7, 1999, November 1 through 2, 1999, and January 24, through 28, 2000. These productions to AT&T are memorialized in internal HBD memoranda dated October 8, 1999, November 3, 1999, and February 4, 2000. True and correct copies of these internal memoranda are attached to the Appendix as Exhibits 43 through 45.

### The Debtors Were Under Tight Time Pressures

32. Several factors imposed pressure upon HBD to complete the privilege and document review in a time frame that required heavy man-power to complete the relevance and privilege review. First and foremost were the demands by Fletcher and the Committee for documents.

33. The Fletcher adversary action was filed in early April, 1999, and the Debtors' initial disclosures under Rule 26 of the Federal Rules of Civil Procedure were due mid June, 1999. Attached as Exhibit 47 to the Appendix is a true and correct copy of the Initial Disclosures, which identify a broad category of documents relevant to the issues in the Fletcher litigation.

34. In mid-June, 1999, Fletcher served broad discovery demands that sought the production of documents relevant to the Debtors' allegations, which included Debtors' allegations of insolvency and financial condition in relevant time frames. A true and correct copy of these document demands are attached to the Appendix as Exhibit 46. At a July 26, 1999 hearing, the Court set the fact discovery cut-off for November 15, 1999, thereby giving Debtors a short time-frame in which to complete the relevance and the extensive privilege review for this production.

35. Meeting the document production requirements in the Fletcher litigation alone required a large scale privilege review and imposed a production burden upon the estates. The production demands and timing demands by the Committee increased the scope and pace of early phases of the privilege review.

36. As noted above, the Committee had been pushing for rapid access to the Debtors' documents from early on in the case. These demands for prompt access to documents did not cease when the Committee decided that it would not enter into a joint defense/prosecution agreement which required HBD to privilege review documents prior to the broad-scale production demanded by the Committee. Instead, the Committee continued to push for a rapid production and privilege review of documents.

37. I had several conversations with Dean Ferguson, the Committee's lawyer, in which he forcefully demanded that the Debtors initiate and complete its privilege review efforts in a very short time period so that the Committee could gain access to the Debtors' documents as soon as possible. In these conversations with Mr. Ferguson, I informed him that the privilege review process that would be required in the absence of a joint defense/prosecution agreement was a huge undertaking that would be very time-consuming and expensive.

38. Nonetheless, the Committee continued to push for a rapid and extensive production that required a broad-based privilege review and served a broad 2004 examination request. The following letters and emails memorialize the procedures that HBD put in place to meet the Committee's documents demands and needs: (a) a July 22, 1999 letter from Jim Johnston to Dean Ferguson; (b) a July 29, 1999 internal HBD email; (c) a July 30, 1999 letter from me to Joe Marshall at Munsch Hardt; and (d) August 13, 1999 memorandum from Linda Kontos and me to Dean Ferguson regarding document management and document imaging issues. These documents are attached to the Appendix as Exhibits 48 through 51.

**Temporary Professionals Were Retained To Reduce the Cost to the Estate and to Meet the Time Commitments to the Committee and Imposed By the Fletcher Litigation**

39. HBD is not a large firm, but is instead a litigation and bankruptcy boutique. The relevance and privilege review was a massive project by any standard. The privilege log alone was over 1,000 pages.

40. HBD did not have the resources to conduct the broad-based privilege review within the time frame demanded by the Committee and Fletcher without retaining some outside assistance. Moreover, HBD's attorneys are specialized in reorganization and complex litigation matters, and the

billing rates and expense associated with using HBD attorneys exclusively for the document review and privilege review project was cost prohibitive. For example, if HBD utilized its regular attorney (at their rates of $175 and up in 1999) and its regular paralegals (at their rates of $135 and up in 1999) for the task, the document production costs would have been far more expensive for the bankruptcy estates.

41.     HBD contracted with temporary staffing agencies to provide temporary attorneys and paralegals to assist with the document production.

42..    HBD oversaw and supervised the work of these temporary attorneys and professionals. These temporary professionals required administrative and clerical resources and support and HBD had to purchase four computers to support the functions of some of these professionals. Further, although HBD did not rent additional space to accommodate the temporary attorneys and paralegals, these professionals, nonetheless, occupied a significant amount of HBD's existing office space. For example, while the initial training of the temporary attorneys (which lasted a day or two) took place in a single large conference room, after the first few days and for the bulk of the time in which the temporary attorneys worked on the document review, these temporary attorneys occupied space that in HBD's current office configuration, houses HBD's entire office services department, three paralegal offices, two small conference rooms, one associate office, and several secretarial bays. In addition, the temporary paralegals also occupied various secretarial bays.

43.     From the outset, HBD determined that, given the nature of the services to be rendered by the professionals and the large scope of the project to be undertaken, it would account for and bill the services of the temporary personnel as professionals (rather than as expenses), but it would not use the temporary personnel as a "profit center" (in the words of LCC). Rather, I instructed Jack Smith, HBD's Chief Financial Officer, that we should not bill the temporary professionals at a rate designed to reap a profit to HBD. The services from which HBD contracted for the temporary professionals charged HBD hourly rates ranging averaging $25 for paralegals and $44 for attorneys. After factoring in the direct and overhead costs, HBD ultimately invoiced the Debtors for the temporary paralegals at $60 per hour (subsequently increased to $65 per hour in 2000) and for the temporary attorneys at $71.50 per hour (subsequently increased to $75 per hour in 2000).

44. If HBD had used its full-time attorneys and paralegals charging the same number of hours to perform the work done by the temporary professionals the cost to the estate would have more than doubled.

45. HBD regularly uses temporary attorneys and paralegals for similar projects for other clients, and HBD subsequently hired as full time professionals three of the temporary professionals who worked on the engagement in this case.

### The Committee Was Aware That HBD Had Employed Temporary Professionals To Assist With The Document Management Process

46. The Committee was aware that HBD had employed temporary professionals for the document review process. For example, when responding to demands from the Committee's lawyers for prompt production of documents, I informed Mr. Ferguson, counsel for the Committee, that HBD was in the process of arranging for the use of temporary attorneys in order to produce documents within a time-frame sought by the Committee. In fact, I discussed HBD's plan to utilize temporary attorneys to assist with this project weeks before we had in fact retained such attorneys. In this conversation, Mr. Ferguson and I had a fairly lengthy discussion in which he encouraged HBD to utilize temporary staffing agencies in Ohio and to secure temporary attorneys located in Ohio for purposes of conducting a broad privilege review in Ohio. (Ultimately, I decided that it was more cost effective to conduct the privilege review in HBD's offices and I decided that conducting the review in HBD's offices gave HBD the ability to exercise tighter oversight and supervision.)

47. I continued to keep the Committee informed of this fact. One such conversation with Mr. Ferguson is memorialized in a letter from Mr. Ferguson dated, July 21, 1999 confirming that I had stated that HBD "has hired five to eight temporary attorneys to conduct the privilege review" necessary to produce the first wave of 60 boxes to the Committee. (True and correct copies of this July 21, 1999 letter from Mr. Ferguson to Mr. Johnston and of Mr. Johnston's July 22, 1999 response letter to Mr. Ferguson are attached to the Appendix as Exhibits 13 and 48).

48. Then, at a July 26, 1999 hearing in the Fletcher litigation matter, I stated on the record that "[t]here are a large number of documents, Your Honor. It will be hundreds of boxes that will end up being produced and the timing on that review is just a time-consuming one. We've get (sic) seven

-14-

contract attorneys retained to work on that, but the timing is what it is." (These representations are set forth on page 8, lines 19 through 24 of the hearing transcript, and a true and correct copy of this transcript of proceedings is attached to the Appendix as Exhibit 14.) Mr. Wielebinski, counsel for the Committee, was present at that hearing.

49. At no time did anyone, including anyone representing the Committee, ever inform me that they objected to HBD utilizing temporary staffing agencies to provide professionals for purposes of assisting with the document review process. To the contrary, based upon several conversations in the summer of 1999 with Messrs. Ferguson and Marshall of Munsch Hardt and correspondence from Munsch Hardt, it was my understanding that the Committee was primarily concerned with expediting the privilege review process so that it could gain access to the Debtors' documents as soon as possible.

### The Obligations of the Debtors To House Documents Has Continued

50. Contrary to the suggestions of the Liquidating Trustee, the project did not end with completion of the privilege review. Rather, because the Committee refused to accept privileged information or otherwise take control over the documents, HBD was forced to maintain the repository and privilege log and to respond to discovery requests in litigation in which the Committee (and not HBD or the Debtors) was involved. This was memorialized in a few letters including a March 5, 2001, letter countersigned by Committee's counsel, a true and correct copy of which is attached to the Appendix as Exhibit 5. And, it is confirmed in a March 28, 2001, letter in which the Committee's counsel states that "[i]t is understood that all privileged documents and documents that have not yet been reviewed for privilege will be maintained by [HBD] on behalf of the Debtors." A true and correct copy of this letter is attached to the Appendix as Exhibit 52.

### Fletcher Litigation

51. I also oversaw the litigation of Fletcher's secured claim of more than $38 million against the Debtors, consisting of a $10.5 million claim for a prepetition loan to the Debtors and a claim for $28.125 million (plus unliquidated amounts) in respect of "make whole" rights under a securities purchase agreement executed prior to the petition date. HBD commenced an adversary proceeding in objection to Fletcher's claims, particularly the "make whole" claims which HBD believed to be subject to subordination under sections 510(b) and 510(c) of the Bankruptcy Code and believed to be

unenforceable under applicable state law.

52.   Under my supervision, HBD litigated discovery issues, and prepared and responded to a number of dispositive motions, including motions for judgment as a matter of law and summary judgment motions in the Fletcher matter. The Fletcher claims involved novel questions of first impression (including issues regarding whether the "make whole" claims properly were classified as debt or equity, whether subordination was appropriate, and whether state laws limiting dividends and stock redemptions precluded the claims).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of May, 2002 at Los Angeles, California.

_____
Shawna Ballard