FILED

2002 JUN -5 PM 12:22

1

2      UNITED STATES BANKRUPTCY COURT
       DISTRICT OF DELAWARE

3                               .
IN RE:                          .        Chapter 11
4                               .
SmarTalk,                       .
5                               .        Bankruptcy #99-108 (MFW)
           Debtor(s).           .        through    #99-127 (MFW)
6 .........................................................

7                     Wilmington, DE
                       May 16, 2002
8                       1:00 p.m.

9              TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE MARY F. WALRATH
10            UNITED STATES BANKRUPTCY JUDGE

11

12 APPEARANCES:

13 For Liquidating Trustee:        Steve Kortanek, Esq.
                                   Klehr, Harrison, Harvey,
14                                 Branzburg & Ellers, LLP
                                   919 Market Street
15                                 Wilmington, DE 19809

16                                 Paul R. DeFillippo, Esq.
                                   Wollmuth, Maher & Deutsch, LLP
17                                 500 Fifth Ave.
                                   New York, NY 10110

18                                 Marvin Sprouse, Esq.
                                   Munsch, Hardt, Kopf
19                                 & Harr
                                   400 Fountain Place
20                                 1445 Ross Ave.
                                   Dallas, TX 75202

21

22

23

24

25



*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191



2

| | | |
|---|---|---|
| 1 | | Joseph Wielebinski, Esq. |
| | | Munsch, Hardt, Kopf |
| 2 | | & Harr |
| | | 400 Fountain Place |
| 3 | | 1445 Ross Ave. |
| | | Dallas, TX 75202 |
| 4 | | |
| | For | Ed Harron, Esq. |
| 5 | | Young, Conaway, Stargatt |
| | | & Taylor, LLP |
| 6 | | The Brandywine Bldg. |
| | | 1000 West Street–17th Fl. |
| 7 | | Wilmington, DE 19899 |
| 8 | For SmarTel Plaintiffs: | Scott A. Kamber, Esq. |
| | | Wechsler, Harwood, Halebain |
| 9 | | & Feffer, LLP |
| | | 488 Madison Ave.–8th Fl. |
| 10 | | New York, NY 10022 |
| 11 | | Kevin Mangan, Esq. |
| | | Walsh, Monzack & Monaco |
| 12 | | 1201 N. Orange Street–Ste. 400 |
| | | Wilmington, DE 19801 |
| 13 | | |
| | | David Shemano, Esq. |
| 14 | | Peitzman, Glassman & Weg, LLP |
| | | Ste. 1225 |
| 15 | | 1801 Ave. of the Stars |
| | | Los Angeles, CA 90067 |
| 16 | | |
| | | Stephen Greenspan, Esq. |
| 17 | | Peitzman, Glassman & Weg, LLP |
| | | Ste. 1225 |
| 18 | | 1801 Ave. of the Stars |
| | | Los Angeles, CA 90067 |
| 19 | | |
| | For Hennigan, Bennett: | Bruce Bennett, Esq. |
| 20 | & Dorman | Hennigan, Bennett & Dorman |
| | | Ste. 3300 |
| 21 | | 601 South Figueroa Street |
| | | Los Angeles, CA 90017 |
| 22 | | |
| | | James Johnston, Esq. |
| 23 | | Hennigan, Bennett & Dorman |
| | | Ste. 3300 |
| 24 | | 601 South Figueroa Street |
| | | Los Angeles, CA 90017 |
| 25 | | |

3

```
1   Audio Operator:              Jennifer M. Patone

2   Transcribing Firm:           Writer's Cramp, Inc.
                                 6 Norton Rd.
3                                Monmouth Jct., NJ 08852
                                 732-329-0191
4
    Proceedings recorded by electronic sound recording, transcript
5   produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                          Index

                                                    Further
2                  Direct Cross Redirect Recross Redirect

3  Witnesses For The:
     Liquidating Trustee

4
     Mr. Marquess              20

5
     Voir Dire
6    Mr. Marquess                   24

7    Mr. Marquess (Cont'd)  38      45

8

   Witnesses For HBD:
9

10

11 MOTIONS:

12

13
   EXHIBITS:                         Marked   Received
14
     LT-1    Transcript               9
15   LT-2    Report                   23
     LT-6    Brochure                 69
16
     HBD-22  Letter                   30
17   HBD-24  Response To Production Request   31
     HBD-79  Letter From Gibbons Del Deo      33
18   HBD-87  Photo Rate Report        47
     HBD-88  Photo Rate Report        48
19   HBD-96  Statement of Engagement  66
     HBD-97  Audit Report             72
20

21 SUMMATION BY:

22

23
   THE COURT: Finding
24

25

1        THE CLERK:  All rise.

2        THE COURT:  Good afternoon.

3        MR. KORTANEK:  Good afternoon, Your Honor.  Steve

4   Kortanek, co-counsel for the Liquidating Trustee in these

5   matters.  Your Honor, we have two matters, two separate

6   agendas today.  One that starts at 1:00 p.m., and one that

7   starts at 2:00 p.m.  The 2:00 p.m. agenda is what I would

8   characterize as a regular Omnibus Hearing that -- and we did

9   do two separate agendas with separate binders sent --

10        THE COURT:  Yes.

11        MR. KORTANEK:  -- to chambers.  We discussed with the

12  people involved in the 2:00 p.m. setting which -- who are not

13  here now, but I can communicate with them, probably makes

14  sense to move the 2:00 p.m. setting to maybe 3 o'clock.  As I

15  understand, Your Honor has a three hour window for Worldwide

16  matters generally this afternoon.

17        THE COURT:  Yeah.  Will we get to them at 3:00?

18        MR. KORTANEK:  I'm not sure, Your Honor.  But

19  certainly it makes more sense to move that --

20        THE COURT:  That's fine.

21        MR. KORTANEK:  -- rather than have the 1 o'clock

22  calendar interrupted.

23        THE COURT:  That's fine.

24        MR. KORTANEK:  So I can advise the parties.

25        THE COURT:  All right.

1    MR. KORTANEK:  And those dialing in at 2:00 will now
2    be told to dial in at 3:00 and can get direction from
3    chambers.  With respect to the 1 o'clock matter, there are, of
4    course, two matters on the agenda.  I will point out to the
5    Court that we apologize.  A number of -- I think four things
6    were filed by the fee applicant here yesterday at or about the
7    time we were filing the amended agenda.  And Mr. Bennett's
8    here, and can identify what those are.
9            THE COURT:  I have them.
10           MR. KORTANEK:  They've been submitted to chambers?
11           THE COURT:  Yes.
12           MR. KORTANEK:  With that, Your Honor, I'll -- I think
13   we probably want to deal with the first item, which is Motion
14   In Limine.  And then we have some initial housekeeping
15   matters.  Your Honor, I'd like to reintroduce Mr. Paul
16   DeFillippo, who Your Honor should know.  I'd move for his
17   admission, because I don't think we've done that previously in
18   this case.
19           THE COURT:  All right.  It's granted.
20           MR. KORTANEK:  All right.
21           MR. DEFILLIPPO:  Good afternoon, Your Honor.  Thank
22   you for admitting me.  Paul DeFillippo, Wollmuth, Maher &
23   Deutsch for the Liquidating Trust.  Your Honor, if it's
24   acceptable to the Court, I'm going to sort of blend the
25   argument in on the In Limine Motion with a road map of about

1   where we stand about right now.  Your Honor, this is the

2   hearing on the final fee application of Hennigan, Bennett &

3   Dorman, which was the Debtor's counsel.  Your Honor handles a

4   lot of big cases.  And Your Honor sees a lot of big fee

5   applications.  Your Honor has heard many fee applications for

6   larger amounts than this, I'm sure, in cases that are much

7   bigger than this.  This one is for $6,000,000 in fees, and

8   $1,000,000 in expenses for a period of less than two years

9   from the petition date until the completion of a hearing on

10  confirmation of the plan.  And in the first three months of

11  the case, as Your Honor knows, the company was sold for about

12  $150,000,000.  Over $20,000,000 in fee applications have been

13  filed in this case by professionals in total.  The Liquidating

14  Trust tried to work out objections to those fees with everyone

15  in advance.  And in some cases -- in many cases it was

16  successful.  It was not successful with Hennigan, Bennett,

17  unfortunately.  So we filed the In Limine Motion to bar

18  evidence of proposals or negotiations involving the offer that

19  the Liquidating Trust made --

20          THE COURT:  Well, I don't want to interrupt you

21  unduly, but I'm aware of where we are in the case.  So --

22          MR. DEFILLIPPO:  Then I'll --

23          THE COURT:  We have a limited time.  Tell me what I'm

24  going to hear as far as testimony --

25          MR. DEFILLIPPO:  Okay.

1    THE COURT:  -- or exhibits.

2    MR. DEFILLIPPO:  Well, Your Honor, the applicant

3  submitted the deposition testimony of David Pauker.  And under

4  the Rule of Completeness we're offering limited counter

5  designations of that testimony today.  And if I could provide

6  that for the Court, it could be marked.

7    MR. BENNETT:  Your Honor, we have no objection to the

8  admission of the entire package.

9    THE COURT:  All right.

10    MR. DEFILLIPPO:  Okay.  Well in that case let me

11  offer the transcript to Your Honor.  (Indiscern.).

12    THE COURT:  You can't be heard if you're not talking

13  into a mike.  Just -- whatever you want to submit.

14    MR. DEFILLIPPO:  LT-1, Your Honor.  Your Honor, the

15  relevant sections of that transcript, which are contained in

16  pages 19 through 27, establish that the Liquidating Trust

17  believe that a dispute over the Hennigan, Bennett fees existed

18  at the time it made the offer to compromise.  And we are

19  asking Your Honor to exclude that evidence under Rule 408.  If

20  it's offered for a different purpose such as bias or motive

21  which the applicant argued in its reply brief, Your Honor, we

22  will ask you to exclude it on the grounds of relevancy.  I

23  would note that the proposal was made before any objection to

24  fees was filed.  So -- and it was made to all professionals.

25  So it is very difficult to logically connect a bias argument

1  if it was made to all professionals.  And it is also

2  impossible to argue that the Liquidating Trustee had a bad

3  motive in objecting to fees if the offer was made prior to the

4  objection actually being filed.  But more to the point, Your

5  Honor, the motivation of the Liquidating Trustee is irrelevant

6  to the issues that Your Honor has to decide under Section 330

7  of the Bankruptcy Code in evaluating the applicant's fees

8  here.  This is especially so, Your Honor, when you have an

9  independent duty to examine these fees, even if no one

10  objects.  And we assume that Your Honor would have had the

11  same questions about the fee application that were raised by

12  the Liquidating Trustee.

13      Now, Your Honor, the applicant's papers imply that it is

14  important that the Court has previously approved interim

15  applications in this case.  But the fact is that that has no

16  relevance here since Your Honor is completely free to

17  reexamine interim fee awards at the time of a final

18  application.  They also argue that their monthly invoices were

19  sent to the Debtor, the Creditor's Committee, and the U.S.

20  Trustee, as if that somehow --

21      (Liquidating Trustee's Exhibit-1 previously marked for

22  identification)

23          MR. BENNETT:  Excuse me.  Are you arguing about the

24  Motion In Limine?

25          MR. DEFILLIPPO:  Well, Your Honor, I would proceed --

1     THE COURT:  Please don't interrupt.  I assume he's

2  arguing on the Motion In Limine.

3     MR. DEFILLIPPO:  No.  I'm not arguing the Motion In

4  Limine, Your Honor.

5     THE COURT:  All right.  Then let me hear any

6  response.

7     MR. BENNETT:  I apologize, Your Honor.  I think our

8  papers make our point clear.  The letter itself says that

9  there has been no determination made and no detailed analysis

10  performed of the fee applications.  They don't know how much

11  they're objecting to.  They say the objection may be less than

12  or greater than the seven percent demanded.  And I think more

13  importantly than anything else is the actual testimony of

14  their witness in the deposition transcript that they just

15  admitted into evidence.  My partner, Laura Lindgren, examined

16  the witness.  It's on page 24 at the bottom of the page.

17  Testimony is very --

18     THE COURT:  Well, I don't have the full copy.  So why

19  don't you get me the full exhibit?

20     MR. BENNETT:  Okay.  May I approach, Your Honor?

21     THE COURT:  Yes.

22     MR. BENNETT:  Thank you.

23     THE COURT:  Thank you.  What page again?

24     MR. BENNETT:  Page 40, Your Honor.  I'm sorry, page

25  24 on that point, Your Honor.  And he's asked about the first

1    full paragraph on the second page, which is where the

2    Liquidating Trustee talks about what he hasn't done.  And he

3    said -- he's asked, "You see that?"  He says, "Yes."  "Is that

4    a correct statement?"  He says, "Yes.  We had not conducted a

5    thorough detailed examination of the applications at that

6    time."  The bottom line is, is the dispute had not been

7    joined.  We actually think it's a lot more sinister than that.

8    That they really just decided to have kind of across the board

9    extortionate demand.  But the law which we cited in our brief

10   so I won't repeat it here says that there has to be a real

11   dispute, a real objection, for something like this to be

12   determined to be an offer to compromise.

13           THE COURT:  Well, there does not have to be a lawsuit

14   filed.  Nor does issue have to be joined.

15           MR. BENNETT:  That's correct.  But there has to be a

16   demand made.  There has to be a dispute manifested somehow.

17           THE COURT:  Well, the --

18           MR. BENNETT:  I --

19           THE COURT:  -- memo itself suggests that there may be

20   a dispute about the fees, and they've done a preliminary

21   investigation.  And based on that, they're prepared without

22   hiring a fee examiner to --

23           MR. BENNETT:  Your Honor, I think the most important

24   words in your own sentence were "may be".  And there had never

25   been a discussion -- there had never been a demand made upon

1   Hennigan, Bennett & Dorman for reduction of any other amount.

2   This was the first demand.  It was a demand.  "Pay seven

3   percent or else."  It was not a settlement negotiation.  If

4   they had said, "We want a settlement reduction of nine, or we

5   want" -- excuse me -- "we will demand nine percent, 10%, or as

6   it turned out, 40%," and then sent this letter saying, you

7   know, "Gee, we've looked at it.  There's cost and expense of

8   litigation.  We'll make a deal at seven.  What do you think?"

9   That's different.  This is not a settlement demand.  This is a

10  demand to pay money.

11          THE COURT:  Well you know that until there's a final

12  Order approving your fees, your fees are subject to objection.

13          MR. BENNETT:  I --

14          THE COURT:  They knew there was the deadline, and

15  they had the right to object.

16          MR. BENNETT:  Your Honor, if you think the Rule is

17  subject to objection, then this should not go in on that

18  grounds.  I don't think that's what the law says.  It's

19  interesting that, you know, we have rules in bankruptcy cases

20  where contested matters don't start until someone objects.

21          THE COURT:  Yes.

22          MR. BENNETT:  So we at least have a little bit of a

23  distinction.

24          THE COURT:  Except it's different with fee

25  applications.  You can't file a certification of no objection

1  and be assured that the Court's gonna sign the Order.

2          MR. BENNETT:  That's --

3          THE COURT:  The Court has had an independent

4  obligation to review the fees.

5          MR. BENNETT:  It --

6          THE COURT:  Anybody can object.

7          MR. BENNETT:  Well, that's another reason that

8  actually occurred to me after we filed our papers why this

9  really isn't a settlement proposal.  Because they freely admit

10  that they don't have the power to make a deal.  That what

11  we're doing if we pay the 7% is we're buying their

12  endorsement.  They're selling their endorsement.  That's not a

13  settlement either.  And I will point out to Your Honor that

14  there's another important fact here that I think makes it

15  factually distinct from any case that says that this could

16  conceivably be a settlement.  And that is the same form letter

17  was sent to every professional in the case.  So --

18          THE COURT:  Well --

19          MR. BENNETT:  -- this is not in the scheme of things

20  the most important thing that's going to happen today.

21          THE COURT:  I know.

22          MR. BENNETT:  But this dispute -- they did not make a

23  demand to reduce fees until we received the objection, which

24  was the 40% demand.  At this point, this was the only demand

25  we'd ever seen for a fee reduction.  It was $700,000, or less

1 than $700,000.  It was before any objection was filed.  It was

2 before any demand was made whatsoever.  In fact, they said

3 they hadn't made a demand and were not in a position to make a

4 demand.  We think under those circumstances the cases hold

5 this is not a settlement, this is a demand.

6     THE COURT:  Why is it relevant what their motivation

7 was in objecting?

8     MR. BENNETT:  Well, we think, Your Honor, that

9 there's been a lot of bad faith in this case.  And I wouldn't

10 say --

11     THE COURT:  Why is that relevant to my considering

12 your fees?

13     MR. BENNETT:  I think it's going to be relevant in

14 connection with the consideration of some of the so-called

15 evidence.  But I -- and I think that the -- everyone in this

16 Court is supposed to act equitably and in good faith.  And

17 people are supposed to -- Rule 11 says they're supposed to

18 file pleadings that they believe are true.  And they're not

19 supposed to be doing it for improper purposes.  And I think

20 this is replete with that.

21     THE COURT:  Well, if you think that they've acted --

22     MR. BENNETT:  I wouldn't say that if I couldn't show

23 it.

24     THE COURT:  If you think they've acted improperly,

25 you can file a motion after consideration of your fees.

1          MR. BENNETT:  Okay.

2          THE COURT:  I'm going to deny the Motion In Limine.

3   I don't think it's relevant.  But I'm not convinced that -- or

4   I won't preclude you from raising an issue regarding it.  But

5   I hope we get to the merits of the fees, rather than waste

6   time on this consideration.

7          MR. DEFILLIPPO:  Thank you, Your Honor.  I have one

8   housekeeping matter that I need to raise before we get to the

9   merits of the fees.  And it relates, Your Honor, to what was

10  filed yesterday.  I think Your Honor must have gotten the same

11  thing I did.  As Your Honor remembers from a status conference

12  we had I think the week before last, we've been working to

13  reach agreement on a number of declarations, and to consent to

14  the admission of a number of exhibits which the applicant

15  wanted to include in this record and -- without requiring the

16  declarants or the persons with knowledge of those exhibits to

17  be present to testify or to be cross examined.  And we did

18  agree to the admission of almost 50 documents, and agreed on

19  the form of three declarations which I think have been

20  submitted to Your Honor.  Those are the ones of Jean Davis,

21  Thad Berreday, and Shawna Ballard.  It was not until 5:30 last

22  night, however, that I received the 127-page fax including a

23  declaration or a proposed declaration of Bruce Bennett, which

24  I think Your Honor has, including exhibits.  And that was the

25  first time that I was informed that Mr. Bennett was proposed

1  to be used as a witness in this case.

2       I have an objection to that based upon unfair surprise,

3  and my ability on less than 24 hours notice to adequately

4  prepare to meet this new evidence.  And I intend to ask Your

5  Honor to allow me a reasonable continuance to another date to

6  prepare to cross examine Mr. Bennett if, in fact, he intends

7  to testify.

8       But we have a more fundamental and difficult problem than

9  just being served late with 127 pages of documents.  The cover

10 letter that I received last night indicates that Mr. Bennett's

11 declaration was filed with the Court.  And attached as an

12 exhibit to that declaration are confidential and privileged

13 documents which we believe Hennigan, Bennett generated while

14 it was counsel for the Debtor, which analyze the Estate's

15 causes of action against Price, Waterhouse, Coopers and

16 Donaldson, Lufkin and Genrette.  The litigation -- I'm sorry -

17 - the Liquidating Trustee is presently suing those two

18 entities in separate actions outside of this Court, in which

19 it's represented by two different counsel.  I have been unable

20 to deliver the Bennett declaration to those counsel so that

21 they can analyze the impact of the disclosure of these

22 confidential materials in the context of that litigation.  But

23 they have asked me to request of Your Honor that you seal the

24 record in this case in order that important and confidential

25 information which the Hennigan firm prepared for the Debtors

1    not be inadvertently disclosed to the Estate's adversaries.

2         THE COURT:  Well, is it too late?

3         MR. DEFILLIPPO:  Well, I don't know.

4         THE COURT:  Was it electronically filed?

5         MR. BENNETT:  I don't think it was electronically

6    filed.

7         THE CLERK:  Yes, it was.

8         MR. BENNETT:  Oh, it was.  All right.  It was.

9         MR. DEFILLIPPO:  And one of the documents Your Honor

10   will see in reviewing it is a confidential legal memorandum

11   from Hennigan, Bennett to their client, which --

12        THE COURT:  Well, I confess since I got it this

13   morning I did not look at it in detail.

14        MR. DEFILLIPPO:  No, neither did I.  But it --

15        THE COURT:  What are you referring to?

16        MR. DEFILLIPPO:  I'm referring to a document that --

17        THE COURT:  What exhibit?

18        MR. DEFILLIPPO:  I think it's about 20 pages long.

19   My fax doesn't have exhibit markers, Your Honor.  It -- may I

20   approach?  If I could --

21        THE COURT:  What fax number?

22        MR. DEFILLIPPO:  Page number 42.

23        THE COURT:  I see it.

24        MR. DEFILLIPPO:  And, Your Honor, as you can see from

25   just the quick review of it, it goes on at great length to

1  analyze the Estate's causes of action.  And, Your Honor, as

2  you know, the 3rd Circuit has held in <u>Billing vs. Raven,</u>

3  <u>Greenberg & Marx</u>, that all of an Estate's claims against

4  counsel must be adjudicated at the time of final fee

5  application, at the risk of any unadjudicated claims being

6  barred and unavailable for assertion.

7           THE COURT:  Are we off the Motion to Seal now?

8           MR. DEFILLIPPO:  Well, not exactly, Your Honor.

9           THE COURT:  All right.  I know.

10           MR. DEFILLIPPO:  I appreciate that.

11           THE COURT:  You'll have to tell me something I don't

12  know.  What is your point?

13           MR. DEFILLIPPO:  My point is that this is a further

14  reason why the Liquidating Trustee needs some opportunity

15  beyond today to examine the impact of the public filing of

16  these confidential materials on its rights against this law

17  firm.  And we are going to request Your Honor not to close the

18  record of these proceedings today, in order that --

19           THE COURT:  All right.

20           MR. DEFILLIPPO:  -- if any additional pleadings need

21  to be filed, we can do so.  Thank you, Your Honor.  That is

22  the summary of my argument on the Motion to Seal.

23           THE COURT:  Any position on that?

24           MR. BENNETT:  I have no objection to the Motion to

25  Seal.  Obviously the Liquidating Trustee in objecting to

1    $650,000 of our fees on this matter saying we didn't do

2    anything, it was wasteful, has put this into issue.  There's

3    buckets of authority that says when an attorney's been

4    attacked he may introduce documents to protect himself.  I

5    have no problem sealing the record.  I don't lien the Estate

6    anymore.

7              THE COURT:  Well, I think it could have been done a

8    little differently.  I don't know that I can now seal it,

9    since it's electronically filed.  How am I going to get it

10   stricken from the record?  I'll take that under advisement.

11             MR. DEFILLIPPO:  Thank you, Your Honor.  We have some

12   evidence to produce, Your Honor.  And if we can proceed to

13   that, I'd like to offer by proffer the direct testimony of

14   John Marquess.

15             THE COURT:  Any objection to proceeding by proffer?

16             MR. BENNETT:  I have no objection to proceeding by

17   proffer, Your Honor.  But I, in fact, may have objection to

18   the admissibility of much of what you're about to hear.

19             THE COURT:  I'm sorry.  What?

20             MR. BENNETT:  I think I have an objection to the

21   admissibility of much of what you're about to hear.  At the

22   appropriate point, I mean.

23             THE COURT:  Well, do we just want to do it by putting

24   the witness on the stand then, so you can object before --

25             MR. BENNETT:  No objection.

Marquess - Direct                         20

1          THE COURT:  -- the testimony comes in?

2          MR. BENNETT:  No objection.

3      (Pause in proceedings)

4          MR. DEFILLIPPO:  I'm sorry, Your Honor.  Did you

5  resolve that I should put the witness on the stand?

6          THE COURT:  Yes.

7          MR. DEFILLIPPO:  Mr. Marquess.

8      (Witness comes forward)

9          THE CLERK:  Place your hand on the Bible.  Please

10  state your full name and spell your last name for the Court.

11         MR. MARQUESS:  John J. Marquess, M-A-R-Q-U-E-S-S.

12     JOHN J. MARQUESS, LIQUIDATING TRUSTEE'S WITNESS, SWORN

13                     DIRECT EXAMINATION

14  BY MR. DEFILLIPPO:

15  Q.  Mr. Marquess, by whom are you employed, sir?

16  A.  By Legal Cost Control, Inc.

17  Q.  And what is your position there?

18  A.  President.

19  Q.  How long have you been with that firm?

20  A.  Since October 1998.

21  Q.  Are you admitted to the bars of any states?

22  A.  Yes.

23  Q.  Which states are you admitted?

24  A.  Pennsylvania and New Jersey.

25  Q.  How long have you been so admitted?

1  A.  Since 1977.

2  Q.  Have you engaged in any other businesses besides Legal

3  Cost Control?

4  A.  Yes.  I was the founder and CEO of Legal Guard,

5  Incorporated.

6  Q.  What kind of business was Legal Guard in?

7  A.  Legal fee auditing.

8  Q.  And what kind of business is Legal Cost Control in?

9  A.  Generally legal fee auditing.

10  Q.  When did you start with Legal Guard?

11  A.  Actually, the -- Legal Guard came into being in 1985.  And

12  I continued there through October of 1996.

13  Q.  Have you ever testified as an expert concerning allowance

14  and payment of legal fees?

15  A.  Yes.

16  Q.  Do you remember how many cases you've testified in?

17  A.  In excess of a dozen.

18  Q.  Have you ever been accepted as an expert on legal fees in

19  bankruptcy by any Bankruptcy Courts?

20  A.  Yes.

21  Q.  Do you remember the Courts?

22  A.  Multiple Courts in California, Texas, Illinois, Michigan.

23  Q.  Did you submit a legal fee audit to the Bankruptcy Court

24  for the District of Delaware in a case recently?

25  A.  Yes.

1   Q.   What case was that?

2   A.   <u>Americer</u>.

3   Q.   What Judge received that report?

4   A.   Judge Peter Walsh.

5   Q.   And was your report accepted by Judge Walsh in that case?

6   A.   Yes.

7   Q.   Have you presented discussions or seminars on the topic of

8   legal fee billing or such?

9   A.   Yes, which would include the ethics of billing.

10  Q.   And where have you presented those seminars?

11  A.   The Oregon State Bar, the Ohio State Bar, Pennsylvania

12  Bar, Philadelphia Bench Bar, the Association of American Law

13  Schools, at their national conference.

14  Q.   What did you do in connection with the fee applications of

15  Hennigan, Bennett in this case?

16  A.   What we did was to take the --

17           MR. BENNETT:  Objection, Your Honor.  I think the

18  question was what "he" did, not what "we" did.

19  BY MR. DEFILLIPPO:

20  Q.   What did you personally do --

21  A.   Okay.

22  Q.   -- after you were retained?

23  A.   Okay.  Secured the fee applications and the billings, read

24  the fee applications, read every line item of every bill that

25  supported the fee applications.

1  Q.  Did you do anything else?

2  A.  Yes.  Directed that the fee applications and bills be

3  entered into a database.  And then instructed one of the

4  employees -- one of the people working with me, to also

5  perform the same line by line analysis, and also to read the

6  fee applications.

7  Q.  Do you know if your employee performed those functions?

8  A.  Yes, he did.

9  Q.  What else was done with respect to the Hennigan fee

10  applications by Legal Cost Control, to your knowledge?

11  A.  The fee applications were read and analyzed.  And each

12  line item of the bill was read and analyzed by me to determine

13  whether in fact there was compliance with the local rules and

14  -- or whether there were issues beyond the local rules that

15  might give rise to questions that needed to be addressed.

16  Q.  And did you prepare a report for the Liquidating Trust?

17  A.  Yes.

18         MR. DEFILLIPPO:  May I approach?

19         THE COURT:  Yes.

20  BY MR. DEFILLIPPO:

21  Q.  I'm showing you Exhibit LT-2, sir.  Is that the report

22  that your firm prepared for the Liquidating Trust?

23       (Liquidating Trustee's Exhibit-2 previously marked for

24  identification)

25  A.  Yes.

1  Q.  Did you write the narrative portion of that report

2  yourself?

3  A.  Yes, I did.

4  Q.  And did you review the exhibits to that report personally?

5  A.  Yes, I did.

6          MR. DEFILLIPPO:  Your Honor, I would offer LT-2 into

7  evidence.

8          MR. BENNETT:  Objection, Your Honor.

9          THE COURT:  What is the objection?

10          MR. BENNETT:  May I conduct some Voir Dire first?

11          THE COURT:  Yes.

12                          VOIR DIRE

13  BY MR. BENNETT:

14  Q.  Sir, is -- I'm sorry, this is --

15      (Pause in proceedings)

16  Q.  Sir, the report before you -- have you determined that

17  each and every item of information contained in it is true and

18  correct?

19  A.  Let me answer it this way.  I believe there are probably

20  some errors in here, if that's your answer to your question.

21  I'm not sure if that's -- if that answers --

22  Q.  So it's not true and correct?

23  A.  No.

24  Q.  Did you take --

25  A.  It's true and correct to the best of my knowledge, with

1  the exception that there may be some errors contained in the

2  report.

3  Q.  Could you possibly while you sit here today take us

4  through it and remove the errors for us so that it would be

5  true and correct?

6          MR. DEFILLIPPO:  Objection, Your Honor.  This is

7  cross examination that goes to the weight of that evidence.

8  It does not go to the admissibility of the evidence.

9          THE COURT:  Yeah.  Let's go to the admissibility.

10         MR. BENNETT:  Okay.

11  BY MR. BENNETT:

12  Q.  Could you please turn to Exhibit 2 of the report?  Where

13  did this information come from?

14  A.  The data entry that was done of the bills that were

15  submitted by Hennigan, Bennett.

16  Q.  Did you do the data entry?

17  A.  No.

18  Q.  So you have no personal knowledge of -- that these items

19  are correct.  Do you?

20  A.  I reviewed -- after the data entry was done, I reviewed

21  each of these items against the billings.

22  Q.  And are they accurate recitations of the items in the

23  billings, sir?

24  A.  Yes, in the main.

25  Q.  I think it's a yes or no question.  Are they accurate

1  representations of the material in the billings?

2  A.   Yes.

3  Q.   Okay.  Would you please turn to page --

4            MR. BENNETT:  And, Your Honor, I'm testing the

5  witness' personal knowledge.

6  BY MR. BENNETT:

7  Q.   -- twenty-three of 87, sir.

8            THE COURT:  Well, is that relevant to whether or not

9  the report should be admitted?

10           MR. BENNETT:  Actually it is, Your Honor.

11           THE COURT:  Why?

12           MR. BENNETT:  Mr. Marquess, as I'll get to in a

13 minute, cannot be an expert in this case.  He wasn't --

14           THE COURT:  He hasn't been proffered as an expert.

15           MR. BENNETT:  That's right.  So then he has to have

16 personal knowledge of the matter he's putting into evidence.

17 Mr. Marquess had nothing to do with the entry of these items.

18 And he didn't review them.  And I think I can show that by the

19 number of errors that are in them.

20           THE COURT:  Well, I'll allow you to do it on cross.

21 I'm going to overrule the objection to the report.  He says he

22 did it.  He said he reviewed them.  I don't think it goes to

23 the admissibility of it.  You can test whether it's accurate.

24 That's a different issue.

25           MR. BENNETT:  Okay.  It also has opinion testimony.

1   And he cannot make opinion testimony in this Courtroom.  May I

2   proceed on the expert issue, Your Honor?

3          THE COURT:  Yes.

4   BY MR. BENNETT:

5   Q.  Mr. Marquess, as a result of your many opportunities to

6   testify as a expert witness, and your many years member of the

7   bar, are you familiar generally with the rules applying to

8   expert testimony?

9   A.  Yes.

10  Q.  Were you designated as an expert witness in this matter at

11  any time?

12  A.  I have no idea.  You'd have to ask counsel.

13         MR. DEFILLIPPO:  We'll stipulate he wasn't designated

14  as an expert, Your Honor.  No one has designated experts.

15         THE COURT:  All right.

16         MR. BENNETT:  Okay.  Your Honor, there was a

17  stipulation admitting Exhibit Number 22.  Exhibit Number 22

18  attached to our pleadings is the responses and objections to

19  the first set of interrogatories by Hennigan, Bennett and

20  Dorman.

21         THE COURT:  Do I have this?

22         MR. BENNETT:  Yes, you do, Your Honor.

23         THE COURT:  Where is it?

24         MR. BENNETT:  It is attached as an exhibit to our

25  reply brief.  I contend that --

1    MR. JOHNSTON:  I have copies.

2    MR. BENNETT:  We have copies of all of them, Your

3 Honor.

4    (Pause in proceedings)

5    MR. BENNETT:  May I approach the bench, Your Honor?

6    THE COURT:  Yes.  Somebody give me a copy.

7    MR. BENNETT:  And as I will soon demonstrate, Your

8 Honor, this is not a technical detail.  Could I have a copy

9 for the witness?  Your Honor, I'm sorry.

10    (Pause in proceedings)

11 BY MR. BENNETT:

12 Q.  Could you please turn to page six?  At the top of the

13 page, sir, does it say, "Identify each witness who you expect

14 to provide either oral or written testimony regarding HBD's

15 fees and expenses, and state whether the witness will testify

16 as a lay or an expert witness"?

17 A.  Yes.

18 Q.  And does your name appear on this list, sir?

19 A.  No.

20 Q.  Doesn't it?  Is --

21 A.  Oh, I'm sorry.  You mean -- I'm sorry.  Am I looking at

22 the right page?

23 Q.  It's page six.

24 A.  Okay.  Yes.

25 Q.  Are you designated as an expert there, sir?

1   A.   Doesn't indicate what I'm designated as.

2   Q.   Do you know as an expert what Federal Rule of Civil

3   Procedure 26 and Bankruptcy Rule of Civil Procedure 7026

4   requires with respect to designation of experts?

5   A.   That they be so designated as experts.

6   Q.   That is right.  Sir, the report you're looking in front

7   of, is that an expert report complying with the requirements

8   of Bankruptcy Rule 7026 or Rule of Civil Procedure 26?

9   A.   I believe it does.

10  Q.   Did you sign it?

11  A.   No.

12  Q.   Does it bear the words "draft" on the first page?

13  A.   Yes, it does.

14  Q.   Is there anywhere --

15  A.   Strike that.  Let me correct that.  The copy I've been

16  given does not say "draft".

17  Q.   Does the copy you produced say "draft"?

18  A.   Yes.

19        MR. BENNETT:  Can I have that letter?  I only have

20  one of these, Your Honor, but it's very short.  And Mr.

21  Marquess will be able to read it.  I'd like to mark it as

22  identification of the next in order.

23        THE COURT:  Well, I don't know -- we have HBD-22.

24        MR. BENNETT:  Okay.

25        THE CLERK:  I'll mark it.

1    (Hennigan, Bennett & Dorman's Exhibit-22 previously

2   marked for identification)

3    MR. BENNETT:   Thank you.   I'm sorry, Your Honor.

4   BY MR. BENNETT:

5   Q.   While he's doing that, could you find in this report the

6   statement of your qualifications?

7   A.   I don't believe that they would be in there.

8   Q.   Would you please find in the report a statement of all

9   your publications in the last 10 years?

10  A.   I don't believe that's in there either.

11  Q.   Would you find in the report the statements of all the

12  testimony you've given in the past four years?

13  A.   I don't believe that's in there.

14  Q.   Would you please point out the place where you disclose

15  the compensation to be paid for the study and testimony?

16  A.   It's not in there.

17  Q.   Most importantly, would you please point out the data or

18  other information considered by the witness in forming the

19  opinions?

20  A.   Go to page three.   "LCC will evaluate the firm's overall

21  practice and compliance with standing order number 32, (comma)

22  attachment (quote) 'A' (unquote) of the fee order, (comma) 11

23  U.S.C. 330 and generally accepted legal auditing principles."

24  Q.   Yes.   Is it true that you relied upon generally accepted

25  legal auditing principles in preparing this report?   You did

1  testify about it at your deposition.

2  A.   Okay.  I'll take your word for it.  Yes.

3  Q.   And did you testify at your deposition that there is a

4  written manifestation of this in training manuals and other

5  materials that you have at your firm?

6  A.   Yes.

7  Q.   And when you were asked to produce those materials, did

8  you do so?

9  A.   No.

10  Q.   And why is that?

11  A.   Because they're considered proprietary, and I was

12  instructed by counsel not to discuss it.

13  Q.   That's right.

14       THE COURT:  Please don't comment on the testimony.

15  Ask a question and --

16       MR. BENNETT:  I'm sorry.

17       THE COURT:  -- leave it at that.

18       MR. BENNETT:  Can I have Exhibit Number 24, please?

19  A.   Do you want me to retain 22, or do you want that?

20       (Hennigan, Bennett & Dorman's Exhibit-24 previously

21  marked for identification)

22       THE COURT:  Leave it there.

23  BY MR. BENNETT:

24  Q.   You can hold on to it.

25       MR. BENNETT:  You have a copy, correct?

1          MR. DEFILLIPPO:  Twenty-four?

2          MR. BENNETT:  Twenty-four.  May I approach the bench,

3   Your Honor?

4          THE COURT:  Yes.

5   BY MR. BENNETT:

6   Q.  Do you recognize Exhibit 24?

7   A.  No, I don't.

8   Q.  It is the joint response to the request for production of

9   documents.  You'll see "Golden Associates" on the first line.

10  And if you count five lines down it says, "Legal Cost

11  Control."

12  A.  Okay.  I'm seeing that for the first time.

13  Q.  Okay.  I'm gonna skip.  Could you please read request

14  number three on page three?

15  A.  "All documents relating to any task performed or services

16  provided by Legal Cost Control to Golden, the Liquidating

17  Trust, the Liquidating Trust Board, or any member of the

18  Liquidating Trust Board including without limitation

19  employment or compensation contracts, agreements, or

20  arrangements between Golden and Legal Cost Control."

21  Q.  And would you please read the last sentence of the

22  objection?

23  A.  "Respondents also object to this request to the extent

24  that it seeks disclosure of documents, information, or data

25  that are protected by the attorney/client privilege

1  and/{slash}or subject to the attorney work product doctrine or

2  other applicable privileges."

3  Q.  Since 1993 when Federal Rule of Civil Procedure 9026 was

4  amended, is there any privilege that protects the disclosure

5  of information used by an expert in developing its opinion?

6  A.  I have no idea sitting here.  I'd have to make some

7  research.

8       MR. BENNETT:  I want to check my notes, Your Honor,

9  on -- oh, I'm sorry.  I want to use Exhibit -- what's been

10  marked as Exhibit 29.

11       MR. JOHNSTON:  Seventy-nine.

12       MR. BENNETT:  Seventy-nine, I'm sorry.  HBD-79.  It

13  is a letter from Gibbons, DelDeo supplementally producing a

14  document from Legal Cost Control.  It's a letter from Mr.

15  Marquess.  It's two sentences long, so I think he can read it.

16  I only have one copy.  I really apologize.

17       (Hennigan, Bennett & Dorman's Exhibit-79 previously

18  marked for identification)

19       MR. DEFILLIPPO:  May I see it first, Your Honor?

20       (Pause in proceedings)

21       MR. BENNETT:  May I approach?

22       THE COURT:  You may.

23  BY MR. BENNETT:

24  Q.  Mr. Marquess, the first page is a transmittal letter.  And

25  you can ignore it unless it helps you.  Would you please read

1  -- excuse me.  First, would you please identify the letter

2  that is attached to the cover page?

3  A.  You're talking about the November 16, 2001 letter?

4  Q.  Yes.

5  A.  "Dear Ms. Mix.  As a result of a clerical error, the Legal

6  Cost Control initial reports referable to the above were

7  inadvertently not marked as {quote} 'draft' {unquote}.

8  Accordingly, kindly mark each of those reports as draft.  We

9  will insure that the remaining reports are appropriately

10 marked.  If you need anything else or care to discuss this,

11 please contact me."

12 Q.  Mr. Marquess, does that perhaps explain why the copy in

13 front of you isn't marked draft?

14 A.  Could.

15 Q.  Was it your intent, in fact, to cause all of your reports

16 to be marked draft?

17 A.  Yes.

18 Q.  Did you ever issue final reports?

19 A.  No.

20         MR. BENNETT:  Your Honor, I think I've concluded the

21 part of the examination of the witness on the subject of

22 whether he could qualify as an expert.

23         THE COURT:  He's not been offered as an expert.

24         MR. BENNETT:  Well --

25         THE COURT:  The question is whether or not that --

1    MR. BENNETT:  -- excluding the opinion testimony that

2  is in his report, which in fact is the entire narrative

3  portion that he prepared.  If he's not an expert --

4    THE COURT:  Let me hear the responses that --

5    MR. BENNETT:  I do want to make some legal argument.

6  I have authorities on this if Your Honor is interested.

7    MR. DEFILLIPPO:  Your Honor, as a result of

8  discussions that we had before the case started, we have

9  agreed to only press portions of the report.  So it's probably

10 helpful in this context for me to identify which portions of

11 the fee auditor's report that the objectors are continuing to

12 press in the initial objection that was filed, which was based

13 upon the fee audit report.  And then that will help --

14    THE COURT:  So you're not offering all of LT-2?

15    MR. DEFILLIPPO:  We are not objecting to each of the

16 items in LT-2.  However, the document is a integrated whole.

17 And I've offered it as the report of this witness.  I am

18 withdrawing the objection as to certain portions of it.  So we

19 are only pressing the objections in sections 2(A), 3(C), 3(F),

20 3(G), 3(H), 3(J), and certain portions of the expense

21 objections:  4(B) to the extent that taxes were charged for

22 more than $1 a page, 4(I) to the extent copies exceed 15 cents

23 a page, 4(J) to the extent it relates to items in our

24 supplemental objection, and 4(K) to the extent Your Honor

25 rules that retention of experts that were paid by this firm is

1   a condition to their payment by the firm, which is a legal

2   issue.  So having narrowed it down in that way, Your Honor, I

3   think that the limited purpose for which this report is being

4   used certainly allows its admissibility.  It is the report of

5   this witness.  It contains his opinion as a fee auditor.  And

6   I don't think the fact that it's draft makes any difference.

7   And if I need to ask him questions related to that to --

8            THE COURT:  Well, are you offering him as an expert?

9            MR. DEFILLIPPO:  I'm offering him as the author of

10  the report that's been marked as LT-2, Your Honor.

11           THE COURT:  That doesn't help me.  Is he offered as a

12  fact witness or an expert witness?

13           MR. DEFILLIPPO:  Well, Your Honor, he's offered as a

14  fact witness.

15           THE COURT:  And does his report contain things other

16  than a recitation of facts found by him?

17           MR. DEFILLIPPO:  Your Honor, to the extent his report

18  may contain opinions, we think they're opinions that are

19  permissible of a fact witness, in that they allow Your Honor

20  to see the issues in context, and are not objectionable

21  opinions under Rule 701, I believe.

22           THE COURT:  Well, I don't have the report.  So

23  somebody tell me what -- I guess I'll ask the firm to tell me

24  -- the fee applicant to tell me what they object to in the

25  report.

1      (Pause in proceedings)

2          MR. BENNETT:  Your Honor, every word of the narrative

3   is opinion -- every single word of it.

4          THE COURT:  Well give me the report then.  I'll have

5   to read it in order to make a decision on this.

6          MR. DEFILLIPPO:  Well, I think we should probably use

7   the one that was marked.

8      (Pause in proceedings)

9          THE COURT:  And I'll reserve ruling on it.

10         MR. BENNETT:  Actually, Your Honor, I have a little

11  bit of a concern that that wasn't the same report that was

12  produced, because ours was stamped draft, and that one is not.

13         MR. JOHNSTON:  Your Honor, the "report" (quote)

14  (unquote) was attached as an exhibit to their objection to our

15  fees, and then was incorporated by reference in their

16  supplemental objection to our fees.  That is what we've been

17  provided with.  That's what was attached to the pleadings.

18  That was marked draft.  And we don't know what's before you

19  right now.

20         MR. BENNETT:  Well --

21         THE COURT:  Well what's before me -- have you given

22  them a copy of what you've marked as LT-2?

23         MR. DEFILLIPPO:  I believe it was produced in

24  discovery, Your Honor.

25         THE COURT:  Well, do you have a copy of LT-2 today?

1          MR. DEFILLIPPO:  I think I do.

2          THE COURT:  Give them the copy.  And if you want to

3  review it, you can.

4          MR. BENNETT:  I apologize, Your Honor.  I think we

5  have it too.

6          THE COURT:  You may proceed with your examination.

7          MR. DEFILLIPPO:  Thank you, Your Honor.

8               DIRECT EXAMINATION (CONT'D)

9  BY MR. DEFILLIPPO:

10 Q.  Mr. Marquess, I need you to go back to the report.  And

11 for that purpose I need you to just borrow the Judge's.

12         THE COURT:  Just so it's clear, anything attached to

13 pleadings are not a matter of record.  If you want an exhibit

14 introduced, you're going to have to move it.

15         MR. DEFILLIPPO:  We understand.

16         THE COURT:  All right.

17         MR. BENNETT:  I don't know why the witness still has

18 this.  It's not in evidence.  We've objected to it.

19         MR. DEFILLIPPO:  Well, Your Honor, I would suggest

20 that --

21         THE COURT:  I'm allowing him to continue to proceed.

22 If you have an objection to a question, you can raise an

23 objection to a question.

24 BY MR. DEFILLIPPO:

25 Q.  Mr. Marquess, turn to Section 2(A) of your report.  What

1  was the basis for including the entries that are identified in

2  Section 2(A)?

3  A.   The local rules for the Delaware Bankruptcy Court indicate

4  that entries cannot be lumped together.  It's what I would

5  call block billing or grouping.  And each activity has to be

6  separated with a separate time entry.  The entries that were

7  not separated, that were in fact lumped and did not have

8  separate time entries are included in this category.

9           MR. BENNETT:  Objection as to opinion, Your Honor.

10          THE COURT:  Overruled.

11 BY MR. DEFILLIPPO:

12 Q.   Turn to Section 3(C), sir.  What was the basis for

13 including the Hennigan time entries that are contained in

14 exhibit 3(C)?

15 A.   Exhibit -- you're talking about the secretarial --

16 Q.   Yes.

17 A.   -- clerical?  Upon reviewing each of the line item

18 entries, the work that was contained therein that should have

19 been clerical or secretarial was included in this category.

20 Q.   How do you describe secretarial or clerical work in here?

21 A.   Administrative or clerical tasks like scheduling, copying,

22 filing, making travel arrangements, calendaring.

23 Q.   Can we turn to Exhibit 7 of the report, just talk about a

24 couple of examples of things that you included in here?  Take

25 a look at page 46 of 87.  And look at the entry at the very

1  bottom of the page dated 2/26/99.  Can you read that?

2  A.  You're talking about ES' entry?

3  Q.  Yes.

4  A.  Prepare labels of all Creditors for Mr. Boukata.

5  Q.  And ES was charged at what hourly rate?

6  A.  $135 per hour.

7  Q.  And how much time was spent doing that?

8  A.  Two and a half hours.

9  Q.  Can you look at page 53 of 87, sir?  Can you go down the

10  bottom of the page there to the entry on 7/4/99, the first

11  entry on 7/4/99?

12  A.  It says "Data"?

13  Q.  Yes.  Would you explain what the basis for including that

14  entry in the report was?

15  A.  The data entry input would have been a secretarial

16  function or a clerical function.

17        MR. BENNETT:  Objection, Your Honor, that is an

18  opinion.

19        THE COURT:  Overruled.

20  BY MR. DEFILLIPPO:

21  Q.  Take a look at the entry on page 55 of 87, specifically

22  focusing on the first entry on 7/26/99.  Would you describe

23  that entry for us?

24  A.  You're talking about LR's entry?

25  Q.  Yes.

1  A.  "Prepare Pendaflex folders for retaining records for

2  claimants."

3  Q.  What are Pendaflex folders?  Do you know?

4  A.  File folders.

5  Q.  How much was charged for that an hour?

6  A.  $80 per hour.

7  Q.  And how many hours were spent?

8  A.  Six and a half hours.

9  Q.  And why did you include that entry in here?

10  A.  It was something that a secretary or a clerk should be

11  doing.  And it should be already included in the firm's hourly

12  rate.  It should not be unbundled and charged as a

13  professional or para-professional service.

14         MR. BENNETT:  Objection, Your Honor, that is also

15  opinion.

16         THE COURT:  Sustained.

17  BY MR. DEFILLIPPO:

18  Q.  Take a look at the entry, that same page, 55 of 87, down

19  at the bottom, the second entry on the date 7/29/99 for LR.

20  A.  "Pull and copy proof of claims from register for officers

21  and directors."

22  Q.  Why did you include that on there?

23  A.  Again, that's a function that a secretary or a clerk

24  should perform.

25         MR. BENNETT:  Objection, that's an opinion.

1          THE COURT:   Overruled.

2    BY MR. DEFILLIPPO:

3    Q.   I'm not going to go through this at great length, but do

4    the rest of the entries in Exhibit 7 generally have the same

5    quality as the entries we've been talking about?

6    A.   Yes.

7    Q.   Let's move to Section 3(G).

8          MR. DEFILLIPPO:  Well, Your Honor, I have no

9    questions on 3(G).  Sorry.  I meant 3(H).

10   BY MR. DEFILLIPPO:

11   Q.   And turn to Exhibit 12.  Explain what caused you to

12   include the entries in Exhibit 12 that were put in there.

13   A.   Just so we're sure we're on the same page, we're talking

14   about the questionable secretarial/clerical?

15   Q.   Yes.

16   A.   Okay.  The descriptions indicate that the work could

17   either be work that was done or should have been done by a

18   clerk or secretary, or could be work that required certain

19   independent judgment, perhaps of a paralegal.  The

20   descriptions weren't clear enough for me to make that

21   determination.

22   Q.   Take a look at Section 3(J) of the report.

23   A.   Talking about the travel time issue?

24   Q.   Yeah.  What was the basis for including entries in the

25   travel time portion of the report?

1   A.   The local rules require non-working travel time to be

2   specified.   And also requires non-working travel time to be

3   charged at half rate or half time.   It works out to be the

4   same thing.

5   Q.   And --

6   A.   And in this case the charges on Exhibit 14 indicate full

7   time charge and full hourly rate.   So it's in contravention of

8   the rules.

9   Q.   Take a look at Section 4(B) of the report, please.

10           THE COURT:   Section 4(B)?

11           MR. DEFILLIPPO:   4(B).

12  BY MR. DEFILLIPPO:

13  Q.   4(B) -- what's the nature of the charges that are included

14  in that section?

15  A.   The firm charged a dollar and a quarter a page.   And the

16  rules --

17  Q.   For what?

18  A.   For each outgoing fax.

19  Q.   And what do the rules say?

20  A.   One dollar per page.

21  Q.   Have you calculated how much the firm overcharged by doing

22  that?

23       (Pause in proceedings)

24  A.   The one entry that is relevant here is the facsimile

25  greater than $1 per page, the 4/30/99 entry.

1    Q.   What page is that on?

2    A.   That's page 24 of 87.  It indicates that the charge was a

3    dollar and a quarter per page, $9,967.50.  If that were

4    reduced to $1 per page, the difference would be approximately

5    $2,000.

6    Q.   Take a look at Section 4(I) of the report.  What's the

7    basis for including items in that section?

8    A.   The firm charged various rates per page for photocopying.

9    First fee application was 25 cents per page.  Second and third

10   fee applications were 20 cents per page, and 15 cents per page

11   thereafter.  The rules allow 15 cents per page.  So the

12   quantification was the copying that was done in excess of 15

13   cents.

14   Q.   Have you made an effort to figure out how much of an

15   amount in excess of that allowed by the rules was charged?

16        (Pause in proceedings)

17   A.   I don't have it right in front of me, but I can explain

18   how it can be done.

19        MR. BENNETT:  Objection, Your Honor.  It's non-

20   responsive.  They asked if he had done it or not.

21        THE COURT:  Overruled.

22   A.   The page that indicates photocopies at 20 cents per page

23   shows $99,092.80.  The way you would do that is to divide that

24   total dollar by 20 cents, which would then yield the total

25   number of copies.  You would multiply the number of copies by

1  15 cents, take the difference, and that would be what the

2  result would be on the 20 cents.  On the photocopy at 25 cents

3  per page, it would be the same task.  Take the $17,952 --

4          THE COURT:  All right.  You don't have to continue.

5  A.  Okay.  Thank you.

6          MR. DEFILLIPPO:  I have no further questions, Your

7  Honor.

8                    CROSS EXAMINATION

9  BY MR. BENNETT:

10 Q.  Mr. Marquess, did Hennigan, Bennett & Dorman ever get paid

11 25 cents per page for a photocopy in this case?

12 A.  I don't know.

13 Q.  Mr. Marquess, at the beginning of this case was the

14 allowable price per page -- what was the allowable price per

15 page for photocopying in this District?

16 A.  I don't believe it was designated as 15.  I do not believe

17 it was designated.

18 Q.  Do you know what it was?

19 A.  No.

20 Q.  Did you try to find out?

21 A.  I believe I looked.

22 Q.  But you didn't find out?

23 A.  No.

24 Q.  Do you know when it became 15 cents a page?

25 A.  February 1 of 2001.

1  Q.  Did you make any effort in your work to figure out what

2  the price was charged for the period of time before the rate

3  changed?

4  A.  You mean a price that the firm charged?

5  Q.  Uhm-huh.

6  A.  That's what's indicated in the fee applications to which I

7  just testified.

8  Q.  Okay.  Did you make the effort to find out what the firm

9  was paid for the telecopies before the rate changed -- of the

10  rule?

11  A.  You're talking about in this case?

12  Q.  In this case.

13  A.  No.

14  Q.  You didn't.  Did you personally prepare the exhibit on the

15  photocopies?

16  A.  Yes.

17  Q.  Would you -- you did?  You prepared it yourself?  Typed it

18  in yourself?

19  A.  No, that's a different question.  You asked me if I

20  prepared it.

21  Q.  What did you do to prepare it?

22  A.  Instructed the -- once the billings were in the system, I

23  reviewed them, and I coded the billings.  Marked the ones that

24  I thought belonged in a particular category, and had them

25  placed into that category, which is what's contained within

1 the exhibit.

2 Q. And did you check it to see if it was right?

3 A. Yes.

4 Q. Okay.

5 A. Back to facsimile per page. Did Hennigan, Bennett &

6 Dorman ever charge the Estate more than $1 for the

7 transmission of a facsimile?

8 Q. According to the fee application it did.

9 A. Did you do anything to find out whether it did or it

10 didn't receive more than $1 per page for facsimiles?

11 Q. That's a different question. No.

12 A. You didn't do anything.

13        MR. BENNETT: Your Honor, I'm going to offer Exhibit

14 marked number 87. I have copies for counsel, copies for the

15 Court, copies for the witness.

16    (Hennigan, Bennett & Dorman's Exhibit-87 previously

17 marked for identification)

18 BY MR. BENNETT:

19 Q. Would you please read Exhibit 87?

20    (Witness reads the document)

21 A. Okay.

22 Q. What does it say?

23 A. Where? You want me to read the whole thing? Or --

24        THE COURT: Please don't make him read it.

25        MR. BENNETT: Okay. I just --

1  BY MR. BENNETT:

2  Q.  Did you learn anything by reading Exhibit 87, sir?

3  A.  It appears that you amended to reduce your photocopy rate

4  from 25 cents per page to 20 cents per page for the 71,796

5  pages.

6  Q.  Does it say anything else relevant to your report?

7  A.  And that 7,974 pages for facsimile were being amended to

8  $1 per page.

9  Q.  Would that cause you to change anything in your report,

10  sir?

11  A.  It would certainly cause me to change regarding the

12  facsimile.  And regarding the photocopying it would still be

13  my estimation it should have been 15 cents per page.

14  Q.  What was the local rule at that time?

15  A.  Twenty cents per page.

16  Q.  Thank you.

17        MR. BENNETT:  Your Honor, I'm presenting Exhibit 88.

18      (Hennigan, Bennett & Dorman Exhibit-88 previously marked

19  for identification)

20  BY MR. BENNETT:

21  Q.  Would you please read Exhibit 88?

22      (Witness reads the document)

23  A.  Okay.

24  Q.  Would this cause you to amend any of the materials in your

25  report?

1   A.   Yes, regarding the photocopying expense of 15 cents per

2   page for the third application, and any subsequent

3   applications if, in fact, they were amended to 15 cents.

4   Q.   Mr. Marquess, in your direct testimony your attention was

5   pointed to page 60 of 87.

6   A.   Which exhibit is that in?  Do you know?

7   Q.   Twelve in my copy.

8   A.   Are we talking about the questionable

9   secretarial/clerical?  Just so we're on the same page 60.

10  Q.   We are talking what you've denominated questionable

11  secretarial/clerical.  Could you please move down to the one,

12  two, three, four, five, sixth entry?  There's information in

13  the brackets.  Is that information in H&B's billing records?

14  A.   No.

15  Q.   Did you put it there?

16  A.   Yes.

17  Q.   What does it mean?

18  A.   As I indicated earlier, I couldn't tell what this was,

19  whether it was in fact clerical or paralegal.  I put the

20  comment in there so that it would assist anybody looking at

21  it.

22  Q.   Would you please turn to page 3 of 87?

23  A.   Same exhibit or a different one?

24  Q.   I think they're numbered sequentially, but I'm not sure.

25  Yes.  On at least the copy you gave to me they're numbered

1  sequentially.

2          THE COURT:  Well, is it in the same exhibit?  Well --

3          MR. BENNETT:  If they're all -- the exhibits starting

4  at number one, they're numbered sequentially is what I meant.

5  He has numbers -- 3 of 87 happens to show up in Exhibit 2.

6  But they're numbered --

7          THE COURT:  That's his question.  What exhibit?

8  BY MR. BENNETT:

9  Q.  Oh, it shows up in Exhibit 2.

10 A.  Okay.  And I'm at the same page as you now, now that you

11 said it's two.  Just to be sure.

12 Q.  Okay.  Is the one, two, three, four, five, six, seventh --

13 could you read the seventh line item, please?

14 A.  You're talking about the 8/5 --

15 Q.  Yes.

16 A.  -- 99 entry?

17 Q.  Yes.

18 A.  "Teleconference with Ms. Ballard; {semi-colon} Conference

19 with Mr. Gerger regarding litigation matters."

20 Q.  Yes.  Is it properly included in this report?

21 A.  It appears to be there are two entries here.  So one of

22 them shouldn't be here.

23 Q.  But this isn't right?

24 A.  No, the first one's correct.  The second one appears to be

25 a dup.

1  Q.  Would you please refer to page 42 of 87?

2  A.  Which exhibit again?

3  Q.  Page 42 of 87.

4         MR. DEFILLIPPO:  Which exhibit?

5  BY MR. BENNETT:

6  Q.  Oh, I'm sorry.  It shows up in -- it would show up in

7  Exhibit -- I think it's in Exhibit 4.

8         MR. BENNETT:  Well, actually, Your Honor, I think we

9  have our first problem.  The copy he presented to me that the

10 witness is using doesn't have a page 42 of 87.

11 A.  Which exhibit are you looking at?

12 BY MR. BENNETT:

13 Q.  Okay.  I was looking at the copy of your professional

14 report.  It's called, "questionable legal research."  It's

15 numbered 42 of 87.  And it was the copy that was produced to

16 us.

17        THE COURT:  Behind what exhibit tab?

18        MR. BENNETT:  Well the questionable legal research --

19 it would be behind 11.

20        THE COURT:  Behind Exhibit 11.

21        MR. BENNETT:  Oh, the numbering is messed up.

22 BY MR. BENNETT:

23 Q.  Third item --

24 A.  You said -- just so I get this, page 42 you said, right?

25 Q.  Right.  Now, when you did your work you relied on the

1  accuracy of these?  Or how did you figure out whether they

2  were right or wrong?

3  A.    I looked at the actual bill entries.

4  Q.    But when you categorized them to be objectionable, did you

5  use these, or did you use the bill entries?

6  A.    Both.

7  Q.    Both?

8  A.    Yes.

9  Q.    Okay.  And so you were kind of convinced they were the

10  same?

11  A.    Kind of -- I'm not sure --

12  Q.    Were you convinced --

13  A.    -- what your question is.

14  Q.    Were you convinced that the two databases were the same?

15  A.    Yes.

16  Q.    Would you read the item 8/30/99?

17  A.    "Research regarding issues relating to affidavits

18  submitted in support of summary judgment motions."

19  Q.    Okay.  And it was objectionable because?

20  A.    It doesn't indicate what issues were being researched,

21  which affidavits were being referred to.

22  Q.    Now, are you aware that -- whether or not Hennigan,

23  Bennett & Dorman did anything to subcategorize the accounts

24  that they billed time into?

25  A.    Yes.

1  Q.  And is it true that you ignored them?

2  A.  No.

3  Q.  Oh, I'm sorry.  Could you please turn to page one of your

4  report?

5  A.  What does it say at the top of the page?

6  Q.  "Introduction."

7  A.  Okay.

8  Q.  And the paragraph you referred to before at the bottom of

9  the page?

10  A.  I have it.

11  Q.  And it says -- the second line says, "The firm separated

12  its activities into separate sub-matters.  LCC does not

13  evaluate the sub-matters on an individual basis."

14  A.  That's right.

15  Q.  So when you looked at Mr. Jones' -- GKJ is, I think, Greg

16  Jones -- item for 8/30/99, "Research regarding issues relating

17  to affidavits submitted in support of the summary judgment

18  motion," did you look what category it was in?

19  A.  Yes.

20  Q.  You did?

21  A.  Yes.

22  Q.  I think we have the fee application as an exhibit.  And

23  it's dated, so it shouldn't be too hard to find.

24         (Pause in proceedings)

25             THE COURT:  Which fee application is it?

1        MR. BENNETT:  The second interim fee application.

2      (Pause in proceedings)

3        THE COURT:  Do you want to help him along, or --

4   A.  Yeah, you know where it is.

5        THE COURT:  -- do you want him to read --

6   A.  Why don't you tell me what category.  I'm sorry.

7   BY MR. BENNETT:

8   Q.  That's actually my problem.  I can't find it.  I think you

9   made it up.

10  A.  Really?

11     (Pause in proceedings)

12       THE COURT:  Well, do you want him to go through every

13  single page of that fee application?

14       MR. BENNETT:  Your Honor, it sounds awfully trivial,

15  but it's not there, at least.  And if he says it's there, and

16  he said he checked it, it ought to be there.

17       THE COURT:  Well, why don't you move on, and I'll

18  allow him to point it out if he finds it later.  Doesn't look

19  like we're finishing today anyway.

20       MR. BENNETT:  Sorry, Your Honor.

21  BY MR. BENNETT:

22  Q.  Page 59 of 87.

23  A.  Which exhibit?

24  Q.  Request for legal research, same exhibit.

25  A.  Okay.

1  Q.  Second -- would you please read the second line?

2  A.  "Research Section 101(5) issue, i.e. collared claim."

3  Q.  Okay.  And why was that item objectionable?

4  A.  Doesn't indicate which issue was being researched.

5  Q.  Do you know what 101 (open paren) (5) is?

6  A.  No.

7  Q.  Did you try to find out?

8  A.  No.

9  Q.  Do you know what collared claim means?

10 A.  No.

11 Q.  Did you try to find out?

12 A.  No.

13 Q.  Could you please read the next line?

14 A.  It appears to be the same issue.

15 Q.  Does it belong here?

16 A.  No.  It appears to be a dup.

17 Q.  Page 37 of 87, "Inadequate description, meeting or

18 hearing".

19 A.  Which exhibit?

20 Q.  I'm gonna find a number.  I'm sorry I don't have the

21 numbers on the copy that I have.  But I will get there in a

22 second.

23       MR. DEFILLIPPO:  Your Honor, I don't think we were

24 pressing that section of the report.  And so I don't

25 understand why we're spending time examining them.

1       MR. BENNETT:  Your Honor asked that I -- said she was

2   going to receive the report, but wanted to hear testimony on

3   cross examination concerning its credibility.  I don't think

4   we've --

5       THE COURT:  All right.  You may proceed.

6   A.  Which exhibit and which page?

7   BY MR. BENNETT:

8   Q.  Page 37 of 87 in Exhibit Number Four.

9   A.  Okay.

10  Q.  Okay.  Could you look at the entry third from the bottom?

11  A.  6/26/2000?

12  Q.  Yes.

13  A.  Okay.

14  Q.  Why was that objectionable?

15  A.  Might have been multiple layers.  But among other things,

16  the participant's role was not explained.

17  Q.  Now, when this item wound up on this list, $2,088 was

18  added to the category of objections.  Is that right?

19  A.  Appears to be.

20  Q.  Okay.  So did you do anything to check if that was right -

21  - a good thing to do?

22  A.  If what was right and a good thing to do?

23  Q.  Well was it -- did you do anything -- you know, this is

24  $2,100.  It's still a material amount of money to me.  When

25  you decided that there was $2,088 worth of objectionable time

1  that you were going to raise questions about, what did you do?

2  A.  I don't recall.

3  Q.  Is there anything wrong or suspicious about this entry?

4  A.  Again, I don't think this entry is accurate.  I thought

5  that this entry -- I had struck this entry from the category.

6  I don't recall why.

7  Q.  Okay.

8       MR. BENNETT:  Given that it's here, with Your Honor's

9  permission I want to hand him the fifth interim verified

10 application of Hennigan, Bennett & Dorman -- and I promise I'm

11 about to move on -- for interim allowance of compensation and

12 reimbursibles.

13 BY MR. BENNETT:

14 Q.  Is there any item dated 6/26 of 2000 for RLP, which is

15 Robert Palmer?

16 A.  Yes.

17 Q.  Would you please read it to me and to the Court?

18 A.  "Review and revise settlement memorandum."

19 Q.  No, I think we're talking about the -- I'm sorry.

20 A.  Are you talking about the second?

21 Q.  I'm talking about the -- excuse me.  I'll point it out.

22       (Pause in proceedings)

23 A.  Which one?  The E-conference?

24 Q.  Right.  Could you please read that item?

25 A.  "E-conference with Mr. Scrutin regarding settlement

1    meeting."

2    Q.   Could that be the item that's listed here?

3    A.   Could be.   In fact, yeah, I would say it should be.

4    Q.   Okay.   So is the description the same?

5    A.   No.   Oh, wait a minute.   The description's the same, yes.

6    Q.   Oh, I'm sorry.   Is it?   What exactly are the words in the

7    description there?

8    A.   "E-conference with Mr. Scrutin regarding settlement

9    meeting."

10   Q.   And what appears on your report?

11   A.   "E-con with Scrutin, settlement meeting."

12   Q.   Okay.   So they're -- it changed a little bit?

13   A.   Yeah.

14   Q.   Okay.   What's the amount billed?

15   A.   $130.50 .30.

16   Q.   Point three zero.   Now, is there anything wrong with the

17   item in the fee application?

18   A.   Yeah, it's got the previous entry transposed over top.

19   Q.   No, I meant is there anything wrong with the fee

20   application, the one in your hand.   Is there anything wrong

21   with that entry?   Is it objectionable to you for any reason?

22   A.   No.

23   Q.   And how much was involved?

24   A.   $130.50

25   Q.   And as a result of the work you did, including your

1  quality control, what happened as a result of the entry on

2  page 37 of 87?

3  A.  I don't know.

4  Q.  What happened?  Did the objection go up or go down?

5  A.  No, I said it should have been removed.

6  Q.  But it wasn't.

7  A.  It's in here in error.  That's right.

8  Q.  So what happened?

9  A.  I don't know.  I thought I removed it.  And I didn't,

10  obviously.

11       MR. BENNETT:  Your Honor, this could go very long,

12  but there are a hundred such items.

13       THE COURT:  Well, I'm not going to accept your

14  testimony for it.

15       MR. BENNETT:  So should I just keep going?

16       THE COURT:  Well, yeah.  But please limit it to the

17  areas that they're continuing to press.

18  BY MR. BENNETT:

19  Q.  Page 23 of 87 in "Questionable Legal Research," which I

20  believe is your Tab 11.  And it turns out to be the first page

21  of Tab 11.  Fifth item from the bottom, 1/22/99, JOJ, $300 per

22  hour, two hours and 20 minutes, for a total of $660.  And then

23  it says it's "Research regarding cash collateral and property

24  of the Estate."  Do you see that item?

25  A.  Yes.

1  Q.   And you objected to that for what reason?

2  A.   Doesn't specify what the research was.

3  Q.   Do you know what cash collateral is?

4  A.   Not in the context sitting here, no.

5  Q.   Do you know what was happening in the case in January 22nd

6  of 1999?

7  A.   No.

8  Q.   Did you do anything to try to find out?

9  A.   I read the fee applications.

10 Q.   Does it say -- or should I --

11 A.   It certainly discusses the cash collateral.

12 Q.   What do you remember was happening in January 22nd of '99?

13 A.   I don't remember.  I already said that.

14        MR. BENNETT:  With the Court's permission I'm going

15 to hand him the first application (indiscern).

16 BY MR. BENNETT:

17 Q.   First of all, may I ask you is there a note at the top of

18 the page about what the general subject matter of this work

19 was?

20 A.   Financing.

21 Q.   Does that help you understand what research was done here?

22 A.   No, not at all.

23 Q.   Okay.  For the date range, the January 22nd, '99, do you

24 find an entry for Jim Johnston?

25 A.   I'm sorry, what's the date again?

1  Q.  January 22nd, '99, for Jim Johnston charging $660 an hour

2  for research regarding cash collateral and property of the

3  Estate.

4  A.  No.

5  Q.  So as a result of your including this item for $660, the

6  objection went up by $660?

7  A.  No, the objection went up by the difference between $660

8  and $473.

9  Q.  And why is that?

10  A.  It may be because Mr. Johnston's hourly rate was increased

11  during this period.  I don't know.

12  Q.  Actually, could you go back to your chart, page 23 of 87?

13  A.  Okay.

14  Q.  Go up two lines from the $660 line.  What's there?

15  A.  You're talking about the entry says, "Research regarding

16  shareholder actions and property of the Estate"?

17  Q.  Right.

18  A.  Okay.

19  Q.  And what's the number next to it?

20  A.  473.

21  Q.  So you already took that one out?

22  A.  Yeah.  It would appear to be that the JOJ entry doesn't

23  belong there.

24  Q.  Mr. Marquess, I'm now going to hand you --

25       (Pause in proceedings)

Marquess - Cross                    62

1   Q.  Same application.  Oh, you have it?  Same application.

2   Would you please turn to page nine?

3          MR. BENNETT:  Would Your Honor like a copy for

4   convenient reference?

5          THE COURT:  No.

6   BY MR. BENNETT:

7   Q.  Paragraph 13, financing.  Do you see it?

8   A.  I'm sorry.  Are we looking at something different?  You

9   directed me to the bill or the fee app?

10  Q.  To the fee app.

11  A.  Because I'm back here.  There are two separate sets of

12  bills right here under financing.

13  Q.  On that very cover -- not a bill.

14         THE COURT:  It's a narrative.

15  BY MR. BENNETT:

16  Q.  Narrative.

17  A.  Page?

18  Q.  Page nine.  Would you read it to yourself, the first two

19  paragraphs, so that we can speed along?

20  A.  Okay.

21  Q.  Do any of these entries belong on your report, based upon

22  your review of these two paragraphs?

23  A.  Which entries are you referring to?  The ones that we just

24  addressed?

25  Q.  Uhm-huh.

1   A.   The page nine that I've just read talks generally about

2   the issues that arose in financing.  Doesn't help me reading

3   the research entries to understand again specifically what was

4   being researched.

5   Q.   Okay.  Why don't I try to help some more?  The first

6   sentence says, "Due to the cash position of SmarTalk on the

7   petition date, SmarTalk required the use of alleged cash

8   collateral of Fletcher International, Limited. to enable its

9   continued operations."

10  A.   I see that.

11  Q.   Do you know what cash collateral interest Fletcher

12  International, Limited claimed?

13  A.   No.

14  Q.   Do you imagine it's part of the record of the case?

15  A.   I would hope so.

16  Q.   If you wanted to, could you have found out?

17  A.   Yes.

18  Q.   Did you make any effort at all to find out?

19  A.   No.

20  Q.   Would it surprise you to find out that Fletcher is a

21  shareholder and had redemption rights, and claimed a security

22  interest to secure those?

23  A.   It wouldn't surprise me, but it would be irrelevant to me.

24  Q.   Why would it be irrelevant?

25  A.   Because it still doesn't answer the question of what

1  issues were researched.  All it does is tell me a little

2  background.  It doesn't tell me anything at all about how

3  these descriptions indicate exactly what issues were being

4  researched at the time that they were being charged.

5  Q.  I'm going to take a break from the line items just for a

6  second.  I'm going to go back to your report.  And I'm sorry,

7  I need my copy because it has my notes on it.  So excuse me

8  just a second.

9       (Pause in proceedings)

10       MR. BENNETT:  I apologize, Your Honor.  I'm sorry I

11 have to shuffle between papers.

12 BY MR. BENNETT:

13 Q.  I'm reading on page five of your report.  It starts,

14 "Purpose".

15 A.  Yes.

16 Q.  And there's a third bullet point.

17 A.  Right.

18 Q.  "Purpose is to provide an opportunity for the firm to

19 respond to and correct the at issue billing practices

20 identified in the report."

21 A.  Yes.

22 Q.  Did you ever give the firm an opportunity to respond to

23 and address the at issue billing practices identified in this

24 report?

25 A.  That was my intention when I wrote the report.

1  Q.  Did you ever do it?

2  A.  It's not for me to do.  It's for the client to do.  To

3  present -- wasn't for me to do that.

4  Q.  Are you aware that the counsel for the Liquidating Trustee

5  propounded a request for production of documents to Hennigan,

6  Bennett & Dorman at some point in time?

7  A.  I'm not personally aware of it, no.

8  Q.  Did he ever tell you he was going to do it?

9  A.  He being?

10  Q.  Counsel for the Liquidating Trustee.

11  A.  No.

12  Q.  Did any other member of either firm representing the

13  Trustee ever tell you they were gonna do it?

14  A.  I'm sorry, I lost the question again.  Did they ever tell

15  me that they were going to --

16  Q.  Propound a broad document request on Hennigan, Bennett &

17  Dorman.

18  A.  Actually, I was told the opposite, that there would be no

19  discovery.

20  Q.  There'd be no discovery.  Had Hennigan, Bennett & Dorman

21  provided their entire files to the Liquidating Trustee's

22  counsel, would you have wanted to see them?

23  A.  No.  But what I would have wanted would have been the

24  responses to the issues in the report.  The file itself may or

25  may not help me with that.

1  Q.  Do you have a brochure that describes the services that

2  you provide for your clients?

3  A.  Yes.

4  Q.  Was a copy of that brochure provided to the Liquidating

5  Trustee?

6  A.  Yes.

7  Q.  Does that brochure accurately describe the methodology

8  that you use when you perform an audit?

9  A.  An audit?

10  Q.  Yes.

11  A.  A law firm audit?  Yes, it does.

12  Q.  Is this a law firm audit?

13  A.  No, it's not.

14  Q.  What is this?

15  A.  This is a fee audit.

16  Q.  A fee audit.

17  A.  Yes.

18  Q.  What's the difference?

19  A.  Review of the fees, generation of an initial report to

20  allow the firm to address them, without the requirement of

21  going to the firm.

22        MR. BENNETT:  I'm sorry, Your Honor, I need to do

23  another impromptu exhibit.

24     (Hennigan, Bennett & Dorman's Exhibit-96 marked for

25  identification)

1        MR. BENNETT:  Your Honor, again I'm sorry I don't

2  have any copies.  Let me show this to opposing counsel.

3        (Pause in proceedings)

4        MR. BENNETT:  Again, Your Honor, I'll just go to a

5  very short part.

6        THE COURT:  What is this marked?

7        THE CLERK:  Marked Number 96, Your Honor.

8  BY MR. BENNETT:

9  Q.  You'll have to forgive me, Mr. Marquess, but that is the

10 only document that was produced by anybody in this case --

11 your fee arrangement.  And it's --

12       MR. DEFILLIPPO:  Objection.  Objection to the --

13       THE COURT:  Testimony.  Sustained.

14       MR. BENNETT:  I'm sorry.

15 BY MR. BENNETT:

16 Q.  Do you recognize that document?

17 A.  Yes.

18 Q.  Could you please identify it for the Court?

19 A.  It appears to be a draft of a statement of engagement

20 between somebody and Legal Cost Control, Inc.

21 Q.  Is the actual fee engagement that you entered into that

22 form?

23 A.  I would think so.  Again, I haven't looked at it.  But I

24 don't see anything here that I would understand to have

25 changed.

1  Q.    Okay.   Could you please read paragraph four for me?

2  A.    "Pursuant to this engagement, LCC shall provide the

3  services set forth in LCC's proposal dated August 21, 2001."

4  Q.    Was that -- what was in that proposal?

5  A.    The proposal was generally as what's set forth here in the

6  purpose section that you and I were just going over, as to

7  what we were going to do.

8  Q.    Okay.   Why don't you read paragraph five?

9  A.    About our fees?

10  Q.    Yes.

11  A.    "LCC's fees shall be one and one quarter percent of the

12  legal billings received by LCC.   LCC shall be paid a fee

13  representing 80% of its fee within 30 days of its engagement.

14  Remaining 20% of LCC's fees shall be billed upon delivery of

15  the final audit reports by LCC.   LCC's fee of 1.25% percent

16  shall be an all inclusive fee, and shall include not only the

17  services set forth in paragraph four, but shall also include

18  all attending costs incurred by LCC {parenthesis} (office

19  support, {comma} mail/{slash}postage, {comma} photocopying}

20  {closed parenthesis} {period}."

21  Q.    Does that refresh your recollection as to whether you were

22  retained to do a audit as --

23  A.    It doesn't say that we were to do a law firm audit here.

24  Nowhere does this say that.

25  Q.    It says -- what does it say you were going to --

1   A.   Final audit reports.

2   Q.   Final audit reports.  So is what you do in preparing a

3   final audit report memorialized anywhere?

4   A.   I'm sorry?

5   Q.   Is --

6   A.   Is what --

7   Q.   Is what your firm does, to do a final audit report,

8   memorialized anywhere?

9   A.   (No verbal response).

10  Q.   Written down anywhere?  I have --

11  A.   I'm not sure what you mean.

12  Q.   Exhibit 6, which is your brochure -- it's admitted into

13  evidence.

14       (Liquidating Trustee's Exhibit-6 previously marked for

15  identification)

16          THE COURT:  Are you in the middle of this question?

17          MR. BENNETT:  (Indiscern.).

18          THE COURT:  All right.

19  BY MR. BENNETT:

20  Q.   Does any portion of this brochure describe the services

21  that you provided for the Liquidating Trustee?

22  A.   No.

23  Q.   Does there exist a brochure that does describe those

24  services?

25  A.   What we perform in bankruptcy is a hybrid between the desk

1  invoice reviews and the law firm auditing.  It's not

2  separately described in this brochure.

3      (Pause in proceedings)

4  Q.  Mr. Marquess, did you encounter any evidence that any of

5  the billings that were supplied by HBD to you and that were in

6  the fee applications were inaccurate in any way?

7  A.  When you say inaccurate, you mean mathematical errors?

8  What exactly do you mean?

9  Q.  Were they mathematically inaccurate in any way?

10 A.  We did make that determination.  And we determined that

11 there were no mathematical issues.

12 Q.  Did you make any determination as to whether or not there

13 were any time entries that were improperly recorded as to the

14 amount of time billed?

15 A.  No.

16 Q.  Did you accumulate any evidence that any of the services

17 that were performed were unnecessary?

18 A.  The areas that are listed as questionable.  It's difficult

19 to determine whether they were necessary or unnecessary,

20 because they are inadequately described.  And I'll talk again

21 specifically about the questionable legal research.

22 Q.  Did you determine whether any was unnecessary?

23 A.  Based on the descriptions, I would have no idea whether it

24 was necessary or unnecessary, because I don't know what it

25 was.

1   Q.   Did you determine whether or not the Estate in any way

2   benefitted from the services performed?

3   A.   Again, except for those limited categories where I don't

4   know what the work was, no.

5   Q.   In the area of the documents, did you ever look at the

6   document repository in Ohio?

7   A.   No.

8   Q.   Did you ever look at any of the documents that were

9   accumulated, sorted, coded, and privilege reviewed by

10  Hennigan, Bennett & Dorman?

11  A.   No.

12  Q.   Did you ever look at the privilege log produced?

13  A.   No.

14  Q.   Did you ever look at the indices of the documents?

15  A.   No.

16  Q.   Did you ever consult with any attorneys in the case to

17  determine whether that production management, the indices, and

18  the privilege log were useful in any way?

19  A.   No.

20  Q.   Could you please go back to Exhibit 6, your brochure?

21  A.   Exhibit 6?  It's Exhibit 1, isn't it?

22  Q.   No, Exhibit --

23  A.   Is it 6?  Okay.  I can't read the marking on the front.

24  All right.  I've got it.

25          MR. BENNETT:  And has Mr. Marquess' deposition

1    already been filed?  Or --

2        MR. DEFILLIPPO:  No.

3        MR. BENNETT:  So I have to mark it.  Can I mark Mr.

4    Marquess' deposition?

5        (Hennigan, Bennett & Dorman's Exhibit-97 marked for

6    identification)

7        MR. BENNETT:  Excuse me, Your Honor, while we get

8    another copy.

9        THE COURT:  Please keep your voice up, because I

10   don't think the --

11       MR. BENNETT:  Excuse me, Your Honor.

12       THE COURT:  -- record is getting it.

13       MR. BENNETT:  I apologize.  I'm just getting another

14   copy.

15       (Pause in proceedings)

16   BY MR. BENNETT:

17   Q.  Mr. Marquess, I direct your attention to page 18 of your

18   deposition.

19   A.  Okay.

20   Q.  And could you please read lines two through 20, please?

21   A.  Question, "Can you take a look at the 15 --

22   Q.  I'm sorry.  You can read it to yourself.  I want to --

23   A.  Oh, I'm sorry.

24   Q.  -- hurry this along.

25   A.  Okay.  Page -- I'm sorry, line two through what?

1  Q.   Lines two through 20.

2  A.   Okay, I've read it.

3  Q.   Does this refresh your recollection as to what you were

4  contracted to do, and whether the brochure states the

5  procedures you were to follow?

6  A.   Absolutely it doesn't need to refresh my recollection.   I

7  know what we were contracted to do.   And we were not

8  contracted to do what this question and answer session

9  covered.   And I said that at the deposition.   We were not

10  contracted to perform a law firm audit.   We were not hired to

11  go to the law firm, interview the law firm personnel, or to

12  review the work product.   So if you see that I've said that

13  somewhere, please correct me and I'll gladly read it out loud,

14  if you see me saying something different.

15  Q.   That's right.

16       (Pause in proceedings)

17  Q.   In connection with preparing this audit did you interview

18  anybody at all?

19  A.   In connection with preparing the order?

20  Q.   This, your audit report.

21  A.   No.

22  Q.   And I may have asked this question before, but excuse me.

23  Did you review any of the Court files or pleadings in the

24  SmarTalk proceeding other than the fee applications?

25  A.   No.

1    Q.    Did you even look at the docket?

2    A.    Looked at the docket, sure.

3    Q.    You did look at the docket?

4    A.    Yes.

5    Q.    And did you learn anything from that?

6    A.    Nothing that meant anything as far as the issues raised in

7    the fee report.

8    Q.    And when you read the docket you apparently missed the

9    supplements of the fee applications.

10   A.    No, no, no, no, no.  I read the docket yesterday.

11   Q.    You read the docket yesterday?

12   A.    Yes.

13   Q.    Wouldn't it have been more helpful to have done that

14   before you wrote your report?

15   A.    The docket was meaningless to me.

16   Q.    Why did you read it yesterday?

17   A.    To try to determine whether this hearing was still on.

18   Q.    Did you at least acquire an inventory of the adversary

19   proceedings that were filed in this bankruptcy case?

20   A.    No.

21   Q.    Did you get inventory of the motion practice that occurred

22   in the bankruptcy case?

23   A.    No.

24   Q.    Did you review any of the transcripts of any of the

25   proceedings that were reflected?

1    A.   No.

2    Q.   Look at the claims docket?

3    A.   No.

4    Q.   Did anyone tell you how many proofs of claim had been

5    filed?

6    A.   No.

7    Q.   The amounts of the claims?

8    A.   No, other than what's stated in the fee apps.

9    Q.   Could you please turn to page 32 of 87 on questionable

10   legal research?

11   A.   Okay.

12   Q.   I'm looking at the one, two, three, four, five, sixth item

13   on the page.

14         MR. DEFILLIPPO:  What page?

15         MR. BENNETT:  Thirty-two of 87, questionable legal

16   research, Tab 11.

17   A.   I see it.

18   BY MR. BENNETT:

19   Q.   You see that item?

20   A.   Yes.

21   Q.   Could you please tell me why it wound up on this list?

22   A.   Because there was a question whether -- well, for a couple

23   reasons.  First of all, it doesn't say what the nature of the

24   research was, number one.  And number two, as you can see from

25   the notation, there was a question whether this research was

1  duplicative of what LK had done --

2  Q.   Okay.

3  A.   -- or was doing.

4  Q.   And do you know what a Rule 12 Motion is?

5  A.   No.

6  Q.   And do you know what Fletcher refers to?

7  A.   The Fletcher matter as described in the fee application.

8  Q.   Was there one matter with Fletcher, or more than one

9  matter with Fletcher?

10  A.   I don't recall.

11  Q.   Does this entry look right to you?

12  A.   What do you mean look right?

13  Q.   Well when you proofread it, what would you have done to

14  make sure it was right?

15  A.   Checked it against the actual billing entry.

16  Q.   Okay.  Would you do that for us?

17  A.   Which fee app?

18  Q.   It would be first fee app, 5/16/99.

19  A.   And --

20  Q.   The date is --

21  A.   -- under which matter?

22  Q.   -- May 16th of '99.  Well, there seems to be a problem.  I

23  can't find this one.  So you'll have to help me.

24  A.   Does Your Honor want me to read through this, each and

25  every entry here?

1        THE COURT:  I don't want him to do it now.

2        MR. BENNETT:  Okay.

3    BY MR. BENNETT:

4    Q.  This one was important enough to write a comment about.

5    So before you wrote the comment, would it -- was it -- would

6    you have checked the entry?

7    A.  I would think so.

8    Q.  If we don't find the entry in the book, does it mean that

9    you didn't check it?

10   A.  No.  It means that I might have checked it, and it was

11   supposed to be stricken from this, and it wasn't.

12   Q.  What measures did you take to determine that the things

13   that were supposed to be stricken were stricken?

14   A.  I would have deleted this from the chart.

15   Q.  Well, let me ask the question a different way.  How can we

16   tell now if the problem was you didn't strike it to begin

17   with, or if the problem was a clerical employee didn't follow

18   your instructions?  Could we possibly tell?

19   A.  Well, it doesn't matter whether a clerical employee did or

20   didn't do it.  I'm ultimately responsible for it.  So if I

21   should have struck it, and didn't, I'm not going to sit here

22   and blame a clerical employee.  It's ultimately my

23   responsibility.  That's why my name is on the report, and not

24   the clerk.

25   Q.  Please go to 31 of 87 in questionable legal research.

1   A.   Okay.

2   Q.   Fifth line from the bottom.  It's a 5/1/99 entry by Shawna

3   Ballard.

4   A.   Okay.

5   Q.   Could you please read the description of that one?

6   A.   "Research and analyze Fletcher's unjust enrichment and

7   set-off defenses and counter claims."

8   Q.   Did you do anything to find out what Fletcher's unjust

9   enrichment and set-off defenses and counter claims were?

10  A.   No, because the issue here was the research.  What

11  research was done?  And it doesn't describe the research.

12  Q.   And is your testimony that research unjust enrichment and

13  set-off defenses and counter claims doesn't mean anything to

14  you?

15  A.   What were they researching in reference to unjust

16  enrichment?  Affirmative?  Defensive?  What's the topic?

17  Research unjust enrichment means nothing.

18  Q.   And did you proofread the inclusion of this item in the

19  report?

20  A.   I proofread every one.

21  Q.   And did this one belong here?

22  A.   I don't recall.

23  Q.   Do you want to try to find it in the first interim fee

24  application which is right there?  Or --

25  A.   If it's not there, it shouldn't be here.

1    Q.   Is it there?

2    A.   I have no idea.  Do you want me to read every page of it?

3    I'll --

4    Q.   You have no idea is the point.  The item fifth from the

5    top, "LK $230 per hour, $368, Research regarding fraudulent

6    conveyance law in Delaware regarding Fletcher."

7    A.   I see it.

8    Q.   Will you accept my representation that it's inaccurate?

9    Or do you think it's accurate?

10   A.   Inaccurate in what sense?  What are you representing to me

11   that's inaccurate?

12   Q.   That it's wrong.

13   A.   That it's what?

14   Q.   Is it correct, or is it wrong?

15   A.   What's your representation?  You said would I accept your

16   representation.  I'm asking what you're telling me.

17   Q.   I'm asking the questions.  Is it right?  I withdraw my

18   prior question.  Is it right or is it wrong?

19   A.   No idea sitting here looking at it.

20   Q.   Did you check it?

21   A.   Yes.

22   Q.   So if it's wrong, you made a mistake?

23   A.   That's right.

24           MR. BENNETT:  Have you withdrawn the objections on

25   inadequate meetings and hearings?

1        MR. DEFILLIPPO:  I think so.  What section is that?

2    (Pause in proceedings)

3  BY MR. BENNETT:

4  Q.  Now, page 1 of 87, attorneys performing paralegal

5  functions.

6  A.  Which exhibit?

7  Q.  Attorneys performing paralegal functions is --

8        (Pause in proceedings)

9        MR. DEFILLIPPO:  We're not objecting to that.

10        MR. BENNETT:  You're not objecting to that one?

11  Okay.

12  BY MR. BENNETT:

13  Q.  Questionable legal research, Tab 11 again, page 30 of 87.

14  A.  Okay.

15  Q.  Sixth line down, LK 230, 1.5.

16  A.  All right.

17  Q.  What was wrong with that description?

18  A.  I'd probably remove that from the chart.  In fact, I would

19  remove it from the chart.  I don't recall what the objection

20  to it was at the time that I did this.

21  Q.  And you determined that by reading that just now?

22  A.  Excuse me?

23  Q.  And you determined that by reading it?

24  A.  Yes.

25  Q.  And what about it, based on your reflection, now makes

1    this entry acceptable?

2    A.   I think it's pretty clear to me that the question was

3    whether New York Courts would apply decisions of foreign

4    corporation, or foreign jurisdictions, whatever it should have

5    been.   I would remove it, again.   It's adequately described

6    from my point of view sitting here.

7    Q.   I'm going to hand you page 250 of the first -- oh, you

8    have it -- first application of Hennigan, Mercer & Bennett,

9    page 250, last item.

10   A.   I see it.

11   Q.   Could you please read that to the Court?

12   A.   "Research whether New York State Courts will apply New

13   York law to issue involving internal corporate decisions of

14   foreign corporation."

15   Q.   Does that description make sense?

16   A.   Yes.

17   Q.   Does the description that you transcribed make sense?

18   A.   It does to me.

19           B.   Excuse me one second, please.   The topic of

20   inadequate description, which is Tab -- oh, it's not pursued.

21   I'm sorry.   I'll skip that one.

22           THE COURT:   How much longer are you going to be with

23   this witness?

24           MR. BENNETT:   I think I can rather quick -- I think I

25   have about eight more --

1          THE COURT:  All right.

2          MR. BENNETT:  -- from my selection.

3          THE COURT:  Because I have the 3 o'clock and a 4

4    o'clock.

5          MR. BENNETT:  I'm sorry, Your Honor.

6    BY MR. BENNETT:

7    Q.  Could you please go to questionable legal research again,

8    page 39 of 87?  And I direct your attention to the bottom two

9    entries.

10   A.  Okay.  Appear to be a dup.

11   Q.  Shouldn't have been there?

12   A.  That's right.

13   Q.  Questionable legal research page 58 of 87.  There are two

14   entries for January 1st, '01.  Are they duplicates?

15   A.  January 1st.  You mean January 2nd?

16   Q.  I'm sorry, January 2nd, '01.  I apologize.

17   A.  The second one appears to be a dup, yes.

18   Q.  Does it belong there?

19   A.  Not if it's a dup, it doesn't.

20   Q.  Further down the page, January 3rd, '01 and January -- two

21   entries, January 3rd, '01, James O. Johnston.

22   A.  Same response.  It appears to be dups and shouldn't be

23   there.  The second entry should be out.

24   Q.  Would you go down to the January 4th, '01 entry on the

25   bottom of 58 of 87, and go to the next page at the top?

1   A.   Right.   Same answer.   It appears to be a dup, and the

2   second one should not be there.

3   Q.   Apart from these, is the rest of the report accurate?

4   A.   To the best of my knowledge.

5   Q.   Let's do some more.

6        (Pause in proceedings)

7   Q.   Please turn to block group description which is at issue,

8   one that you're continuing to press, page 3 of 87.  I think

9   that's number two.

10            MR. DEFILLIPPO:   Tab two.

11            MR. BENNETT:   Tab two.

12            THE COURT:   What page again?

13            MR. BENNETT:   Page 3 of 87, and page -- page 3 of 87.

14  BY MR. BENNETT:

15  Q.   I'm looking at the fourth and third from the bottom

16  entries.   Are they correct?

17  A.   As far as I know sitting here, they are.   You're talking

18  about the -- so we're sure -- the 2/24?

19  Q.   No, the 8/5/99 and the 8/5/99, page 3 of 87.

20  A.   Wait a minute.   I'm on the wrong page.   Now, the second

21  one appears to be a dup, and shouldn't be there.

22  Q.   Is there anything wrong with the description?

23  A.   What do you mean is there anything wrong?   You mean why is

24  it here?

25  Q.   Yes.

1    A.   It's here because it's a blocked entry.

2    Q.   Is it really?

3    A.   The activities are not individually described with

4    corresponding time.

5    Q.   Is there an alternative explanation that might explain

6    that time entry?

7    A.   I don't know what you mean.

8    Q.   Is it possible that Mr. Bennett -- that's me -- was in his

9    office and was speaking with Mr. Gerger while Ms. Ballard was

10   on the telephone?

11   A.   If it is, shame on you for not saying that in the

12   description.

13   Q.   I think I did say it that way.

14              MR. DEFILLIPPO:   Objection.

15              THE COURT:   Sustained.

16   BY MR. BENNETT:

17   Q.   Block group description, page 4 of 87.   Are there any

18   entries on this page that are wrong?

19        (Witness reviews the page)

20   A.   What was the question?

21   Q.   Are there any items on this page that are incorrectly

22   transcribed?

23   A.   I don't know.

24        (Pause in proceedings)

25   Q.   Please compare the entry for 9/13/99 in the third interim

1  fee application.

2  A.   I don't have the third interim here.

3       (Pause in proceedings)

4            MR. BENNETT:  Your Honor, while Mr. Johnston is

5  finding that, I would like to make a motion that this report

6  be excluded on the basis that it's completely unreliable, as

7  demonstrated by the testimony of the proffering party's

8  witness.  I do believe it would expedite proceedings greatly.

9            THE COURT:  I'm going to deny that.  You can go ahead

10  and cross examine on the point.  But I won't exclude the

11  entire report.

12       (Pause in proceedings)

13            MR. BENNETT:  I apologize for the delay.

14  A.   What are you pointing to?  Which one?

15  BY MR. BENNETT:

16  Q.   Is there a mistake?

17  A.   Now, it looks like the entry actually contains more group

18  entries than is actually contained in my chart.

19  Q.   What about the time?

20  A.   The time on the bill says three and a half hours.  The

21  time on the chart says three and a half hours.

22  Q.   We'll move on to -- but there's more in the description

23  than you listed, right?

24  A.   Yes.

25  Q.   Thank you.  Block group description, page 6 of 87, third

1  item from the top.  Is it correct or incorrect?

2  A.  Talking about the 10/17/99 entry by SB?

3  Q.  Yes.

4  A.  I have no idea.  Assuming it is.  Which fee app?  Which

5  page?  Which page number?

6  Q.  I think actually you need to find it for me.

7      (Pause in proceedings)

8  A.  You want me to wade through this entire thing?

9  Q.  I don't think the Judge does.  Do you know if you can find

10  it or not?

11  A.  No, I couldn't find it sitting here right now, no.

12  Q.  Do you know for a fact that it's in there?

13  A.  I'm assuming it is.  That's why it's on the chart.

14  Q.  Do you know for a fact that it's in the document -- fee

15  application?

16  A.  Well without reviewing that thing sitting here now, I

17  can't state it as a fact, nor would I without the opportunity

18  to review the entire document.

19  Q.  So do you have any personal knowledge as to whether any of

20  these entries are really in there?

21  A.  I reviewed every one of them against the actual billing.

22  So, yeah, I do have personal knowledge.

23  Q.  Okay.

24  A.  That's personal knowledge.  I reviewed them.

25  Q.  No, I --

Marquess - Cross                                    87

1   A.   I prepared them.  I edited them.

2   Q.   I'll ask the question again.  Let's just use this page.

3   Do you have any personal knowledge as to whether the first

4   entry on this page is in that document, is in the fee

5   application?

6   A.   If I hadn't have seen it, it wouldn't be in here.

7   Q.   Sir, I'm going to ask you a series of yes or no questions.

8   Do you know personally today whether the item on the top of

9   this page is in the interim fee applications or not?

10  A.   I already said no to that question earlier.

11  Q.   Do you know whether the second one is in that document or

12  not?

13  A.   Same answer.

14  Q.   Could you please answer again, different question?

15  A.   I'm sorry?

16  Q.   It's a different question.  Is the entry -- do you have

17  personal knowledge today of whether the second entry on that

18  page, page 14 of 87, is in fact in one of the interim fee

19  applications filed by Hennigan, Bennett & Dorman?

20  A.   And my answer would be the same.  Unless I went through

21  each and every one I couldn't answer that question today.  So

22  the answer is no.

23  Q.   Thank you.  With respect to the third item on that page,

24  do you have personal knowledge of whether that entry is in

25  fact in the fee applications filed by Hennigan, Bennett &

1  Dorman?

2  A.  Same answer.

3  Q.  Would you please answer the question.

4  A.  I -- the answer is no.

5       THE COURT:  It's not necessary to do that.  I'm not

6  going to exclude it.  If you have -- if you want him to go

7  through it, I'll let him go through it.

8       MR. BENNETT:  Okay.

9       THE COURT:  But I'm not going to assume it's not in

10 there or it is in there.  You can use your time as you want.

11 We're going to have to continue this anyway.

12       MR. BENNETT:  I know, Your Honor.  I feel like this

13 is an enormous waste of time.  But I feel like I have to make

14 a record.

15 BY MR. BENNETT:

16 Q.  Could you please look at page 17 of 87 on block group

17 description?  Are there any mistakes on this page?

18      (Witness reviews the page)

19 A.  It appears to be that the last entry on the page is a dup

20 and should not be there.

21 Q.  Block group description, page 18 of 87.  Is this page true

22 and correct in all respects?

23 A.  There appear to be duplicate entries on this page.

24 Q.  One, two, three?  How many?

25 A.  I don't know.  I don't have a pencil.  I'll check them off

1    if you want me to count them.  I'd rather tell you which

2    entries I consider duplicate.  It would be easier.

3    Q.  Try your best.

4    A.  The fourth entry on the page appears to be a dup.  The

5    fifth entry appears to be a dup.  And the last entry appears

6    to be a dup.

7    Q.  How about the next page?

8    A.  Second entry appears to be a dup.

9    Q.  How about page 20 of 87?

10   A.  Fourth entry appears to be a dup.  Seventh entry is a dup.

11   Q.  Is it otherwise correct?

12   A.  As far as I can tell on quick review.

13   Q.  Why don't you go back a page?  Does that help you find an

14   additional error?

15   A.  Going back to 19?  Is that what you're referring to?

16   Q.  Yes.

17   A.  Yeah, the first entry on page 20 appears to be a dup.  I

18   thought I already addressed that.

19   Q.  How many duplicate entries are there on page 20?

20   A.  I don't know.  I didn't take my pencil and count them.

21   Q.  Okay.  Could you please count them now?

22   A.  Three.

23   Q.  Three.  The first -- it's correct that the first, the

24   fourth, and the seventh are all duplicate entries?

25   A.  Yes.

Marquess - Cross                                      90

1   Q.  How about page 21?

2        (Witness reviews the page)

3   A.  The fifth entry, the time entry of .10 appears to be a

4   dup.

5   Q.  Page otherwise completely accurate and correct?

6   A.  Appears to be, based on sitting here.

7   Q.  Why don't we do what we did the last time we turned back

8   to page 20?  And I'll ask the question again, are there any

9   other errors on page 21?

10  A.  The second entry with the .10 time entry appears to be a

11  dup.

12  Q.  It's a duplicate of which one?

13  A.  Of the one from the prior page, page 20.

14  Q.  Second to last one?

15  A.  Yes.

16  Q.  So they are four entries away, but they're a dup?

17  A.  Appears to be.

18  Q.  Page 28 of 87.

19  A.  Which exhibit?

20  Q.  Exhibit -- oh, I'm sorry -- inadequate description.

21       MR. BENNETT:  Oh, is this one that you've waived?

22     (Pause in proceedings)

23       MR. BENNETT:  I'm sorry.  That one's been waived.

24       THE COURT:  Well, let's take a break and we'll come

25  back to this another day, so I can hear my other matters.

1    Sorry, you're still under oath.  When are the parties

2    available?  I have some time free the 28th in the afternoon,

3    May 28th.

4            MR. DEFILLIPPO:  I'm free that day.

5    A.   What day of the week is that?  Is that a Tuesday?

6            THE COURT:  Tuesday after Memorial Day.

7            MR. DEFILLIPPO:  I'm free that day, Your Honor.

8            MR. BENNETT:  That's the day after Memorial Day?

9            THE COURT:  Yes.

10           MR. BENNETT:  I don't think, Your Honor, I'm free

11   that day.  I don't -- I think I left my calendar in local

12   counsel's office.  And if Your Honor does have a full day,

13   this is quite expensive for us to come all the way across the

14   country.  I do think we're going to need some more time if we

15   have to go through this in a very particularized basis.

16           THE COURT:  Well the first full day I have is August

17   21st.

18           MR. BENNETT:  Is that the last week in August?

19           THE COURT:  Third week in August.

20           MR. BENNETT:  What day is that?

21           THE COURT:  Wednesday.

22           MR. JOHNSTON:  It's a Wednesday, but it's not the

23   last week.

24       (Pause in proceedings)

25           MR. BENNETT:  I am not having a good day.

1    A.   It'll be my vacation.

2          MR. BENNETT:  August which day?

3          THE COURT:  Twenty-first.  I think the witness is on

4    vacation that day.

5          MR. BENNETT:  Oh.  What's your next full --

6    A.  Do you have a full calendar there, Your Honor?  Is that

7    the last two weeks of August that's covered.  That's

8    through --

9          THE COURT:  Yes.

10   A.   -- Labor Day?

11         THE COURT:  Yes.

12   A.  I am on vacation that week -- those two weeks.

13         THE COURT:  Well, I have the day after Labor Day

14   available.

15         MR. BENNETT:  The third?

16         THE COURT:  The third.  Or the fifth.

17         MR. BENNETT:  Obviously I'd prefer the fifth, Your

18   Honor.  But I can definitely do that day.

19         THE COURT:  Well let's do the fifth.

20         MR. DEFILLIPPO:  Okay.

21         THE COURT:  I'll reserve the entire day.

22         MR. BENNETT:  Thank you.  I really appreciate that,

23   Your Honor.

24         MR. DEFILLIPPO:  What time, Your Honor?

25         THE COURT:  Let's say 9:30.

1      MR. JOHNSTON:  Your Honor, may I make a suggestion

2  that we move into evidence the exhibits that the Liquidating

3  Trust has agreed be submitted, so that we don't have to haul

4  all these boxes back here again?

5      THE COURT:  Yeah, but why don't you do it by

6  stipulation so I don't have my time wasted?  All right.  I'm

7  going to take a short break, and hear the rest of the

8  Worldwide Direct matters.

9      MR. DEFILLIPPO:  Your Honor, are we adjourned for the

10 day on this matter?

11     THE COURT:  We are.

12     MR. JOHNSTON:  And, Your Honor, what time on

13 September 5th?

14     MR. DEFILLIPPO:  9:30.

15     THE COURT:  9:30.  Is that okay?

16     MR. JOHNSTON:  That's fine.

17 A.  Am I excused?

18     THE COURT:  You're excused.  All right.  We'll stand

19 adjourned.

20   (Pause in proceedings)

21     THE COURT:  I will grant the motion to have your

22 deposition exhibits under seal.

23     MR. BENNETT:  Actually, Your Honor, I was a little

24 shaken from the beginning of the hearing, and I forgot

25 something.  The memo he complained about, he stipulated to its

94

1    admissibility.

2            MR. DEFILLIPPO:  I did not.

3            MR. BENNETT:  May I approach?

4            THE COURT:  Whether it's admissible or not doesn't

5    address the issue as to whether it should be under seal.

6            MR. BENNETT:  Oh, I have no problem with it being

7    under seal.  But there was an --

8            THE COURT:  That's --

9            MR. BENNETT:  -- accusation of improper conduct.

10           THE COURT:  Well, I want it under seal, so I will

11   direct -- first ask to whom you served it on.

12           MR. BENNETT:  Who did we serve it on?  Who did we

13   serve it on, Jim?

14           MR. JOHNSTON:  We served it on Mr. DeFillippo, Mr.

15   Kortanek, Mr. Ralston of the Munsch, Hardt firm, and the

16   Office of the United States Trustee.

17           THE COURT:  I'm going to direct you to advise each of

18   those that the exhibit is under seal.  And I will direct the

19   Clerk's Office to place it under seal.  And I'll ask counsel

20   to get me a Form of Order to that effect.

21           MR. DEFILLIPPO:  Thank you, Your Honor.

22           THE COURT:  All right?  Thank you.

23        (Court adjourned)

24

25

95

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          6-27-02
Signature of Transcriber                      Date