## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| WORLDWIDE DIRECT, INC., | ) Case Nos. 99-108 (MFW) |
| et al., | ) through 99-127 (MFW) |
| | ) |
| Debtors. | ) (Jointly Administered Under |
| | ) Case No. 99-108 (MFW)) |

### OPINION[1]

This case is before the Court on the Objection of the
Liquidating Trustee to the Sixth and Final Verified Application
of Hennigan, Bennett & Dorman ("HBD") for Allowance of
Compensation and for Reimbursement of Expenses ("the Final Fee
Application"). For the reasons stated below, we sustain the
objection in part and reduce the fees requested accordingly.

### I.    FACTUAL BACKGROUND

On January 19, 1999, Worldwide Direct, Inc., SmarTalk
TeleServices, Inc., and several affiliates (collectively "the
Debtors") filed voluntary petitions under chapter 11 of the
Bankruptcy Code. HBD was retained as counsel for the Debtors.
Immediately prior to the filing, the Debtors had executed an
asset purchase agreement with AT&T for the sale of substantially
all of the Debtors' assets. Pursuant to auction procedures
approved by Order dated February 26, 1999, the sale was

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is applicable to contested
matters pursuant to Rule 9014.

advertised and prospective alternative bidders were contacted, but ultimately no other bidder submitted an alternative offer for the Debtors' assets and businesses. By Order dated March 18, 1999, we approved the sale to AT&T pursuant to the original asset purchase agreement.

On April 27, 2000, the Debtors and the Official Unsecured Creditors Committee ("the Committee") filed a Second Amended Joint Consolidated Liquidating Plan of Reorganization ("the Plan") which was ultimately confirmed by Order dated June 7, 2001. Under the Plan, Goldin Associates, L.L.C. ("the Liquidating Trustee") was appointed to liquidate the Debtors' remaining assets, review claims, and make a distribution to creditors.

Throughout the case, HBD and the other professionals served monthly bills on interested parties and filed quarterly fee applications which were generally approved. On August 14, 2001, HBD filed the Final Fee Application, which seeks fees of $5,872,609.90 (after voluntary reductions of $763,225.23) and expenses of $1,042,422.46.

The Liquidating Trustee filed an objection to the Final Fee Application on December 3, 2001, based on a draft fee audit report ("the Fee Audit Report") performed by Legal Cost Control ("the Fee Auditor") which raised 24 categories of objections. A Supplemental Objection was filed by the Liquidating Trustee on

2

March 1, 2002, which objected principally to the allowance of fees for temporary attorneys and paralegals used by HBD for document review and analysis. The sum of the categories of objections raised by the Liquidating Trustee totals $1,740,695.95 in fees and $988,641.05 in expenses.

HBD filed a Reply to the Liquidating Trustee's Objections on March 15, 2002, and an initial hearing on the Final Fee Application was held on May 16, 2002. A final hearing was held on December 5, 2002, where the scope of the Objections was narrowed to four categories. The matter is ripe for decision.

II.  JURISDICTION

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(1), (b)(2)(A), (B), & (O).

III.  DISCUSSION

A.  Admissibility of Fee Audit Report

At the hearing, HBD objected to our consideration of the Fee Audit Report, asserting that it was unreliable and not based on any acceptable method of review. Although the Fee Auditor asserted that his analysis was done in accordance with "generally accepted legal auditing principles," he acknowledged that there is no such thing and that, instead, he utilized internal

procedures only (which he refused to produce asserting they are proprietary). Although the engagement letter and other promotional material described what his firm did, the Fee Auditor testified that they did not explain what he did in this case. Consequently, we agree with HBD that the Fee Audit Report cannot be considered an expert report done in accordance with generally accepted methodologies of performing such a report. See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993) (noting that pertinent considerations in determining the reliability of expert testimony include whether the method has been subjected to peer review and accepted within the scientific community).

Even as a factual witness, however, the Fee Auditor was less than helpful. The Fee Auditor testified that in preparing the report he only reviewed the fee applications themselves. He did not review any pleadings, transcripts of hearings, the docket or claims in the case to familiarize himself with the issues or litigation that HBD handled. Nor did he talk to HBD or to anyone else involved in the case to ascertain what HBD had done.

On cross examination of the Fee Auditor it became evident that the Fee Audit Report was factually inaccurate in numerous ways. For example, the Fee Auditor retyped the HBD time entries into his computer base and there were numerous errors in that process (in description and in amount of time recorded).

4

Further, in doing so, the entries were removed from their categories and other entries that provided context to what was done. In addition, the Fee Auditor admitted that there were duplications in his categories of objections; that is, some time entries or expenses were objectionable on more than one basis. Therefore, the overall objection to the fees and expenses was less than the sum of the categories ($2,729,337). The Fee Auditor could not identify the exact amount of reduction being requested, however. Finally, the Fee Auditor was not aware that HBD had already agreed to reduce its fees and expenses. Therefore, there were some items in the Fee Audit Report which had already been reduced (namely, charges for copies and facsimiles).

Because the Fee Auditor did not follow an accepted methodology of performing a fee examination and the Fee Audit Report itself has numerous factual errors, we conclude that it is not reliable. We, therefore, have reviewed the Final Fee Application itself to determine the validity of the remaining objections of the Liquidating Trustee.

    B.   Remaining Objections

        1.   Blocked/Grouped Description

The Liquidating Trustee continues to press an objection to the entries identified as "blocked/grouped" in the Fee Audit Report. It appears from our review of these entries that the

5

Liquidating Trustee is objecting because the time is "lumped" and it is unclear how much time was spent on each function within the entry.

"Courts have refused repeatedly to approve unitemized disbursements for services that are lumped together in a single entry, because such action inhibits the court from estimating the reasonableness of the individual services and their value to the debtor's estate." In re Ward, 190 B.R. 242, 246 (Bankr. D. Md. 1995). See also, In re Green Valley Beer Corp., 281 B.R. 253, 259 (Bankr. W.D. Pa. 2002); In re Poseidon Pools of America, Inc., 180 B.R. 718, 731 (Bankr. E.D.N.Y. 1995).

The Court in In re Leonard Jed Co. noted that lumping is not favored because

> One, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable. Two, it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.

103 B.R. 706, 713 (Bankr. D. Md. 1989). See also, In re Recycling Ind., Inc., 243 B.R. 396, 406 (Bankr. D. Colo. 2000).

While the objection is technically correct, we do not find generally that the time entries are lumped to such an extent that we cannot ascertain whether an appropriate amount of time was spent on each task. It appears that all the activity within many of the entries related to one issue (i.e., cash collateral or the

6

sale of assets) rather than unrelated issues.  Further, the time entries generally combined only work on that one issue plus a telephone conference with the client or opposing counsel on that same issue.  We do not find those types of entries objectionable.

However, there were some entries that combined more than one discrete task and issue from which we cannot determine the amount of time devoted to each.  Therefore, we are unable to determine if the amount of time spent on each task was reasonable.  Consequently, we will disallow those entries identified on Exhibit A hereto which total $6,205.25 in fees.

### 2.   Secretarial/Clerical Functions

The Liquidating Trustee also objects to several entries that it asserts were secretarial or clerical in nature and, therefore, inappropriately performed by attorneys or paralegals charging rates from $80 to $325 per hour.  The Third Circuit has cautioned that simply defining a task as "clerical" is not helpful, the question is "whether comparable non-bankruptcy firms typically charge the particular task to their clients as paralegal services [and] the market rate at which such services are provided."  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 854 (3d Cir. 1994).

At first blush, entries identified as "data entry" appear to be secretarial only.  However, from other entries by the identified time keepers and the testimony presented at the final

hearing, it is clear that the work done was not merely secretarial or clerical. HBD was required, at the insistence of the Committee to secure and maintain the Debtors' books and records after the sale to AT&T. In addition, HBD was required to prepare a log identifying the categories of documents which it had and a log of those documents covered by any applicable privilege. Thus, the work performed was not simply typing a list of documents, it also included analysis of the documents to permit their proper identification and to determine if any privilege applied. Therefore, we conclude that this function did require the skill of a professional and would normally be billed to a client.

Similarly, we conclude that many of the other entries which the Liquidating Trustee identifies as secretarial or clerical also required professional skills. Those entries include preparing files or exhibits for discrete legal issues and disputes (cash collateral, claims objections). The analysis necessary to determine what documents to be included in each such file is not merely clerical. See, e.g., Doe v. Ward, 282 F. Supp. 2d 323, 334-35 (E.D. Pa. 2003) (holding that, in complex litigation, it is often appropriate for an attorney to perform discovery-related clerical tasks since he is the one most familiar with the case and can do it the most cost-effectively).

However, many other entries are secretarial or clerical tasks that do not need a professional's training to perform. Such tasks include maintaining the notice list and calendar, and preparing labels of creditors' addresses. These are not the type of services that are typically billed to non-bankruptcy clients. Accordingly, we conclude that they are not compensable. We will disallow $9,920 in fees for those services identified on Exhibit B hereto.

### 3.   Questionable Legal Research

The Liquidating Trustee also objects to certain entries because it asserts that experienced attorneys do not need to do such research. We disagree. It is inconceivable that counsel would be expected to represent its client without performing research on legal issues and their application to the facts of the case. Therefore, there is no prohibition on compensation for counsel performing research.

The Liquidating Trustee also objects to these entries because it asserts they do not sufficiently identify the research done. We also disagree with this. In most instances, the time entries do identify the subject of the research. Though other entries were not very explicit, when viewed in context with the other work done by the attorneys at the same time (which is not evident from the Fee Audit Report), the Court is able to determine what issues were researched.

In addition, since the Fee Auditor was not a bankruptcy practitioner and did not inquire of anyone involved in the case about the nature of the research, he could not opine as to its significance.  The Court is familiar with the case (and the contested issues) and, therefore, is able from the descriptions and context to determine the appropriateness of the research done.  Unlike the assumption of the Fee Auditor, we find that the research was not done on routine matters about which any experienced bankruptcy attorney should be well-versed.

The Liquidating Trustee also objects specifically to the allowance of any fees for research and other work done by HBD investigating causes of action against the Debtors' former auditors and advisors because it was clear from early in the case that those actions would be prosecuted by the Committee. Therefore, he asserts there was no benefit to the estate by those services.

Mr. Bennett testified, however, that it was not clear the Committee would be prosecuting those claims and that he was specifically directed to do the work by his client.  In addition, he testified that HBD shared the results of this work with the Committee.  Thus, he contends that there was a benefit to the estate by HBD doing that investigation.  We agree and accordingly do not deduct anything for the research done by HBD in this case.

### 4.    Temporary Employees

Finally, and most significantly, the Liquidating Trustee objects to fees of approximately $900,000 for use of temporary attorneys and paralegals.

#### a.    Section 504 Prohibits Fee Sharing

Initially, the Liquidating Trustee asserts that HBD may not be compensated for those professionals because they were not employees of HBD and payment of their fees constitutes fee sharing which is prohibited.

Section 504(a) of the Bankruptcy Code prohibits fee sharing in bankruptcy cases:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share -
> > (1) any such compensation or reimbursement with another person; or
> > (2) any compensation or reimbursement received by another person under such sections.

11 U.S.C. § 504(a).  However, section 504(b) provides an exception for fees shared among members, partners, and associates in a law firm.  It states:

> (b)(1) A member, partner, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 503(b)(4) of this title with another member, partner, or regular associate in such association, corporation, or partnership, and may share in any compensation or reimbursement received under such sections by another member, partner, or regular associate in such association, corporation, or partnership.

Id. at § 504(b).

11

The Trustee argues that, since the temporary attorneys and paralegals were not regular associates of HBD, but remained employees of the temporary staffing agencies, HBD may not share any compensation for their services. See, e.g., Quesada v. U.S. Trustee, 222 B.R. 193, 198 (D.P.R. 1998) (holding that associates who were independent contractors and not members of trustee's law firm could not be compensated without having filed a separate retention application); U.S. Trustee v. In re Grenoble Apartments, II (In re Grenoble Apartments, II), 152 B.R. 608, 611 (D.S.D. 1993) (holding that attorney for chapter 11 debtor could not receive compensation for work performed by his son who was not a member of his law firm, though nunc pro tunc retention of son by debtor would allow him to be paid); In re Tarasiak, 280 B.R. 791, 793 (Bankr. D. Mass. 2002) (holding that section 504 prevented debtor's attorney in chapter 11 case from receiving fees for paralegal who prepared debtor's schedules because paralegal was not an employee but an independent contractor who required separate retention approval); In re Kewriga, 2002 Bankr. LEXIS 274, at *5 (Bankr. D. Mass. 2002) (holding that section 504 mandated denial of fees for conducting legal research done by attorney who was not a member, partner or regular associate of debtor's counsel); In re United Cos. Fin. Corp., 241 B.R. 521, 528 (Bankr. D. Del. 1999) (holding that Code prohibited debtors' accountants from subcontracting work to an affiliated limited liability corporation); In re Codesco, 15 B.R. 351, 353 (Bankr.

S.D.N.Y. 1981) (disallowing fees to appraiser for consultant
hired without disclosure and in violation of section 504).

HBD argues, however, that its retention of temporary
attorneys and paralegals is not prohibited fee sharing.  It
contends that "the purpose of the statute is to ensure that
lawyers preserve the integrity of the bankruptcy process and not
treat 'bankruptcy matters as matters of traffic'."  In re Warner,
141 B.R. 762, 766 (M.D. Fla. 1992), quoting In re Matis, 73 B.R.
228, 231 (Bankr. N.D.N.Y. 1987).  In this case, HBD notes that it
does not seek fees for referring the case to another; in fact it
did not originally want to perform the work in question but did
so only at the insistence of the Creditors' Committee.

Further, it argues that there was no agreement to share fees
at all.  HBD was obligated to pay the temporary employment
agencies even if it ultimately did not receive compensation from
the estate for the services rendered by the temporary employees.
HBD argues that this case is similar to In re Statewide Pools,
Inc., in which the Court held that a proposal by the trustee's
attorney to pay a former officer of the debtor on an hourly basis
to collect accounts receivable was not fee sharing prohibited by
the Code.  79 B.R. 312, 315-16 (Bankr. S.D. Ohio 1987).

We are not persuaded by the Statewide Pools decision.  The
case is distinguishable because it involved the retention of a
former officer of the debtor, not the retention of attorneys and
paralegals.  The latter are clearly professionals requiring

13

approval by the court.  11 U.S.C. § 327(a).  Cf.  In re Zerodec

Mega Corp., 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (compensation

of officers of debtor is subject to court approval).   In

addition, the Statewide Pools decision contains no analysis of

why the Court felt the proposal was not in violation of section

504.

     HBD cites other authority to support its position that a

professional retained in a chapter 11 case can retain independent

contractors without court approval.  Those cases are also

distinguishable.  The decision in In re Interstate Savings, Inc.,

did not address the issue presented here but instead dealt with

whether the work performed by the trustee's accountants exceeded

the scope of their engagement and were rendered by more senior

personnel than needed.  1998 WL 295654, *1 (Bankr. E.D. Pa.

1998).  Although there is a reference to a computer consultant,

it is not clear whether that person was an employee of the

accounting firm, and the Court did not address the issue of

whether payment of that individual was prohibited by section 504.

Id. at *4.

     Similarly, HBD's citation to In re Landmark Distributors,

Inc., is inappropriate.  195 B.R. 837 (Bankr. D.N.J. 1996).  That

case dealt with an award of attorneys' fees and costs under

section 303(i) against a petitioning creditor where an

involuntary bankruptcy petition was dismissed for bad faith.  Id.

14

at 839.  Consequently, it did not deal with the issue of who may
be retained and paid by a debtor in a chapter 11 case.

The ultimate question presented by section 504 in the
context of this case is whether the temporary attorneys and
paralegals used by HBD to perform work for the Debtors on behalf
of HBD were "regular associates" of the firm.  11 U.S.C. § 504(b)
(permitting sharing of fees by "member, partner or regular
associate" in a law firm).  We begin our analysis with the
admonition of the Third Circuit in Busy Beaver that our paramount
consideration in approving professional fees in chapter 11 cases
is what is appropriate in the market.  19 F.3d at 849.  In
considering the appropriate use and compensation of paralegals in
that case, the Third Circuit noted:

> The past two decades have witnessed a remarkable
> transformation of the legal market. . . .  A critical
> component of this transformed legal market is the
> incorporation of paralegals providing a wide range of
> legal services into the law firm tapestry, a component
> brought about by the cost-effectiveness of employing an
> intermediate level of professional to handle matters
> beyond the ken of the average legal secretary but not
> demanding the full education, experience, or skill of a
> licensed attorney. . . .  The availability of
> paralegals is a positive development from the point of
> view of conserving the debtor's estate, and we expect
> that, when feasible, members of the bar representing
> debtors will engage paralegals and other support staff
> when they are able to render legal services efficiently
> yet effectively, with the objective of alleviating the
> diminution of the estate's assets.

Id. at 851-52 (citations omitted).

The same can be said about the use of temporary employees in
the legal field.  See, e.g., Vincent R. Johnson & Virginia Coyle,

15

On the Transformation of the Legal Profession: The Advent of
Temporary Lawyering, 66 Notre Dame L. Rev. 359 (1990).  This
trend has been evident for at least 15 years.  See, e.g., Terry
Pristin, The Newest Temps in Law Firms: Lawyers, N.Y. Times, Feb.
24, 1998, at B7 ("the hiring of temporary lawyers, which started
as a trickle more than 10 years ago, is suddenly a growth
industry.  Nationwide, the temp lawyer business is growing at a
rate of 30 percent a year.").

The most recent trend has corporations and law firms using
attorneys and paralegals who are not even in this country to
perform legal work that would otherwise be done by attorneys and
paralegals in-house.  See, e.g., William O'Shea, Caseload Grows
for Advocates in Abstentia, Financial Times (London), Oct. 4,
2004, at Business Life 10; Jennifer Fried, Offshoring Work, Law
Departments Are Cutting Costs Sending Work Abroad, 26 Nat'l L. J.
37 (May 17, 2004).

The use of such professionals has reduced the cost to firms,
in training and in salaries.  Pamela Mendels, They'll Make it
Brief: Temp Lawyers Seek Limited Duty, Newsday, Feb. 29, 1988, at
Business 3 ("The law temp agencies' owners say their business is
fueled in part by increasingly cost-conscious law firms that are
unwilling to add permanent members to their staffs. . . .").  To
the extent that these cost-savings are passed on to clients and
debtors' estate, the use of temporary employees is laudable.

It has also allowed firms the flexibility to handle complex litigation in a short period of time with minimum cost (i.e., without the carrying cost of salaries and benefits for associates or paralegals waiting for the next big case to arrive). 66 Notre Dame L. Rev. at 377 ("The arrangement endeavors to facilitate short-term responsiveness through prompt adjustments in the supply of goods and services."). This ability to "ramp up" using temporary employees also promotes expediency in resolving chapter 11 cases, which is one of the goals of the Bankruptcy Code. See H.R. Rep. 95-595 (1977)(reprinted in 1978 U.S.C.C.A.N. 5963, 5975) ("speed and efficiency in bankruptcy is also essential because delay only operates to devalue assets, hinder financial rehabilitation, and prevent exercise of rights.").

If HBD had directly hired associates and paralegals on a temporary or contract basis to handle this particular case, there would be no question that HBD could bill the estate for their time and receive compensation for it. The difference in this case is that HBD hired them through an employment service. We do not believe that this distinction alone is dispositive. In fact, that is the typical payment arrangement in the marketplace today. 66 Notre Dame L. Rev. at 387-88 ("An attorney temporarily placed with a firm is normally paid from monies received by the agency from the employer.")

In this case, while the temporary personnel were employees of the employment agency and not employees of HBD, they

17

essentially acted like associates of the firm. They were provided desks, computers and all other things necessary to do their work within the HBD offices. They enjoyed many of the fringe benefits that the firm provided to their own associates (a weekly breakfast, coffee and other amenities). Their assignment to HBD was on a long term basis, in many instances for the length of the document review. Several of the temporary employees ultimately were hired by HBD.

In the legal market today, firms are relying on temporary attorneys and paralegals to perform many of the same tasks that traditional associates and paralegals have in those firms. "The variety of work for which temporary attorneys are hired is as broad as the practice of law. In addition to other types of legal assistance, it encompasses corporate representation, court appearances, depositions and general litigation." Id. at 388-89.

In this case the temporary personnel worked in the HBD offices, under the direct supervision of HBD attorneys, performing tasks similar to the tasks that regular associates of HBD performed. Such direct supervision supports a finding that the temporary personnel must be considered "regular associates" of HBD rather than outside lawyers. Id. at 427 ("A 1988 American Bar Association ethics opinion dealing with temporary lawyers states, in its discussion of [Disciplinary Rule] 2-107(a) and [Ethical Consideration] 2-22, that 'where a temporary lawyer is working under. . . close firm supervision. . ., such employment

does not involve "association with a lawyer outside the firm"
within the meaning of this Ethical Consideration.'  Therefore,
presumably the Model Code's attorney fee splitting rules do not
apply in cases of 'close supervision' [of temporary
attorneys].").

Based on all of these factors, we conclude that in essence
the temporary associates and paralegals cannot be considered
unassociated with HBD but were, in fact, "regular associates" of
HBD as that term is used in section 504(b).  As such, the firm
was able, notwithstanding section 504(a), to bill for their hours
and "share" in the compensation earned by them.

We do not believe that this ruling is contrary to the Code.
The history of section 504 was explained by the Court in Matis:

> Code § 504 represents a significant departure from
> prior bankruptcy law dealing with the sharing of
> compensation. . . . Generally stated, [under the
> Bankruptcy Act] the sharing of compensation between
> professionals in a bankruptcy case was not denounced
> except in a case where one of the professionals simply
> referred or forwarded the bankruptcy case to another
> professional who thereafter rendered all of the
> services. . . . [I]t is clear that Congress intended
> [in the Bankruptcy Code] to prohibit altogether the
> sharing of compensation in a bankruptcy case except
> where the sharing occurred between "a member, partner
> or regular associate in a professional association,
> corporation or partnership,". . . Thus, the practice
> permitted under former Rule 219 which allowed the
> sharing of compensation by attorneys, regardless of
> whether they were members or associates of the same
> firm, so long as they actually contributed services or
> expenses to the bankruptcy, is now prohibited by Code §
> 504.

73 B.R. at 230-31.

19

The reason behind the change was explained in <u>In re</u>

<u>Peterson</u>:

> Whenever fees or other compensation are shared
> among two or more professionals, there is incentive to
> adjust upward the compensation sought in order to
> offset any diminution to one's own share.
> Consequently, sharing of compensation can inflate the
> cost of a bankruptcy case to the debtor, and therefore
> to the creditors. . . . The potential for harm makes
> such arrangements reprehensible as a matter of public
> policy as well as a violation of the attorney's ethical
> obligations.

2004 WL 1895201, at *4 (Bankr. D. Idaho 2004) (quoting 4 Resnick

& Sommer, <u>Collier on Bankruptcy</u> ¶ 504.01 at 504-3 (15th ed. rev.

2004)).

This case does not present the circumstances which the Code

meant to address.  HBD was not referring a case to another

professional in order to receive a referral fee.  There was no

trafficking in bankruptcy cases or services.  <u>Cf.</u>, <u>In re Holmes</u>,

304 B.R. 292, 297 (Bankr. N.D. Miss. 2004) (holding that

attorney's practice of paying $5 incentive bonus to non-attorney

staff for encouraging clients to accept additional services was

impermissible fee sharing).  Nor is this an instance where work

was performed by two distinct lawyers or law firms, only one of

which was retained by the Court, thereby possibly avoiding the

disinterestedness rules or fiduciary obligations that

professionals owe to the estate.  <u>See, e.g.</u>, <u>Grenoble</u>

<u>Apartments, II</u>, 152 B.R. at 611; <u>Kewriga</u>, 2002 Bankr. LEXIS 274,

at *5.    The relationship between the temporary personnel and

HBD is much more than the tenuous relationships of the

professionals in those cases where courts concluded that there
was improper fee sharing.  See, e.g., Peterson, 2004 WL 1895201
(holding that practice of having attorney who shared office space
pay "rent" by attending section 341 meetings of clients of
landlord/attorney was prohibited fee sharing).

In particular, this case does not present the situation we
faced in the United Companies case.  In that case, a retained
professional had formed a limited liability corporation,
transferred most of its employees to that affiliate, and
subcontracted the bankruptcy work to it.  241 B.R. at 526.  That
subcontracting was not revealed to the Court until the continued
hearing on the retention application of the original
professional, almost eight months after the petition date and
four months after the original retention application was filed.
Id. at 524, 529.  We held that a separate retention application
was required for the limited liability corporation, because we
concluded that "[s]uch a subcontracting arrangement, if approved,
would eviscerate the protections of section 327(a) and allow a
third party (rather than the debtor or the Court) to determine
who should render professional services for the estate."  Id. at
528.  See also, In re AC and S, Inc., 297 B.R. 395, 404 (Bankr.
D. Del. 2003) (disapproving subcontracting arrangement between
asbestos claims processor and its subsidiary because it violated
sections 327(a) and 504(a)).

21

This case does not involve a separate corporation performing services under a subcontracting arrangement with HBD.  Instead, attorneys and paralegals, hired on a temporary basis by HBD through an employment service, are performing the services for which HBD was retained by the Debtors.  HBD remains the party with a fiduciary duty to the Debtors and the estate for the proper performance of those duties.  66 Notre Dame L. Rev. at 385 ("it seems clear that a law firm can be held civilly liable for the negligence of a temporary attorney it employs.").  HBD presented evidence that the temporary personnel were screened for conflicts and were expected to preserve the confidentiality of the client, just as regular associates were and that HBD supervised the temporary personnel in the same manner as it is supervised its associates and paralegals.

Consequently, we conclude that the temporary personnel hired by HBD through employment agencies must be considered "regular associates" of the firm for purposes of section 504.  Therefore, HBD may bill and receive compensation for their services from the Debtors' estates.

### b.    Disclosure

The Liquidating Trustee objected, however, to the payment of any compensation for the temporary personnel's services because no disclosure was made that they were being used and no separate retention application was filed for them.  It asserts that approval at this stage is not warranted.  See, e.g., In re

Arkansas Co., Inc., 798 F.2d 645, 650 (3d Cir. 1986) (retroactive retention of counsel warranted only in extraordinary circumstances).

HBD argues that a separate retention application was not needed when it retained the temporary employees, because its retention application was sufficient to cover them.  It also asserts that the Committee was aware of its retention of temporary employees to do the document review because it was discussed when the Committee insisted that HBD establish the document and privilege log.  HBD advised the Committee that it did not have the personnel necessary to do the work and would have to hire temporary employees.  HBD also states that the Court was aware of this practice because it was disclosed at various hearings where the issue of the document review was discussed. It was also disclosed prominently in the interim and Final Fee Applications.  HBD states that this is all that was necessary.

To support its position, HBD relies on the Keravision decision which held that "Rule [2014(b)] supports the unremarkable proposition that when the bankruptcy court approves the debtor's application to employ partner X of a law firm, all the attorneys at the firm may work on the case 'without further order of the court.'  A rule requiring the debtor to reapply to the bankruptcy court any time a different attorney performs billable work would be unworkable."  In re Keravision, Inc., 2002 U.S. Dist. LEXIS 1586, at *9 (N.D. Cal. 2002).

It has been held that temporary attorneys who are under the
close supervision of a law firm are not outside attorneys who
must be disclosed to the client under the Model Code of
Professional Responsibility (1980) or the Model Rules of
Professional Conduct (1989).

> [W]here the temporary lawyer is performing independent
> work for a client without the close supervision of a
> lawyer associated with the law firm, the client must be
> advised of the fact that the temporary lawyer will work
> on the client's matter and the consent of the client
> must be obtained.  This is so because the client, by
> retaining the firm, cannot reasonably be deemed to have
> consented to the involvement of an independent lawyer.
> On the other hand, where the temporary lawyer is
> working under the direct supervision of a lawyer
> associated with the firm, the fact that a temporary
> lawyer will work on the client's matter will not
> ordinarily have to be disclosed to the client.

66 Notre Dame L. Rev. at 427-28, citing ABA Comm. on Ethics and
Professional Responsibility, Formal Op. 88-356, 11 (1988).

Since we have found that the temporary personnel in question
were closely supervised by attorneys at HBD, we conclude that the
retention of HBD covered them as well and a separate retention
application was not necessary.

### c. Amount of Fees

While we conclude that compensation may be paid to HBD for
the services rendered by the temporary associates and paralegals
who worked on this case, the amount of the compensation is an
issue.  It was disclosed at the hearing that HBD billed the
estate for more than it paid for the services of the temporary
personnel.  (HBD estimated that the amount paid to the temporary

employment agencies was $600,000 while the estate was billed
approximately $900,000 for those services.)

HBD cites the Landmark Distributors case for the proposition
that a firm may bill temporary attorneys at a rate higher than
the firm pays the temporary agency.  However, the Landmark
Distributors case dealt with an award of attorneys' fees and
costs under section 303(i) against a petitioning creditor where
an involuntary bankruptcy petition was dismissed for bad faith.
195 B.R. at 839.  Consequently, it did not deal with the issue of
the appropriate fee that may be paid to counsel for a debtor in a
chapter 11 case.  In addition, the Court in Landmark Distributors
did not affirmatively hold that a firm may charge more than it is
charged by a temporary employment agency.  It simply noted the
allegation that the firm was charging more than the temporary
agency charged and did not make any deductions as a result of
that objection.  Id. at 850.  Thus, the Landmark Distributors
case is hardly the ringing endorsement of HBD's practice that HBD
contends.

HBD also asserts that, even by billing the temporary workers
at rates higher than it paid for them, it saved the estate a
considerable amount of money.  It could have used its own full-
time associates or paralegals to do the same work at rates from
$175 to $325 for associates and $140 to $155 for paralegals.
Instead, it charged only $71.50 to $75 per hour for the temporary
associates and $60 to $65 per hour for the temporary paralegals.

Although the rates HBD charged for the temporary personnel were higher than it paid to the employment agency ($42.25 to $60 per hour for associates and $18 to $35 for paralegals), Mr. Bennett testified that HBD did not make a profit on the use of the temporary personnel. Instead he testified that their hourly rates were set (and later increased) to account for the extra overhead they cost the firm. He testified that a spreadsheet detailing those extra costs had been prepared but was no longer available. However, other than a few computers, which the firm retained after the temporary employees were gone, he could identify no concrete additional costs the firm incurred for the temporary employees. In fact, they were placed in conference rooms and offices in space for which the firm was already paying rent. No additional support staff was hired for them; no additional furniture was bought.

We conclude that HBD has not met its burden of proving that the additional amount it seeks from the estate over the actual cost of the temporary personnel should be borne by the Debtors. Nor has it shown that the practice it advocates is normal in the marketplace. See 66 Notre Dame L. Rev. at 388 ("firms are reluctant to make a profit on services performed by temporary lawyers. . . ."). See also, Busy Beaver, 19 F.3d at 853-53 ("Like any sophisticated consumer of legal services, the bankruptcy court should compare the costs of 'equivalent' practitioners of the art (including their billing structures) as

well as the applicant's billing practices with 'equivalent clients'.")

Consequently, we will allow HBD only the cost to it of the temporary legal personnel used on this case.  We, therefore, will disallow $364,124.96 in requested compensation representing the difference between the $898,500 sought by HBD and the sum of the invoices of the temporary employment agencies of $534,375.04. (Exhibit 68.)


IV.   CONCLUSION

For the reasons stated above, we grant, in part, the objection of the Liquidating Trustee to the Sixth and Final Verified Application of Hennigan, Bennett & Dorman ("HBD") for Allowance of Compensation and for Reimbursement of Expenses and will allow compensation except as detailed above.

An appropriate Order is attached.

BY THE COURT:

Dated: October 29, 2004

Mary F. Walrath
United States Bankruptcy Judge

27

# Exhibit A: Blocked/Grouped Description

### Exhibit A: Blocked/Grouped Description

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 1/26/99 | Travel from Wilmington to Los Angeles, work on revision of Frontier stipulation, review of Century issues and review of research regarding derivative actions.<br>James O. Johnston | 7.30 | 2190.00 |
| 2/09/99 | Travel to Los Angeles (work on plane including review of Wilson Sonsini employment application, section 105 complaint, preliminary injunction papers, AT&T waiver letter, DTR background documents, Century background documents, and employee retention motion).<br>James O. Johnston | 7.60 | 2280.00 |
| 12/9/1999 | (J. Habel) Legal research regarding location of 30(b)(6) deposition; attend team meeting regarding motions; continue drafting motion for protective order; revise motion to amend complaint; finalize motion for a protective order, declaration, and order.<br>Temporary Attorneys | 4.50 | $321.75 |
| 12/10/1999 | (J. Habel) Legal research regarding bankruptcy cases interpreting Rule 30(b)(6) depositions in preparation for protective order; review all cases cited by Fletcher in motion for judgment on the pleadings regarding fraudulent conveyances and preferences.<br>Temporary Attorneys | 9.00 | $643.50 |
| 12/13/1999 | (J. Habel) Revise motion for a protective order on different grounds; revise draft motion to amend complaint; revise supporting declaration; revise complaint and reply to reflect change of date.<br>Temporary Attorneys | 2.50 | $178.75 |
| 12/20/1999 | (J. Habel) Draft initial draft of opposition to motion for judgment on the pleadings regarding claim 13 and legal research thereon; draft initial draft of opposition to motion for judgment on the pleadings regarding claim 11 and legal research thereon.<br>Temporary Attorneys | 5.50 | $393.25 |
| 4/6/2001 | Review and correct chart of documents reviewed and selected by Heller Ehrman during their October, 1999 visit; telephone conference with Mr. Gordon from Litigation Graphics regarding their recent inquiry on the shipment of the documents.<br>Tina Johnson | 1.20 | $198.00 |
| Total | | | $6205.25 |

# Exhibit B: Secretarial/Clerical Functions

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 1/27/99 | Review and revise calendar for case.<br>James O. Johnston | .60 | 180.00 |
| 1/29/99 | Calendaring of case dates.<br>Frank Lojero | 1.90 | 152.00 |
| 02/01/99 | Calendaring regarding Smartalk matters.<br>Frank Lojero | 2.10 | 168.00 |
| 2/02/99 | Prepare revisions/additions to case calendar.<br>Kathryn S. Bowman | 1.90 | 285.00 |
| 02/05/99 | Update computerized case calendar regarding<br>upcoming hearing dates.<br>Robert Kennedy | .30 | 45.00 |
| /09/ | Prepare revisions to master calendar.<br>Kathryn S. Bowman | 2.00 | 300.00 |
| 2/09/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.90 | 152.00 |
| 02/11/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.00 | 80.00 |
| 02/15/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.10 | 88.00 |
| 2/17/99 | Calendaring of Smartalk matters.<br>Frank Lojero | .90 | 72.00 |
| 03/02/99 | Calendaring of case issues.<br>Frank Lojero | 1.00 | 80.00 |
| 03/08/99 | Calendaring of case issues.<br>Frank Lojero | 1.60 | 128.00 |
| 3/18/99 | Prepare mailing of Commencment of case to be sent<br>out to Creditors with change of Addresses.<br>Frank Lojero | 1.20 | 96.00 |
| /19/99 | Calendaring of case issues.<br>Frank Lojero | .60 | 48.00 |

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|---|---|---|---|
| 03/22/99 | Review latest case calendar for pending deadlines and issues.<br>James O. Johnston | .30 | 90.00 |
| 4/01/99 | Calendaring.<br>Frank Lojero | 1.60 | 128.00 |
| 04/08/99 | Calendaring.<br>Frank Lojero | .90 | 72.00 |
| 04/13/99 | Calendaring.<br>Frank Lojero | .50 | 40.00 |
| 04/14/99 | Analyze and organize all orders in chronological order, for submission to the case files.<br>Frank Lojero | 1.50 | 120.00 |
| /04/99 | Update creditor list for Ms. Bowman.<br>Eric Sandin | 3.00 | 405.00 |
| 05/12/99 | Preparation of Special Notice List.<br>Frank Lojero | .60 | 48.00 |
| 05/14/99 | Prepartion of calendar.<br>Frank Lojero | 1.60 | 128.00 |
| 5/18/99 | Preparation of calendar.<br>Frank Lojero | 1.30 | 104.00 |
| 05/21/99 | Preparation of calendaring.<br>Frank Lojero | .50 | 40.00 |
| 05/24/99 | Preparation of calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 05/25/99 | Preparation of calendar.<br>Frank Lojero | .50 | 40.00 |
| 05/26/99 | Preparation of calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 05/28/99 | Preparation of calendar.<br>Frank Lojero | 1.10 | 88.00 |
| 6/11/99 | Preparation of case calendar.<br>Frank Lojero | .90 | 72.00 |

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 06/14/99 | Preparation of case calendar.<br>Frank Lojero | 1.60 | 128.00 |
| 06/15/99 | Preparation of case calendar.<br>Frank Lojero | .50 | 40.00 |
| 07/05/99 | Calendaring.<br>Frank Lojero | 1.10 | 88.00 |
| 07/08/99 | Calendaring.<br>Frank Lojero | 1.20 | 96.00 |
| 07/09/99 | Calendaring.<br>Frank Lojero | .50 | 40.00 |
| 07/10/99 | Calendaring.<br>Frank Lojero | 1.20 | 96.00 |
| 07/11/99 | Calendaring.<br>Frank Lojero | 1.00 | 80.00 |
| 07/28/99 | Calendaring.<br>Frank Lojero | 1.60 | 128.00 |
| 08/03/99 | Preparation of case calendar.<br>Frank Lojero | .90 | 72.0 |
| 08/04/99 | Preparation of case calendar.<br>Frank Lojero | 1.80 | 144.00 |
| 08/16/99 | Preparation of case calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 08/30/99 | Preparation of case calendar.<br>Frank Lojero | 1.10 | 88.00 |
| 07/26/99 | Prepare pendalflex folders for retaining records<br>for claimants.<br>La Saundra Redd | 6.50 | 520.00 |
| 08/31/99 | Create mailing labels for bar date notice to be<br>sent to additional rebate creditors.<br>David T. Okada | 1.30 | 312.00 |
|  | Prepare numbering labels for placement on boxes of<br>documents at SmarTalk's offices.<br>Robert Kennedy | 1.00 | 150.00 |

3

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| ▓▓▓ | Calendar Intrine deadlines.<br>Shawna Ballard | .10 | 30.00 |
| ▓9/99 | Prepare labels regarding Dewey Ballantine boxes.<br>Kathryn S. Bowman | 4.00 | 600.00 |
| 11/10/1999 | Prepare calendar items from 11/12/99 hearings continued to December.<br>Kathryn S. Bowman | 0.70 | $105 |
| ▓/5/1999 | Calendar critical dates regarding Fletcher adversary from Young Conaway's 10/31/99 memorandum.<br>Kathryn S. Bowman | 0.60 | $90.00 |
| ▓▓▓01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.00 | 240.00 |
| ▓▓▓01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.50 | 280.00 |
| ▓▓▓01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.50 | 280.00 |
| ▓▓▓/99 | Organize fagged documents for copying of the attorney's review.<br>Debbie Lambdin | 1.50 | 120.00 |
| ▓▓99 | Organize non-responsive documents to ensure they are in bates order.<br>Debbie Lambdin | 1.60 | 128.00 |
| ▓▓▓99 | Organize redaction envelopes.<br>Debbie Lambdin | 1.00 | 80.00 |
| 11/8/1999 | Calendar upcoming deposition dates.<br>Tina Johnson | 0.50 | $75.00 |
| 11/16/1999 | Calendar deposition dates and discovery dates from the pre-trial scheduling order; review pleading files for a pre-trial conference date or a recent status conference date to calendar pertinent litigation due dates in this matter.<br>Tina Johnson | 1.00 | $150.00 |

4

## Exhibit B: Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 11/16/1999 | Continue to make labels for all the red and blue flagged documents set aside for document production.<br>La Saundra Redd | 3.00 | $240.00 |
| 11/16/1999 | Label and file each Cooper and World Wide Direct/Donald Luftin and Jenerette redwell (containing documents) into storage boxes. Stack World Wide Direct/Donald Luftin and Jenerette boxes separate from the PriceWaterhouse boxes. Label each storage box by the Bates stamp start and end range.<br>Shelley Sumpter | 3.00 | $240.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/13/2000 | Organize privilege redwelds by production box number and label boxes.<br>Tina Johnson | 4.00 | $620.00 |
| 3/28/2001 | Generate production cd copies and label for Ms. Kontos.<br>Celestino Santos | 1.00 | $100.00 |

Total        $9920