UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No. 99-00108 (MFW) through |
| | . | Case No. 99-00127 (MFW) |
| | . | |
| WORLDWIDE DIRECT, | . | |
| INC., et al., | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| | . | |
| Debtors. | . | February 8, 2005 |
| . . . . . . . . . . . . . .. | | 11:37 a.m. |

TRANSCRIPT OF AGENDA HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Liquidating          Klehr, Harrison, Harvey, Branzburg,
Trustee:                        & Ellers, LLP
                             By:  STEVEN K. KORTANEK, ESQ.
                             919 Market Street
                             Suite 1000
                             Wilmington, DE  19801

                             Munsch, Hardt, Kopf, & Harr, PC
                             By:  MARK H. RALSTON, ESQ.
                             1445 Ross Avenue
                             4000 Fountain Place
                             Dallas, TX  75202
                             (Telephonic Appearance)

                             Wolmuth, Maher, & Deutzsch
                             By:  PAUL R. DEFILLIPO, ESQ.

Audio Operator:              Danielle R. Gadson

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For Hennigan, Bennett,        Hennigan, Bennett, & Dorman, LLP
and Dorman, LLP:          By:  JAMES O. JOHNSTON, ESQ.
                          601 South Figueroa Street
                          Suite 3300
                          Los Angeles, CA   90017

                          Young, Conaway, Stargatt,
                            & Taylor, LLP
                          By:  ROBERT S. BRADY, ESQ.
                          Brandywine Building
                          1000 West Street
                          17th Floor
                          P.O. Box 391
                          Wilmington, DE   19899-0391

3

1         THE CLERK:  All rise.  You may be seated.

2         THE COURT:  Good morning.

3         UNIDENTIFIED ATTORNEY:  Good morning.

4         UNIDENTIFIED ATTORNEY:  Good morning, Your Honor.

5         THE COURT:  You're going to have to sit at the table,

6    the middle microphone has been shut off.

7         MR. KORTANEK:  Good morning, Your Honor.  Steve

8    Kortanek, with Klehr Harrison.  We're co-counsel to the

9    liquidating trustee.

10        And essentially, Your Honor, we have two matters on

11   today's agenda scheduled to go forward.  One is our motion,

12   filed two cycles ago, to enforce Your Honor's order regarding

13   the Hennigan Bennett final fee application.  And then, in a

14   related vein, Hennigan Bennett did file a -- its own fee

15   application.

16        We have been proceeding with the -- with our motion

17   going first, as Item 2.

18        With me, today, is Mr. Paul DeFillipo of the Wolmuth

19   firm, who has been admitted pro hac vice, and if Your Honor

20   please, he can begin with Item 2.

21        THE COURT:  All right.  Thank you.

22        MR. DEFILLIPO:  Good morning, Your Honor.

23        THE COURT:  Please remain seated.

24        MR. DEFILLIPO:  Okay.  Thank you.

25        THE COURT:  Sorry.  While we have this temporary

**J&J COURT TRANSCRIBERS, INC.**

4

1  system in, make sure you're talking into the mike.

2       MR. DEFILLIPO:  Very well.  Your Honor, briefly, the
3  background I'm sure you're familiar with, but on July 1st, or
4  thereabouts, the plan became effective, the liquidating trustee
5  was appointed, and shortly after that, he asked the
6  professionals in this case for a seven percent fee reduction.

7       That would have come to $411,000.00 for the Hennigan
8  firm.  We attached the Hennigan firm's response to that
9  request, dated October 2nd, 2001, in which they indicated they
10 would not agree to a one penny reduction in their fees.

11      So, the trustee filed an objection.  The Court
12 disallowed approximately $380,000.00 of the Hennigan Firm's
13 application, based primarily on their markup of temporary
14 attorney time, which was, they -- they concede, the focus of
15 the hearing.

16      The Court entered an order which required
17 disgorgement of the excess.  And I wrote two letters to the
18 Hennigan Firm, November 1st and November 18th, attaching the
19 liquidating trustee's calculation of approximately $399,000.00
20 in fee overpayments to that firm and requesting that they make
21 payment in accordance with the Court's order.

22      On December 8th, the Hennigan firm wrote back and
23 said, we would not -- they would not pay us.

24      And on December 16th, we filed a motion to compel
25 payment, on the basis that a party just can't refuse to perform

**J&J COURT TRANSCRIBERS, INC.**

1  an order of the Court.  If they think it's wrong, they should
2  appeal from it.  The Hennigan firm did not appeal, nor did they
3  seek a stay.

4          After we filed the motion, the Hennigan firm made a
5  partial payment on account of the disgorgement order, but held
6  back about 231,000 and filed a supplemental fee application in
7  that amount.

8          We filed an objection to that supplemental fee
9  application on the basis that the supplemental fees do not meet
10 the standard, under Section 330, for approval, on the basis
11 that they are neither necessary, nor beneficial, or reasonably
12 likely to have been beneficial at the time they were performed.
13 And the application does not explain why either standard has
14 been met.

15         In our view, the client that Hennigan represented did
16 not require the services, since it was liquidated at the time,
17 and Hennigan performed those services for itself.

18         We argue that this is a case where the American Rules
19 should apply, and each party should bear its own litigation
20 expenses, that no exception to the American Rule applies, that
21 this is not a common fund case, that there's no agreement to
22 make payment to the firm, that this is -- there's been no
23 showing of bad faith, or violation of a Court order, and 330 is
24 not a statute which shifts the fees to the loser.

25         And we cited cases, in our objection to the Court,

**J&J COURT TRANSCRIBERS, INC.**

1  that stand for that proposition.  So, the prevailing party
2  argument does not fly, under Section 330 either.

3      And the comparable compensation argument doesn't work
4  because if we were outside this Court, they would not be
5  allowed to recover those fees from a client, if they had to sue
6  to collect.  And that's the basis for comparable compensation,
7  is what you would get outside of this Court.

8      Even the Ninth Circuit <u>Smith</u> case, that they rely
9  heavily on, says that an applicant must show that litigation
10  was necessary in order for it to be compensable.

11      Here, litigation was not necessary.  Our first offer
12  was 411,000.  They refused to even negotiate.  And as the Court
13  found, there were almost $400,000.00 in objectionable fees.  We
14  could have avoided this litigation, had the firm negotiated
15  with us, as we did with all other professionals in the case.
16  They chose to litigate.  We don't think their litigation
17  expenses should be payable by the estate.

18      THE COURT:  All right.  I'll hear from Hennigan
19  Bennett.

20      MR. JOHNSTON:  Thank you, Your Honor.  Jim Johnston,
21  on behalf of the firm.  It's a pleasure to be back here and I
22  compliment you on your new courtroom.

23      THE COURT:  Thank you.

24      MR. JOHNSTON:  It looks good.  Since Mr. DeFillipo's
25  argument really combined the issues of the motion to compel and

1 our application, I think it makes sense to take our
2 application, first.

3         What we've requested is 86 percent of the reasonable
4 fees and expenses that we incurred in defending against the
5 liquidating trust's $2.7 -- excuse me -- million objection to
6 our final fees and expenses.

7         Your Honor, this was not your usual dispute regarding
8 fees.  My firm's heard these estates for two and a half years
9 without a single objection to our retention or to our fees.
10 Our clients didn't object, the creditors didn't object, the
11 U.S. Trustee didn't object.

12         It was only after confirmation and effectiveness of
13 the plan that the liquidating trust objected.  In concept, we
14 don't have any problem with that.  That was the trust's right,
15 under the plan.

16         What we did have a problem with was the way that the
17 objection was raised and prosecuted.  You know, first the size
18 itself.  The trust objected to more than $2.7 million of our
19 fees.  This was 40 percent of our total request.  Essentially,
20 more than a year's worth of our work.

21         And what was unusual, in addition to the size, was
22 the way in which that very large objection was made.  Before
23 choosing to launch an attack of that magnitude, a responsible
24 fiduciary would perform enough investigation to ensure that
25 there was at least some colorable basis for an objection to all

1 of the fees.   Here the evidence revealed that that was not at
2 all what happened.

3        The liquidating trustee filed the objection without
4 even reading our fee application.  He didn't review any of our
5 work product, or discuss our services with our clients, or the
6 board members, or any creditors.  And it didn't raise or
7 discuss a single objection with us.

8        What the trust chose to do, instead, was to file a
9 one paragraph objection that attached the Legal Cost Control
10 report, even though that report, on its face, stated that it
11 was a "draft report" and that it was prepared to give the
12 professional, HBD, a chance to address concerns.

13        And the trustee testified, in his deposition, that
14 he'd never even spoken with Legal Cost Control about the
15 report, and the evidence showed that he had not even read the
16 whole report.

17        Your Honor's now found that the Legal Cost Control
18 report was entirely unreliable, both as a factual matter and as
19 purported expert testimony.  We submit that should have been
20 obvious to the trustee, from the outset, at least if he had
21 read the report, or talked to its authors.

22        The report states that no one from LCC contacted HBD,
23 reviewed any of our work product, or did anything to
24 familiarize itself with the issues in the case.

25        But, what the trustee did was attach that to its

**J&J COURT TRANSCRIBERS, INC.**

1  objection, and filed it, and demanded the return of $2.7

2  million in fees.  That's unusual point number one.

3       Unusual point number two, is the trustee then

4  proceeded to litigate in the same way that the objection was

5  made.  He demanded the production of virtually every document

6  in our files, regarding this case, including all of our work

7  product.

8       At very great expense, we wound up producing 500

9  boxes of documents to the trustee, in addition to four CD-ROM's

10 worth of electronic files.  After we produced it, the trustee

11 scarcely -- scarcely even bothered to review the documents.

12      The trust then deposed me for an entire day.  The

13 trust objected to our narrowly tailored request to the trust

14 and to the trust board members.

15      And because the trust refused to abandon what we

16 submit was an obviously flawed LCC report, we were forced to

17 depose two members of the LCC team that worked to prepare the

18 report.  And we had to expend an extensive amount of the

19 Court's time, cross examining Mr. Markowitz.

20      All of this turned what could and should have been a

21 summary review of our fees, into a very costly exercise, for

22 us, for the trust, and for the Court.

23      And what a waste it was, Your Honor.  Especially when

24 you consider that the trust decided to abandon all but four of

25 the 24 categories of objections that were raised in the LCC

10

1  report, immediately on the eve of trial.

2        And at the end of the day, Your Honor, we prevailed,
3  overwhelmingly.  We prevailed on virtually all of the issues
4  raised in the trust's original objection.

5        And even when you take the temporary attorney issue
6  into account, we prevailed on more than 86 percent of the fees
7  the trust objected to and more than half of the fees relating
8  to temporary attorneys themselves.

9        In its objection to our fees, and this morning, you
10 heard Mr. DeFillipo basically call all of this irrelevant.

11        The trust argues that the American Rule applies,
12 there's no prevailing party in bankruptcy cases, and we
13 couldn't have possibly benefitted the estate.

14        We submit, Your Honor, that the vast way of authority
15 is to the contrary.  At the outset, we are not seeking to
16 reverse the American Rule, or impose any kind of prevailing
17 party standard.  All that we're requesting is an award of
18 reasonable fees and expenses for our services in this case.

19        Your Honor has --

20        THE COURT:  Didn't I award you your fees in this
21 case?

22        MR. JOHNSTON:  You absolutely did and we have no
23 quarrel with your ruling.

24        All that we request is that that award not be diluted
25 by the fees and expenses that we had to incur in defending

**J&J COURT TRANSCRIBERS, INC.**

11

1  against the trust's $2.7 million objection.

2          THE COURT:  Well, how did that benefit the estate?

3          MR. JOHNSTON:  It benefitted the estate, and this is

4  what the case law says, by fixing -- by enabling the Court to

5  fix the amount of our fees.  The Court fixed the amount of our

6  fees, only after a one year, two day trial process.

7          The benefit to the estate was enabling the Court to

8  determine the validity, or lack of validity of the trust's

9  objections, and to fix the amount of our fees.

10          The cases say --

11          THE COURT:  Well, I could have done that by

12  sustaining the objection.  And if you had never even responded

13  to the objection I could have fixed your fee.

14          MR. JOHNSTON:  You absolutely could have.  And then

15  we wouldn't have been put through the process, our fee wouldn't

16  have been diluted.

17          THE COURT:  Oh, it would have been diluted, if I had

18  sustained their objection.

19          MR. JOHNSTON:  It wouldn't have been diluted by the

20  litigation fees and expenses incurred in responding to the

21  objection.

22          I think, Your Honor -- and hindsight is 20/20, had

23  you just looked at the auditor's report, I don't think that you

24  would have disallowed $2.7 million in our fees.  But,

25  certainly, we had to go to the time and expense, and it was

**J&J COURT TRANSCRIBERS, INC.**

12

1  great time and expense, to establish to the Court the

2  unreliability of that report.

3          You'll recall, Your Honor --

4          THE COURT:  Yes.

5          MR. JOHNSTON:  -- Mr. Markowitz on the stand for many

6  hours, trying to defend what was indefensible work product.

7          THE COURT:  Well, that's true.  But, wasn't that for

8  your benefit, not for the estate?

9          MR. JOHNSTON:  Ultimately, yes.  It certainly was for

10  our benefit, but that is not the be-all and end-all of the

11  Court's inquiry.

12          And I think there are two fundamental principles that

13  I'd like to walk the Court through.  The first is that

14  articulated by the Third Circuit in the <u>Busy Beaver</u> case, where

15  the Circuit observed that one of Congress's important

16  objectives, in overhauling the bankruptcy laws in 1978, was to

17  provide "fully competitive income to bankruptcy attorneys."

18          A number of cases have considered that plain

19  legislative -- intent of the Bankruptcy Code, and they've

20  determined that this goal of competitive income to bankruptcy

21  attorneys would be frustrated if professionals and bankruptcy

22  attorneys were not entitled to be reimbursed for reasonable

23  fees and expenses in fending off meritless objections to their

24  fees.

25          We cited five cases in our application, two at the

**J&J COURT TRANSCRIBERS, INC.**

1    Circuit level, two at the District Court level, and one at the
2    Bankruptcy Court level, which are all directly on point.  They
3    all directly hold that these types of fees are reimbursable.

4          THE COURT:  Well --

5          MR. JOHNSTON:  We also --

6          THE COURT:  But, how do they provide a benefit and
7    how are they, under Busy Beaver, comparable to what you get
8    outside of bankruptcy?  If you litigate your fees outside of
9    bankruptcy, you don't get paid for litigation fees.

10          MR. JOHNSTON:  Well, that's the second key point,
11    which is that --

12          THE COURT:  Well, the first -- what is the first
13    point?  That other Courts have allowed it?

14          MR. JOHNSTON:  No.  The first key point is that the
15    touchstone of compensation, in bankruptcy, is comparable
16    compensation --

17          THE COURT:  Correct.

18          MR. JOHNSTON:  -- for non-bankruptcy professionals.

19          The flip-side to that, and what you heard Mr.
20    DeFillipo argue, is that, well, fee disputes are routine, both
21    in bankruptcy and non-bankruptcy cases, and outside of
22    bankruptcy you don't get reimbursed for this, so why should you
23    get reimbursed for it in bankruptcy?

24          One -- the Third Circuit touched upon this, in Busy
25    Beaver, if you take a look at footnote 17, where the Circuit

14

1  cited the <u>Powlack v. Greenawald</u> (phonetic) case, noting that,

2  if attorneys are required to litigate for their fees, they're

3  not fully -- their compensation is diluted.  They're not fully

4  compensable.

5        And the Court also noted that there are unique

6  aspects of the bankruptcy fee application and compensation

7  process that doesn't happen outside of the bankruptcy case --

8  outside of bankruptcy cases.

9        To compare bankruptcy cases to non-bankruptcy cases,

10 really isn't a fair comparison.  Bankruptcy is unique.

11       If you take a look at the decision, the Ninth

12 Circuit's decision in <u>Smith</u>, the <u>Big Rivers</u> case, the <u>Nunley</u>

13 case, they all talk about this fact and then they all talk

14 about the fact that disputes over fees, in the bankruptcy

15 context, are not analogous to attorney/client disputes outside

16 of bankruptcy.

17       I think this case demonstrates that point with some

18 force.  Here, our clients, the debtors, were perfectly

19 satisfied with our work.  They didn't raise any objection to

20 our fees.  Neither did the creditors, the creditors committee,

21 U.S. Trustee.

22       It was only after the case was over, from our

23 perspective, that an objection was raised.  That would not have

24 happened outside of the bankruptcy context and it certainly

25 wouldn't have happened in the manner that the objection was

 1  raised here.

 2                            (Pause)

 3          MR. JOHNSTON:  I see Your Honor struggling with the

 4  point and I'd like to help you through it, as much as possible.

 5          THE COURT:  Well, the representative of the estate,

 6  the estate was your client.

 7          MR. JOHNSTON:  That's correct.

 8          THE COURT:  The representative of the estate did, in

 9  fact, object to your fees.

10          MR. JOHNSTON:  At the end of the day --

11          THE COURT:  Right.

12          MR. JOHNSTON:  -- that's true.  But, the comparison

13  to say, in a non-bankruptcy situation our client objected to

14  our fees, doesn't hold here.

15          THE COURT:  Why?

16          MR. JOHNSTON:  Because, the people that we actually

17  performed the work for, the people that we were reporting to

18  for two and a half years, never objected.  No party in interest

19  in the case ever objected, for two and a half years, despite

20  many, many opportunities to do so.

21          I can't think of a context outside of the bankruptcy

22  context where a law firm would be put in the position of

23  working for two and a half years, without one iota of -- one

24  inkling that there was any complaint or objection to the nature

25  of the firm's services, or to the fees, and then -- and be paid

1  for all of those fees, and then be sued, after the fact, to
2  recover the fees, by someone who had nothing to do with the
3  original engagement.

4        That -- bankruptcy's unique in that regard and the
5  Third Circuit has recognized it --

6        THE COURT:  But, what -- if somebody who has a
7  legitimate interest, does object, why should you be entitled to
8  attorney's fees for defending your fees?

9        MR. JOHNSTON:  It goes back to the point of market
10 based non-diluted compensation.  That, we submit, is a policy
11 --

12        THE COURT:  Well, it's not market based, if there's
13 nothing outside of bankruptcy that's comparable.

14        MR. JOHNSTON:  That -- when you would not receive the
15 type of objection that you received in bankruptcy, when you
16 wouldn't receive it outside of bankruptcy, the cases say that
17 the professionals are entitled to be compensated to makeup for
18 the delusion that occurs in having to fend off the objections.

19        And the clear weight of authority is to that effect.
20 There's a number of cases that expressly hold that Court's are
21 entitled to award these types of fees and the trust has really
22 cited only one case to the contrary.

23        That -- all of the cases that they cited do not
24 involve applications for fees incurred in fending off
25 objections, at the Trial Court level, with the exception of

1  one.

2         And that one case is the <u>St. Rita's Associates</u> case

3  out of the Western District of New York.  I think that's

4  closest to the point that the trustee tries to make, but it

5  winds up resting on a faulty premise and it results in a

6  strange contradiction.

7         In <u>St. Rita's</u>, the Court did hold that the debtor's

8  attorney was not entitled to an award of fees incurred in

9  defending against an objection made in the bankruptcy case.

10 But, then the Court turned around and held that the attorney

11 was entitled to an award of expenses it incurred in the fee

12 dispute.

13         That's a contradictory result, where expenses are

14 allowed and fees are disallowed.  To my knowledge that's never

15 been followed or adopted anywhere.

16         But, the decision is premised on an assertion that

17 fee disputes are a fact of life for all attorneys in bankruptcy

18 and outside of bankruptcy, so why should bankruptcy attorneys

19 be treated differently.

20         As I indicated, Your Honor, I just don't think that's

21 a fair comparison, particularly in this case, where it's not

22 conceivable that a law firm would be faced with objections of

23 the type that were raised in this case.

24         I would like to call the Court's attention to one

25 case that I discovered, in shepardizing <u>St. Rita's</u>, that wasn't

1  cited in our papers, that I think really summarizes these
2  issues nicely.  And it was a Court that was clearly struggling,
3  like Your Honor's struggling, with, how do you find a basis for
4  awarding fees in appropriate circumstances.

5          It's a case called Computer Learning Centers, out of
6  the Eastern District of Virginia, 285 B.R. 191.  There, the
7  Court surveyed much of the case law, including many of the
8  cases that we cited, and it wound up rejecting the arguments
9  made by the trust -- like those made by the trustee, based on
10 the American Rule and no benefit to the estate.

11         And the Court synthesized what I would submit is an
12 appropriate way of looking at this and developed some factors.
13 I'd like to just quote a brief passage.

14         The Court said, "Good faith and professionalism
15 should be encouraged in the fee application process and the
16 impact of the allowance or denial of additional fees for
17 defending a fee application should be minimized.  These
18 objectives, as well as the Congressional objective of
19 compensating professionals the same, whether they are engaged
20 in a bankruptcy case or in a non-bankruptcy matter, are
21 furthered by allowing fees to successfully present, prosecute,
22 or defend a fee application, in appropriate circumstances."

23         It then goes on to describe what it considers would
24 be appropriate circumstances.  "Factors that may be taken into
25 account in deciding whether to award additional fees for

**J&J COURT TRANSCRIBERS, INC.**

1  defending a fee application are, one, whether the application
2  was accurate and complete, two, whether the application
3  complied with all applicable standards, three, whether the
4  objections were made in good faith, four, the extent of
5  additional work reasonably necessary under the circumstances,
6  and five, the extent to which the -- the requested fees were
7  rewarded."

8      We submit, Your Honor, that if you apply those
9  factors here, and we think they make sense, the supplemental
10 fee and expense award that we've requested is appropriate.

11     You know, first, was our fee application accurate and
12 complete and did it comply with the applicable standards?  I
13 think the answer to that is absolutely, as evidenced by Your
14 Honor overruling virtually all of the timekeeping type
15 objections raised in the LCC report.

16     Second, were the trust's objections made in good
17 faith?  We submit that they were not, Your Honor, for all of
18 the reasons outlined in our papers.  The very fact that the
19 trust objected to 2.7 million in fees, and prevailed on just
20 380,000 of the objections, tends to show a lack of good faith,
21 as does the way in which the objections were prosecuted.

22     Third, was our additional work reasonably necessary
23 under the circumstances?  Again, yes.  The mud against the wall
24 approach, adopted by the trust in objecting to such a large
25 portion of our fees, left us with no choice but to take the

1  steps we took to defend ourself.

2      And fourth, as to the extent to which our requested
3  fees were awarded, well, we prevailed on 95 percent of our
4  requested fees and over 86 percent of the fees that were
5  subject to an objection. We would submit that that's success
6  by any measure.

7      Nevertheless, as noted in our application, we seek
8  only 86 percent of the fees and expenses we requested -- or of
9  the fees and expenses we incurred, to account for the fact that
10 Your Honor did disallow some of our fees.

11     Before I conclude, let me just briefly address the
12 argument regarding the trust's alleged settlement offer. I
13 note that the trust's emphasis on this alleged offer is a bit
14 ironic, given that they tried very hard to keep the evidence of
15 the offer out of the record of these proceedings and filed and
16 lost a motion in limine on that point.

17     That aside, I'm not sure of the point being made
18 here. I guess it's they say we should have agreed to settle,
19 and I'll use that word loosely, for $412,000.00, and thus saved
20 our expense of litigating.

21     But, that's looking at it the wrong way. The point
22 might have made some sense if the trust had objected to
23 $411,000.00 of our fees, and the Court then had sustained
24 $380,000.00 of the objections. That's not what happened.

25     The trust objected to millions and millions of

1    dollars of our fees, only a fraction of which were sustained.

2          Moreover, the notion that the trust made a good faith

3    settlement offer to HBD is ludicrous.  As we noted before, the

4    offer was made before the trust even reviewed our fee

5    application.  It said so right on its face.

6          The trust merely made a demand to every professional

7    employed in this case, for an across the board seven percent

8    reduction.  And then it threatened to hire a fee auditor if the

9    demand was not acceded to.  That's not a settlement offer,

10   that's a shakedown.

11         In the letter, the trust didn't identify a single

12   ground for objection to HBD's fees, and we welcomed an

13   independent fee auditor in this case, so we didn't agree to

14   what was an unprincipled demand for a reduction.

15         That, then, cannot authorize the trust to turn around

16   and object to 40 percent of all of our fees, and deprive us of

17   the right to recover our costs in defending ourselves.

18         And so, we would submit Your Honor, and respectfully

19   request an award of reasonable fees incurred, in fending off

20   the trust's objection to our final fee application.

21         THE COURT:  Any response?

22         MR. DEFILLIPO:  No, Your Honor.  Thank you.

23                     (Pause)

24         THE COURT:  Well, if I were to apply the Computer

25   Learning Center factors, I would agree with Hennigan Bennett,

1  in large part, that they meet those.

2       I think that the fee application was largely
3  compliant with the rules, although I do note that the one
4  disallowance I made was based on the temporary employees, and
5  I'm not sure full disclosure was made as to the terms of their
6  retention and the fact that the firm was charging overhead as a
7  basis of their hourly rates.  So, that factor I think is
8  somewhat different.

9       But, the other factors I think, in large part the
10 objection of the trustee, did not have a sound basis in fact,
11 although I don't go so far as to say it was in bad faith.

12      In large part the fees were allowed by the Court for
13 the Hennigan Bennett request.  I don't know whether I'd say the
14 additional work was needed, but certainly it did flesh out the
15 issues for the Court.

16      But, I disagree with the Courts that say, excepting
17 extraordinary circumstances, that a professional would be
18 entitled to compensation for fees incurred in objecting --
19 excuse me, in responding to objections to fees they have
20 requested.

21      I think that the benefit by responding to those
22 objections is for the benefit of the professional, not the
23 estate.  And I think a rule, to that extent, would not be
24 appropriate.

25      I don't think I'm bound by <u>Busy Beaver</u> to hold

**J&J COURT TRANSCRIBERS, INC.**

1  otherwise, because <u>Busy Beaver</u> simply said that the fees

2  awarded should be comparable to those of professionals outside

3  of bankruptcy.

4          And under the American Rule, fees in litigating

5  either objections to fees or refusal to pay fees are borne by

6  the party who encouraged them, not by the prevailing party.

7          So, I decline to award any fees in this circumstance.

8  I don't think this would rise to the exceptional circumstance

9  where I may in fact award fees.

10          I think that the fees incurred by Hennigan Bennett

11  were simply to assure that it got itself paid.  Although it was

12  unusual, in that there was a two day hearing on it, I think

13  that is simply the cost of doing business.

14          I came to my refusal to permit fees for litigating a

15  retention application, so I'll disallow the fee application.

16          I don't think I need to go forward with the trustee's

17  motion, since I assume Hennigan Bennett will otherwise disgorge

18  the remainder of the fees awarded.

19          MR. MCMICHAEL:  We will tender the check --

20          THE COURT:  Not awarded.

21          MR. MCMICHAEL:  We will tender the check immediately.

22          Your Honor, one request in the trustee's motion was

23  for Your Honor to award prejudgment interest.  We continue to

24  object to that request and submit that it's not appropriate.

25          MR. DEFILLIPO:  We withdraw it, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

24

```
 1            THE COURT:  All right.  Thank you.
 2            MR. JOHNSTON:  Thank you, Your Honor.
 3            MR. DEFILLIPO:  Thank you, Your Honor.
 4            MR. KORTANEK:  We have no other matters going
 5  forward.
 6            THE COURT:  All right.  We'll stand adjourned.   Thank
 7  you.
 8                         *  *  *  *  *
 9                  C E R T I F I C A T I O N
10            I, MELISSA HYNES, court approved transcriber, certify
11  that the foregoing is a correct transcript from the official
12  electronic sound recording of the proceedings, in the
13  above-entitled matter, to the best of my ability.
14
15  _____
16  MELISSA HYNES
17  J&J COURT TRANSCRIBERS, INC.          DATE:  February 22, 2005
```

**J&J COURT TRANSCRIBERS, INC.**