Case No. CV 1:05-00206-KAJ

## UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

---

*In re* WORLDWIDE DIRECT, INC., et al., *Debtors*.

HENNIGAN, BENNETT & DORMAN LLP, *Appellant*,

v.

GOLDIN ASSOCIATES, L.L.C.,
as Liquidating Trustee for the Worldwide Direct Liquidating Trust, *Appellee*.

---

*Appeal From The United States Bankruptcy Court*

*For The District of Delaware*

Bankr. Case Nos. 99-108 to -127 (MFW) (jointly administered)

---

## APPENDIX TO

## APPELLANT HENNIGAN, BENNETT & DORMAN LLP's OPENING BRIEF

James O. Johnston, Jr.
HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street
Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Telecopy: (213) 694-1234

Robert S. Brady (Bar No. 2874)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Telecopy: (302) 571-1253

*Counsel for Appellant*
*Hennigan, Bennett & Dorman LLP*

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure and Local Rule 7.1.3.(d), Appellant Hennigan, Bennett & Dorman LLP ("HBD") submits this Appendix to accompany its Opening Brief on appeal.

This Appendix contains the following documents:

| Tab/Docket Number | Description |
| --- | --- |
| 2549 | Objection To Application Objection To The Final Fee Applications Of Hennigan, Bennett & Dorman And Howrey & Simon For Compensation And Reimbursement Of Expenses For The Pre-Effective Date Period (without exhibits) |
| 2650 | Supplemental Objection To The Final Fee Application Of Hennigan Bennett & Dorman For The Pre-Effective Date Period (without exhibits) |
| 2661 | Reply Of Hennigan, Bennett & Dorman To The Liquidating Trust's Objection To The Final Fee Application |
| 2662 | Appendix to Reply Of Hennigan, Bennett & Dorman To The Liquidating Trust's Objection To The Final Fee Application (Exhibit 18 only) |
| 3258 | Memorandum Opinion dated October 29, 2004 |
| 3297 | Application Of Hennigan, Bennett & Dorman LLP For Compensation And For Reimbursement Of Expenses Incurred In Defense Of Objection To The Firm's Final Fee Application (without exhibits) |
| 3308 | Transcript Of Hearing Held On February 8, 2005 (excerpt) |
| 3312 | Order Regarding Application Of Hennigan, Bennett & Dorman LLP For Compensation And For Reimbursement Of Expenses Incurred In Defense Of Objection To The Firm's Final Fee Application, dated March 8, 2005 |
| 3316 | Notice of Appeal |

July 22, 2005

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
The Brandywine Building – 17th Floor
1000 West Street
P.O. Box 391
(302) 571-6600 (Telephone)
(302) 571-1253 (Facsimile)

-- and --

HENNIGAN, BENNETT & DORMAN LLP

James O. Johnston
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
(213) 694-1200 (Telephone)
(213) 694- 1234 (Facsimile)

# Tab No. 2549

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| WORLDWIDE DIRECT, INC., *et al.*, | § | Case No. 99-00108-MFW through |
| | § | Case No. 99-00127-MFW |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Objection Deadline: December 3, 2001 @ 4:00 p.m.** |
| | § | **Uncontested Hearing Date:  December 13, 2001 @ 2:00 p.m.** |
| | § | **Contested Hearing Date:  January 8, 2001 @ 2:00 p.m.** |
| | § | |
| | § | **Related Docket Nos. 2431, 2441, 2442 & 2516** |

### OBJECTION TO THE FINAL FEE APPLICATION OF HENNIGAN BENNETT & DORMAN AND HOWREY & SIMON FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PRE-EFFECTIVE DATE PERIOD

Goldin Associates, L.L.C., in its capacity as Liquidating Trustee (the "Liquidating

Trustee") for the Worldwide Direct Liquidation Trust (the "Liquidating Trust") created in

accordance with the Second Amended Consolidated Liquidating Chapter 11 Plan For SmarTalk

TeleServices, Inc., And Affiliates, Proposed By The Debtors And By The Official Committee Of

Unsecured Creditors (as subsequently confirmed and modified, the "Plan"), hereby objects to the

Final Fee Applications of Hennigan Bennett & Dorman and Howrey Simon Arnold & White

Seeking Compensation and Reimbursement of Expenses for the Pre-Effective Date Period.  In

support of the relief requested, the Liquidating Trustee would respectfully show as follows:

#### Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter

is a core proceeding within the meaning of 28 U.S.C. § 157.

2.      The statutory predicates for the relief requested herein are sections 105, 330 and

331 of the Bankruptcy Code.

## Background

3.    On January 19, 1999 (the "Petition Date"), Worldwide Direct, Inc., SmarTalk

TeleServices, Inc. ("SmarTalk") and SmarTalk's eighteen (18) direct and indirect subsidiaries

(collectively, the "Debtors"), filed separate voluntary petitions seeking relief under Chapter 11 of

the Bankruptcy Code, 11 U.S.C. §§ 101, et seq.[1]

4.    On January 20, 1999, the Bankruptcy Court signed its Order directing the joint

administration of the Debtors' cases under Case No. 99-108 (MFW).  On February 2, 1999, the

Official Committee of Unsecured Creditors ("Committee") was constituted.

5.    On June 7, 2001, the Court entered its Findings of Fact, Conclusions of Law, and

Order Confirming Second Amended Consolidated Liquidating Chapter 11 Plan for SmarTalk

TeleServices, Inc., and Affiliates, Proposed by the Debtors and by the Official Committee of

Unsecured Creditors (the "Confirmation Order").  Pursuant to the Confirmation Order, the Court

confirmed the Plan as modified therein and, among other things: (i) approved the creation and

transfer of the Remaining Assets to the Liquidating Trust; (ii) appointed Goldin Associates,

L.L.C. and Harrison J. Goldin as the Liquidating Trustee; (iii) named the members of the Board

---

[1] The subsidiaries are SmarTalk USPS Sales Co., a Delaware corporation; GTI TeleCom, Inc., a Florida corporation; USA Telecommunications Services, Inc., a North Carolina Corporation; SmarTel Communications, Inc., a Delaware corporation; SMTK NY-1 Corp., a New York corporation; Creative Network Marketing, Inc., a Delaware corporation; SmarTalk (Delaware) Corp., a Delaware corporation; SMTK Acquisition Corp., a Florida corporation; Conquest Telecommunication Services Corp., a Delaware corp.; SMTK Acquisition Corp. III, a Delaware corporation; SmarTalk Acquisition Corp., a Nevada corporation; Conquest Communications Corp., an Ohio corporation; Conquest Long Distance Corp., an Ohio corporation; Conquest Operator Services Corp., an Ohio corporation; SmarTel, Inc., a Massachusetts corporation; SmarTel International, Inc., a New York corporation; SmarTel Communications of Virginia, Inc., a Virginia corporation; and Conquest Operator Services, LP, a Delaware corporation.

of the Liquidating Trust; and (iv) authorized the Liquidating Trustee to implement the provisions

of the Liquidating Trust Agreement as set forth in the Plan upon the Effective Date.[2]

6.     All of the conditions precedent to the Effective Date of the Plan have occurred

and the Effective Date of the Plan was established as June 30, 2001. On July 3, 2001, the

Liquidating Trustee served a Notice of Effective Date in accordance with the provisions of the

Plan.

### Relief Requested and Basis for Relief

7.     Pursuant to the Confirmation Order, final fee applications were to be filed no later

than August 14, 2001. The Liquidating Trustee estimates that approximately up to twenty-two

(22) final fee applications were filed representing fees in excess of $20 million. The Liquidating

Trustee was particularly struck by the enormity of the fees, particularly in light of the sale of

substantially all of the assets of the Debtor for a sale price of approximately $110 million. The

professional fees in the case, therefore, represent approximately 18% of the recovery from the

asset sale.

8.     The Liquidating Trustee and its counsel reviewed and analyzed all of the final fee

applications. The Liquidating Trustee retained a fee auditor ("Fee Auditor") to review and

prepare reports of 13 selected fee applications. These reports assisted the Liquidating Trustee

and its counsel in reviewing the fee applications, and as set forth more fully below,

recommending reductions to the final fee applications.

9.     As the Fee Auditor completed the reports and they were reviewed by the

Liquidating Trustee and its counsel, the reports were provided to the various professional firms,

---

[2] As provided in the Order Granting Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Order Effecting Non-Material Modification and Clarification to Confirm Chapter 11 Plan, Docket No. 2355, dated July 12, 2001 the ("Modification Order"), Goldin Associates, L.L.C. is now the sole Liquidating Trustee.

together with a request that the firms make a voluntary fee reduction. In almost all of the cases,

the Liquidating Trustee and the professional firms negotiated mutually-agreeable fee reductions.

10.    Among the applications analyzed by the Fee Auditor were those filed by Henigan

Bennett & Dorman and Howrey Simon Arnold & White. A copy of the draft Fee Auditor's

report for Hennigan Bennett & Dorman is annexed hereto as Exhibit A and the Fee Auditor's

report for Howrey Simon Arnold & White is annexed hereto as Exhibit B. The Liquidating

Trustee incorporates the Fee Auditor's analysis contained in Exhibit A and B as the basis for the

objection for those firms' fees and expenses.

11.    The party requesting compensation bears the burden of proving the

reasonableness of the fees sought. Zolfo, Cooper & Co. v. Sunbeam Oster Company, Inc., 50

F.3d 253, 260 (3d Cir. 1995); In re Engel, 124 F.3d 567, 576 (3d Cir. 1998). "Because time is

precious, the reviewing court need only correct reasonably discernable abuses, not pin down to

the nearest dollar the precise fee to which the professional is ideally entitled." In re Busy Beaver

Building Centers, Inc., 19 F.3d 833, 845 (3d Cir. 1994). "It is not necessary that a court setting

reasonable fees focus on each and every time entry if the pattern of excessive hours and staffing

appears knowledgeable to the court from its own experience . . ." In re Rancourt, 207 B.R. 338,

362 (Bankr. D.N.H. 1997) (citations omitted). As recognized by the Third Circuit:

> The Court should review a fee application to ensure the applicant
> exercises the same "billing judgment" as do non-bankruptcy
> attorneys by, for example, writing off unproductive research time,
> duplicative services, redundant costs precipitated by overstaffing,
> or other expenses with regard to which the professional generally
> assumes the cost as overhead in corresponding non-bankruptcy
> matters, or for which non-bankruptcy clients typically decline to
> pay.

Busy Beaver Building Centers, 19 F.3d at 856 (citations omitted).

12.     "The Court may determine what is the reasonable amount of time a professional should have to spend on a given project . . . Professionals will not be rewarded for inefficiency, nor fully compensated for spending an unreasonable amount of time on activities of little benefit to the estate." In re Spanjer Brothers, Inc., 203 B.R. 85, 90 (Bankr. N.D.Ill. 1996) (citations omitted).

13.     Even if a fee is reasonable, the Court may not allow compensation for duplicative services or for services that were unnecessary nor reasonably likely to benefit the Debtor's estate. 11 U.S.C. § 330(a)(4). When more than one professional is working on the case in the same capacity as another, then the likelihood of duplication of effort increases. In re Seneca Oil Co., 655 B.R. 902, 909 (Bankr. W.D. Okla. 1986). A bankruptcy estate may not be burdened with unnecessary duplication of services. See In re Bennett Funding Group, Inc., 213 B.R. 234, 245 (Bankr. N.D.N.Y. 1997).

14.     Time entries with regard to conferences must be greatly detailed, as it is impossible for the Court to evaluate whether the meetings are for the purpose of informing other professionals as to the status or whether each professional made a substantive contribution. In re Poseidon Pools of America, Inc., 180 B.R. 718, 730-31 (Bankr. E.D.N.Y. 1995); In re General Oil Distributors, Inc., 51 B.R. 794, 801 (Bankr. E.D.N.Y. 1985). In particular, entries pertaining to meetings, conferences, correspondence and telephone calls should identify the participants and describe the general substance or subject matter of these services. See e.g., In re Citrone Dev. Corp., 106 B.R. 359, 362 (Bankr. S.D.N.Y. 1989).

15.     Benefit to the estate is an essential component of any compensation award. The Court must consider whether the services were beneficial at the time the services were rendered, and may not allow compensation for services that were not reasonably likely to benefit the estate.

16. .    Additionally, work performed by senior professionals which could have been assigned to more junior level staff with a lower billing rate should be compensated at that lower rate." See e.g., Busy Beaver Building Centers. Inc., 19 F.3d at 848-55. As this Circuit has held, "the reasonable hourly rate has a cap based on the expected and actual complexity of the case . . ." Id. at 856, fn. 35 (cited with approval Zolfo, 50 F.3d at 259).

**The Fee Application of Hennigan Bennett & Mercer**

17.    Hennigan Bennett and Mercer ("Hennigan") acted as counsel for the Debtors. Hennigan has filed a fee application requesting the allowance of fees in the total sum of $5,957,951.40 and expenses in the total sum of $1,057,086.77. Hennigan further requests approval for payment in the amount of $294,578.00 in fees and $89,106.83 in expenses incurred during the period from December 1, 2000 through June 30, 2001. As a result of five prior interim fee applications and monthly payments pursuant to an Administrative Order, to date Hennigan has been awarded and received payment of the sum of $6,934,252.37.

18.    The Fee Auditor's report for Hennigan points out many objectionable areas and suggests that further documentation and information may be necessary. The Liquidating Trustee hereby incorporates the Fee Auditor's report into this objection.

19.    Simultaneously with this objection, the Liquidating Trustee is serving discovery upon Hennigan, and will be prepared to supplement the record after discovery is completed.

**The Fee Application of Howrey Simon Arnold & White**

20.    Howrey Simon Arnold & White ("Howrey") acted as special counsel for the Official Committee of Unsecured Creditors. Howrey has filed a fee application requesting the allowance of fees in the total sum of $653,830.70 and expenses in the total sum of $29,911.49. Howrey further requests that payment thereon be made of the remaining unpaid amount of

$119,160.19 in fees and expenses. As a result of four prior interim payments, Howrey has received funds totaling $564,582.00.

21.    The Fee Auditor's report for Howrey points out numerous objectionable areas and suggests that further documentation and information is necessary. The Liquidating Trustee hereby incorporates the Fee Auditor's report into this objection.

WHEREFORE, the Liquidating Trustee respectfully requests the Court to reduce the final fee applications of Hennigan and Howrey for the Pre-Effective Date Period, and grant such other and further relief as is just and proper.

GIBBONS, DEL DEO, DOLAN,
GRIFFINGER :& VECCHIONE
Elizabeth S. Kardos, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 639-6247
Counsel for Goldin Associates, L.L.C.,
Liquidating Trustee of the
Worldwide Direct Liquidation Trust

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, LLP

_____ /s/ Steven K. Kortanek _____
Steven K. Kortanek (#3106)
919 Market Street, Suite 1000
Wilmington, DE 19801
(302) 426-1189 Telephone
(302) 426-9193 Facsimile
skortanek@klehr.com
Local Counsel for Goldin Associates, L.L.C.,
Liquidating Trustee of the
Worldwide Direct Liquidation Trust

Dated: December 3, 2001

DEL1: 38089-1

**Ap. 2549**

# Tab No. 2650

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| WORLDWIDE DIRECT, INC., *et al.*, | § | Case No. 99-00108-MFW through |
| | § | Case No. 99-00127-MFW |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | Related Docket Nos. 2431, 2441, 2442, 2516 & 2549 |

## SUPPLEMENTAL OBJECTION TO THE FINAL FEE APPLICATION OF HENNIGAN BENNETT & DORMAN FOR THE PRE-EFFECTIVE DATE PERIOD

Goldin Associates, L.L.C., in its capacity as Liquidating Trustee (the "Liquidating Trustee") for the Worldwide Direct Liquidation Trust (the "Liquidating Trust") created in accordance with the Second Amended Consolidated Liquidating Chapter 11 Plan For SmarTalk TeleServices, Inc., And Affiliates, Proposed By The Debtors And By The Official Committee Of Unsecured Creditors (as subsequently confirmed and modified, the "Plan"), hereby submits its Supplemental Objection to the Final Fee Application of Hennigan Bennett & Dorman for the Pre-Effective Date Period. In support of the relief requested, the Liquidating Trustee would respectfully show as follows:

### Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157.

2.      The statutory predicates for the relief requested herein are sections 105, 327, 330, 331 and 504 of the Bankruptcy Code.

#580530 v1
102882-41010

DEL1: 40244-1

Ap. 2650

## Background

3.     On January 19, 1999 (the "Petition Date"), Worldwide Direct, Inc., SmarTalk

TeleServices, Inc. ("SmarTalk") and SmarTalk's eighteen (18) direct and indirect subsidiaries

(collectively, the "Debtors"), filed separate voluntary petitions seeking relief under Chapter 11 of

the Bankruptcy Code, 11 U.S.C. §§ 101, et seq.[1]

4.     On January 20, 1999, the Bankruptcy Court signed its Order directing the joint

administration of the Debtors' cases under Case No. 99-108 (MFW).  On February 2, 1999, the

Official Committee of Unsecured Creditors ("Committee") was constituted.

5.     On June 7, 2001, the Court entered its Findings of Fact, Conclusions of Law, and

Order Confirming Second Amended Consolidated Liquidating Chapter 11 Plan for SmarTalk

TeleServices, Inc., and Affiliates, Proposed by the Debtors and by the Official Committee of

Unsecured Creditors (the "Confirmation Order").  Pursuant to the Confirmation Order, the Court

confirmed the Plan as modified therein and, among other things: (i) approved the creation and

transfer of the Remaining Assets to the Liquidating Trust; (ii) appointed Goldin Associates,

L.L.C. and Harrison J. Goldin as the Liquidating Trustee; (iii) named the members of the Board

of the Liquidating Trust; and (iv) authorized the Liquidating Trustee to implement the provisions

of the Liquidating Trust Agreement as set forth in the Plan upon the Effective Date.

---

[1] The subsidiaries are SmarTalk USPS Sales Co., a Delaware corporation; GTI TeleCom, Inc., a Florida corporation; USA Telecommunications Services, Inc., a North Carolina Corporation; SmarTel Communications, Inc., a Delaware corporation; SMTK NY-1 Corp., a New York corporation; Creative Network Marketing, Inc., a Delaware corporation; SmarTalk (Delaware) Corp., a Delaware corporation; SMTK Acquisition Corp., a Florida corporation; Conquest Telecommunication Services Corp., a Delaware corp.; SMTK Acquisition Corp. III, a Delaware corporation; SmarTalk Acquisition Corp., a Nevada corporation; Conquest Communications Corp., an Ohio corporation; Conquest Long Distance Corp., an Ohio corporation; Conquest Operator Services Corp., an Ohio corporation; SmarTel, Inc., a Massachusetts corporation; SmarTel International, Inc., a New York corporation; SmarTel Communications of Virginia, Inc., a Virginia corporation; and Conquest Operator Services, LP, a Delaware corporation.

6.    All of the conditions precedent to the Effective Date of the Plan have occurred and the Effective Date of the Plan was established as June 30, 2001. On July 3, 2001, the Liquidating Trustee served a Notice of Effective Date in accordance with the provisions of the Plan.

7.    On December 3, 2001, the Liquidating Trustee filed an Objection to the Final Fee Applications of Hennigan, Bennett & Dorman ("HBD") for Compensation and Reimbursement of Expenses for the Pre-Effective Date Period (the "Objection").

8.    In support of the Objection, the Liquidating Trustee served a Notice of Deposition on HBD, requesting several categories of documents from HBD and requesting the testimony of James O. Johnston, Esq. Thereafter, HBD served upon the Liquidating Trustee and the Fee Auditor (as that term is defined in the Objection) various discovery requests. Since that time, both parties have reviewed responsive documents and have taken depositions of various individuals. The time by which the parties are required to complete discovery regarding the Objection was February 28, 2002. Pursuant to a Stipulation with HBD, the Liquidating Trustee was permitted to file this Supplemental Objection by March 1, 2002.

### Relief Requested and Basis for Relief

9.    In addition to the reasons set forth in the Objection, HBD's fees and expenses should be reduced for the following reasons.

### Fees charged for Services Rendered By Temporary Timekeepers Are Not Allowable

10.    Beginning in the Second Interim Period (May 1 through August 31, 1999), HBD started extensive use of attorneys and paralegals, who were not partners, members, regular associates, or employees of the firm (the "Temporary Timekeepers"). Deposition of James Johnston at 71:17 - 72:2; 77:6-9 ("Johnston Dep."). A copy of relevant portions of the transcript

#580530 v1
102882-41010

of the Johnston Dep. is annexed to the Certification of Brendan P. Langendorfer, Esq. In Support of Supplemental Objection to the Final Fee Application of Hennigan Bennett & Dorman for the Pre-Effective Date Period (the "Langendorfer Cert") filed simultaneously herewith as Exhibit A. Services of the Temporary Timekeepers were provided to the firm by a number of employment or staffing agencies. (Johnston Dep. at 72:22-24). The bulk of the services rendered by the Temporary Timekeepers were in the Document Analysis, Review and Management Category (Category Number 500), a service category in which HB seeks allowance of a total of $1,588,365 in fees incurred in roughly an 18 month period. Of that total, in excess of $901,000 is attributed to the services provided by Temporary Timekeepers.

11.    In addition, HBD used Temporary Timekeepers for other tasks. Approximately $31,000 in fees for services rendered by the Temporary Timekeepers in categories other than Document Analysis, Review and Management was charged to the Debtors. HBD received interim compensation based in part upon the services rendered by the Temporary Timekeepers. HBD would pay invoices rendered by the staffing agencies who provided the Temporary Timekeepers, and did not pay the Temporary Timekeepers directly. (Johnston Dep. at 74:15-20; 77:1-3).

12.    HBD's Retention Application, a copy of which is annexed as Exhibit B to the Langendorfer Cert., does not disclose that the firm intended to utilize the services of Temporary Timekeepers in its representation of the Debtors. The Court did not approve HBD's use of Temporary Timekeepers to provide legal or paralegal services to these Debtors. (Johnston Dep. 71:5-7). The Debtors never applied for authorization to employ any of the Temporary Timekeepers in accordance with section 327 of the Bankruptcy Code or Rule 2014 of the Federal

Rules of Bankruptcy Procedure. Nor did the Court ever enter an Order authorizing the Debtors to employ any of the Temporary Timekeepers as professional persons in this case.

13.     The HBD partner in charge of the case was unaware how the description of services purportedly provided by the Temporary Timekeepers was derived by the firm in the preparation of its fee application. (Johnston Dep. at 92:22 - 93:3). The description of services rendered by the Temporary Timekeepers is extraordinarily repetitive.

14.     HBD applied significant markups to the rates HBD paid for the Temporary Timekeepers' services before passing those costs on to the Debtors. The regular hourly rates which HBD paid the staffing agencies for temporary attorneys ranged from approximately $42.25 to $45.00,[2] and from $17.90 to $35.00 for temporary paralegals. HBD seeks allowance and payment for the services of the Temporary Timekeepers at the rates of $71.00 to $75.00 for temporary attorneys and $60.00 to $65.00 for paralegals. The Temporary Timekeepers did not receive any benefits from the firm of the type provided to employees generally, such as health insurance and retirement benefits. (Johnston Dep. at 77:21-78:1). Although, the Temporary Timekeepers might have received an occasional meal and payment of parking expenses, Mr. Johnston was not certain. (Johnston Dep. at 75:11-17; 76:3-25).

15.     The Temporary Timekeepers performed their work in an existing conference room in the firm's Los Angeles offices. (Johnston Dep. at 75:19-23; 79:18-23). Accordingly, overhead costs attributable to the HBD's use of the Temporary Timekeepers appear to have been de minimus.

16.     Section 330 of the Bankruptcy Code allows the Court to award to "a professional person employed under section 327" reasonable compensation for the services rendered by such

---

[2] James Habel, a temporary attorney used by HBD was employed at a rate of $60.00 per hour. Because Mr. Habel's payment arrangement was unique, his rate was not included in this range.

professional person "and by any paraprofessional person employed by any such person" who qualifies for compensation under section 330 of the Bankruptcy Code. <u>The Court authorized the retention of HBD only</u>. The temporary attorneys used by HBD were not employed under section 327 of the Bankruptcy Code, nor were those temporary attorneys eligible to render services in this case without further order of the Court under Bankruptcy Rule 2014(b), since they were not partners, members, or regular associates of HBD. The temporary paralegals used by HBD were not employed by HBD, the professional person retained in accordance with section 327 of the Bankruptcy Code and eligible for compensation under section 330 of the Bankruptcy Code, as required by section 330(a)(1)(A) of the Bankruptcy Code. Because the Temporary Timekeepers are professionals or paraprofessionals who are not partners, members, associates or employees of HBD, they were required to have been separately retained under section 327 of the Bankruptcy Code as a condition of allowance of their fees. In <u>Quesada v. United States Trustee</u>, 222 B.R. 193 (D.P.R. 1998), the District Court was confronted with nearly identical circumstances. In that case, the chapter 7 trustee filed an application requesting compensation for legal serves performed by attorneys who were not associated with or employed by his firm. There, because the chapter 7 trustee did not seek advance approval of the retention of the temporary attorneys at issue, the Court denied the chapter 7 trustee all compensation associated with the employment of the temporary attorneys. The Court based its holding on the universal principle that a professional hired by a debtor in possession without the court's approval may not be compensated. <u>Quesada</u> at 198. <u>See also</u> <u>In re Arkansas Co., Inc.</u>, 798 F. 2d 645, 649 (3d Cir. 1986) (Bankruptcy Code and Bankruptcy Rules require both prior approval of employment and after the fact approval of compensation); and <u>In re United Companies Financial Corp.</u> 241, B.R. 521, 528 (Bankr. D.Del. 1999).

17.     Payment by HBD for the services of the Temporary Timekeepers also violates section 504(a) of the Bankruptcy Code, which provides an independent basis to disallow the fees requested. Section 504 of the Bankruptcy Code prohibits professional fee sharing with "another person," except that "a member, partner or regular associate" in a law firm may share bankruptcy fees with members, partners or regular associates of that firm. Clearly, sharing the interim fees received, either with the Temporary Timekeepers or the agencies which provided them, is on its face violative of section 504(a) of the Bankruptcy Code, which prohibits fee sharing with any "person", see Bankruptcy Code Section 101(41). For example, in In re Codesco, Inc., 15 B.R. 351 (Bankr.S.D.N.Y. 1981), the debtor's appraiser retained, without Court approval, an outside consultant who was to be paid from the fees that the appraiser was to receive from the debtor; such arrangement was held to violate section 504 of the Bankruptcy Code. Fee sharing among attorneys is prohibited and the proper remedy is to require disgorgement. In re Consolidated Bancshares, Inc., 785 F. 2d 1249, 1256-1257 (5th Cir. 1986). In In re Arthur and Joan Larsen, 190 B.R. 713 (Bankr. D.Me. 1996), an attorney sought compensation for pre-conversion services rendered to the debtors during the pendency of their chapter 11 cases. In Larsen, the attorney requested reimbursement of expenses in connection with services rendered by an attorney not associated with the fee applicant's firm. Although the attorney was seeking reimbursement of an expense and not payment of fees, the Court nevertheless denied reimbursement on the grounds that the expense was an impermissible sharing. Id. at 718.

18.     The record keeping with respect to the Temporary Timekeepers' services does not allow the court to determine whether those services rendered were actual, i.e., in fact performed, as required by Local Rule 2016-2(d). Nor can the Court ascertain the reasonableness or necessity of the Temporary Timekeepers' services in light of the apparent absence of a

contemporaneous description of those services by the service provider.  See e.g., In re Zenith Laboratories, Inc., 119 B.R. 51, 53-55 (Bankr. D.N.J. 1990) ( . . . any professional fees sought to be paid from a debtor's estate should be based upon meticulous contemporaneous time records . . . which should reveal sufficient data to enable the Court to make an informed judgment about the specific tasks and hours allotted." (citations omitted); American Law Center P.C. v. Linda Ekstrom Stanley (In re Jastrem), 253 F.3d. 438, 443 (9th Cir. 2001) (The Court of Appeals upheld the Bankruptcy Court's decision to reduce the fees for debtor's counsel based, in part, on his failure to provide contemporaneous time records supporting his claim for fees) and Mayalt v. Parker & Parsley Petroleum Co., 963 F.Supp. 310, 312-13 (S.D.N.Y. 1997) (In deciding to award fees to counsel to plaintiff class in settled securities class action, the Court recognized that "where adequate contemporaneous records have not been kept, the court should not award the full amount requested." (citations omitted).  In sum, it is respectfully submitted that based upon the unambiguous statutory language, as well as the cases cited above, that the Court may not allow compensation for reimbursement for services rendered by, or reimbursement of expenses paid to the Temporary Timekeepers, which requires a reduction in the HBD fee application of $932,000.

**Excessive time was charged to the Document Analysis, Review and Management Category**

19.     In its Third Interim Fee Application for the  period September 1 through December 31, 1999, HBD represented that the Document project was essentially complete, after having spent 14,203 hours and seeking to charge the estates $1,312,508.15 through the end of the Third Interim Period for the project.  In and of itself this amount is shockingly high and should be scrutinized.  In addition to, and notwithstanding that representation, HBD charged an additional $155,000 in fees to that project in the Fourth Interim Period (January 1 through April

30, 2000). Given that HBD filed its *Third Interim Verified Application of Hennigan, Mercer &
Bennett for Interim Allowance of Compensation and for Reimbursement of Expenses* ("Third
Interim Application") on February 15, 2000, one and a half months into the Fourth Interim
Period, it is difficult to square the aforementioned representation made in the Third Interim
Application with the need for an additional $155,000 in fees to complete an already essentially
completed document review.

**HBD is not entitled to reimbursement for the fees charged by financial consultants
employed by the firm, whose retention was not authorized by the Court.**

20.    HBD charged a total of 531.7 hours of time, with a value in excess of $73,000 for
professional persons employed by the firm, who HBD describes as "financial consultants."
Those financial consultants, who are not attorneys, are not members of or regular associates of
HBD. (Johnston Dep. at 66:20 – 68:22). Use of, and billing for those persons, who are neither
lawyers nor paralegals, was neither disclosed in the Retention Application nor approved by the
Court. No application was made to employ those financial consultants as professional persons,
and no Order was ever entered by this Court authorizing the retention of those financial
consultants as professional persons. As such, those financial consultants were not authorized to
provide professional services to the Debtors, and the Debtors were not allowed to make payment
for the services rendered by those financial consultants. Accordingly, all fees attributed to
services rendered by financial consultants must be denied. In re United Companies Financial
Corporation, 241 B.R. 521, 528 (Bankr. D.Del. 1999).

**Excessive, Non-Beneficial, Duplicative, Unreasonable and Unnecessary Fees Were Incurred
in the Asset Analysis Category of Services.**

21.    Much of the so-called Asset Analysis category of services was not necessary, was
excessive, unreasonable, duplicative, and was not likely to confer a benefit when performed.

#580530 v1
102882-41010

DEL1: 40244-1

Approximately $675,0000 was spent by HBD in legal and factual analysis as to the estates'

causes of action against 3 or 4 third parties:  Donaldson, Lufkin & Jenrette and its affiliated

entities ("DLJ"), CS First Boston ("CSFB"), the debtors former accountants PriceWaterhouse

Coopers ("PWC") and the Debtors' directors and officers.  The firm took no depositions and did

no other discovery with respect to the potential claims against those third parties, and no actions

against such parties were filed by HBD. (Johnston Dep. at 122:20 – 123:8).  The firm was well

aware "early on" in the case, and certainly by late 1999, that the Committee intended to control

the prosecution of the estates' causes of action.  (Johnston Dep. at 105:15 – 106:12; 123:13-18).

In fact, on August 6, 1999, the Debtors and the Committee stipulated that the Committee would

control the investigation and prosecution of claims against the Debtors' directors and officers

(defined as the "Delegated Claims").  On February 22, 2000, the Committee filed an uncontested

Motion for entry of an Order transferring to the Committee authority to pursue all of the claims

which had not previously been delegated to it.  See Exhibit C annexed to the Langendorfer Cert.

Despite its awareness of the Committee's intentions with respect to the causes of action, the firm

plowed forward with hundreds of thousands of dollars in fees in researching the validity of such

claims.  All of HBD's work in this area was for naught, as no use was put to any of HBD's work

product resulting from the $675,000 in fees which the firm spent in this category.  (Johnston

Dep. at 124:22-25).  The Committee refused to accept the work product performed by HBD

when it was tendered by the firm. (Johnston Dep. at 123:13 - 124:3).  Thus, the estates have

been saddled with the duplication of effort and expense resulting from the same causes of action

having been researched and analyzed by two different firms.

**HBD's plan services were largely unnecessary and wasteful.**

22.     In 1999, shortly after the asset sale was concluded the Committee provided the

Debtor with a draft of a liquidating plan. (Johnston Dep. at 125:2-6). HBD recognized that in

these liquidating cases, the wishes of the Committee would be controlling in terms of a plan's

contents. (Johnston Dep. at 127:7-10). Ultimately, the proceeds of the liquidation belonged to

the creditors, who had the right to control the form of their distribution. Notwithstanding their

recognition that the creditors had the right to control the form of the plan, HBD spent substantial

sums negotiating with the Committee over the plan's form and redrafting same. Those services

should not be allowed, as they were neither beneficial nor necessary. HBD spent a total sum in

excess of $300,000 on plan related work, and a substantial reduction in the amount of the

compensable time spent by the firm in challenging the Committee's view of what a plan should

contain is warranted.

**The So-Called "Voluntary Reductions" of Fees Are Not Meaningful as They Represent
Time Which Was Not Compensable**

23.     HBD will no doubt argue that it has already taken its medicine by voluntarily

reducing its charges by a total of $763,225.23 before submitting its fee application. The firm

was not being magnanimous in doing so, however, as the motivation for those reductions was

recognition that the services which were the subject of the voluntary reductions would not be

compensable in any event. See Johnson Dep. at 148:5-13. The records of time written off are

annexed to the Langendorfer Cert. as Exhibit D. Even a cursory review of the records provided

by HBD in discovery identifying the charges written off demonstrate the non-compensability of

virtually all of those services. Some examples of the more egregious entries that were written off

include the following: (1) "Locate and retrieve book and law review articles for Ms. Smith"; (2)

"Telephone Conference with Mr. Okada regarding document inventory"; (3) "Pull pleading

clips, tab and deliver to OS for copies, and deliver copies to Mr. Most"; (4) "Leave Message with Mr. Johnston regarding status"; and (5) "Address calendaring issues." <u>See</u> Exhibits E through I attached to the Langendorfer Cert. The voluntary reductions generally consist of time entries representing secretarial, clerical, or non-legal work which the timekeeper inexplicably, and clearly inappropriately, billed to this file, which were properly eliminated on review by a responsible person. The so-called voluntary reductions should not color this court's view as to the amount of an appropriate reduction to the firm's fee application.

    WHEREFOR, the Court must reduce the final fee application of HBD for the Pre-Effective Date Period, disallow compensation in accordance with the Liquidating Trustee's objections, and grant such other and further relief as is just and proper.

                        KLEHR, HARRISON, HARVEY,
                        BRANZBURG & ELLERS, LLP


                            /s/ Steven K. Kortanek
                        Steven K. Kortanek, Esq.
                        Stephanie A. Fox, Esq.
                        919 Market Street, Suite 1000
                        Wilmington, Delaware 19801
                        Phone: (302) 426-1189
                        Fax:    (302) 426-9193

                        -and-

                        Elizabeth S. Kardos, Esq.
                        Gibbons, Del Deo, Dolan,
                        Griffinger & Vecchione
                        A Professional Corporation
                        One Riverfront Plaza
                        Newark, New Jersey 07102
                        Telephone: (973) 596-4500
                        Facsimile: (973) 639-6247

Dated: March 1, 2002

DEL1: 40244-1

#580530 v1
102882-41010

**Ap. 2650**

# Tab No. 2661

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) ) ) Chapter 11 |
| WORLDWIDE DIRECT, INC., et al., | ) ) ) |
| Debtors. | ) Case Nos. 99-108 to -127 (MFW) ) ) |
| | ) Jointly Administered ) ) |

**Hearing: May 16, 2002, at 1:00 p.m.**

**Briefing is now complete**

## REPLY OF HENNIGAN, BENNETT & DORMAN TO THE
## LIQUIDATING TRUST'S OBJECTION TO THE FINAL FEE APPLICATION

Hennigan, Bennett & Dorman ("HBD") hereby replies to the Objections raised by the

Liquidating Trust to HBD's final fee application in this case.

148316.v2

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 5

        A.      HBD's Significant Accomplishments. .................................................. 6

        B.      HBD's Critical Role In The Plan Process. ........................................... 10

        C.      HBD's Analysis Of Estate Causes Of Action. ..................................... 13

        D.      HBD's Extensive Efforts To Preserve Estate Records And
                Respond To The Committee's Discovery Requests. ............................. 16

III.    THE LIQUIDATING TRUST'S FIRST OBJECTION,
        AND THE "AUDITOR"'S REPORT ................................................................ 18

        A.      The Report Does Not Reflect an Audit And Is Incomplete. .................. 19

        B.      The Report Utilized Flawed Methodology. ........................................... 21

        C.      The Report Misrepresents The Content Of HBD's Fee
                Applications And Time Entries. ............................................................. 24

        D.      The "Auditor"'s Objections Are Without Merit. ................................... 25

                1.      LCC's Purported Timekeeping Objections. .............................. 25

                2.      HBD's Rate Increases. .............................................................. 27

                3.      LCC's Purported Expense Objections. ...................................... 28

IV.     HBD'S USE OF TEMPORARY PROFESSIONALS AND
        FINANCIAL CONSULTANTS WAS BENEFICIAL TO THE
        ESTATE AND  REASONABLE UNDER THE CIRCUMSTANCES ........... 30

        A.      The Temporary Professionals Did Not Need To Seek Separate
                Employment Authorization. .................................................................. 32

        B.      The Use Of Temporary Attorneys And Paralegals Did Not Result
                In "Fee Splitting." ................................................................................. 37

        C.      HBD Maintained Contemporaneous Time Entries For The
                Temporary Personnel. ............................................................................ 39

        D.      HBD Properly Billed For Services Rendered By In-House Financial
                Consultants. ........................................................................................... 41

-i-

V.    **THE LIQUIDATING TRUST HAS NOT ACTED IN GOOD FAITH** ......................... 42

    A.    The Liquidating Trust's Threat Regarding The Appointment Of A
          Fee Auditor. ............................................................................................... 43

    B.    The Liquidating Trust's Discovery Stonewalling. .................................... 44

    C.    The Liquidating Trust's Refusal To Acknowledge HBD's
          Substantial Voluntary Fee And Expense Write-Offs. ............................... 48

VI.    **CONCLUSION** ............................................................................................... 48

148316.v2

HENNIGAN, BENNETT & DORMAN

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re American Preferred Prescription, Inc.*, 218 B.R. 680 (E.D.N.Y. 1998) ................................... 36

*In re Arkansas Co.*, 798 F.2d 645 (3d Cir. 1986) .......................................................................... 37

*In re Arthur and Joan Larsen*, 190 B.R. 713 (Bankr. D. Me. 1996) ................................................ 39

*In re Babcock Dairy Co. of Ohio*, 70 B.R. 691 (Bankr. N.D. Ohio. 1987) ...................................... 29

*In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833 (3d Cir. 1993) .................................... *passim*

*In re Codesco, Inc.*, 15 B.R. 351 (Bankr. S.D.N.Y. 1981) ............................................................... 39

*In re Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir. 1986) .............................................. 39

*Elstead v. Nolden (In re That's Entertainment Marketing Group, Inc.)*,
     168 B.R. 226 (N.D. Cal. 1994) .................................................................................................. 29

*In re Interstate Savings, Inc.*, 32 Bankr. Ct. Dec. 902 (Bankr. E.D. Pa. 1998) ........................... 32, 42

*In re Jastrem*, 253 F.3d 438 (9th Cir. 2001) .................................................................................. 41

*In re Keravision, Inc.*, 2002 U.S. Dist. LEXIS 1586 (N.D. Cal. 2002) ............................................. 32

*In re Landmark Distributors, Inc.*, 195 B.R. 837 (Bankr. D.N.J. 1996) ........................................... 33

*Maywalt v. Parker & Parsley Petroleum Co.*,
     963 F. Supp. 310 (S.D.N.Y. 1997) ....................................................................................... 40, 41

*In re Met-L-Wood Corp.*, 115 B.R. 133 (Bankr. N.D. Ill. 1990) ...................................................... 36

*In re Napolean*, 233 B.R. 910 (Bankr. D.N.J. 1999) ...................................................................... 29

*In re Ponce Marine Farm, Inc.*, 259 B.R. 484 (D.P.R. 2001) .......................................................... 29

*Quesada v. United States Trustee*, 222 B.R. 193 (Bankr. D.P.R. 1998) ..................................... 36, 37

*In re Statewide Pools, Inc.*, 79 B.R. 312 (Bankr. S.D. Ohio 1987) .................................................. 38

*In re Warner*, 141 B.R. 762 (Bankr. M.D. Fla. 1992) ................................................................. 37, 39

*In re Zenith Laboratories, Inc.*, 119 B.R. 51 (Bankr. D.N.J. 1990) ................................................. 40

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

## Other

11 U.S.C. § 330(a)(3) ........................................................................................................... 1

4 *Collier on Bankruptcy* ¶ 504.02 (15th ed. rev. 2002) ..................................................... 37

9 *Collier on Bankruptcy* ¶ 2016.1 (15th ed. rev. 2002) ................................................... 38

148316.v2

HENNIGAN, BENNETT & DORMAN

# I.     INTRODUCTION

The Liquidating Trust, controlled by a "trust board" consisting primarily of members of the former Official Committee of Creditors, has objected to a staggering $2,729,337 of the final fees and expenses requested by HBD for its two-and-a-half years of service as counsel to the Debtors. This objection amounts to nearly forty percent (40%) of HBD's final fee and expense request, which itself reflects HBD's voluntary reduction of more than $750,000 in fees and expenses.

Professional responsibility dictates that, before launching an objection to a professional's fees and expenses (particularly a massive attack such as the one waged by the Liquidating Trust), one investigate and assess the services rendered by that professional in the case. 11 U.S.C. § 330(a)(3) ("In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking in account all relevant factors.").

Here, despite receiving several extensions of the deadline for filing objections to HBD's timely-filed final fee application (resulting in a period of more than three-and-a-half months for review of the application), the Liquidating Trust dispensed with any assessment of the merits of HBD's service in this case. The Liquidating Trust's utter derogation of its duties is reflected by the fact that –

- The Liquidating Trustee (the entity pursuing the objection on behalf of the Liquidating Trust) never read HBD's application;

- The Liquidating Trustee never reviewed any of HBD's work product;

- The Liquidating Trustee never discussed HBD or its work with any of HBD's clients;

- The Liquidating Trustee never discussed HBD or its work with any members of the Liquidating Trust Board or any other creditors in the case; and

- The Liquidating Trustee never discussed any of its "objections" to the application with HBD.

-1-

148316.v2

Instead, the Liquidating Trust hired a "fee auditor" (and a new law firm whose sole purpose apparently is to engage in objections to professionals' fees). Then, upon receiving a preliminary draft of the fee auditor's report regarding HBD's final application, the Liquidating Trustee simply filed that draft as its "objection," without any discussion with the auditor and without even reading the report in its entirety.

Had the Liquidating Trustee bothered to do so, it would have learned that —

- The auditor never reviewed any of HBD's work product;

- The auditor never discussed HBD or its work with any of HBD's clients;

- The auditor never discussed HBD or its work with any members of the Liquidating Trust Board or any other creditors in the case;

- The auditor never discussed any of its "objections" to the application with HBD;

- The auditor did not review a single document from the case file and never familiarized itself with any of the issues involved in the case;

- The auditor failed to follow its own "generally accepted legal auditing principles," which, in any event, the auditor simply made up, are not "generally accepted" (or even known) by anyone, and conflict with this Court's guidelines for the practices regarding allowance of fees and expenses;

- The auditor's "analysis" consisted primarily of running computerized searches of its (incorrect) transcription of HBD's invoices to identify "objectionable" time entries (such that, for example, virtually all time entries that included a semicolon were deemed objectionable);

- The time entries identified in the exhibits to the auditor's report (which the auditor apparently manually copied from HBD's invoices) are incorrect in a shockingly-large percentage of instances, thus falsely indicating that certain entries were for greater periods of time than that actually recorded by HBD, that certain time entries duplicated other entries, and that certain time entries contained abbreviations, editorial comment, or other verbiage that do not appear in HBD's actual bills;

-2-

- The auditor ignored the categories into which HBD grouped its fees and the detailed narrative descriptions in the interim and final fee applications, meaning that the time entries identified in the exhibits to the auditor's report lack the important context of the category grouping, the related contemporaneous time entries, and the narrative; and

- Counsel hired by the Liquidating Trust (as well as counsel previously hired by the Committee) have billed the Liquidating Trust for the very same expenses that the auditor claims to be objectionable.

Finally, after being given the opportunity to conduct discovery and to supplement its inadequate initial objection (which consists of two paragraphs regarding HBD), the Liquidating Trust (or at least the Liquidating Trust's counsel) changed tactics. First, after propounding and receiving substantial discovery from HBD, the Liquidating Trust stonewalled HBD's legitimate discovery efforts. Then, while still pursuing "objections" in respect of the auditor's report notwithstanding HBD's production of all supporting documentation regarding its fees and expenses, the Liquidating Trust filed a supplemental objection that, without any substantive analysis of HBD's work product or accomplishments, alleges that HBD should be denied compensation because it helped achieve confirmation of a Plan, analyzed causes of action available to the estate, and used "temporary" attorneys and paralegals in an effort to keep the costs down in the case.

As demonstrated below, these belated attacks on HBD lack any substance or merit. Among other things –

- HBD performed a critical role, at the request of the Committee (now the Liquidating Trust Board), in achieving confirmation of the Plan;

- HBD conducted its analysis of available causes of action at the direct instruction of its clients (including the CEO that the Committee directed the Debtor to hire) and with the full knowledge of the Committee (now the Liquidating Trust Board) – when the Committee subsequently decided that it wanted to pursue those actions itself, HBD offered all of its work product to the Committee and immediately ceased work on the project;

-3-

- The document/privilege review services performed by the "temporary" professionals were performed at the direction of the Committee (now the Liquidating Trust Board) – in fact, the Debtor and HBD repeatedly requested that the Committee agree to accept unreviewed privileged documents from the Debtor and thereby greatly reduce the temporary professional services necessitated by the review process, and the Committee repeatedly refused;

- The use of "temporary" professionals was disclosed to and approved by the Committee (now the Liquidating Trust Board), and HBD made full disclosure of such professionals to the Court and all interested parties on numerous occasions;

- HBD calculated an hourly rate for the "temporary" professionals based upon a reasonable approximation of HBD's actual cost in providing such personnel to the estate, notwithstanding the fact that HBD billed some of the very same personnel to other clients at rates that were more than double the rates billed to the estate in this case;

- The law firm hired by the Committee (now the Liquidating Trust Board) billed and received compensation for the use of contract attorneys and in-house financial consultants during the bankruptcy case; and

- Neither the Committee (now the Liquidating Trust Board) nor anyone else objected to, raised any concerns regarding, or made any reservation of rights with respect to any of HBD's five previous interim fee applications, all of which clearly and unambiguously described all of the services, fees, and expenses to which the Liquidating Trust now objects and all of which were approved by the Court after notice and a hearing.

In summary, the Liquidating Trust's objections and gamesmanship smack of an effort to generate money at any cost, including denigration of the professionals who served in the case (at least the professionals who were employed by the Debtors). In the process, the Liquidating Trust tries to rewrite history without ever attempting to learn what actually occurred, and disregards the provisions of the Bankruptcy Code (including provisions that ensure the payment of reasonable compensation to professionals) and the professional services performed, the reasonableness of the fees and expenses requested, and any consistency among professionals in the case.

-4-

This is borne out by the Liquidating Trust's early threat – made to all professionals without any consideration of the work performed, the results achieved, or the write-offs taken – that it would employ a fee auditor unless the professional agreed to an across-the-board, seven percent (7%) reduction in its final fee application. HBD stood up to that threat and, apparently because it had been employed by the Debtors rather than the Committee (with whose professionals the Liquidating Trust now has settled), faces an objection to more than $2.7 million of its final fees and expenses.

This is not a full and fair inquiry into the reasonableness of HBD's fees. This also is not the inquiry mandated by the Third Circuit, which has stressed that "it is critical that courts allow attorneys the same leeway in types of tasks billed for at their (and their paralegals') established rate that non-bankruptcy clients permit their attorneys' (and their attorneys' paralegals), or Congress' manifest intent to provide fully competitive income to bankruptcy attorneys would be transgressed." *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 853 (3d Cir. 1993). For that reason and the reasons described more fully below, HBD requests that the Court overrule the Liquidating Trust's objection and approve in full HBD's final fee and expense application.

## II.    BACKGROUND

The Debtors filed their chapter 11 cases on January 19, 1999, and this Court approved HBD's retention as the Debtors' counsel by an order entered on January 21, 1999. From the petition date through the effective date of the Plan on June 30, 2001, HBD played a major role in every development and accomplishment in the case.

This Court previously has noted its belief that, because the Debtors' assets were liquidated and sold in the four months following the petition date, this was not a particularly "complicated" case. With respect to operational and "reorganization" issues typically confronted in a reorganizing chapter 11 case, this is true. However, because of the disarray of the Debtors' financial affairs, the enormous claims asserted against the estate, the possibility of significant recoveries from third parties through nonbankruptcy litigation, and the presence of a Committee with varying (and

-5-

HENNIGAN, BENNETT & DORMAN

Ap. 2661

occasionally conflicting) agendas, HBD was forced to confront a number of difficult and complex issues, some of which are summarized below. HBD successfully brokered many compromises, meaning that many of those issues never surfaced for determination before the Court. Moreover, regardless of the characterization of the case as "complicated" or not, there is no question that the case was labor intensive. The enormity of HBD's efforts also are summarized below.

Throughout the case, HBD was guided by the overarching principle that, particularly because this was a liquidating case, the touchstone of HBD's services would be economy and the maximization of the estate for distribution to creditors. To that end, HBD was extremely generous to the estate in its billing practices, ultimately effecting voluntary (*i.e.*, not at the prompting of the client or any other parties) write-offs in its fees and expenses of more than $750,000. Moreover, where appropriate, HBD also employed the temporary attorneys and paralegals on a contract basis – with billing rates that were half or less than the rates of HBD's full-time attorneys and paralegals – to which the Liquidating Trust now objects. As described below, the alternative to the use of such temporary professionals was the use of full-rate professionals, which would have resulted in a marked increase in the costs to the estate.

A.    **HBD's Significant Accomplishments.**

As described in HBD's six interim fee applications, HBD meticulously grouped its services into seventeen different fee categories. HBD will not reiterate those categories here. Rather, in order to give the Court some perspective on the tasks faced and the results accomplished by HBD, the following summarizes the most significant matters for which HBD was responsible and the results achieved in those matters.

• **Sale To AT&T.** The Debtors commenced the case after having negotiated for a sale of their business as a going concern to AT&T. With their petitions, the Debtors filed a motion for approval of the sale and for approval of certain sale procedures, including minimum overbids and a break-up fee. After a number of objections to the sale procedures were filed – including an objection by the Committee – HBD negotiated with the objectors and with AT&T to modify the requested procedures, and filed responsive briefs. Ultimately, after this Court indicated that it

-6-

would not approve the modified procedures, HBD professionals negotiated literally all night with AT&T and the Committee for further revisions, and HBD managed to salvage AT&T's continued participation as a bidder for the Debtors' assets through further modified procedures that this Court subsequently found acceptable. After conclusion of the sale procedures, HBD responded to several objections to the sale (filed by, among others, a former member of the Committee interested in purchasing the assets for less than AT&T's offer) and ultimately obtained the Court's approval for the sale. HBD then negotiated extensively with AT&T to achieve a closing of the transaction. The end result was that, in less than four months, the Debtors were able to consummate the sale and ultimately receive consideration of approximately $150 million.

- **Debtor In Possession Financing/Cash Collateral**. As part of the pre-filing negotiations, AT&T agreed to provide the Debtors with DIP financing to ensure that the Debtors would have adequate liquidity with which to operate the business pending a sale. On the petition date, the Debtors filed a motion for approval of the DIP facility. After various parties (including a member of the Committee) objected to portions of the facility, HBD litigated and obtained approval of the loan agreement, thereby ensuring that the value of the estate would be preserved throughout the sale process. HBD also successfully defended an interlocutory appeal made to the Court's approval order. Concurrently, HBD litigated and negotiated with Fletcher International Limited ("Fletcher"), the only secured creditor of the Debtors, for the use of cash collateral in which Fletcher asserted an interest, and HBD ultimately obtained Fletcher's consent to the use of cash collateral throughout the sale process.

- **Holdback Note Litigation With AT&T**. $40 million of the nominal purchase price to be paid by AT&T in respect of the Debtors' assets was in the form of a "holdback note," with installments of $20 million coming due six months after the closing date of the sale and then twelve months after the sale closing date. AT&T made no payments on either installment date, instead asserting indemnification claims in excess of $40 million against the estates. HBD subsequently conducted a comprehensive case analysis, and prepared and filed an exhaustive forty-page complaint against AT&T to recover that $40 million. The analysis of AT&T's indemnification

-7-

claims proved to be a massive undertaking, particularly with respect to AT&T's $20 million claim relating to "prepaid minutes liability," because it entailed the review and analysis of data regarding literally tens of millions of phone cards on the Debtors' "platform" as of the date of the sale closing. HBD responded to AT&T's extensive discovery requests regarding prepaid minutes and other issues, and answered the various counterclaims raised by AT&T. Ultimately, HBD's efforts proved incredibly fruitful, as HBD was able to demonstrate conclusively the lack of merit of the vast majority of AT&T's claims, and the Debtors and AT&T ultimately reached a settlement that provided for the payment of essentially all of the amounts due from AT&T.

- **Fletcher Claims**. Fletcher asserted a secured claim of more than $38 million against the Debtors, consisting of a $10.5 million claim for a prepetition loan to the Debtors and a claim for $28.125 million (plus unliquidated amounts) in respect of "make whole" rights under a securities purchase agreement executed prior to the petition date. HBD commenced an adversary proceeding in objection to Fletcher's claims, particularly the "make whole" claims which HBD believed to be subject to subordination under sections 510(b) and 510(c) of the Bankruptcy Code and were unenforceable under applicable state law. HBD subsequently coordinated the Debtors' response to Fletchers' broad discovery requests (described below), litigated discovery issues, and prepared and responded to a number of dispositive motions, including motions for judgment as a matter of law and summary judgment motions. As the Fletcher claims involved novel questions of first impression (including issues regarding whether the "make whole" claims properly were classified as debt or equity, whether subordination was appropriate, and whether state laws limiting dividends and stock redemptions precluded the claims), HBD was required to develop and assert new and untested legal theories.

Ultimately, HBD's theories and efforts prompted Fletcher to seek a settlement of the claims with the Committee, which desired a settlement rather than litigation (because, among other things, the Indenture Trustee sitting on the Committee feared the Debtors' argument that Fletcher held a claim for "redemption rights" that, although subordinated to general unsecured creditors, could be deemed senior to the subordinated notes represented by the Indenture Trustee). Although the

-8-

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

Debtors and HBD believed that a better course would be to litigate the objection to Fletcher's claims (a determination later confirmed by the decisions of this Court and other courts confirming HBD's legal analysis and interpretation), the Debtors agreed to consent to the Committee's settlement with Fletcher, and HBD negotiated the complicated settlement (which included, among other things, the auction and purchase of the settled claim by a member of the Committee) on the estates' behalf.

• **Estate Management.** Following the sale to AT&T, the Debtors' Chief Executive Officer resigned. Subsequently, the Debtors retained Mr. William Snyder and his firm, Crossroads Capital, to fill the CEO position. The Committee, however, objected to the employment of Crossroads and, in a continuing effort to defer to the wishes of the Committee, the Debtors determined to find a replacement candidate. HBD therefore conducted extensive negotiations with the Committee, which resulted in the Debtors' election of the Committee's candidate for CEO, Eugene Davis and his firm, Executive Sounding Board Associates. HBD drafted a stipulation to document the Debtors' agreement with the Committee regarding Mr. Davis. HBD also successfully defended against a motion for the appointment of a chapter 11 trustee brought by a group of dissident shareholders.

• **Cure Claims.** HBD successfully objected to the $2 million "cure claim" asserted by AudioFAX, culminating in a judgment of liability by this Court for only $25,000 (an amount for which the Debtors had offered to stipulate in its briefs). HBD successfully objected to and obtained the disallowance of the late-filed $2.5 million "cure claim" asserted by Pacific Applications International Corporation, and then successfully defended an appeal by that claimant.

• **Intrine Claim.** HBD represented the estates in defending against the $500 million proof of claim filed by Intrine LLC. HBD researched numerous legal issues, prepared a damage analysis, interviewed witnesses, meet with potential experts, conducted discovery, and prepared a detailed settlement memorandum. Ultimately, HBD's thorough efforts enabled HBD to negotiate (in five settlement conferences) a very favorable settlement that resulted in the allowance of a claim of only $4.675 million.

-9-

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

- **Other Claims**. Nearly 2,000 claims were filed or scheduled in the bankruptcy case. HBD was responsible for the claim analysis and objection process. As a direct result of HBD's efforts, by the effective date of the Plan, all but several dozen of the proofs of claim had been reconciled and resolved, the maximum amount of claims had been reduced from well over $1.5 billion to less than $400 million, and the estates stood in a position to make a substantial interim distribution to creditors shortly after the Effective Date of the Plan.

- **Other Accomplishments**. HBD successfully defended against a motion for relief from stay brought by a creditor (Telemac) who sought injunctive relief that could have derailed the sale to AT&T. HBD successfully negotiated for and obtained approval of a multimillion dollar sale of the Debtors' "prepaid cellular" assets that were not sold to AT&T. HBD successfully objected to and opposed a competing plan and disclosure statement filed by Fletcher prior to the settlement of the Fletcher claims.

*     *     *

The Liquidating Trust apparently cares nothing of these accomplishments, and instead attacks (in summary fashion) HBD's other accomplishments in achieving confirmation of the Plan, analyzing causes of action available to the estate, and using "temporary" attorneys and paralegals in an effort to keep the costs down in the case. The following sections set the record straight with respect to HBD's efforts in this regard.

**B.    HBD's Critical Role In The Plan Process.**

At the direction of the Committee, the Debtors did not seek to extend the plan exclusivity period in these cases. Rather, given the liquidating nature of the case, the Debtors were committed to working with the Committee in the rapid formulation and confirmation of a plan that could result in the distribution of the AT&T sale proceeds as rapidly as possible. To that end, the Committee requested that the Debtors serve a "co-proponent" of a plan, and the Debtors and the Committee formed a "plan working group," consisting of HBD, counsel to the Committee, and counsel to the Indenture Trustee (a member of the Committee), to develop the terms of the plan.

-10-

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

The Committee, through the working group, first instructed HBD to prepare a disclosure statement (in respect of a plan that had not yet been drafted), and HBD devoted substantial effort to preparing and distributing a draft to meet the timetable established by the Committee. The Committee then circulated a draft liquidating plan which, frankly, was not much more than a form plan from a different case. HBD reviewed and commented upon that plan and identified numerous material problems that needed to be addressed and resolved. Johnston Decl. ¶ 3.[1]

HBD subsequently assisted the Committee in researching and considering numerous issues implicated by the Committee's draft plan, and HBD participated in lengthy meetings with Committee professionals in which issues regarding the plan were discussed and negotiated. Among other things, fearing that a liquidating trust would be needlessly complex and controversial, HBD proposed several plan structures that differed from the "liquidating trust" structure favored by the Committee. Johnston Decl. ¶ 4.

Ultimately, however, the Committee insisted upon the use of a liquidating trust, so HBD commented upon and extensively revised the draft plan and liquidating trust agreement prepared by the Committee, and HBD revised and reworked the disclosure statement that it previously had prepared. At the request of the Committee and as counsel to the co-proponent of the Plan, HBD also commented upon and revised other plan-related documents, including a draft revenue ruling request to the Internal Revenue Service regarding certain anticipated tax consequences of the proposed plan. Johnston Decl. ¶ 5.

When the Disclosure Statement and Plan were finalized, HBD prepared a detailed motion to establish procedures for the solicitation of votes on the Plan following approval of the Disclosure Statement, and HBD filed the documents with the Court. The Debtors and HBD then were shocked when, a few weeks later, a member of the Committee objected to provisions of the Plan that the

---

[1]    In this brief, "Appendix" refers to the accompanying Appendix of Exhibits; "Depo. Appendix" refers to the Accompanying Appendix of Deposition Excerpts; "Davis Decl." refers to the accompanying Declaration of Eugene I. Davis; "Johnston Decl." refers to the accompanying Declaration of James O. Johnston; "Ballard Decl." refers to the accompanying Declaration of Shawna Ballard; and "Kontos Decl." refers to the accompanying Declaration of Linda Kontos.

HENNIGAN, BENNETT & DORMAN

Committee itself had insisted upon (the provisions insisted upon by the Indenture Trustee regarding fee shifting in litigation in respect of "senior claim" status under the Plan). This objection necessitated signification additional work by HBD, which ultimately brokered a compromise among the feuding members of the Committee. Johnston Decl. ¶ 6.

Thereafter, HBD researched a number of issues implicated by other objections raised to the Disclosure Statement, negotiated with the objecting parties for resolution of the objections, and based upon those negotiations, HBD subsequently prepared and filed comprehensive revisions to the Plan, Disclosure Statement, and the Liquidating Trust Agreement. HBD also prepared a detailed reply brief with respect to the remaining Disclosure Statement objections. Johnston Decl. ¶ 7.

Ultimately, after the Court approved the Disclosure Statement on the condition that certain additional changes be made to the Plan documents, HBD prepared a detailed Second Amended Plan, Disclosure Statement, and Liquidating Trust Agreement. HBD then arranged to have the Disclosure Statement and related materials disseminated to all creditors for the purposes of Plan balloting. Concurrently, HBD prepared and obtained approval of a motion to subordinate and classify into a class of subordinated claims under the Plan the hundreds of claims filed by persons who asserted securities-fraud claims against the Debtors. Thereafter, HBD received and tabulated the hundreds of ballots cast with respect to the Plan. Johnston Decl. ¶ 8.

Following the receipt of a number of objections to confirmation based upon the controversial liquidating trust structure demanded by the Committee (which HBD had warned was not the most efficient plan structure), HBD drafted a comprehensive reply and brief in support of confirmation, and HBD subsequently participated in negotiations that resolved all but several of the objections. Subsequently, HBD prepared for and attended the three days of hearings regarding confirmation of the Plan (which spanned several weeks) and, at the direct request of the Committee, HBD conducted direct examination of a witness and argued various point at the hearing. Thereafter, HBD prepared an extensive post-hearing brief, along with a comprehensive proposed order of confirmation and proposed findings of fact and conclusions of law. Johnston Decl. ¶ 9.

-12-

148316.v2

HENNIGAN, BENNETT & DORMAN

Ap. 2661

Given all of this, the statement in the Liquidating Trust's supplemental objection that "HBD's plan services were largely unnecessary and wasteful" is simply jaw dropping. Without HBD, there would have been no plan confirmed in this case. The Committee knew this and requested that the Debtors be a co-proponent of the Plan, and then relied upon HBD to do all of the "heavy lifting" in drafting the Disclosure Statement and Plan and in fending off the numerous objections prompted by the structure that the Committee had insisted upon. Had the Liquidating Trustee bothered to ask its own counsel or the members of the Liquidating Trust Board, it would have learned (at least if those persons answered truthfully) that this was the case. The Liquidating Trust's argument that HBD's plan-related services "were neither beneficial or necessary" is either evidence of a total lack of investigation or outright bad faith.

### C.    HBD's Analysis Of Estate Causes Of Action.

The Debtors believed that their precarious financial condition arose in large part due to the forced restatement of its financial results necessitated by errors made by the Debtors' prepetition accountants PricewaterhouseCoopers ("PWC"), and by the Debtors' ill-fated acquisition of Worldwide Direct at the advice of Donaldson Lufkin & Jenrette ("DLJ") and the Debtors' sale of their operator services business at the advice of Credit Suisse First Boston Corporation ("CSFB"). HBD has a nationally-renowned commercial litigation practice, and was a natural choice to assist the estate in investigating and pursuing claims against such third parties. (For example, HBD served as lead bankruptcy and litigation counsel to Orange County, California in connection with the largest municipal bankruptcy in history, and on behalf of the County HBD achieved record recoveries – more than $850 million in total – against the very types of investment professionals and accounting firms that were potential defendants in the litigation to be brought on behalf of the estate in this case).

Thus, after consummation of the AT&T sale, at the direction of the Debtors' CEO (whom the Committee had directed the Debtors to hire), HBD began an analysis of the estates' potential claims against PWC, DLJ, and CSFB. *See* Davis Decl. Among other things, contrary to the Liquidating Trust's assertion that HBD conducted no discovery, HBD prepared and obtained Court

-13-

approval of various requests for authorization to conduct examinations of those entities pursuant to Bankruptcy Rule 2004 and to discover numerous related documents. Thereafter, HBD negotiated protective orders with counsel for the potential defendants and began to receive and review the voluminous documents produced in compliance with the Rule 2004 subpoenas. Ballard Decl. ¶ 4.

HBD also conducted extensive factual and legal research (including witness interviews and document review) regarding the potential claims that ultimately could be asserted on behalf of the bankruptcy estates, and HBD began to prepare for litigation with respect to those claims. Among other things, HBD prepared an extensive complaint against DLJ and was prepared to file that complaint by October 1999. HBD also prepared and delivered to its clients a comprehensive memorandum analyzing the potential causes of action against PWC, and HBD began to draft a complaint to assert those claims.[2] Ballard Decl. ¶ 4.

In early 2000, for reasons that the Debtors never fully understood, the Committee demanded that the Debtors cease all work in pursuing the third-party claims and delegate the right to bring the claims to the Committee. Appendix, Ex. 1 (letter dated February 7, 2000, from counsel to the Committee). Given HBD's extensive efforts and expertise, and the fact that HBD was ready, willing, and able to begin the litigation immediately, the Debtors believed that the Committee's demand was unwise. Nevertheless, showing the deference that they showed throughout the case, the Debtors agreed to a delegation to the Committee, and HBD thereafter negotiated the terms of the "uncontested" motion to accomplish that delegation. Notwithstanding the Liquidating Trust's flabbergasting assertion that HBD "plowed forward" in analyzing the causes of action after it was determined that they be delegated to the Committee, HBD performed essentially no additional work on the potential litigation from that point forward.

---

[2]   Contrary to the Liquidating Trust's unsupported statement, HBD never expended any time in reviewing causes of action against the Debtors' directors and officers (whom the Committee had threatened to sue from the very first days of the bankruptcy case). HBD realized that the Committee was the appropriate entity to analyze and assert any claims against the directors and officers, and HBD therefore negotiated a stipulation to delegate those claims to the Committee very early on in the case (August 1999).

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

In fact, in an effort to give the Committee a "head start" in its analysis of the claims, HBD offered to provide to the Committee all of its extensive work product regarding the litigation (and HBD went so far as to deliver to the Committee, in a sealed envelope, a copy of the draft complaint against DLJ). The Committee, however, declined to review or accept that work product, apparently on the belief that acceptance of the work product would jeopardize the Committee' ability to recover from the Debtors' D&O insurance carriers in respect of the claims that the Committee had threatened against the Debtors' directors and officers.

For all of this, including performing an analysis of causes of action at the direction of its client (whom the Committee had directed be hired by the Debtors), the Liquidating Trust now objects to HBD's fees on the grounds that "the estates have been saddled with the duplication of effort and expense resulting from the same causes of action having been researched and analyzed by two different firms." Supplemental Objection at 10. Astonishing. HBD should not be penalized (by the Committee, now in the guise of the Liquidating Trust) for the Committee's duplication of work product that HBD created and then offered to the Committee.

In fact, HBD would have been remiss if it had failed to diligently investigate and initiate the prosecution of the claims, particularly considering the looming trial date and expert witness deadlines in the Fletcher litigation. That litigation involved issues regarding what caused the demise of the Debtors' business and the dates of the Debtors' insolvency. HBD knew that those similarly would be critical issues in the cases against PWC and DLJ, and HBD knew that it would be critical to maintain a consistent and unified position throughout the litigation. Thus, when HBD met with the experts retained for the Fletcher litigation, it already had developed a theme for litigation of the other matters, and made sure that the theories developed in each were consistent and coherent. HBD should be compensated for these efforts. Ballard Decl. ¶ 11.

-15-

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**