**D.    HBD's Extensive Efforts To Preserve Estate Records And Respond To The Committee's Discovery Requests.[3]**

Early in the case, HBD and the Debtors realized that this would be a "document intensive" matter that, given the numerous avenues of litigation, would entail the review of voluminous documents and records maintained by the Debtors (to establish, among other things, the Debtors' insolvency at various points in time). From the outset, however, the Committee exhibited a high level of suspicion regarding maintenance of the Debtors' documents, and the Committee repeatedly demanded that the Debtors locate all of their documents in a single, secure repository and adhere to a very aggressive schedule in reviewing and producing the documents to the Committee. Notwithstanding the Debtors' assent, the Committee also filed an expansive Rule 2004 document demand to the Debtors. Ballard Decl. ¶ 2.

Early in the case the Debtors also received broad document requests from Fletcher, and the Debtors anticipated that similarly extensive requests would be received from other litigants and from the Securities Exchange Commission (which was investigating issues relating to the restatement of the Debtors' financial affairs). Ballard Decl. ¶ 9.

As a result, at the demand of the Committee and the direction of its clients, HBD set out to create a comprehensive repository of documents, from which documents could be reviewed and produced as efficiently as possible. HBD compiled documents from numerous sources, including the Debtors' facilities in Ohio and Massachusetts, the Debtors' former litigation counsel, and the Debtors' former corporate counsel, and HBD organized those documents in a warehouse in Dublin, Ohio. HBD's extensive efforts included a general, subject matter review of approximately 1,200 boxes of documents and the creation of a detailed index of the information in the repository, which ultimately ran nearly 1,000 pages. HBD also interviewed numerous current and former employees of the Debtors regarding the location and nature of the documents, and HBD arranged to have the

---

[3]    The Ballard Declaration sets forth a more detailed factual recitation regarding the need for and the nature of HBD's document review and management efforts. HBD encourages the Court to review that Declaration in its entirety.

148316.v2                                                    HENNIGAN, BENNETT & DORMAN

Debtors' electronic mail and related files preserved, downloaded, and printed for analysis and discovery purposes. Ballard Decl. ¶ 5, 6.

Throughout this process, in an effort to avoid the very large expenses that would be associated with conducting a privilege review of all of the documents and creating a privilege log, the Debtors repeatedly offered to enter into a "joint defense" agreement with the Committee and to give the Committee access to <u>all</u> of the Debtors' documents, including otherwise privileged documents.[4] After equivocating for months, the Committee said that it did not want to review the privileged materials (again citing the perceived risk to D&O insurance coverage for the lawsuit against directors and officers), and <u>the Committee directed HBD to perform a privilege review of the hundreds and hundreds of boxes of potentially relevant documents</u>. Ballard Decl. ¶ 15-18.

The Debtors and HBD therefore had no choice but to commence the arduous process of reviewing hundreds of boxes of potentially relevant documents for privileged and confidential information and creating a privilege log with respect to such documents. In order to conduct this review as efficiently and cost-effectively as possible, with the full knowledge and assent of the Committee, HBD employed a team of "temporary" attorneys and paralegals, with billing rates significantly lower than the billing rates for HBD's full-time attorneys and paralegals, to perform the privilege review process. (The Liquidating Trust's new objections to the use of such temporary professionals is addressed in Section IV, below). Ballard Decl. ¶ 35-36.

This was a massive project by any standard. The final privilege log alone runs for more than a 1,000 pages. Moreover, the Liquidating Trust's unsupported assertions to the contrary, the project

---

[4]    *See* Appendix, Ex. 2 (May 14, 1999 letter to Committee counsel) ("Finally, and most importantly, we continue to await your first draft of the joint-defense, non-disclosure stipulation . . . ."); Appendix, Ex. 3 (May 27, 1999 letter to Committee counsel) ("Without such an agreement [regarding joint defense], SmarTalk will have no choice but to review each and every document prior to disclosure to the Committee and, where appropriate, to create privilege logs and refrain from producing privileged information to the Committee. In addition to making our lives needlessly difficult, such an outcome obviously would increase the administrative expenses of the bankruptcy estates substantially . . . ."); Appendix, Ex. 4 (July 30, 1999 letter to Committee counsel) ("a privilege review of all of the Debtors' documents would be extremely time costly and time and would not be a reasonable or justifiable use of the Estate's limited resources.").

-17-

HENNIGAN, BENNETT & DORMAN

did not end with completion of the privilege review. Rather, because the Committee refused to accept privileged information or otherwise take control over the documents, HBD was forced throughout the case to maintain the repository and privilege log and to respond to discovery requests in litigation in which the Committee (and not HBD or the Debtors) was involved. In fact, as recently as March 5, 2001, the Committee gave HBD the express direction "to continue to maintain the privilege with respect to the documents listed on the Debtors' privilege log and to incur the expense associated therewith, including the expense associated with responding to challenges raised by PWC and other parties to entries on the privilege log." Appendix, Ex. 5 (March 5, 2001, letter countersigned by Committee counsel) (also noting that "The Debtors continue to believe that, under the circumstances of these cases, the maintenance of the estates' documents – including privileged documents – and the maintenance of the privilege log are roles more appropriate to the Committee. We understand, however, that the Committee does not want to assume such responsibilities for a variety of reasons relating to the litigation that it currently is conducting on behalf of the bankruptcy estates."). Then, on March 28, 2001, the Committee reiterated that "[i]t is understood that all privileged documents and documents that have not yet been reviewed for privilege will be maintained by [HBD] on behalf of the Debtors." Appendix, Ex. 52 (March 28, 2001, letter from counsel to the Committee). Ballard Decl. ¶ 41-44.

Here again, it is impossible to fathom how the Liquidating Trust can object to services that HBD performed at the express direction of the Committee. Where were the Committee members (now members of the trust board) who presumably directed the Committee's positions throughout the bankruptcy case? Where was the Committee's counsel who worked closely with HBD on these projects? Were they even consulted by the Liquidating Trust before these objections were pursued?

### III.    THE LIQUIDATING TRUST'S FIRST OBJECTION, AND THE "AUDITOR'"S REPORT

After obtaining months of extensions, on December 3, 2001, the Liquidating Trust objected to more than $2.7 million of HBD's requested fees and expenses. That objection, however,

-18-

HENNIGAN, BENNETT & DORMAN

contained not one iota of analysis or discussion regarding HBD, its services, or its fees. Rather, the objection merely attached the "draft report" of a purported fee auditor and states that the report "points out many objectionable areas and suggests that further documentation and information may be necessary." Objection at 6. This is the sum total of the Liquidating Trust's analysis.

In fact, the Liquidating Trustee has testified that he made no effort to audit or examine HBD's fees. The Liquidating Trustee did not even review HBD's bills or fee applications, or even read the entirety of the LCC Report. Pauker Depo. 27:12-18 and 64:10-13.[5] Rather, the Liquidating Trust simply submitted the flawed report to the Court and now seeks, without any analysis, to utilize the report to justify the forfeiture of nearly forty percent (40%) of the fees earned, and expenses actually incurred, by HBD.

The "auditor"'s report, however, is incomplete and so riddled with errors that it should be disregarded in its entirety. Moreover, upon analysis, the various "issues" identified by the "auditor" are easily dismissed.

### A.  The Report Does Not Reflect an Audit And Is Incomplete.

The "Fee Auditor's Report" was prepared by a firm known as Legal Cost Control ("LCC"). Discovery has revealed that, notwithstanding its title, the report was not based on an audit and was prepared without any review of HBD's underlying work product, without any consultation with HBD's clients or members of the Committee or any other parties in interest, and without any knowledge of the issues involved in the case. In fact, the report was prepared without any discernable methodology and in violation of the methodology espoused by LCC in its "audit" guidelines. The report specifically states that "[i]dentification as to the extent work was performed was limited to the material contained in the Hennigan Fee Applications. . . . LCC was not

---

[5]  "Marquess Depo." refers to the transcript of the deposition of Mr. John Marquess, relevant portions of which are attached to the Depo. Appendix. "Altland Depo." refers to the transcript of the deposition of Mr. Skyler Altland of LCC, relevant portions of which are attached to the Depo. Appendix. "Pauker Depo." refers to the transcript of the deposition of Mr. David Pauker of Goldin Associates, relevant portions of which are attached to the Depo. Appendix. Citations are made to the page:line number of the transcript.

148316.v2

requested, nor did LCC undertake, to provide any opinions regarding the substantive nature or quality of the professional services rendered by Hennigan . . . ." LCC Report at 6 (emphasis added).

Mr. John Marquess, the LCC employee who drafted the report, testified that LCC did not examine any of HBD's work product and did not review any of the underlying invoices supporting HBD's expenses. Marquess Depo. 14:3-8; 162:25 to 163:2. Mr. Marquess further testified that LCC did not review any pleadings, did not familiarize itself with the legal or factual issues raised in the case, does not know what adversary proceedings were addressed or the issues involved, and does not know the number of proofs of claim that were filed, the amounts in issue with respect to any of the proofs of claim or the issues raised by any of the proofs of claim. Marquess Depo. 31:4 to 34:9. Mr. Marquess also confirmed that LCC did not interview the Debtors, HBD, the Liquidating Trust or any other party to obtain an understanding of the issues involved and the services rendered in order to evaluate the work performed. *Id.*

Yet, the testimony reveals that all of the foregoing are steps that LCC typically would take in a fee "audit." Marquess Depo. 17:12 to 18:20; Altland Depo. 42:4 to 44:6. Moreover, LCC ignored its own published methodology for auditing legal fees. LCC's brochure, sent to the Liquidating Trust as a marketing tool, states that in auditing legal fees, LCC:

> [P]rovides on-site peer review audit services by trained and experienced attorneys in the legal practice area being audited. . . . Legal Costs Control's attorneys perform on-site review of the subject law firm's legal file(s), comparing the file contents against the billing submitted for reimbursement. Legal Cost Control will analyze billing practices against the client guidelines, Generally Accepted Legal Auditing Principles (GALAP), the ABA Standing Committee on Ethics and Professional Responsibility Formal Opinion on Billing for Professional Fees, Disbursements and Other Expenses and relevant case law. The audit will determine the reasonableness and necessity of the charges, verify that the work product is in the file, and verify documentation of costs and disbursements.

148316.v2

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

LCC Brochure, attached as Exhibit 6 to the Appendix (emphasis added).

LCC performed none of these steps. LCC did not utilize peer review or "experienced attorneys in the legal practice area being audited." Indeed, of the three LCC employees involved in preparing the report, only one, Mr. Marquess, is even an attorney, and he admittedly has no bankruptcy experience or experience in securities litigation or the other types of litigation involved in the adversary actions in this case. Marquess Depo. 9:12-17 and 138:14-20. LCC did not perform an on-site review, or a review of any of HBD's legal files. LCC did not compare the file contents against the billings submitted for reimbursement. Marquess Depo. 164:16-19 and 170:12-17; Altland Depo. 42:4-24.

LCC also claims to employ "Generally Accepted Legal Auditing Principles (GALAP)" in connection with its reviews. GALAP, however, is a fiction created by LCC, and there are no such "generally accepted" principles. In the accounting arena, Generally Accepted Auditing Standards (GAAS) and Generally Accepted Accounting Principles (GAAP) are adopted by independent accounting boards such as the Financial Accounting Standards Board. These standards are subject to third party and peer review and undergo intense scrutiny before adoption, and there is a uniform body of authoritative literature interpreting these standards. In contrast, so-called "GALAP" is a secret, copyrighted set of internal rules created by LCC, and those rules are not published anywhere or subject to review by any third party or peer group. Marquess Depo. 22:23 to 24:16 and 26:1 to 27:24. There appears not even to be a written description of "GALAP."

Although LCC claims that some of the "GALAP" standards can be found in its training materials, it considers these materials proprietary and refused to produce them to HBD. Marquess Depo. 23:18 to 24:16. Apparently, HBD is supposed to take LCC's word that it followed its own made-up rules. In any event, whatever "GALAP" may be, it is not generally accepted, and it is certainly not appropriate to utilize an undisclosed, private standard in evaluating law firm bills.

**B.    The Report Utilized Flawed Methodology.**

The arbitrary methodology that LCC actually employed in "reviewing" HBD's application provides no basis for the Liquidating Trust's request that nearly forty percent (40%) of HBD's fees

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

and expenses be forfeited. There is no question that the time recorded by HBD's professionals actually was expended on behalf of the Debtors, or that the expenses for which HBD seeks reimbursement actually were incurred and paid by HBD. LCC's objection to HBD's fees is based almost entirely on its view that the specific verbiage utilized in the HBD time entries somehow renders them inadequate, although this Court or any attorney familiar with the issues would readily comprehend the entries.

Specifically, LCC utilized a methodology that rejects any time entry that contains a word or phrase that LCC finds objectionable, and the LCC Report thus attaches exhibits that categorize "objectionable" time entries under a series of topics. The selection of "objectionable" entries was largely based on computer queries that select various time entries based on the usage of certain words or punctuation. Altland Depo. 10:8-12 and 13:5-11; Marquess Depo. 36:2-17.[6]

For example, the entries for first objectionable category, identified as "Blocked/Grouped Description" in Exhibit 2 to the report, were selected in large part based upon whether a semi-colon was used in the timekeeper's description. Altland Depo. 13:13-18 and 14:2-6; Marquess Depo. 55:6-18. Similarly, in Exhibit 3 to the report LCC "objects" to eighty-two time entries (totaling $46,990.00) on the grounds that the time entries contain "inadequate descriptions." Most of these entries were selected because the word "prepare" or "preparation" was utilized in the description. Altland Depo. 16:15-25.

On this basis, LCC seeks to disallow all attorney time involved in preparing for any hearing in this case on the grounds that LCC does not understand what it means to "prepare" for a Court hearing. In fact, however, Mr. Marquess himself testified that when he appeared in Court on behalf of clients he "prepared" for those hearings and charged the client for that preparation. Marquess Depo. 9:18 to 10:5. Why should HBD be held to a standard different than that to which the

---

[6] Mr. Altland did testify that queries were not the only basis upon which selections were made. Some "objections," such as the exhibit reflecting all federal express charges, were developed by simply reading and adding up all applicable entries. In other instances, additions or deletions allegedly were made to exhibits created utilizing queries.

Ap. 2661

"auditor" holds himself? Of course, any competent attorney is aware of what is involved in preparing for a court appearance or a meeting, and no one reasonably can suggest that an attorney should not be compensated for time spent so "preparing."

Exhibit 4 to the report sets forth an "objection" to all time entries where an HBD attorney "appeared" at a hearing or "attended" a hearing on behalf of the Debtors, based solely on the use of the word "appear" or "attend" in the timekeepers' description. Marquess Depo. 65:5-11; Altland Depo. 17:23 to 18:16. LCC asserts that all such entries are improper because they represent an "inadequate description," although the subject matter or topic of the meeting or hearing is in every instance reflected. There is nothing ambiguous about what is meant to "appear" on behalf of a client at a hearing; indeed, the time entries in question could substitute the word "argued" and apparently pass muster with LCC's computer systems.

Another egregious example of the flawed methodology utilized by LCC is reflected in Exhibit 11 to the report, labeled "Questionable Legal Research." An overwhelming number of HBD's time entries that use the work "research" are included in this exhibit, with a request that HBD forfeit $261,949.20 in fees incurred in performing legal research. The reasons for the objections, as attested to by Mr. Marquess, were that he could not determine from the description what the research was for, and does not believe that an experienced law firm should "need" to conduct legal research. This is preposterous. The time entries fully disclose the research that was conducted and, had LCC bothered to consider HBD's actual fee applications (including the narrative sections, the categories into the various time entries were grouped, and the surrounding time entries to provide context to the questioned charges), it readily could have discerned the matters for which the research was conducted (and, of course, LCC made no effort to contact HBD to address any of its purported "questions" about HBD's research). LCC's also asserts that an experienced bankruptcy firm should have no need to conduct research. This also merits little response. Obviously, each of the myriad, fact-specific issues raised in the bankruptcy case were not capable of being addressed by a canned, generic brief that LCC apparently assumes that HBD has on hand.

-23-

In summary, this wasn't an "audit." This was a game in which LCC's computer program identified allegedly "questionable" time entries (in many cases, the very same time entry was identified in multiple objection categories, thus vastly inflating the "amount" of the time entries at issue, *see* LCC Report at 7 n.5), and then LCC turned its computer-generated data into a "report," and the Liquidating Trust rubber stamped it into an objection to over $2.7 million of HBD's fees and expenses.[7]

## C.    The Report Misrepresents The Content Of HBD's Fee Applications And Time Entries.

The LCC Report also misrepresents and misstates the content of HBD's fee applications, creating a distorted and inaccurate picture of what was actually presented in HBD's fee applications to the Debtor, to the Committee, and to the Court for approval. For example, LCC ignored the subject matter categories into which HBD meticulously grouped its fees. By ignoring this information, LCC then can claim that entries are "vague," where simply referring to the fee category into which the entries are classified would provide context and resolve any "vagueness" regarding the entries. LCC also ignored the lengthy, narrative descriptions in HBD's six fee applications, thereby classifying as "vague" entries that were fully comprehensible when all of the information provided to the Court was considered. The descriptive narrative and certification contained in the fee applications was presented for the very purpose of providing the explanation and detail that LCC claims is lacking.

Even more amazingly, the purported time entries identified in the exhibits to LCC's report (which entries LCC apparently manually copied from HBD's invoices) are simply wrong in a shockingly-large percentage of instances. By HBD's count, the LCC Report contains over 100 errors when compared to HBD's actual time entries. In some cases, the "time entries" that appear in the LCC Report overstate the time actually recorded in HBD's invoices. In other cases, LCC has

---

[7]   LCC's "report" also stated that a lion's share of HBD's expenses, including courier and messenger services, copy charges and certain travel expenses, were not properly reimbursable, and the Liquidating Trust apparently agreed by incorporating the report into its objection. Yet, the Liquidating Trustee has agreed to pay those very same expenses as they are incurred by their current counsel, Gibbons Del Deo. Pauker Depo. 58:19 to 59:10, and Ex. 7 to the Appendix.

created duplicate entries when only a single entry appears in HBD's invoices. In other cases, LCC simply appears to have fabricated time entries that have no correspondence time entry at all in HBD's invoices. And in many cases, LCC's exhibits contain abbreviations, editorial comment, or other verbiage that does not appear in the HBD's actual bills and that misleadingly make HBD's time entries appear to be cursory and vague. A few of the more egregious examples include the following –

- a time entry attributed on page 1 of the report to HBD partner James Johnston (3.6 hours for "prepare index of unresolved claims" at an hourly rate of $345) in fact relates to a time entry by HBD clerk John Bass at an hourly rate of $50;

- a time entry transcribed on page 28 of the report as "Research whether New York sate [sic] courts will apply decisions of foreign corporation" actually appears in HBD's invoices as "Research whether New York state courts will apply New York law to issue involving internal corporate decisions of foreign corporation"; and

- a time entry attributed on page 37 of the report to HBD partner Robert Palmer as 4.8 hours for "econf w/ Scruton tr settlement meeting" in fact relates to a time entry of 0.3 hours for "econference with Mr. Scruton regarding settlement meeting."

A chart that identifies many of LCC's errors is attached as Exhibit 8 to the Appendix

## D.     The "Auditor"'s Objections Are Without Merit.

HBD's six fee applications were incredibly detailed, including over 2,600 pages of specific time entries and expense listings. As demonstrated in this section, none of LCC's myriad quibbles with HBD's invoices withstands even the slightest scrutiny.

### 1.     LCC's Purported Timekeeping Objections.

Based upon its computerized searches, LCC identified hundreds of HBD time entries that, it claims, have "grouped descriptions" or "inadequate descriptions." *See* LCC Report at 8-9 and Exs. 2-4 thereto. LCC identified hundreds of other time entries that relate to "questionable" services that LCC – despite knowing nothing about the case and having refused to review a single piece of HBD's work product – deemed unnecessary to HBD's services in the case. *See* LCC

-25-

**Ap. 2661**

Report at 10-11, 13, 15-16 and Exs. 5-7, 9, 11-14 thereto. In each case, ignoring HBD's detailed fee applications, fee matter categories, and the general context of the services rendered, LCC demands that the invoices be disallowed "absent adequate explanation or correction by the firm." *See, e.g.,* LCC Report at 8.[8]

This substance-less nitpicking is contrary to the Third Circuit's directives regarding the review of fee applications. Specifically, as noted in the *Busy Beaver* case:

> [W]e do not intend that a district [or bankruptcy] court, in setting an attorney['s] fee, become enmeshed in a meticulous analysis of every detailed facet of professional representation. It . . . is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. . . . Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled.

*Busy Beaver*, 19 F.3d at 844-845 (emphasis added) (quotations omitted).

Moreover, as noted above, LCC's "analysis" simply does not comport with the realities of modern legal practice. For example, LCC contends that HBD cannot be compensated for preparing for or attending Court hearings or meetings (representative time entry to which an "objection" was made – "Appear at hearing regarding cure claims, Houlihan Lokey, bar date, Caterpillar, and Fletcher, plus pre- and post-hearing conferences with co-counsel and opposing counsel"). LCC also contends that HBD cannot be compensated for researching complicated issues of fact and law (representative time entry to which an "objection" was made – "Research California common law

---

[8]    LCC's work product in this regard was typically sloppy. For example, LCC notes with indignation "that attorney BF required a great deal of supervision to complete the tasks, including tasks which LCC believes could have been completed by a competent paralegal with minimum supervision." LCC Report at 10. The problem is that there is no "attorney BF" at HBD, and none of HBD's time entries relate to "attorney BF." This is yet another example of the total unreliability of LCC's report.

-26-

HENNIGAN, BENNETT & DORMAN

regarding ability of a corporation to issue dividends or distribute shares upon insolvency of corporation").

As a consequence, LCC's report also is contrary to the Third Circuit's directive in *Busy Beaver* that the key inquiry in a review of professional fees in a bankruptcy case is the market practices in the non-bankruptcy legal market. *See Busy Beaver*, 19 F.3d at 849 (noting that "the cost of comparable services factor has an overarching role to act as a guide to the value of the services rendered given their nature and extent").

### 2.  HBD's Rate Increases.

HBD's service as counsel to the Debtors in this case lasted for nearly two-and-a-half years. During that time, in accord with its customary practice and its retention agreement with the Debtors, HBD raised its hourly rates twice, effective January 1, 2000, and January 1, 2001. These increases were made on an across-the-board basis, applicable to all of HBD's clients (not just the Debtors).

LCC has calculated these increases to amount to a modest 12.6% increase in HBD's average hourly rate of $200. LCC Report at 12. LCC, however, apparently believes professionals never can raise their rates during an engagement, even one that spans multiple years. Thus, LCC has identified as objectionable the $145,000 in fees that it calculates to relate to HBD's annual rate increases. LCC Report at 11. LCC says that increases are objectionable because "[i]t has been LCC's experience that many clients are often unaware of rate increases." *Id.* Of course, neither LCC nor the Liquidating Trust ever asked the Debtors whether they know of or consented to HBD's rate increases. LCC and the Liquidating Trust also did not care that virtually every other professional employed in the case also raised their rates, or that the Liquidating Trustee itself has agreed to pay increases in hourly rates as those are adjusted from time to time by Gibbons Del Deo. Pauker Depo. 57:1 to 58:18. Why let simple inquiry or consistency get in the way of "grounds" for objection to an additional $145,000 in fees?

As a point of fact, concurrently with the dissemination of its invoices for January 2000 and January 2001, HBD expressly informed the Debtors, the Committee, and the United States Trustee of its rate increases. *See* Appendix, Ex. 9 (memorandum to Debtors, Committee, and United States

-27-

Trustee dated March 17, 2000) ("Please note that, effective January 1, 2000, in accord with its standard practice, H&B revised its guideline hourly rates to reflect the advancing experience, capabilities, and seniority of its professionals, as well as general economic conditions. H&B's guideline rates now range from $345 to $460 for partners, from $355 to $410 for of-counsel attorneys, from $200 to $325 for associate attorneys, from $90 to $340 for financial consultants, and from $50 to $155 for paralegals and clerks. The attached invoice reflects these revised rates."); Appendix, Ex. 10 (memorandum to Debtors, Committee, and United States Trustee dated March 5, 2001) ("Please note that, effective January 1, 2001, in accord with its standard practice, HB&D revised its guideline hourly rates to reflect the advancing experience, capabilities, and seniority of its professionals, as well as general economic conditions. HB&D's guideline rates now range from $365 to $520 for partners, from $245 to $475 for of-counsel attorneys, from $180 to $365 for associate attorneys, from $100 to $380 for financial consultants, and from $60 to $165 for paralegals and clerks. The attached invoice reflects these revised rates.").

The Debtors acknowledged and had no objection to the rate increases, and the Court approved HBD's various interim fee applications that reflected HBD's increased rates. *See* Appendix, Ex. 11 (excerpt from Fourth Interim Fee Application reflecting increased rates); Appendix, Ex. 12 (excerpt from Sixth Interim Fee Application reflecting increased rates); Davis Decl.

### 3.    LCC's Purported Expense Objections.

To put it charitably, LCC has a unique view of the types of expenses for which a law firm is (and is not) entitled to seek reimbursement. For example, LCC argues that law firms are not entitled to receive reimbursement for postage, overnight delivery services and couriers, photocopies, computerized legal research, or facsimiles. *See* LCC Report at 17-24. This, of course, does not comport with the reality of the legal market (both in bankruptcy and nonbankruptcy cases), in which it is market practice for law firms to seek and receive reimbursement for such expenses. In fact, all of the Committee's professionals and all of the Liquidating Trust's professionals sought and received reimbursement for identical expenses. As a result, LCC's idiosyncratic views have

-28-

absolutely no weight in this Circuit, where the touchstone inquiry is whether firms in the non-bankruptcy market receive such reimbursement. *See Busy Beaver,* 19 F.3d at 849.[9]

LCC also contends that the Court should disallow the $147,000 in expenses incurred by HBD for arbitrator fees with respect to the Intrine matter (which the Court directed the Debtors to pay in its order granting relief from stay in the Intrine matter) and expert witness fees with respect to the Fletcher matter, blithely asserting that the arbitrator and experts are "professionals" who must be separately employed under section 327. LCC Report at 23. Apparently, LCC and the Liquidating Trust care not that HBD wrote checks for those substantial amounts to the arbitrator (at the Court's direction) and to experts that were necessary to defend the estates' interests in critical pending litigation. Regardless, LCC and the Liquidating Trust ignore that the overwhelming majority of courts hold that expert witnesses employed by a debtor's counsel are <u>not</u> professionals and are properly reimbursed and reasonable and necessary expenses in a bankruptcy case. *E.g., In re Ponce Marine Farm, Inc.,* 259 B.R. 484, 494 (D.P.R. 2001) ("most courts that have addressed the issue of whether prior court authorization is necessary for the retention of an expert witness have found that expert witnesses are not 'professional persons' within the meaning of section 327(a)"); *Elstead v. Nolden (In re That's Entertainment Marketing Group, Inc.),* 168 B.R. 226, 230 (N.D. Cal. 1994) (same); *In re Napolean,* 233 B.R. 910, 913-14 (Bankr. D.N.J. 1999) ("Most courts have come to the conclusion that there is no requirement of prior court authorization for retention of an expert witness because an expert is not a 'professional person' within the meaning of section 327"); *In re Babcock Dairy Co. of Ohio,* 70 B.R. 691, 692 (Bankr. N.D. Ohio. 1987) (same).

---

[9]    Although it never asked HBD for any supporting invoices or documentation, LCC also indicated in the report that certain expenses were objectionable absent review of such support. In discovery, HBD provided to the Liquidating Trust full and complete back-up for each and everyone of its invoiced expenses. The Liquidating Trust has ignored that fact and continued to assert as an "objection" all expenses identified by LCC in its report.

## IV.    HBD'S USE OF TEMPORARY PROFESSIONALS AND FINANCIAL CONSULTANTS WAS BENEFICIAL TO THE ESTATE AND REASONABLE UNDER THE CIRCUMSTANCES

As explained above, HBD was thrust into the role of creating and maintaining the enormous document repository in these cases and then, due in large part to the Committee's unwillingness to see privileged information, having to conduct a thorough privilege review of more than 500 boxes of documents, and a substantial number of electronic files and e-mails.

From the outset, HBD recognized that this would be a massive project that would cost millions and millions of dollars if HBD utilized its regular attorneys (at their regular rates of $180 and up) and its regular paralegals (at their rates of $140 and up) for the task.[10]  Accordingly, in order to minimize those costs, HBD employed a team of lower-cost "temporary" attorneys and paralegals that it retained on a flexible, contract basis from several contract attorney services. Ballard Decl. ¶ 34-36.

This action was taken with the knowledge and consent of the Debtors and the Committee. For example, on July 21, 1999, counsel to the Committee wrote to HBD to confirm that HBD had "hired five to eight temporary attorneys to conduct the privilege review." Appendix, Ex. 13 (letter from counsel to the Committee dated July 21, 1999). Five days later, on July 26, 1999, counsel to the Debtor disclosed to the Court at a hearing regarding a discovery dispute with Fletcher that HBD had retained "seven contract attorneys" for the purpose of performing a privilege review of the documents. Appendix, Ex. 14 (transcript of hearing held on July 26, 1999). Thereafter, on October 6, 1999, HBD filed a motion for authority to electronically scan and maintain certain documents. That motion, which had been negotiated with and reviewed and commented upon by the Committee, stated that HBD had "begun to conduct a comprehensive privilege and

---

[10]   In fact, as a small firm, HBD did not have sufficient full-time personnel to devote to such a project even if it would have been economical to do so. This is one of the reasons that HBD regularly uses temporary professionals in its litigation efforts.

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

confidentiality review" through the use of "a number of lower-cost contract attorneys." Appendix, Ex. 37; Ballard Decl. ¶ 42-44.

From the outset, HBD determined that, given the nature of the services to be rendered by the professionals and the large scope of the project to be undertaken, it would account for and bill the services of the temporary personnel as professionals (rather than as expenses), but it would not use the temporary personnel as a "profit center" (in the words of LCC). Rather, HBD strove to derive an hourly rate for the temporary personnel that roughly approximated HBD's cost in obtaining and using such personnel (calculated by considering the rates charged to HBD by the temporary personnel services, and then factoring in HBD's expenses in providing parking, office space, meals, computer equipment, and secretarial and support services to the temporary professionals). The services from which HBD contracted for the temporary professionals charged HBD hourly rates ranging averaging $30 for paralegals and $45 for attorneys. After factoring in the other costs, HBD ultimately invoiced the Debtors for the temporary paralegals at $60 per hour (subsequently increased in 2000) and for the temporary attorneys at $71.50 per hour (subsequently increased in 2000). In contrast, HBD billed other clients its standard hourly rates for some of the very same personnel who worked on this case and were billed at significantly discounted rates. Ballard Decl. ¶ 38.

As a result, HBD was able to minimize to the fullest extent possible the costs of the document and privilege review project. In fact, HBD's temporary professionals rendered more than 12,750 hours of service, at a total invoiced cost to the Debtors of approximately $898,500 (approximately $71 per hour). If HBD had used its full-time attorneys and paralegals to perform the work – or if HBD had followed its standard practice and billed the temporary professionals at higher rates – the cost to the estate would have more than doubled. Ballard Decl. ¶ 39.

The Liquidating Trust purports not to care about those benefits, and seeks to disallow all of the fees charged by HBD for temporary professionals on the grounds that HBD did not obtain Court approval to utilize such personnel, that use of the personnel somehow constituted an improper "fee

-31-

sharing" arrangement, and that the temporary professionals timekeeping was inadequate. Supplemental Objection at 5-8. The Liquidating Trust is simply wrong on all accounts.

## A.    The Temporary Professionals Did Not Need To Seek Separate Employment Authorization.

HBD, as a firm, was employed as the Debtors' counsel in these cases. After consulting with its client, HBD, as a firm, determined that it was in the best interests of the estates to utilize the lower cost temporary professionals for the document review and management project. At all times, the temporary professionals retained by HBD acted under the supervision and control of HBD, and HBD assumed responsibility for their work product.

The Liquidating Trust asserts that separate employment authorization from this Court was required for each and every temporary professional. This is silly. There is no rule that, once a firm is authorized to be hired, it must seek additional authorization every time that it retains new personnel to work on the matter:

> The Rule supports the unremarkable proposition that when the bankruptcy
> court approves the debtor's application to employ partner X of a law firm,
> all the attorneys at the firm may work on the case "without further order of
> the court." A rule requiring the debtor to reapply to the bankruptcy court
> any time a different attorney performs billable work would be unworkable.

*In re Keravision, Inc.*, 2002 U.S. Dist. LEXIS 1586, *9 (N.D. Cal. 2002) [a copy of *Keravision* is attached as Ex. 54 to the Appendix]; *see also In re Interstate Savings, Inc.*, 32 Bankr. Ct. Dec. 902, 904 (Bankr. E.D. Pa. 1998) (finding that firm's authorization of employment as accountant included computer consultants engaged by the firm; "I find that based on the Trustee's explanation of the needs he had and how they were met by [the firm] in this case, [the firm]'s were accounting in nature. I find [the objector]'s conception of accounting services that would exclude all work of the computer consultant and those [of the firm's] employees securing and closing down the Debtor's operation to be too narrow.").

-32-

HENNIGAN, BENNETT & DORMAN

**Ap. 2661**

The "temporary" status of the persons hired by HBD for the limited purpose of reviewing documents on behalf of the estate does not change the analysis. For example, the court in *In re Landmark Distributors, Inc.,* 195 B.R. 837 (Bankr. D.N.J. 1996), approved compensation for temporary attorneys as part of the fee application submitted by a law firm engaged as counsel to an involuntary debtor, over an objection on the ground that the firm billed rates for the temporary attorneys that were higher than the rates paid by the firm to the agency that provided the temporary attorneys to it. *Id.* at 850.

Moreover, HBD made full and ample disclosure of its use of temporary professionals. In addition to the disclosures described above, the summary pages for each of HBD's invoices for months in which temporary personnel were utilized contained separate line items for "Temporary Attorneys" and "Temporary Paralegals," and the time entries for the temporary professionals were identified separately and distinguished from the time entries for HBD's other professionals. More importantly, HBD highlighted the use of temporary professionals in each of its interim fee application for periods in which temporary personnel performed work.

For example, in HBD's second interim fee application, HBD stated that "[i]n order to conduct this review as efficiently and cost-effectively as possible, [HBD] employed a team of twelve or more temporary attorneys and paralegals, with billing rates significantly lower than the billing rates for [HBD]'s full-time attorneys and paralegals, to perform the privilege review process." Appendix, Ex. 15. Then, in HBD's third interim fee application (covering a period in which the document review project was most intensive and active), (a) HBD included on the cover page a statement that HBD's total fee "*includes $619,900.95 in fees relating to lower-rate contract attorneys and paralegals engaged by [HBD] to perform document review services,*" (b) HBD stated that "*the fees requested by [HBD] include approximately $619,900.95 in fees incurred by lower-rate, temporary contract attorneys and paralegals who assisted [HBD] and the Debtors in performing certain necessary document review services*"; and (c) HBD calculated that "$584,965.55 (or 59%) of the total fee amount of $990,319.55 (and 8,274.0, or 74%, of the total of 11,160.8 hours of services rendered) is attributable to the fees of the lower-cost temporary professionals employed

-33-

HENNIGAN, BENNETT & DORMAN

for the privilege review project" (emphasis in original in each case). Appendix, Ex. 15. HBD made comparable, highlighted disclosures in its fourth and fifth, as well as the final, fee applications. In every instance, HBD's requested fees (including the fees with respect to the temporary professionals) were approved without objection.

The retention of "temporary" and contract professionals also is consistent with *Busy Beaver*'s market-based standard. In fact, in *Busy Beaver*, the Third Circuit noted that Congress specifically contemplated and lauded the use of lower-cost billing personnel (paraprofessionals) in bankruptcy cases:

> In nonbankruptcy areas, attorneys are able to charge for a paraprofessional's time on an hourly basis, and not include it in overhead. If a similar practice does not pertain in bankruptcy cases, then the attorney will be less inclined to use paraprofessionals even where the work involved could easily be handled by an attorney's assistant, at much lower cost to the estate. This provision is designed to encourage attorneys to use paraprofessional assistance where possible to ensure that the estate, not the attorney, will bear the cost, to the benefit of both the estate and the attorneys involved.

*Busy Beaver*, 19 F.3d at 850 n.22 (quoting H.R. Rep. No. 95-595 (1978)).

The Third Circuit also specifically approved developments in the market for legal services regarding the increasing use of such personnel:

> The past two decades have witnessed a remarkable transformation of the legal market, converting once loyal and steadfast clients into sophisticated consumers of legal products in a competitive legal marketplace. A critical component of this transformed legal market is the incorporation of paralegals providing a wide range of legal services into the law-firm tapestry, a component brought about by the cost-effectiveness of employing an intermediate level of professional to handle matters beyond the ken of the average legal secretary but not demanding the full education, experience, or

-34-

skill of a licensed attorney. The availability of paralegals is a positive development from the point of view of conserving the debtor's estate, and <u>we expect that, when feasible, members of the bar representing debtors will engage paralegals and other support staff when they are able to render legal services efficiently yet effectively with the objective of alleviating the diminution of the estate's assets.</u>

*Id.* at 851-52 (emphasis added) (citations omitted).

The Third Circuit summarized that the "germane question" is "not what types of services an institution or any expert believes is proper for a paraprofessional to perform, but rather is for what types of serves the non-bankruptcy market recompenses a paraprofessional." *Id.* at 850 n.26. Here, the "non-bankruptcy market" without question "recompenses" law firms that use temporary and contract attorneys and paralegals. As noted, HBD regularly employs temporary professionals where appropriate in its nonbankruptcy (and bankruptcy) engagements. Moreover, HBD has hired as full time professionals three of the temporary professionals who worked on the engagement in this case. Ballard Decl. ¶ 40.

HBD believes that the use of temporary personnel is now common in the marketplace. Perhaps the best indication of this is the fact that the regular counsel to the Committee in this case used a "contract attorney" and a "contract paralegal" and charged the estate $150 and $100 an hour for such services. *See* Appendix, Ex. 16 (final fee application of the Munsch Hardt firm).[11]

---

[11] Although HBD believed it to be a more appropriate and customary to include the temporary personnel as billing professionals in the case, a persuasive argument can be made that HBD simply could have invoiced the estate for an aggregate charge for such personnel, and dispensed with the meticulous recording of and accounting for the temporary professionals' time. Specifically, the hiring and use of temporary attorneys and paralegals for the purpose of conducting document review and management for litigation matters involving the estate is akin to the hiring of expert witnesses to assist with litigation matters. As noted above, courts have not required separate applications for retention of expert witnesses involved in the firm's litigation matters when the experts were working in conjunction with and under the direct supervision of the firm's attorneys.

Similarly, other courts have compensated court-appointed professionals for the hiring of outside professionals to assist the court-appointed professional with litigation matters not involving actual case administration, where the costs were incurred due to the action of another party

Continued on the next page

-35-

Ap. 2861

*Quesada v. United States Trustee*, 222 B.R. 193 (Bankr. D.P.R. 1998), the only case cited by the Liquidating Trust, is not to the contrary. In that case, an individual "solo practitioner" attorney (Quesada) was appointed as interim chapter 7 trustee in a case. Although Quesada apparently never sought authorization to retain counsel, he acted as counsel to himself during the case. He also subcontracted with two associate attorneys to assist as counsel to the trustee, and then applied for compensation for such attorneys based upon an hourly rate of $100. The Court denied compensation on the grounds that Quesada – an individual – was the trustee, and that Quesada never disclosed, sought, or received authorization to employ the two attorneys as counsel under section 327 of the Bankruptcy Code. *Id.* at 199. The Court noted that section 327's rule of prior authorization served the "important policy concerns" of avoiding the invitation of "officious intermeddlers and additional unwarranted and unnecessary financial burdens to an already troubled estate, to the detriment of other creditors and to the benefit of none except those employed by the debtor." *Id.* at 197 (quotations omitted). The Court also noted that the rates charged for the subcontracted attorneys were well above the going market rate for paralegals. *Id.* at 198.

Here, unlike in *Quesada*, HBD as a firm was employed to serve as counsel to the Debtors. Moreover, unlike in *Quesada*, HBD's use of temporary personnel was fully disclosed on numerous occasions to all parties in interest, and was approved by the very parties that (in a different guise) have now lodged an objection. There was no "officious intermeddling" to the "detriment" of

---

Continued from the previous page

involved in the administration of the estate. For example, in *In re Met-L-Wood Corp.*, 115 B.R. 133, 135 (Bankr. N.D. Ill. 1990), the Court did not require a chapter 11 debtor's counsel to file a separate application for employment of a separate law firm to defend the debtor's counsel against allegations of wrongdoing in connection with the sale of estate assets made when the trustee, a former member of the Creditors' Committee, had moved to disqualify debtor's counsel. *See also In re American Preferred Prescription, Inc.*, 218 B.R. 680, 686 (E.D.N.Y. 1998) (where accounting firm hired as debtor's professional was forced to hire a law firm to defend itself, no prior court approval was necessary to hire firm and compensation was awarded to accounting firm for law firm's fees). Here, HBD should be fully compensated for the costs associated with the document review and production efforts required to comply with the myriad production demands by the Committee, where the Committee refused to accept the Debtors' offer to provide all of its documents to the Committee and instead forced HBD to undertake the massive production process.

148316.v2

HENNIGAN, BENNETT & DORMAN

Ap. 2661

creditors here – rather, there was a successful attempt to minimize the fees associated with a project that was necessary and beneficial to the estate.

Under *Busy Beaver*, HBD is entitled to be compensated for that which it would be compensated in the non-bankruptcy market. HBD has asked for nothing more. The Liquidating Trust's attempt to deny HBD that market compensation should be overruled.[12]

**B.    The Use Of Temporary Attorneys And Paralegals Did Not Result In "Fee Splitting."**

Digging lower in its bag of hodgepodge arguments, the Liquidating Trust argues that (notwithstanding its own counsel's use of contract professionals), HBD somehow has engaged in "fee splitting" prohibited by section 504 of the Bankruptcy Code. Supplemental Objection at 7.

Section 504 "illustrates a congressional intent to preserve the integrity of the bankruptcy process so that professionals engaged in bankruptcy cases attend to their duty as officers of the bankruptcy court, rather than treat their interest in bankruptcy cases as 'matters of traffic.'" 4 *Collier on Bankruptcy* ¶ 504.02 (15th ed. rev. 2002); *e.g.*, *In re Warner*, 141 B.R. 762, 766 (Bankr. M.D. Fla. 1992) ("the purpose of the statute is to ensure that lawyers preserve the integrity of the bankruptcy process and not treat bankruptcy matters as matters of traffic") (quotations omitted). Obviously, HBD has not treated this case as a "matter of traffic." In fact, HBD and the Debtors would have liked nothing more than to be relieved of the burden of performing the document review services on which the temporary professionals ultimately worked -- it was only because the Committee (now the Liquidating Trust) insisted upon a complete privilege review of all documents that the need for temporary personnel even arose.

---

[12]    If this Court ultimately determines that HBD was required to have filed a separate application for employment of any of the temporary attorneys, temporary paralegals or financial consultants, HBD requests leave to file a separate application for employment and an accompanying motion for *nunc pro tunc* approval of the employment, which HBD believes would be appropriate under this court's "power to authorize retroactive employment of counsel and other professionals under [its] broad equity power." *In re Arkansas Co.*, 798 F.2d 645, 648 (3d Cir. 1986).

Section 504, as implemented by Bankruptcy Rule 2016, also is designed to prevent compensation arrangements among counsel that are "hidden" or kept "secret" from the Court:

> Rule 2016 is part of a statutory and rule-based framework designed to provide fair compensation to persons working in the bankruptcy arena while protecting bankruptcy estates from over-reaching. The heart of this framework is disclosure.

9 *Collier on Bankruptcy* ¶ 2016.1 (15th ed. rev. 2002). HBD has demonstrated that there was no "over-reaching" in this case and, as noted above, there was an abundance of disclosure and approval regarding HBD's use of temporary personnel.

Moreover, there simply was no agreement by HBD to "share" the allowed compensation in this case with anyone. In fact, HBD paid the agencies that provided the temporary personnel without regard for whether or not the fees charged for such services by such personnel were written off or ultimately allowed in this case, and HBD has no right to recover any such payments on those or any other grounds. HBD will keep and retain all of its allowed compensation in this case. There was no "fee sharing" here.

*In re Statewide Pools, Inc.*, 79 B.R. 312, 316 (Bankr. S.D. Ohio 1987) is instructive on this point. There, the Bankruptcy Court found no violation of section 504 where the trustee's attorney entered into an arrangement in which the attorney would hire a former officer of the debtor on an hourly basis to assist the attorney in collecting accounts: "[The former officer] is to be paid by [the attorney] on an hourly basis for the use of that expertise. It is not proposed, and the Court does not authorize, that [the former officer] receive any payment directly from the estate or any predetermined percentage of [the attorney]'s fees. Rather, [the attorney] has proposed to pay [the former officer] on an hourly basis only as [the former officer] performs services. It is hoped that [the former officer's] assistance will expedite collection of some accounts without the need to resort to legal actions. Such choice seems to be well considered and poses no immediately foreseeable adverseness to the estate."); *see also Warner*, 141 B.R. at 766 (determining that no improper fee

-38-

**Ap. 2661**

splitting occurred where debtor's attorney paid separate counsel for services provided in connection with issuance of subpoena).[13]

There was no impermissible "fee splitting" here.

## C.    HBD Maintained Contemporaneous Time Entries For The Temporary Personnel.

Finally, the Liquidating Trust argues that all of the fees for work performed by the temporary personnel must be denied in its entirety because "[t]he record keeping with respect to the Temporary Timekeepers' services does not allow the court to determine whether those services rendered were actual, i.e., in fact performed, as required by Local Rule 2016-2(d)," apparently on the grounds that "[t]he description of services rendered by the Temporary Timekeepers is extraordinarily repetitive." Supplemental Objection at 7.

This Court readily can determine the reasonableness and necessity of the services based on the descriptions provided, and there is no "absence" of contemporaneous descriptions. Each temporary timekeeper recorded the time spent working on matters relating to the Debtor on a daily basis. Based upon the work performed on that particular day, HBD then assigned one of a number of applicable narrative descriptions to the work by the particular time keeper at issue, and those time entries and descriptions then appeared for each individual timekeeper in HBD's invoices. Kontos Decl. ¶ 3.

---

[13] The cases cited by the Liquidating Trust are not analogous. In *In re Codesco, Inc.*, 15 B.R. 351 (Bankr. S.D.N.Y. 1981), the Court confronted the very type of situation that the rules were designed to combat – namely, hidden compensation arrangements with persons who were not revealed to the Court. Nevertheless, despite finding a fee sharing problem where an appraisers' retention of a West Coast "consultant" was never disclosed to the Court and where the Court determined that the appraiser had failed to adequately perform his duties, the Court permitted compensation to the appraiser for the reasonable value of services performed. In *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1256-1257 (5th Cir. 1986), the Court found no merit in the allegations of fee splitting because an earlier decision had rendered the issue moot. In *In re Arthur and Joan Larsen*, 190 B.R. 713 (Bankr. D. Me. 1996), the Court found counsel to have a "consistent, seemingly studied, disregard for the rules governing disclosures regarding compensation for Chapter 11 debtor's counsel" and found a "thoroughgoing inadequacy of his [fee] application," and the Court engaged in a two sentence analysis of a $250 fee splitting issue between debtor's counsel and another attorney, without any discussion of how the attorney was or was not affiliated with debtor's counsel and or any explanation of how the challenged fees were incurred or for what purpose.

---

The descriptions for the temporary personnel's activities necessarily were repetitive because the work performed by the temporary personnel was numbingly repetitive. All of the temporary attorneys were hired for the same project for the estate and they generally performed the same task – namely, the review of hundreds of thousands of pages of the estate's documents. Although the box numbers and box groupings varied, with limited exceptions, the basic tasks did not change. At one point in the project, certain temporary attorneys logged documents withheld on the basis of privilege, and at another point in the project certain temporary attorneys reviewed computerized email files. The contemporaneous time records reflect those changes in task. Simply put, the temporary professionals were hired to help manage the large volume of documents and their time descriptions reflect the activities that they performed. Kontos Decl. ¶ 4.

There are only so many ways to describe a document review and management project. For consistency and clarity, HBD ensured that the general descriptions of the same work were similar. This appears to be the exact same procedure followed by the Committee's counsel with respect to its temporary personnel, whose numerous time entries seem to be identical in almost every instance. Appendix, Ex. 16 (final fee application of the Munsch Hardt firm). Kontos Decl. ¶ 5.

None of the cases cited by the Liquidating Trustee support its position that the entirety of (or any of) the temporary personnel's time should be disallowed because of an alleged failure to provide contemporaneous time entries. In fact, in *In re Zenith Laboratories, Inc.*, 119 B.R. 51, 53-55 (Bankr. D.N.J. 1990), and *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 312-313 (S.D.N.Y. 1997), the courts reviewed the time entries submitted by counsel and held that the descriptions were sufficient. The *Maywalt* court set forth a standard that HBD easily has met:

> The Supreme Court has found that "counsel, of course, is not required to
> record in great detail how each minute of his time was expended but at least
> counsel should identify the general subject matter of his time expenditures."

*Maywalt*, 963 F. Supp. at 313 (citing *Hensley v. Zekerhart*, 461 U.S. 424, 457 n.12 (1983)). The third case cited by the Liquidating Trust, *In re Jastrem*, 253 F.3d 438, 443 (9th Cir. 2001), involved

---

-40-

a case where counsel failed to provide any contemporaneous time records, and even then the Court allowed reasonable compensation.

### D.    HBD Properly Billed For Services Rendered By In-House Financial Consultants.

One of the important and beneficial services that HBD provides to its clients is the availability of HBD's staff of full-time financial consultants/analysts. These personnel, who typically have CPA accreditation or MBA degrees, provide important litigation support and case administration services and help to minimize client expenses by avoiding the necessity to engage outside testifying experts at the early stages of a case. For example, in this case, HBD's analysts prepared comprehensive economic damages models relating to the estates' possible causes of action against third parties, and provided important analysis of a number of the large claims asserted against the estate. HBD's analysts also created a comprehensive computer database on which the 1,000-page privilege log, the 1,000-page document index, and the claims register in the bankruptcy case were maintained.

The Liquidating Trust ignores those benefits and argues that all fees charged for such services must be disallowed, on the theory that HBD needed to apply separately for authority to bill for the financial consultants. As with the Liquidating Trust's other arguments, this contention lacks any merit whatsoever.

As noted above, HBD was employed as a firm in this case, and the financial consultants are employees of HBD. In the vernacular of the Bankruptcy Code, they are "paraprofessionals" of HBD. HBD's other clients (both in bankruptcy and nonbankruptcy matters) regularly pay for the services of the financial consultants, and the compensation requested by HBD is well within the *Busy Beaver* standards. Again, evidence of the relevant market is provided by two law firms employed by the Committee (and now by the Liquidating Trust), which billed the estate for hourly services rendered by a "certified public accountant" and a financial consultant on staff at the firm. Appendix, Ex. 16 (final fee application of the Munsch Hardt firm), Appendix, Ex. 17 (final fee application of the Howrey & Simon firm). *See Interstate Savings*, 32 Bankr. Ct. Dec. at 905 (firm's

-41-

authorization of employment as accountant included computer consulting services rendered by the firm).

The Liquidation Trust's purported concerns regarding "disclosure" of the financial consultants also are not well founded. HBD's clients were well aware of the work performed by the consultants, who made several presentations to the client regarding their damage modeling and analysis. Moreover, each of HBD's monthly invoices and interim fee applications clearly and explicitly disclose that financial consultants were rendering services in the case, and they itemize and describe with specificity the nature of those services. *See* Appendix, Ex. 9 (memorandum to Debtors, Committee, and United States Trustee dated March 17, 2000) ("Please note that, effective January 1, 2000, in accord with its standard practice, H&B revised its guideline hourly rates to reflect the advancing experience, capabilities, and seniority of its professionals, as well as general economic conditions. H&B's guideline rates now range from . . . $90 to $340 for financial consultants . . . ."); Appendix, Ex. 10 (memorandum to Debtors, Committee, and United States Trustee dated March 5, 2001) ("Please note that, effective January 1, 2001, in accord with its standard practice, HB&D revised its guideline hourly rates to reflect the advancing experience, capabilities, and seniority of its professionals, as well as general economic conditions. HB&D's guideline rates now range from . . . $100 to $380 for financial consultants . . . .").

The Liquidation Trust's statement that "all fees attributed to services rendered by financial consultants must be denied" is just another example of its overreaching with respect to HBD's fees.

## V.    THE LIQUIDATING TRUST HAS NOT ACTED IN GOOD FAITH

The Liquidating Trust's conduct with respect to its objection to HBD's fees have been disturbing in many regards. As noted above, the Liquidating Trust has interposed baseless, substance-less objections to nearly $3 million in HBD's legitimate fees and expenses, all without bothering even to read HBD's fee application, to interview HBD's clients, or to review HBD's work product. This is not an exercise of the Liquidating Trust's "fiduciary duties" – this is a crusade designed to achieve a reduction in HBD's compensation without regard to entitlement or merit.

-42-

**Ap. 2661**

Several developments in the bankruptcy case following confirmation of the Plan and the Liquidating Trust's assumption of control over the estate bear this out.

## A.    The Liquidating Trust's Threat Regarding The Appointment Of A Fee Auditor.

On October 1, 2001 – two and a half months after professionals had filed their final fee applications – the Liquidating Trustee wrote to every professional previous employed in the bankruptcy cases and posed the following "Hobson's choice": either agree to a flat seven percent (7%) reduction in their request fees (in consideration for which, "the Liquidating Trustee and the Liquidating Trust Board will inform the court that we support the final application") or face a fee audit, which would subject the professional "to the cost and inconvenience of having to address issues raised by a fee audit," and could result in an objection "greater than what is currently proposed." Appendix, Ex. 18. At that time, the Liquidating Trustee conceded that it had not made "a thorough and detailed examination" of the various fee applications. The Liquidating Trustee later revealed that it had not even read the applications at that time. Pauker Depo. 24:19 to 25:1.

HBD promptly responded by declining to agree to the seven percent reduction in its fees (more than $690,000 in HBD's case). HBD noted that it believed that the Liquidating Trust should take into account HBD's prior voluntary write offs of more than $750,000 (described below) and the services rendered and results achieved by HBD in the case, and HBD indicated that it would not agree to a discount. HBD also indicated that it believed that, under the circumstances, pursuit of an objection to HBD's fees by the Liquidating Trustee would render continued service by HBD in the bankruptcy case impractical. Appendix, Ex. 19.

The Liquidating Trustee's letter indicated that "[t]he fee examiner will ensure the effective and timely review of final fee applications and address and resolve (hopefully, by agreement) any issues regarding the compensation sought by each applicant." *Id.* However, this proved not to be true. While LCC raised a number of issues and questions regarding HBD's fee application, neither LCC nor the Liquidating Trustee ever sought to resolve those issues and questions.

Rather, after receiving several extensions (agreed or consented to by HBD), the Liquidating Trust objected to more than $2.7 million HBD's requested fees and expenses on December 3, 2001.

-43-

Ap. 2661

As noted above, that objection contained no analysis or discussion regarding HBD, its services, or its fees. Rather, the objection merely attached the "draft report" of a purported fee auditor and states that the report "points out many objectionable areas and suggests that further documentation and information may be necessary." Objection at 6. This was the sum total of the Liquidating Trust's three-and-a-half months of "analysis."

Meanwhile, the Liquidating Trust (controlled by former members of the Committee) had negotiated small settlements with almost all of the professionals formerly retained by the Committee and, notwithstanding this Court's previously-published opinion denying fees requested by a Committee member in this case, the Liquidating Trustee also agreed to pay the fees requested by counsel for another former Committee (and current Trust Board) member. At the same time, the Liquidating Trust actively was pursuing objections to the Debtors' three primary professionals – HBD, Arthur Andersen, and Executive Sounding Board Associates.

Thereafter, after HBD provided to the Liquidating Trust all the support and backup sought in the LCC Report, the Liquidating Trust filed its Supplemental Objection that incorporates all of the very same "objections" set forth in the original draft LCC Report.

HBD believes that this continued pursuit of objections without any regard to the documents that have been produced, the nature of the services rendered, or the results achieved by HBD is further evidence of a lack of good faith.

**B.    The Liquidating Trust's Discovery Stonewalling.**

The Liquidating Trust's actions in discovery regarding this matter are additional evidence of the impermissible nature of its objections.

On December 4, 2001, the Liquidating Trustee noticed the deposition of HBD partner James Johnston and attached a document request seeking the production of virtually every document in HBD's files relating to the matter, including all of HBD's work product.[14]

---

[14]    The deposition notice requested the following categories of documents:  (1) All documents relating to any voluntary "write-offs" as that term is used by Hennigan in any Fee Application, including but not limited to, the original time entries for any tasks and any invoices subject to
Continued on the next page

HENNIGAN, BENNETT & DORMAN

HBD spent a significant amount of time preparing the documents for production to the Liquidating Trustee in advance of Mr. Johnston's deposition and, at the Liquidating Trustee's request, provided to counsel an index of HBD's files prior to the document review. HBD made every effort to comply with the Liquidating Trustee's requests by producing Mr. Johnston for deposition, by making available for review over 500 boxes of hard copy documents and HBD's electronic files on four CD-Roms (roughly 2 gigabytes of data), and by not objecting to the production of documents on the grounds of privilege. HBD's belief was that a full and fair review of its work product in the case would make clear that no valid objections could exist with respect to its fees and expenses.

Ultimately, however, the Liquidating Trustee's counsel spent less than two days reviewing the documents and selected only a fraction of the documents for copying in advance of Mr. Johnston's deposition, which may explain why on several occasions during his deposition, Mr. Johnston was asked to produce documents that had already been made available to the Liquidating Trustee. Johnston Depo. at 135.

The Liquidating Trustee has not been nearly as cooperative. The Liquidating Trustee and its counsel have thwarted HBD's modest discovery requests in a number of ways, including:

- Objecting to the majority of document requests propounded on the Liquidating Trustee, producing less than two boxes of documents in response to the requests and waiting to

---

Continued from the previous page

such write-offs; (2) All documents relating to the Document Review, Analysis and Management, as identified as category 500 in the Fee Application; (3) All written or recorded work product of Hennigan for which Hennigan seeks recovery of fees; (4) All communications between Hennigan and the Debtors relating to any fees charged to the Debtors by Hennigan; and (5) All communications between Hennigan and the representative of any other party relating to the Debtors by Hennigan. Appendix, Ex. 20. The Liquidating Trustee then served an Amended Notice of Deposition of Mr. Johnston that included requests for the following four additional categories of documents: (6) All documents relating to the employment of temporary personnel, including but not limited to, copies of all documents relating to payments made to temporary personnel and the resumes of any individual billed by Hennigan as an attorney or paralegal; (7) All documents relating to expenses incurred by Hennigan in connection with computer assisted legal research for which it seeks reimbursement; (8) All documents relating to payments to third parties; and (9) All documents relating to travel and/or transportation expenses incurred by Hennigan for which it seeks reimbursement. Appendix, Ex. 21.

-45-

produce certain additional documents until after HBD had completed the depositions of certain key witnesses;

- Asserting attorney-client privilege over communications between the Liquidating Trustee's counsel and the Liquidating Trust Board members prior to counsel's representation of those board members;

- Asserting a "settlement privilege" over the Liquidating Trustee's audit threat letter, and filing a motion to preclude the admission of that memorandum and all evidence "relating to" that memorandum and "negotiations concerning the same";[15]

- Refusing to answer the majority of interrogatories propounded, most of which sought explanation of objections in LCC's report, and then failing to verify supplemental responses that provided, at best, a modicum of the requested information, Appendix, Ex. 22; and

- Refusing to accept service of the subpoenas duces tecum on behalf of any of the Liquidating Trust Board members and requiring HBD to incur the expense of serving the out of state subpoenas. Then, without meeting and conferring with HBD regarding the subpoenas duces tecum, filing motions to quash the subpoenas on behalf of the Liquidating Trust Board members. Appendix, Ex. 23.[16]

---

[15] On March 9, 2002, the Liquidating Trustee filed and served via email a Motion in Limine to preclude the admission of the memorandum and related evidence at the hearing on HBD's fee application pursuant to Federal Rule of Evidence 408. HBD intends to file an opposition to that motion by the response date provided for in the local rules and will seek a ruling that the memorandum itself and evidence relating to the memorandum is admissible and not prohibited by Federal Rule of Evidence 408.

[16] Counsel for the Liquidating Trustee objected to the subpoenas on the grounds that the production of documents by the Liquidating Trust Board members would be duplicative of the production by the Liquidating Trustee. Appendix, Ex. 24. HBD and counsel for the Liquidating Trustee ultimately resolved the matter through an agreement proposed by HBD to save the time and expense of litigating a resolution. HBD agreed to accept the certification of each Liquidating Trust Board member that it had no responsive documents that had not already been produced by the Liquidating Trustee. Ironically, however, the Liquidating Trustee has refused to produce numerous documents sought by HBD, claiming attorney client privilege. Appendix, Ex. 25. HBD is still awaiting the certification of one of the Board Members, Global Crossing.

-46-

The Liquidating Trustee's gamesmanship has continued to date. On Wednesday, March 13, 2002, HBD called counsel to the Liquidating Trustee to request (due to circumstances in another case on which the HBD attorneys working on this brief were responsible) a one week extension of time to respond to the Liquidating Trustee's Supplemental Objection until March 22, 2002 (thus giving HBD three weeks to respond to an objection for which the Liquidating Trustee had more than six months to prepare). Kontos Decl. ¶ 7. HBD believed that the limited extension would not prejudice the Liquidating Trustee in any manner, particularly since this Court had recently ordered that the hearing on HBD's Final Fee Application be held on May 16, 2002, rather than March 22, 2002. Kontos Decl. ¶ 8. Notwithstanding HBD's several agreements to continue the original deadline for objecting to HBD's fee application, however, the Liquidating Trustee refused to grant the extension unless HBD agreed to permit the Liquidating Trustee to file an impermissible third brief with the Court in response to HBD's Reply. Kontos Decl. ¶ 9. Then, the Liquidating Trustee went out of the way to send a letter "confirming that no extension has been granted." Appendix, Ex. 26. HBD refused to give in to that request and, at great personal sacrifice, finalized and filed this Reply in a timely manner.

HBD requests that this Court prohibit any response that the Liquidating Trustee may attempt to file to this Reply.

## C.    The Liquidating Trust's Refusal To Acknowledge HBD's Substantial Voluntary Fee And Expense Write-Offs.

As explained above, HBD was extremely generous in its billing discretion, ultimately voluntarily writing off more than $750,000 in fees and expenses. *Cf. Busy Beaver*, 19 F.3d at 855 ("the court should review a fee application to ensure the applicant exercises the same 'billing judgment' as do non-bankruptcy attorneys").

Remarkably, the Liquidating Trust argues that these reductions "should not color this court's view as to the amount of an appropriate reduction to the firm's fee application," apparently on the grounds none of the reduced fees or expenses would be allowable. Supplemental Objection at 12.

-47-

HENNIGAN, BENNETT & DORMAN

In support, the Liquidating Trust selectively cites five of the thousands of written-off time entries. *Id.*

HBD requests that, rather than take the Liquidating Trust's word for it, the Court peruse the source. Specifically, HBD has prepared a compendium of all of its reduced time and expenses, which is attached as Exhibit D to the Supplemental Objection. A review of that compendium will reveal that there are hundreds of thousands of dollars of time that HBD properly could have (but did not) bill to the estate in this case. None of the other professionals (including by the Committee professionals with whom the Liquidating Trust has now settled) exercised anywhere near this level of billing discretion.

HBD submits that, in fact, this should count for something, and it in fact should "color" the Court's assessment of the Liquidating Trust's objection.

## VI.    CONCLUSION

There frequently may exist good reasons to employ a fee auditor in a bankruptcy case. A fee auditor who actually develops a consistent and fair set of "generally accepted" legal auditing principles would be a welcome addition to the often difficult task of fee review in the bankruptcy process.

In fact, HBD would have welcomed an actual "audit" in this case, because a full and fair review of HBD's services, results, work product, and expenses, and of the issues confronted and resolved in the case, would have demonstrated that HBD is entitled to the reasonable compensation requested in its final fee application. It was for this reason that HBD declined the Liquidation Trust's demand for an across-the-board discount without fear of the threatened audit.

-48-

Unfortunately, an "audit" is not what occurred here. What occurred here is the unprincipled search for money from professionals who apparently are not favored by the persons now in charge of the estate. HBD respectfully requests that the Court see the objection for it is, and approve HBD's requested final fees and expenses in full.

Dated: Los Angeles, California
March 15, 2002

HENNIGAN, BENNETT & DORMAN

Bruce Bennett
James O. Johnston
Laura Lindgren
Shawna Ballard
Linda Kontos
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Telecopy: (213) 694-1234

-49-

# Tab No. 2662

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re                   )    Chapter 11
                           )
WORLDWIDE DIRECT, INC., et al.,  )    Case Nos. 99-108 to -127 (MFW)
                           )
        Debtors.          )
                           )    Jointly Administered
                           )

## APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1 | 2/7/00 Wielebinski (Munsch Hardt – Committee Counsel) letter to Bennett (HBD). |
| 2 | 5/14/99 Johnston (HMB) letter to Gordon (Wachtell - AT &T Counsel). |
| 3 | 5/27/99 Johnston (HMB) letter to Ferguson (Munsch Hardt - Committee Counsel). |
| 4 | 7/30/99 Ballard (HMB) letter to Marshall (Munsch Hardt - Committee Counsel). |
| 5 | 3/5/01 Kontos (HMB) letter to Appenzeller (Munsch Hardt - Committee Counsel) countersigned. |
| 6 | Legal Cost Control Brochure |
| 7 | 10/27/01 Gibbons Del Deo retainer agreement. |
| 8 | Chart regarding Legal Cost Control data entry errors. |
| 9 | 3/17/2000 Johnston (HB) memorandum to Debtors, Committee and U.S. Trustee. |
| 10 | 3/5/2001 Johnston (HBD) memorandum to Debtors, Committee and U.S. Trustee. |
| 11 | Excerpt from 4th Interim Fee Application.. |
| 12 | Excerpt from 6th Interim Fee Application. |
| 13 | 7/21/99 Ferguson (Munsch Hardt – Committee Counsel) to Johnston (HMB). |

148715\v1

Ap. 2662

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 14 | July 26, 1999 Transcript of Proceedings. |
| 15 | Second and third interim fee application excerpts. |
| 16 | Final fee application of Munsch Hardt – Committee Counsel |
| 17 | Final fee application of Howrey & Simon. |
| 18 | 10/1/01 Goldin Associates, Liquidating Trustee memorandum to Professionals Retained in the Worldwide Direct/SmarTalk Bankruptcy Cases. |
| 19 | 10/2/01 Johnston letter to Pauker (Goldin & Associates). |
| 20 | 12/4/2001 Notice of Deposition. |
| 21 | 1/30/2002 Amended Notice of Deposition of James Johnston. |
| 22 | 1/28/02 Interrogatory responses and 2/15/02 DeFilippo supplemental letter. |
| 23 | 1/28/02 Notice and Motion and Motion for Order Quashing Subpoenas Served on Aerotel, Ltd. And Resurgence Asset Management, LLC by Hennigan, Bennett & Dorman . |
| 24 | 1/21/02 objections to the first request for production of documents and other tangible things by Hennigan, Bennett & Dorman. |
| 25 | 2/22/02 Langendorfer (Gibbons, Del Deo) letter to Kontos (HBD) attaching privilege log. |
| 26 | 3/14/02 Kardos (Gibbons, Del Deo) letter to Kontos (HBD). |
| 27 | 4/19/99 Thad Bereday memorandum to Wielebinski. |
| 28 | 5/14/99 Johnston (HMB) letter to Ferguson (Munsch Hardt – Committee Counsel). |
| 29 | 5/18/99 Ferguson (Munsch Hardt – Committee Counsel) letter to Thad Bereday. |
| 30 | 5/27/99 Johnston (HMB) letter to Ferguson. |
| 31 | 10/20/99 internal HBD memorandum regarding document reviews. |
| 32 | 11/1/99 internal HBD memorandum regarding document reviews. |
| 33 | 3/31/2000 internal HBD memorandum regarding document review and production. |

148715w1

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 34 | 8/3/99 Kontos (HMB) letter to Ferguson. |
| 35 | 10/27/99 Kontos (HMB) letter to Bush, Phillips, Herkenhoff and Olsen. |
| 36 | 11/2/99 Kontos letter to Bush (Munsch Hardt - Committee Counsel). |
| 37 | 10/6/99 Motion to Limit Notice and Motion for Order Authorizing Use of Funds for the Electronic Imaging of Certain Documents. |
| 38 | 11/18/99 Kontos letter to Phillips (Heller), Buckser (Bernstein) and Bush (Munsch Hardt - Committee Counsel). |
| 39 | 3/30/00 Kontos letter to Lyon (Munsch Hardt - Committee Counsel). |
| 40 | 12/9/99 internal HBD memorandum regarding document review and production. |
| 41 | 12/14/99 Kontos letter to Durrer (Skadden). |
| 42 | 6/2/2000 Kontos letter to Appenzeller and Lyon (Munsch Hardt - Committee Counsel). |
| 43 | 10/8/99 internal HBD memorandum regarding document review and production. |
| 44 | 11/3/99 internal HBD memorandum regarding document review and production. |
| 45 | 2/4/00 internal HBD memorandum regarding document review and production. |
| 46 | Fletcher's document request to Debtors. |
| 47 | Plaintiffs' Rule 26 initial disclosure. |
| 48 | 7/22/99 Johnston (HMB) to Ferguson (Munsch Hardt - Committee Counsel). |
| 49 | 7/29/99 internal HBD e-mail from Ballard to Johnston. |
| 50 | 7/30/99 Ballard letter to Marshall. |
| 51 | 8/13/99 Kontos and Ballard memorandum to Ferguson. |

148715v1

**Ap. 2662**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 52 | 3/28/01 Appenzeller (Munsch Hardt - Committee Counsel) letter to Kontos (HBD). |
| 53 | In re Keravision, Inc., 2000 U.S. Dist. LEXIS 1586 (2000). |

Dated: March 15, 2002

HENNIGAN, BENNETT & DORMAN
Bruce Bennett
James Johnston
Linda A. Kontos
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234

By: _____

Linda A. Kontos

148715v1

## MEMORANDUM

To:     Professionals Retained in the Worldwide Direct/SmarTalk Bankruptcy Cases

From:   Goldin Associates, Liquidating Trustee

Date:   October 1, 2001

Re:     Final Fee Applications

---

As you know, 15 firms have filed final fee applications for work performed as professionals engaged in these cases. Goldin Associates, while generally familiar with the SmarTalk bankruptcy case and related litigation, did not become directly involved in overseeing these matters until confirmation of the Plan. In light of our lack of direct involvement in many of the matters that are reflected in the final fee applications, and considering the sheer number and volume of those fee applications and the amount of fees and reimbursable expenses at issue, we previously determined to retain a fee examiner to review the final fee applications. The fee examiner will ensure the effective and timely review of final fee applications and address and resolve (hopefully, by agreement) any issues regarding the compensation sought by each applicant. After interviewing a number of candidates, the Trust has engaged as fee examiner Legal Cost Control, Inc., which has extensive experience reviewing fees and billings for all manner of legal services. The firm has been provided with the fee applications and has commenced its review.

The Trust has sought to schedule the hearing date for the final applications so as to provide the fee examiner with sufficient time to conduct its review, raise questions or concerns regarding any application with the applicant and attempt to resolve by agreement any possible objection to the compensation sought by the applicant. The fee hearing is currently scheduled for Friday, November 9.

At a recent meeting of the Liquidating Trust Board, members of the Board suggested and subsequently authorized an alternative to the fee audit process that may be more convenient or otherwise desirable to the professional firms involved.

As an alternative to the fee audit process, a professional firm may elect to accept a voluntary reduction of SEVEN PERCENT (7%) of the amount of final fee compensation sought (i.e., the total fees for the length of the Professional Firm's services up to and including the June 30, 2001 – the Effective Date of the Liquidating Plan). In consideration for such voluntary reduction, the Liquidating Trustee and the Liquidating Trust Board will inform the court that we support the final application of that professional firm (as reduced), together with reimbursement of its expenses. The Trust will dispense with the detailed examination of that particular application and file a comment to the final application with the Bankruptcy Court affirming the voluntary fee

EXHIBIT  18  PAGE  1

reduction and stipulating to the reasonableness of the reduced fees and expenses sought. Expenses incurred and included in the final application would not be subject to the voluntary reduction and would be paid in full if approved by the Court.

The purpose of this alternative procedure is to permit the Liquidating Trust to obtain the cost savings that it might otherwise obtain from an audit of each professional firms' final fee application, but to do so without having to subject the firm to the cost and inconvenience of having to address issues raised by a fee audit. Any Professional Firm may choose *not* to elect the alternative procedure without prejudice to the consideration of that firm's final fee application. The Liquidating Trustee will, however, go forward with the fee audit process regarding each non-electing professional firm's final fee application. The offer of a voluntary fee reduction is based on an initial review of the professional fee applications and is not based on a thorough and detailed examination of each. Following such review by the fee examiner, the reduction sought may be greater reduction than what is currently proposed. Because of the separate and distinct legal issues presented by administrative applications of members or former members of the creditors committee, the alternative procedure is . not available regarding those applications.

To permit the fee examiner adequate time to review final fee applications, we request that any professional firm electing the voluntary fee reduction respond in writing (including e-mail) to us no later than October 3, 2001 at noon, Eastern Time. If we do not receive your written election by that time, we will assume that you have determined *not* to elect to engage in the proposed voluntary fee reduction and will continue with the orderly review process with the fee examiner.

We are mindful of the inconveniences and possible difficulties of this process and the corresponding delay in final awards and want to work with you to reduce their impact. We do not intend for the process to be adversarial. We request and appreciate your timely cooperation in addressing any questions, concerns or issues raised by the fee examiner regarding the compensation and reimbursement sought by your firm.

If you have any questions or concerns, please do not hesitate to contact Jay Goldin, David Panker or Iris Mix of Goldin Associates at (212) 593-2255. You may contact Joe Wielebinski or Mark Ralston of the Munsch, Hardt law firm respecting the scheduling and conduct of the fee hearing.

EXHIBIT  18  PAGE  2

Ap. 2662

OCT. 1.2001   2:03PM   GOLDIN ASSOC                    NO.926   P.1/3



# GOLDIN ASSOCIATES, L.L.C.
### 400 Madison Avenue, 10th floor
### New York, New York 10017

Tel: (212) 593-2255                    Fax: (212) 888-2841

| NAMES | COMPANY | FAX NUMBER |
|---|---|---|
| Mr. Ronald Bellschmiede | Arthur Andersen | 312-507-3872 |
| Mr. Andrew Scruton | E&Y Capital Advisors | 212-773-8555 |
| Ms. Frances L. Rayeur, CPA | Ernst & Young LLP | 732-516-4412 |
| Mr. Eugene Davis | Executive Sounding Board | 212-944-0753 |
| Robert J. Lack, Esq. | Friedman Kaplan Seiler & Adelman LLP | 212-355-6401 |
| James Johnston, Esq. | Hennigan, Bennett & Dorman | 213-694-1234 |
| Steve K. Kortanek, Esq. | Klehr, Harrison, Harve, Branzburg and Ellers LLP | 302-426-9193 |
| Jay H. Goldberg CPA | Mintz Rosenfeld & Company LLC | 973-882-1560 |
| Joseph J. Wielebinski, Esq. | Munsch Hardt Kopf & Harr, PC | 214-978-4375 |
| Mark H. Ralson, Esq. | Munsch Hardt Kopf & Harr, PC | 214-978-4376 |
| Sarah R. Wolff, Esq. | Sachnoff & Weaver Ltd. | 312-207-6400 |
| Robert S. Brady, Esq. | Young Conaway Stargatt & Taylor, LLP | 302-571-1253 |

TOTAL NUMBER OF PAGES INCLUDING COVER 3

officefaxsheet.dot

EXHIBIT  18  PAGE 3

Ap. 2662

**EXHIBIT 19**

# Tab No. 3258

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| WORLDWIDE DIRECT, INC., | ) | Case Nos. 99-108 (MFW) |
| et al., | ) | through 99-127 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered Under |
| | ) | Case No. 99-108 (MFW)) |

### OPINION[1]

This case is before the Court on the Objection of the
Liquidating Trustee to the Sixth and Final Verified Application
of Hennigan, Bennett & Dorman ("HBD") for Allowance of
Compensation and for Reimbursement of Expenses ("the Final Fee
Application"). For the reasons stated below, we sustain the
objection in part and reduce the fees requested accordingly.

I.    FACTUAL BACKGROUND

On January 19, 1999, Worldwide Direct, Inc., SmarTalk
TeleServices, Inc., and several affiliates (collectively "the
Debtors") filed voluntary petitions under chapter 11 of the
Bankruptcy Code. HBD was retained as counsel for the Debtors.
Immediately prior to the filing, the Debtors had executed an
asset purchase agreement with AT&T for the sale of substantially
all of the Debtors' assets. Pursuant to auction procedures
approved by Order dated February 26, 1999, the sale was

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is applicable to contested
matters pursuant to Rule 9014.

advertised and prospective alternative bidders were contacted, but ultimately no other bidder submitted an alternative offer for the Debtors' assets and businesses. By Order dated March 18, 1999, we approved the sale to AT&T pursuant to the original asset purchase agreement.

On April 27, 2000, the Debtors and the Official Unsecured Creditors Committee ("the Committee") filed a Second Amended Joint Consolidated Liquidating Plan of Reorganization ("the Plan") which was ultimately confirmed by Order dated June 7, 2001. Under the Plan, Goldin Associates, L.L.C. ("the Liquidating Trustee") was appointed to liquidate the Debtors' remaining assets, review claims, and make a distribution to creditors.

Throughout the case, HBD and the other professionals served monthly bills on interested parties and filed quarterly fee applications which were generally approved. On August 14, 2001, HBD filed the Final Fee Application, which seeks fees of $5,872,609.90 (after voluntary reductions of $763,225.23) and expenses of $1,042,422.46.

The Liquidating Trustee filed an objection to the Final Fee Application on December 3, 2001, based on a draft fee audit report ("the Fee Audit Report") performed by Legal Cost Control ("the Fee Auditor") which raised 24 categories of objections. A Supplemental Objection was filed by the Liquidating Trustee on

2