March 1, 2002, which objected principally to the allowance of
fees for temporary attorneys and paralegals used by HBD for
document review and analysis.  The sum of the categories of
objections raised by the Liquidating Trustee totals $1,740,695.95
in fees and $988,641.05 in expenses.

HBD filed a Reply to the Liquidating Trustee's Objections on
March 15, 2002, and an initial hearing on the Final Fee
Application was held on May 16, 2002.  A final hearing was held
on December 5, 2002, where the scope of the Objections was
narrowed to four categories.  The matter is ripe for decision.

II.  JURISDICTION

This Court has jurisdiction over this matter as a core
proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(1), (b)(2)(A),
(B), & (O).

III.  DISCUSSION

A.    Admissibility of Fee Audit Report

At the hearing, HBD objected to our consideration of the Fee
Audit Report, asserting that it was unreliable and not based on
any acceptable method of review.  Although the Fee Auditor
asserted that his analysis was done in accordance with "generally
accepted legal auditing principles," he acknowledged that there
is no such thing and that, instead, he utilized internal

3

procedures only (which he refused to produce asserting they are proprietary). Although the engagement letter and other promotional material described what his firm did, the Fee Auditor testified that they did not explain what he did in this case. Consequently, we agree with HBD that the Fee Audit Report cannot be considered an expert report done in accordance with generally accepted methodologies of performing such a report. See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993) (noting that pertinent considerations in determining the reliability of expert testimony include whether the method has been subjected to peer review and accepted within the scientific community).

Even as a factual witness, however, the Fee Auditor was less than helpful. The Fee Auditor testified that in preparing the report he only reviewed the fee applications themselves. He did not review any pleadings, transcripts of hearings, the docket or claims in the case to familiarize himself with the issues or litigation that HBD handled. Nor did he talk to HBD or to anyone else involved in the case to ascertain what HBD had done.

On cross examination of the Fee Auditor it became evident that the Fee Audit Report was factually inaccurate in numerous ways. For example, the Fee Auditor retyped the HBD time entries into his computer base and there were numerous errors in that process (in description and in amount of time recorded).

4

Further, in doing so, the entries were removed from their categories and other entries that provided context to what was done. In addition, the Fee Auditor admitted that there were duplications in his categories of objections; that is, some time entries or expenses were objectionable on more than one basis. Therefore, the overall objection to the fees and expenses was less than the sum of the categories ($2,729,337). The Fee Auditor could not identify the exact amount of reduction being requested, however. Finally, the Fee Auditor was not aware that HBD had already agreed to reduce its fees and expenses. Therefore, there were some items in the Fee Audit Report which had already been reduced (namely, charges for copies and facsimiles).

Because the Fee Auditor did not follow an accepted methodology of performing a fee examination and the Fee Audit Report itself has numerous factual errors, we conclude that it is not reliable. We, therefore, have reviewed the Final Fee Application itself to determine the validity of the remaining objections of the Liquidating Trustee.

B.    Remaining Objections

1.    Blocked/Grouped Description

The Liquidating Trustee continues to press an objection to the entries identified as "blocked/grouped" in the Fee Audit Report. It appears from our review of these entries that the

5

Liquidating Trustee is objecting because the time is "lumped" and it is unclear how much time was spent on each function within the entry.

"Courts have refused repeatedly to approve unitemized disbursements for services that are lumped together in a single entry, because such action inhibits the court from estimating the reasonableness of the individual services and their value to the debtor's estate." In re Ward, 190 B.R. 242, 246 (Bankr. D. Md. 1995). See also, In re Green Valley Beer Corp., 281 B.R. 253, 259 (Bankr. W.D. Pa. 2002); In re Poseidon Pools of America, Inc., 180 B.R. 718, 731 (Bankr. E.D.N.Y. 1995).

The Court in In re Leonard Jed Co. noted that lumping is not favored because

> One, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable. Two, it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.

103 B.R. 706, 713 (Bankr. D. Md. 1989). See also, In re Recycling Ind., Inc., 243 B.R. 396, 406 (Bankr. D. Colo. 2000).

While the objection is technically correct, we do not find generally that the time entries are lumped to such an extent that we cannot ascertain whether an appropriate amount of time was spent on each task. It appears that all the activity within many of the entries related to one issue (i.e., cash collateral or the

6

sale of assets) rather than unrelated issues. Further, the time entries generally combined only work on that one issue plus a telephone conference with the client or opposing counsel on that same issue. We do not find those types of entries objectionable.

However, there were some entries that combined more than one discrete task and issue from which we cannot determine the amount of time devoted to each. Therefore, we are unable to determine if the amount of time spent on each task was reasonable. Consequently, we will disallow those entries identified on Exhibit A hereto which total $6,205.25 in fees.

    2.    Secretarial/Clerical Functions

The Liquidating Trustee also objects to several entries that it asserts were secretarial or clerical in nature and, therefore, inappropriately performed by attorneys or paralegals charging rates from $80 to $325 per hour. The Third Circuit has cautioned that simply defining a task as "clerical" is not helpful, the question is "whether comparable non-bankruptcy firms typically charge the particular task to their clients as paralegal services [and] the market rate at which such services are provided." In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 854 (3d Cir. 1994).

At first blush, entries identified as "data entry" appear to be secretarial only. However, from other entries by the identified time keepers and the testimony presented at the final

7

hearing, it is clear that the work done was not merely secretarial or clerical. HBD was required, at the insistence of the Committee to secure and maintain the Debtors' books and records after the sale to AT&T. In addition, HBD was required to prepare a log identifying the categories of documents which it had and a log of those documents covered by any applicable privilege. Thus, the work performed was not simply typing a list of documents, it also included analysis of the documents to permit their proper identification and to determine if any privilege applied. Therefore, we conclude that this function did require the skill of a professional and would normally be billed to a client.

Similarly, we conclude that many of the other entries which the Liquidating Trustee identifies as secretarial or clerical also required professional skills. Those entries include preparing files or exhibits for discrete legal issues and disputes (cash collateral, claims objections). The analysis necessary to determine what documents to be included in each such file is not merely clerical. See, e.g., Doe v. Ward, 282 F. Supp. 2d 323, 334-35 (E.D. Pa. 2003) (holding that, in complex litigation, it is often appropriate for an attorney to perform discovery-related clerical tasks since he is the one most familiar with the case and can do it the most cost-effectively).

8

However, many other entries are secretarial or clerical tasks that do not need a professional's training to perform. Such tasks include maintaining the notice list and calendar, and preparing labels of creditors' addresses. These are not the type of services that are typically billed to non-bankruptcy clients. Accordingly, we conclude that they are not compensable. We will disallow $9,920 in fees for those services identified on Exhibit B hereto.

### 3.    Questionable Legal Research

The Liquidating Trustee also objects to certain entries because it asserts that experienced attorneys do not need to do such research. We disagree. It is inconceivable that counsel would be expected to represent its client without performing research on legal issues and their application to the facts of the case. Therefore, there is no prohibition on compensation for counsel performing research.

The Liquidating Trustee also objects to these entries because it asserts they do not sufficiently identify the research done. We also disagree with this. In most instances, the time entries do identify the subject of the research. Though other entries were not very explicit, when viewed in context with the other work done by the attorneys at the same time (which is not evident from the Fee Audit Report), the Court is able to determine what issues were researched.

9

In addition, since the Fee Auditor was not a bankruptcy
practitioner and did not inquire of anyone involved in the case
about the nature of the research, he could not opine as to its
significance.  The Court is familiar with the case (and the
contested issues) and, therefore, is able from the descriptions
and context to determine the appropriateness of the research
done.  Unlike the assumption of the Fee Auditor, we find that the
research was not done on routine matters about which any
experienced bankruptcy attorney should be well-versed.

The Liquidating Trustee also objects specifically to
the allowance of any fees for research and other work done by HBD
investigating causes of action against the Debtors' former
auditors and advisors because it was clear from early in the case
that those actions would be prosecuted by the Committee.
Therefore, he asserts there was no benefit to the estate by those
services.

Mr. Bennett testified, however, that it was not clear the
Committee would be prosecuting those claims and that he was
specifically directed to do the work by his client.  In addition,
he testified that HBD shared the results of this work with the
Committee.  Thus, he contends that there was a benefit to the
estate by HBD doing that investigation.  We agree and accordingly
do not deduct anything for the research done by HBD in this case.

10

4.    <u>Temporary Employees</u>

Finally, and most significantly, the Liquidating Trustee objects to fees of approximately $900,000 for use of temporary attorneys and paralegals.

a.    <u>Section 504 Prohibits Fee Sharing</u>

Initially, the Liquidating Trustee asserts that HBD may not be compensated for those professionals because they were not employees of HBD and payment of their fees constitutes fee sharing which is prohibited.

Section 504(a) of the Bankruptcy Code prohibits fee sharing in bankruptcy cases:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share –
> (1) any such compensation or reimbursement with another person; or
> (2) any compensation or reimbursement received by another person under such sections.

11 U.S.C. § 504(a). However, section 504(b) provides an exception for fees shared among members, partners, and associates in a law firm. It states:

> (b)(1) A member, partner, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 503(b)(4) of this title with another member, partner, or regular associate in such association, corporation, or partnership, and may share in any compensation or reimbursement received under such sections by another member, partner, or regular associate in such association, corporation, or partnership.

<u>Id.</u> at § 504(b).

11

Ap. 3258

The Trustee argues that, since the temporary attorneys and
paralegals were not regular associates of HBD, but remained
employees of the temporary staffing agencies, HBD may not share
any compensation for their services.  See, e.g., Quesada v. U.S.
Trustee, 222 B.R. 193, 198 (D.P.R. 1998) (holding that associates
who were independent contractors and not members of trustee's law
firm could not be compensated without having filed a separate
retention application); U.S. Trustee v. In re Grenoble
Apartments, II (In re Grenoble Apartments, II), 152 B.R. 608, 611
(D.S.D. 1993) (holding that attorney for chapter 11 debtor could
not receive compensation for work performed by his son who was
not a member of his law firm, though nunc pro tunc retention of
son by debtor would allow him to be paid); In re Tarasiak, 280
B.R. 791, 793 (Bankr. D. Mass. 2002) (holding that section 504
prevented debtor's attorney in chapter 11 case from receiving
fees for paralegal who prepared debtor's schedules because
paralegal was not an employee but an independent contractor who
required separate retention approval); In re Kewriga, 2002 Bankr.
LEXIS 274, at *5 (Bankr. D. Mass. 2002) (holding that section 504
mandated denial of fees for conducting legal research done by
attorney who was not a member, partner or regular associate of
debtor's counsel); In re United Cos. Fin. Corp., 241 B.R. 521,
528 (Bankr. D. Del. 1999) (holding that Code prohibited debtors'
accountants from subcontracting work to an affiliated limited
liability corporation); In re Codesco, 15 B.R. 351, 353 (Bankr.

12

S.D.N.Y. 1981) (disallowing fees to appraiser for consultant hired without disclosure and in violation of section 504).

HBD argues, however, that its retention of temporary attorneys and paralegals is not prohibited fee sharing. It contends that "the purpose of the statute is to ensure that lawyers preserve the integrity of the bankruptcy process and not treat 'bankruptcy matters as matters of traffic'." In re Warner, 141 B.R. 762, 766 (M.D. Fla. 1992), quoting In re Matis, 73 B.R. 228, 231 (Bankr. N.D.N.Y. 1987). In this case, HBD notes that it does not seek fees for referring the case to another; in fact it did not originally want to perform the work in question but did so only at the insistence of the Creditors' Committee.

Further, it argues that there was no agreement to share fees at all. HBD was obligated to pay the temporary employment agencies even if it ultimately did not receive compensation from the estate for the services rendered by the temporary employees. HBD argues that this case is similar to In re Statewide Pools, Inc., in which the Court held that a proposal by the trustee's attorney to pay a former officer of the debtor on an hourly basis to collect accounts receivable was not fee sharing prohibited by the Code. 79 B.R. 312, 315-16 (Bankr. S.D. Ohio 1987).

We are not persuaded by the Statewide Pools decision. The case is distinguishable because it involved the retention of a former officer of the debtor, not the retention of attorneys and paralegals. The latter are clearly professionals requiring

13

approval by the court.  11 U.S.C. § 327(a).  <u>Cf.</u>  <u>In re Zerodec</u>
<u>Mega Corp.</u>, 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (compensation
of officers of debtor is subject to court approval).  In
addition, the <u>Statewide Pools</u> decision contains no analysis of
why the Court felt the proposal was not in violation of section
504.

HBD cites other authority to support its position that a
professional retained in a chapter 11 case can retain independent
contractors without court approval.  Those cases are also
distinguishable.  The decision in <u>In re Interstate Savings, Inc.</u>,
did not address the issue presented here but instead dealt with
whether the work performed by the trustee's accountants exceeded
the scope of their engagement and were rendered by more senior
personnel than needed.  1998 WL 295654, *1 (Bankr. E.D. Pa.
1998).  Although there is a reference to a computer consultant,
it is not clear whether that person was an employee of the
accounting firm, and the Court did not address the issue of
whether payment of that individual was prohibited by section 504.
<u>Id.</u> at *4.

Similarly, HBD's citation to <u>In re Landmark Distributors,</u>
<u>Inc.</u>, is inappropriate.  195 B.R. 837 (Bankr. D.N.J. 1996).  That
case dealt with an award of attorneys' fees and costs under
section 303(i) against a petitioning creditor where an
involuntary bankruptcy petition was dismissed for bad faith.  <u>Id.</u>

14

at 839.  Consequently, it did not deal with the issue of who may

be retained and paid by a debtor in a chapter 11 case.

The ultimate question presented by section 504 in the

context of this case is whether the temporary attorneys and

paralegals used by HBD to perform work for the Debtors on behalf

of HBD were "regular associates" of the firm.  11 U.S.C. § 504(b)

(permitting sharing of fees by "member, partner or regular

associate" in a law firm).  We begin our analysis with the

admonition of the Third Circuit in Busy Beaver that our paramount

consideration in approving professional fees in chapter 11 cases

is what is appropriate in the market.  19 F.3d at 849.  In

considering the appropriate use and compensation of paralegals in

that case, the Third Circuit noted:

> The past two decades have witnessed a remarkable
> transformation of the legal market. . . .  A critical
> component of this transformed legal market is the
> incorporation of paralegals providing a wide range of
> legal services into the law firm tapestry, a component
> brought about by the cost-effectiveness of employing an
> intermediate level of professional to handle matters
> beyond the ken of the average legal secretary but not
> demanding the full education, experience, or skill of a
> licensed attorney. . . .  The availability of
> paralegals is a positive development from the point of
> view of conserving the debtor's estate, and we expect
> that, when feasible, members of the bar representing
> debtors will engage paralegals and other support staff
> when they are able to render legal services efficiently
> yet effectively, with the objective of alleviating the
> diminution of the estate's assets.

Id. at 851-52 (citations omitted).

The same can be said about the use of temporary employees in

the legal field.  See, e.g., Vincent R. Johnson & Virginia Coyle,

15

On the Transformation of the Legal Profession: The Advent of
Temporary Lawyering, 66 Notre Dame L. Rev. 359 (1990). This
trend has been evident for at least 15 years. See, e.g., Terry
Pristin, The Newest Temps in Law Firms: Lawyers, N.Y. Times, Feb.
24, 1998, at B7 ("the hiring of temporary lawyers, which started
as a trickle more than 10 years ago, is suddenly a growth
industry. Nationwide, the temp lawyer business is growing at a
rate of 30 percent a year.").

The most recent trend has corporations and law firms using
attorneys and paralegals who are not even in this country to
perform legal work that would otherwise be done by attorneys and
paralegals in-house. See, e.g., William O'Shea, Caseload Grows
for Advocates in Abstentia, Financial Times (London), Oct. 4,
2004, at Business Life 10; Jennifer Fried, Offshoring Work, Law
Departments Are Cutting Costs Sending Work Abroad, 26 Nat'l L. J.
37 (May 17, 2004).

The use of such professionals has reduced the cost to firms,
in training and in salaries. Pamela Mendels, They'll Make it
Brief: Temp Lawyers Seek Limited Duty, Newsday, Feb. 29, 1988, at
Business 3 ("The law temp agencies' owners say their business is
fueled in part by increasingly cost-conscious law firms that are
unwilling to add permanent members to their staffs. . . ."). To
the extent that these cost-savings are passed on to clients and
debtors' estate, the use of temporary employees is laudable.

16

It has also allowed firms the flexibility to handle complex
litigation in a short period of time with minimum cost (i.e.,
without the carrying cost of salaries and benefits for associates
or paralegals waiting for the next big case to arrive). 66 Notre
Dame L. Rev. at 377 ("The arrangement endeavors to facilitate
short-term responsiveness through prompt adjustments in the
supply of goods and services.").    This ability to "ramp up"
using temporary employees also promotes expediency in resolving
chapter 11 cases, which is one of the goals of the Bankruptcy
Code.  See H.R. Rep. 95-595 (1977)(reprinted in 1978 U.S.C.C.A.N.
5963, 5975) ("speed and efficiency in bankruptcy is also
essential because delay only operates to devalue assets, hinder
financial rehabilitation, and prevent exercise of rights.").

If HBD had directly hired associates and paralegals on a
temporary or contract basis to handle this particular case, there
would be no question that HBD could bill the estate for their
time and receive compensation for it.  The difference in this
case is that HBD hired them through an employment service.  We do
not believe that this distinction alone is dispositive.  In fact,
that is the typical payment arrangement in the marketplace today.
66 Notre Dame L. Rev. at 387-88 ("An attorney temporarily placed
with a firm is normally paid from monies received by the agency
from the employer.")

In this case, while the temporary personnel were employees
of the employment agency and not employees of HBD, they

17

essentially acted like associates of the firm.  They were
provided desks, computers and all other things necessary to do
their work within the HBD offices.  They enjoyed many of the
fringe benefits that the firm provided to their own associates (a
weekly breakfast, coffee and other amenities).  Their assignment
to HBD was on a long term basis, in many instances for the length
of the document review.  Several of the temporary employees
ultimately were hired by HBD.

In the legal market today, firms are relying on temporary
attorneys and paralegals to perform many of the same tasks that
traditional associates and paralegals have in those firms.  "The
variety of work for which temporary attorneys are hired is as
broad as the practice of law.  In addition to other types of
legal assistance, it encompasses corporate representation, court
appearances, depositions and general litigation." Id. at 388-89.

In this case the temporary personnel worked in the HBD
offices, under the direct supervision of HBD attorneys,
performing tasks similar to the tasks that regular associates of
HBD performed.  Such direct supervision supports a finding that
the temporary personnel must be considered "regular associates"
of HBD rather than outside lawyers.  Id. at 427 ("A 1988 American
Bar Association ethics opinion dealing with temporary lawyers
states, in its discussion of [Disciplinary Rule] 2-107(a) and
[Ethical Consideration] 2-22, that 'where a temporary lawyer is
working under. . . close firm supervision. . ., such employment

18

does not involve "association with a lawyer outside the firm"
within the meaning of this Ethical Consideration.' Therefore,
presumably the Model Code's attorney fee splitting rules do not
apply in cases of 'close supervision' [of temporary
attorneys].").

Based on all of these factors, we conclude that in essence
the temporary associates and paralegals cannot be considered
unassociated with HBD but were, in fact, "regular associates" of
HBD as that term is used in section 504(b). As such, the firm
was able, notwithstanding section 504(a), to bill for their hours
and "share" in the compensation earned by them.

We do not believe that this ruling is contrary to the Code.
The history of section 504 was explained by the Court in Matis:

> Code § 504 represents a significant departure from
> prior bankruptcy law dealing with the sharing of
> compensation. . . . Generally stated, [under the
> Bankruptcy Act] the sharing of compensation between
> professionals in a bankruptcy case was not denounced
> except in a case where one of the professionals simply
> referred or forwarded the bankruptcy case to another
> professional who thereafter rendered all of the
> services. . . . [I]t is clear that Congress intended
> [in the Bankruptcy Code] to prohibit altogether the
> sharing of compensation in a bankruptcy case except
> where the sharing occurred between "a member, partner
> or regular associate in a professional association,
> corporation or partnership,". . . Thus, the practice
> permitted under former Rule 219 which allowed the
> sharing of compensation by attorneys, regardless of
> whether they were members or associates of the same
> firm, so long as they actually contributed services or
> expenses to the bankruptcy, is now prohibited by Code §
> 504.

73 B.R. at 230-31.

19

The reason behind the change was explained in <u>In re</u> <u>Peterson</u>:

> Whenever fees or other compensation are shared among two or more professionals, there is incentive to adjust upward the compensation sought in order to offset any diminution to one's own share. Consequently, sharing of compensation can inflate the cost of a bankruptcy case to the debtor, and therefore to the creditors. . . . The potential for harm makes such arrangements reprehensible as a matter of public policy as well as a violation of the attorney's ethical obligations.

2004 WL 1895201, at *4 (Bankr. D. Idaho 2004) (quoting 4 Resnick & Sommer, <u>Collier on Bankruptcy</u> ¶ 504.01 at 504-3 (15th ed. rev. 2004)).

This case does not present the circumstances which the Code meant to address. HBD was not referring a case to another professional in order to receive a referral fee. There was no trafficking in bankruptcy cases or services. <u>Cf.</u>, <u>In re Holmes</u>, 304 B.R. 292, 297 (Bankr. N.D. Miss. 2004) (holding that attorney's practice of paying $5 incentive bonus to non-attorney staff for encouraging clients to accept additional services was impermissible fee sharing). Nor is this an instance where work was performed by two distinct lawyers or law firms, only one of which was retained by the Court, thereby possibly avoiding the disinterestedness rules or fiduciary obligations that professionals owe to the estate. <u>See, e.g.</u>, <u>Grenoble Apartments, II</u>, 152 B.R. at 611; <u>Kewriga</u>, 2002 Bankr. LEXIS 274, at *5. The relationship between the temporary personnel and HBD is much more than the tenuous relationships of the

20

professionals in those cases where courts concluded that there
was improper fee sharing.   See, e.g., Peterson, 2004 WL 1895201
(holding that practice of having attorney who shared office space
pay "rent" by attending section 341 meetings of clients of
landlord/attorney was prohibited fee sharing).

In particular, this case does not present the situation we
faced in the United Companies case.  In that case, a retained
professional had formed a limited liability corporation,
transferred most of its employees to that affiliate, and
subcontracted the bankruptcy work to it.  241 B.R. at 526.  That
subcontracting was not revealed to the Court until the continued
hearing on the retention application of the original
professional, almost eight months after the petition date and
four months after the original retention application was filed.
Id. at 524, 529.  We held that a separate retention application
was required for the limited liability corporation, because we
concluded that "[s]uch a subcontracting arrangement, if approved,
would eviscerate the protections of section 327(a) and allow a
third party (rather than the debtor or the Court) to determine
who should render professional services for the estate."  Id. at
528.   See also, In re AC and S. Inc., 297 B.R. 395, 404 (Bankr.
D. Del. 2003) (disapproving subcontracting arrangement between
asbestos claims processor and its subsidiary because it violated
sections 327(a) and 504(a)).

21

This case does not involve a separate corporation performing services under a subcontracting arrangement with HBD.  Instead, attorneys and paralegals, hired on a temporary basis by HBD through an employment service, are performing the services for which HBD was retained by the Debtors.  HBD remains the party with a fiduciary duty to the Debtors and the estate for the proper performance of those duties.  66 Notre Dame L. Rev. at 385 ("it seems clear that a law firm can be held civilly liable for the negligence of a temporary attorney it employs.").  HBD presented evidence that the temporary personnel were screened for conflicts and were expected to preserve the confidentiality of the client, just as regular associates were and that HBD supervised the temporary personnel in the same manner as it is supervised its associates and paralegals.

Consequently, we conclude that the temporary personnel hired by HBD through employment agencies must be considered "regular associates" of the firm for purposes of section 504.  Therefore, HBD may bill and receive compensation for their services from the Debtors' estates.

b.    <u>Disclosure</u>

The Liquidating Trustee objected, however, to the payment of any compensation for the temporary personnel's services because no disclosure was made that they were being used and no separate retention application was filed for them.  It asserts that approval at this stage is not warranted.  <u>See, e.g., In re</u>

22

Arkansas Co., Inc., 798 F.2d 645, 650 (3d Cir. 1986) (retroactive retention of counsel warranted only in extraordinary circumstances).

HBD argues that a separate retention application was not needed when it retained the temporary employees, because its retention application was sufficient to cover them.  It also asserts that the Committee was aware of its retention of temporary employees to do the document review because it was discussed when the Committee insisted that HBD establish the document and privilege log.  HBD advised the Committee that it did not have the personnel necessary to do the work and would have to hire temporary employees.  HBD also states that the Court was aware of this practice because it was disclosed at various hearings where the issue of the document review was discussed.  It was also disclosed prominently in the interim and Final Fee Applications.  HBD states that this is all that was necessary.

To support its position, HBD relies on the Keravision decision which held that "Rule [2014(b)] supports the unremarkable proposition that when the bankruptcy court approves the debtor's application to employ partner X of a law firm, all the attorneys at the firm may work on the case 'without further order of the court.'  A rule requiring the debtor to reapply to the bankruptcy court any time a different attorney performs billable work would be unworkable."  In re Keravision, Inc., 2002 U.S. Dist. LEXIS 1586, at *9 (N.D. Cal. 2002).

Ap. 3258

It has been held that temporary attorneys who are under the close supervision of a law firm are not outside attorneys who must be disclosed to the client under the Model Code of Professional Responsibility (1980) or the Model Rules of Professional Conduct (1989).

> [W]here the temporary lawyer is performing independent work for a client without the close supervision of a lawyer associated with the law firm, the client must be advised of the fact that the temporary lawyer will work on the client's matter and the consent of the client must be obtained. This is so because the client, by retaining the firm, cannot reasonably be deemed to have consented to the involvement of an independent lawyer. On the other hand, where the temporary lawyer is working under the direct supervision of a lawyer associated with the firm, the fact that a temporary lawyer will work on the client's matter will not ordinarily have to be disclosed to the client.

66 Notre Dame L. Rev. at 427-28, citing ABA Comm. on Ethics and Professional Responsibility, Formal Op. 88-356, 11 (1988).

Since we have found that the temporary personnel in question were closely supervised by attorneys at HBD, we conclude that the retention of HBD covered them as well and a separate retention application was not necessary.

### c.    Amount of Fees

While we conclude that compensation may be paid to HBD for the services rendered by the temporary associates and paralegals who worked on this case, the amount of the compensation is an issue. It was disclosed at the hearing that HBD billed the estate for more than it paid for the services of the temporary personnel. (HBD estimated that the amount paid to the temporary

24

employment agencies was $600,000 while the estate was billed approximately $900,000 for those services.)

HBD cites the Landmark Distributors case for the proposition that a firm may bill temporary attorneys at a rate higher than the firm pays the temporary agency. However, the Landmark Distributors case dealt with an award of attorneys' fees and costs under section 303(i) against a petitioning creditor where an involuntary bankruptcy petition was dismissed for bad faith. 195 B.R. at 839. Consequently, it did not deal with the issue of the appropriate fee that may be paid to counsel for a debtor in a chapter 11 case. In addition, the Court in Landmark Distributors did not affirmatively hold that a firm may charge more than it is charged by a temporary employment agency. It simply noted the allegation that the firm was charging more than the temporary agency charged and did not make any deductions as a result of that objection. Id. at 850. Thus, the Landmark Distributors case is hardly the ringing endorsement of HBD's practice that HBD contends.

HBD also asserts that, even by billing the temporary workers at rates higher than it paid for them, it saved the estate a considerable amount of money. It could have used its own full-time associates or paralegals to do the same work at rates from $175 to $325 for associates and $140 to $155 for paralegals. Instead, it charged only $71.50 to $75 per hour for the temporary associates and $60 to $65 per hour for the temporary paralegals.

25

Although the rates HBD charged for the temporary personnel were higher than it paid to the employment agency ($42.25 to $60 per hour for associates and $18 to $35 for paralegals), Mr. Bennett testified that HBD did not make a profit on the use of the temporary personnel.  Instead he testified that their hourly rates were set (and later increased) to account for the extra overhead they cost the firm.  He testified that a spreadsheet detailing those extra costs had been prepared but was no longer available.  However, other than a few computers, which the firm retained after the temporary employees were gone, he could identify no concrete additional costs the firm incurred for the temporary employees.  In fact, they were placed in conference rooms and offices in space for which the firm was already paying rent.  No additional support staff was hired for them; no additional furniture was bought.

We conclude that HBD has not met its burden of proving that the additional amount it seeks from the estate over the actual cost of the temporary personnel should be borne by the Debtors. Nor has it shown that the practice it advocates is normal in the marketplace.  See 66 Notre Dame L. Rev. at 388 ("firms are reluctant to make a profit on services performed by temporary lawyers. . . ."). See also, Busy Beaver, 19 F.3d at 853-53 ("Like any sophisticated consumer of legal services, the bankruptcy court should compare the costs of 'equivalent' practitioners of the art (including their billing structures) as

26

well as the applicant's billing practices with 'equivalent clients'.")

Consequently, we will allow HBD only the cost to it of the temporary legal personnel used on this case. We, therefore, will disallow $364,124.96 in requested compensation representing the difference between the $898,500 sought by HBD and the sum of the invoices of the temporary employment agencies of $534,375.04. (Exhibit 68.)

## IV.    CONCLUSION

For the reasons stated above, we grant, in part, the objection of the Liquidating Trustee to the Sixth and Final Verified Application of Hennigan, Bennett & Dorman ("HBD") for Allowance of Compensation and for Reimbursement of Expenses and will allow compensation except as detailed above.

An appropriate Order is attached.

BY THE COURT:

Dated: October 29, 2004

Mary F. Walrath
United States Bankruptcy Judge

27

# Exhibit A: Blocked/Grouped Description

### Exhibit A: Blocked/Grouped Description

| Date | Description | Hours | Fees |
|---|---|---|---|
| 1/26/99 | Travel from Wilmington to Los Angeles, work on revision of Frontier stipulation, review of Century issues and review of research regarding derivative actions. James O. Johnston | 7.30 | 2190.00 |
| 2/09/99 | Travel to Los Angeles (work on plane including review of Wilson Sonsini employment application, section 105 complaint, preliminary injunction papers, AT&T waiver letter, DTR background documents, Century background documents, and employee retention motion). James O. Johnston | 7.60 | 2280.00 |
| 12/9/1999 | (J. Habel) Legal research regarding location of 30(b)(6) deposition; attend team meeting regarding motions; continue drafting motion for protective order; revise motion to amend complaint; finalize motion for a protective order, declaration, and order. Temporary Attorneys | 4.50 | $321.75 |
| 12/10/1999 | (J. Habel) Legal research regarding bankruptcy cases interpreting Rule 30(b)(6) depositions in preparation for protective order; review all cases cited by Fletcher in motion for judgment on the pleadings regarding fraudulent conveyances and preferences. Temporary Attorneys | 9.00 | $643.50 |
| 12/13/1999 | (J. Habel) Revise motion for a protective order on different grounds; revise draft motion to amend complaint; revise supporting declaration; revise complaint and reply to reflect change of date. Temporary Attorneys | 2.50 | $178.75 |
| 12/20/1999 | (J. Habel) Draft initial draft of opposition to motion for judgment on the pleadings regarding claim 13 and legal research thereon; draft initial draft of opposition to motion for judgment on the pleadings regarding claim 11 and legal research thereon. Temporary Attorneys | 5.50 | $393.25 |
| 4/6/2001 | Review and correct chart of documents reviewed and selected by Heller Ehrman during their October, 1999 visit; telephone conference with Mr. Gordon from Litigation Graphics regarding their recent inquiry on the shipment of the documents. Tina Johnson | 1.20 | $198.00 |
| Total | | | $6205.25 |

Ap. 3258

# Exhibit B: Secretarial/Clerical Functions

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 1/27/99 | Review and revise calendar for case.<br>James O. Johnston | .60 | 180.00 |
| 1/29/99 | Calendaring of case dates.<br>Frank Lojero | 1.90 | 152.00 |
| 02/01/99 | Calendaring regarding Smartalk matters.<br>Frank Lojero | 2.10 | 168.00 |
| 02/02/99 | Prepare revisions/additions to case calendar.<br>Kathryn S. Bowman | 1.90 | 285.00 |
| 02/05/99 | Update computerized case calendar regarding upcoming hearing dates.<br>Robert Kennedy | .30 | 45.00 |
| /0?/?? | Prepare revisions to master calendar.<br>Kathryn S. Bowman | 2.00 | 300.00 |
| 2/09/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.90 | 152.00 |
| 02/11/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.00 | 80.00 |
| 02/15/99 | Calendaring of Smartalk matters.<br>Frank Lojero | 1.10 | 88.00 |
| 2/17/99 | Calendaring of Smartalk matters.<br>Frank Lojero | .90 | 72.00 |
| 03/02/99 | Calendaring of case issues.<br>Frank Lojero | 1.00 | 80.00 |
| 03/08/99 | Calendaring of case issues.<br>Frank Lojero | 1.60 | 128.00 |
| 3/18/99 | Prepare mailing of Commencment of case to be sent out to Creditors with change of Addresses.<br>Frank Lojero | 1.20 | 96.00 |
| 3/19/99 | Calendaring of case issues.<br>Frank Lojero | .60 | 48.00 |

1

Ap. 3258

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 03/22/99 | Review latest case calendar for pending deadlines and issues.<br>James O. Johnston | .30 | 90.00 |
| 4/01/99 | Calendaring.<br>Frank Lojero | 1.60 | 128.00 |
| 04/08/99 | Calendaring.<br>Frank Lojero | .90 | 72.00 |
| 04/13/99 | Calendaring.<br>Frank Lojero | .50 | 40.00 |
| 04/14/99 | Analyze and organize all orders in chronological order, for submission to the case files.<br>Frank Lojero | 1.50 | 120.00 |
| 04/99 | Update creditor list for Ms. Bowman.<br>Eric Sandin | 3.00 | 405.00 |
| 05/12/99 | Preparation of Special Notice List.<br>Frank Lojero | .60 | 48.00 |
| 05/14/99 | Prepartion of calendar.<br>Frank Lojero | 1.60 | 128.00 |
| 5/18/99 | Preparation of calendar.<br>Frank Lojero | 1.30 | 104.00 |
| 05/21/99 | Preparation of calendaring.<br>Frank Lojero | .50 | 40.00 |
| 05/24/99 | Preparation of calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 05/25/99 | Preparation of calendar.<br>Frank Lojero | .50 | 40.00 |
| 05/26/99 | Preparation of calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 05/28/99 | Preparation of calendar.<br>Frank Lojero | 1.10 | 88.00 |
| 16/11/99 | Preparation of case calendar.<br>Frank Lojero | .90 | 72.00 |

2

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|---|---|---|---|
| 06/14/99 | Preparation of case calendar.<br>Frank Lojero | 1.60 | 128.00 |
| 06/15/99 | Preparation of case calendar.<br>Frank Lojero | .50 | 40.00 |
| 07/05/99 | Calendaring.<br>Frank Lojero | 1.10 | 88.00 |
| 07/08/99 | Calendaring.<br>Frank Lojero | 1.20 | 96.00 |
| 07/09/99 | Calendaring.<br>Frank Lojero | .50 | 40.00 |
| 07/10/99 | Calendaring.<br>Frank Lojero | 1.20 | 96.00 |
| 07/11/99 | Calendaring.<br>Frank Lojero | 1.00 | 80.00 |
| 07/28/99 | Calendaring.<br>Frank Lojero | 1.60 | 128.00 |
| 08/03/99 | Preparation of case calendar.<br>Frank Lojero | .90 | 72.0 |
| 08/04/99 | Preparation of case calendar.<br>Frank Lojero | 1.80 | 144.00 |
| 08/16/99 | Preparation of case calendar.<br>Frank Lojero | 1.20 | 96.00 |
| 08/30/99 | Preparation of case calendar.<br>Frank Lojero | 1.10 | 88.00 |
| 7/26/99 | Prepare pendalflex folders for retaining records<br>for claimants.<br>La Saundra Redd | 6.50 | 520.00 |
| 7/31/99 | Create mailing labels for bar date notice to be<br>sent to additional rebate creditors.<br>David T. Okada | 1.30 | 312.00 |
| | Prepare numbering labels for placement on boxes of<br>documents at SmarTalk's offices.<br>Robert Kennedy | 1.00 | 150.00 |

3

## Exhibit B: Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| ████ | Calendar Intrine deadlines.<br>Shawna Ballard | .10 | 30.00 |
| 09/99 | Prepare labels regarding Dewey Ballantine boxes.<br>Kathryn S. Bowman | 4.00 | 600.00 |
| 11/10/1999 | Prepare calendar items from 11/12/99 hearings continued to December.<br>Kathryn S. Bowman | 0.70 | $105 |
| █/5/1999 | Calendar critical dates regarding Fletcher adversary from Young Conaway's 10/31/99 memorandum.<br>Kathryn S. Bowman | 0.60 | $90.00 |
| ████01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.00 | 240.00 |
| ████01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.50 | 280.00 |
| ████01/99 | Standardize names and entities in privilege log database for Ms. Kontos.<br>Celestino Santos | 3.50 | 280.00 |
| ████/99 | Organize fagged documents for copying of the attorney's review.<br>Debbie Lambdin | 1.50 | 120.00 |
| ████99 | Organize non-responsive documents to ensure they are in bates order.<br>Debbie Lambdin | 1.60 | 128.00 |
| ████99 | Organize redaction envelopes.<br>Debbie Lambdin | 1.00 | 80.00 |
| 11/8/1999 | Calendar upcoming deposition dates.<br>Tina Johnson | 0.50 | $75.00 |
| 11/16/1999 | Calendar deposition dates and discovery dates from the pre-trial scheduling order; review pleading files for a pre-trial conference date or a recent status conference date to calendar pertinent litigation due dates in this matter.<br>Tina Johnson | 1.00 | $150.00 |

4

## Exhibit B:Secretarial/Clerical Functions

| Date | Description | Hours | Fees |
|------|-------------|-------|------|
| 11/16/1999 | Continue to make labels for all the red and blue flagged documents set aside for document production.<br>La Saundra Redd | 3.00 | $240.00 |
| 11/16/1999 | Label and file each Cooper and World Wide Direct/Donald Luftin and Jenerette redwell (containing documents) into storage boxes. Stack World Wide Direct/Donald Luftin and Jenerette boxes separate from the PriceWaterhouse boxes. Label each storage box by the Bates stamp start and end range.<br>Shelley Sumpter | 3.00 | $240.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/12/2000 | Organize privilege redwells by production box number and label boxes.<br>Tina Johnson | 2.20 | $341.00 |
| 12/13/2000 | Organize privilege redwelds by production box number and label boxes.<br>Tina Johnson | 4.00 | $620.00 |
| 3/28/2001 | Generate production cd copies and label for Ms. Kontos.<br>Celestino Santos | 1.00 | $100.00 |

Total                                                                      $9920

5

# Tab No. 3297

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | |
| ) | Chapter 11 |
| WORLDWIDE DIRECT, INC., et al., ) | |
| ) | Case Nos. 99-108 to -127 (MFW) |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |
| ) | **Hearing Date: February 8, 2005** |
| ) | **at 11:30 a.m.** |
| ) | |
| ) | **Objection Deadline: February 1, 2005** |
| ) | |

---

### APPLICATION OF HENNIGAN, BENNETT & DORMAN LLP FOR ALLOWANCE OF COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES INCURRED IN DEFENSE OF OBJECTION TO THE FIRM'S FINAL FEE APPLICATION

<u>Name of Applicant:</u>                    Hennigan, Bennett & Dorman LLP ("<u>HBD</u>")

Authorized to Provide
<u>Professional Services to:</u>              Debtors and Debtors in Possession

<u>Date of Retention:</u>                     Order entered January 21, 1999

Period for Which Compensation
<u>and Reimbursement is Sought:</u>          November 27, 2001, through May 31, 2003

<u>Amount of Compensation Requested:</u>      $186,068.31 (representing 86% of the actual fees
                                          incurred)

Amount of Expense
<u>Reimbursement Requested:</u>              $44,700.78 (representing 86% of the actual
                                          expenses incurred)

This is a final application.

HBD does not request any compensation for the preparation of this Application.

457166.v2

**Prior Applications**

| Date Filed | Period | Requested | | Approved | |
|---|---|---|---|---|---|
| | | Fees | Expenses | Fees | Expenses |
| 6/15/99 (interim) | 1/19/99 – 4/30/99 | $741,457.00 | $91,538.05 | $741,457.00 | $91,538.05 |
| 10/15/99 (interim) | 5/1/99 – 8/31/99 | $1,477,634.45 | $280,216.93 | $1,477,634.45 | $280,216.93 |
| 2/15/00 (interim) | 9/1/99 – 12/31/99 | $1,867,829.45 | $250,322.97 | $1,867,829.45 | $250,322.97 |
| 6/15/00 (interim) | 1/1/00 – 4/30/00 | $871,715.50 | $195,261.65 | $871,715.50 | $195,261.65 |
| 1/15/01 (interim) | 5/1/00 – 11/30/00 | $704,737.00 | $132,304.94 | $704,737.00 | $132,304.94 |
| 8/14/01 (final) | 1/19/99 – 6/30/01 | $5,872,609.90 | $1,042,422.46 | $5,492,359.69 | $1,042,422.46 |

457166.v2

## Timekeeper Summary

| Name of Professional | Position; Years in the position; Year of obtaining license to practice; Area of expertise | Hourly Billing Rate | Total Billed Hours | Total Compensation |
|---|---|---|---|---|
| Bruce Bennett | Partner; Joined HBD as a partner in 1995; member of the California bar since 1982; Bankruptcy. | $550 ('02) | 49.9 | $27,445.00 |
| Laura Lindgren | Partner; Joined HBD as a partner in 1995; member of the California bar since 1978; Litigation. | $420 ('01)<br>$435 ('02) | 5.5<br>145.4 | $2,310.00<br>$63,249.00 |
| James O. Johnston | Partner; Joined HBD as a partner in 1999; member of the California bar since 1993; Bankruptcy. | $390 ('01)<br>$425 ('02)<br>$465 ('03) | 5.3<br>111.4<br>4.0 | $2,067.00<br>$47,345.00<br>$1,860.00 |
| Shawna Ballard | Partner; Joined HBD as an associate in 1996; member of the California bar since 1991; Litigation. | $400 ('02) | 21.6 | $8,640.00 |
| Linda Kontos | Of Counsel; Joined HBD as an associate in 1995; member of the California bar since 1994; Litigation. | $280 ('01)<br>$295 ('02)<br>$325 ('03) | 19.0<br>181.2<br>5.2 | $5,320.00<br>$53,454.00<br>$1,690.00 |
| Julie Stueck | Paralegal; Joined HBD as a paralegal in 1995; paralegal for 19 years. | $165 ('02) | 1.1 | $181.50 |
| Anita Wallace | Paralegal; joined HBD as a paralegal in 1995; paralegal for 13 years. | $165 ('02) | 10.4 | $1,716.00 |
| Celestino Santos | Information Systems Analyst; Joined HBD in 1999. | $115 ('02) | 9.4 | $1,081.00 |
| Grand Total: | $216,358.50, for which HBD seeks payment of eighty-six percent (86%), or $186,068.31. | | | |
| Blended Rate: | $326.78 (including the discount) | | | |

457166.v2

## Compensation by Project Category

| Project Category | Total Hours | Total Fees |
|---|---|---|
| Discovery – Documents | 58.5 | $17,070.00, for which HBD seeks payment of eighty-six percent (86%), or $14,680.20. |
| Discovery – Depositions | 92.8 | $39,653.50, for which HBD seeks payment of eighty-six percent (86%), or $34,102.01. |
| Pleadings and Research | 234.6 | $85,744.50, for which HBD seeks payment of eighty-six percent (86%), or $73,740.27. |
| Hearings | 164.1 | $67,585.00, for which HBD seeks payment of eighty-six percent (86%), or $58,123.10. |
| Correspondence and Miscellaneous | 19.4 | $6,303.50, for which HBD seeks payment of eighty-six percent (86%), or $5,422.73. |

457166.v2

**Expense Summary**

| Expense Category | Service Provider | Total Expenses |
|---|---|---|
| Computerized Legal Research | Lexis/Nexis<br>Westlaw<br>Pacer | $3,872.19, for which HBD seeks payment of eighty-six percent (86%), or $3,330.08. |
| Courier / Overnight Mail | Miscellaneous vendors | $4,349.84, for which HBD seeks payment of eighty-six percent (86%), or $3,740.86. |
| Court Fees | n/a | $90.00, for which HBD seeks payment of eighty-six percent (86%), or $77.40. |
| Facsimile (outgoing at $1/page; no charge for incoming) | n/a | $196.00, for which HBD seeks payment of eighty-six percent (86%), or $168.56. |
| Long Distance Telephone | MCI | $1,908.71, for which HBD seeks payment of eighty-six percent (86%), or $1,641.49. |
| Photocopy (internal at $0.10/page) | n/a | $11,428.10, for which HBD seeks payment of eighty-six percent (86%), or $9,828.17. |
| Photocopy (external at cost) | Miscellaneous vendors | $7,639.81, for which HBD seeks payment of eighty-six percent (86%), or $6,570.24. |
| Postage | n/a | $70.04, for which HBD seeks payment of eighty-six percent (86%), or $60.23. |
| Transcript Fees | Miscellaneous vendors | $5,128.75, for which HBD seeks payment of eighty-six percent (86%), or $4,410.73. |
| Transportation and Travel Expenses | Miscellaneous vendors | $17,294.21, for which HBD seeks payment of eighty-six percent (86%), or $14,873.02. |

457166.v2

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| WORLDWIDE DIRECT, INC., et al., ) | Case Nos. 99-108 to -127 (MFW) |
| Debtors. ) | Jointly Administered |
| ) | Hearing Date: February 8, 2005 |
| ) | at 11:30 a.m. |
| ) | Objection Deadline: February 1, 2005 |

### APPLICATION OF HENNIGAN, BENNETT & DORMAN LLP FOR ALLOWANCE OF COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES INCURRED IN DEFENSE OF OBJECTION TO THE FIRM'S FINAL FEE APPLICATION

Hennigan, Bennett & Dorman LLP ("HBD") hereby moves this Court for an order, under section 330 of the Bankruptcy Code, awarding it reasonable compensation for professional services rendered and reimbursement of its actual and necessary expenses incurred in connection with HBD's defense of the objection filed by the Worldwide Direct Liquidating Trust (the "Trust") to HBD's previously-filed final fee application. HBD requests fees in the amount of $186,068.31 and expenses in the amount of $44,700.78, which together represent eighty-six percent (86%) of the total fees and expenses that HBD incurred in fending off the vast majority of the Trust's objection to more than $2.7 million of HBD's requested fees and expenses.

### I.    INTRODUCTION

Through the Bankruptcy Code, Congress intended "that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts." *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 849 (3d Cir. 1993). The Third Circuit has explained that "Congress' manifest intent [was] to provide fully competitive income to bankruptcy attorneys." *Id.* at 853.

457166.v2

In light of this policy, courts have held that professionals are entitled to be compensated from the bankruptcy estate for their reasonable fees and expenses incurred in successfully defending against objections made to their fee applications:

> Failure to grant fees for successfully defending challenges to an authorized fee application would dilute fee awards, in violation of section 330(a), and this would reduce the effective compensation of bankruptcy attorneys to levels below the compensation available to attorneys generally.

*Smith v. Edwards & Hale, Ltd. (In re Smith)*, 317 F.3d 918, 928 (9th Cir. 2002) (citing *In re Nucorp. Energy, Inc.*), 764 F.2d 655 (9th Cir. 1985)). The Third Circuit has implicitly acknowledged this very point. *See Busy Beaver*, 19 F.3d at 847 (quoting *Pawlak v. Greenawalt*, 713 F.2d 972, 983 (3d Cir. 1983), for the proposition that, "[i]f attorneys are required to litigate for their fees but are not compensated for the time spent on such litigation, their effective rates will be reduced correspondingly").

In fact, previously in this very case, the Court awarded a professional employed by the Debtors $30,000 in attorneys' fees incurred in successfully defending against a fee objection made by the Creditors' Committee (whose members now sit on the Liquidating Trust Board and control the Trust).[1]

HBD seeks a comparable award by this Application. The Court will recall that the Trust objected to a staggering $2,729,337 of the final fees and expenses requested by HBD for its two-and-a-half years of service as counsel to the Debtors in this case. That objection amounted to nearly forty percent (40%) of HBD's final fee and expense request (which itself reflected a voluntary reduction of more than $750,000 in fees and expenses). Ultimately, the Court sustained only $380,250 of the Trust's objections, less than fourteen percent (14%) of the amount

---

[1]    *See* Order Regarding Supplemental Application Of Houlihan Lokey Howard & Zukin, entered June 9, 2000 [doc. # 1749/1768] (awarding compromised amount of $30,000); "Supplemental Application Of Houlihan Lokey Howard & Zukin Capital For Compensation And Reimbursement Of Expenses" [doc. # 1458/1474].

Ap. 3297

of fees and expenses that the Trust sought to deny HBD, while rejecting every legal ground raised by the Trust.

Almost all of the reduction in HBD's requested fees involved the "temporary attorney" issue discussed at length in the Court's opinion in this matter. That issue could have been briefed and litigated efficiently and inexpensively, as fee disputes routinely are handled. Instead, litigation over the Trust's objection was lengthy and expensive, running for more than a year with the trial itself consuming nearly two days of the Court's time. The Trust created and exacerbated this situation in numerous ways.

First, the evidence revealed that the Liquidating Trustee (the entity pursuing the objection on behalf of the Trust) filed the objection without ever reading HBD's final fee application, reviewing any of HBD's work product, discussing HBD or HBD's work with the Debtors or any other parties in interest, or discussing any of its objections with HBD. *See* "Reply Of Hennigan, Bennett & Dorman To The Liquidating Trust's Objection To The Final Fee Application" [doc. # 2661] (the "HBD Reply") at 18-19, and deposition testimony cited therein. Rather, upon receiving a copy of the fee auditor's draft report, the Liquidating Trustee simply filed the draft as its "objection," without any discussion with the auditor and without even reading the report in its entirety. *Id.* As this Court has now found, the auditor also never reviewed any of HBD's work product, discussed HBD or its work with the Debtors or any other parties in interest, or discussed any of the "objections" in the draft report with HBD. Opinion dated October 29, 2004 ("Op.") at 4. Thus, the Court ultimately excluded and found to be unreliable the very report that served as the sole basis for the Trust's $2.7 million objection to HBD's fees, but only *after* (and as a result of) HBD's painstaking (and expensive) discovery, depositions, and cross-examination of the auditor. Op. at 3-5.

Second, after filing the objection, the Trust demanded the production of virtually every document in HBD's files relating to this case, including *all of HBD's work product*. At great expense, HBD ultimately culled through, reviewed, and made available over *500 boxes* of hard copy documents, plus HBD's electronic files on four CD-Roms (roughly 2 gigabytes of data).

Ap. 3297

HBD Reply at 44-45. Yet, *after* HBD incurred that expense, the Trust scarcely bothered to review the production, all the while continuing to maintain that it would seek to disallow the entire $2.7 million in fees and costs that were the subject of the Trust's objection. Then, literally on the eve of trial, the Trust decided to abandon all but four of the twenty-four categories of objections identified in the auditor's draft report. Op. at 2-3. In contrast to HBD's full and voluntary production, the Trust stonewalled HBD's modest discovery requests, refused to accept service of the subpoenas duces tecum on behalf of any of the Liquidating Trust Board members, and filed motions to quash the subpoenas once HBD incurred the expense of serving them out of state. *See* HBD Reply at 45-46 and exhibits cited therein.

Third, because the Trust refused to abandon the auditor's obviously-flawed report, which had nothing to do with the substance of the Trust's objection on the "temporary attorney" issue, the trial on the Trust's objection consumed two days, requiring two cross-country trips by the HBD attorneys tasked with defending HBD's fees. HBD also was forced to travel cross-country on several occasions to depose the fee auditor and his associate, and the employees of the Liquidating Trustee who purportedly were tasked with reviewing and making decisions about HBD's fees.

All of the Trust's tactics served to needlessly prolong and increase the expense of this dispute. Indeed, HBD estimates that, despite the slapdash nature of the Trust's objection, the Trust's professionals incurred approximately $240,000 in fees in attacking HBD, including over $87,500 in fees charged by the fee auditor for producing the report that the Court ultimately found to be unreliable.[2] HBD was required to mount a comparably vigorous defense to defend against the unwarranted objection to more than $2.7 million of its fees and expenses.

---

[2]  *See* "Final Application Of Legal Cost Control, Inc. Fee Auditor For Reimbursement Of Holdback Fees And Expenses" [doc. # 2885] ($87,687 fee relating to the draft report on HBD); "First Interim Post-Effective Date Application Of Gibbons, Del Deo, Griffinger & Vecchione, PC As Counsel To Golding Associates, Liquidating Trustee Of The Worldwide Direct Liquidation Trust" [doc. # 2889] (approximately 2/3rds of requested fees of $185,261 relate to HBD); "First Interim Application Of Wollmuth Maher Deutsch LLP" [doc. # 2891] (approximately 1/3rd of requested fees of $33,201 relate to HBD); "Second Interim

457166.v2                           -4-

In light of HBD's near total success on all objections other than the objection raised with respect to the "temporary attorneys," and HBD's success on more than half of the fees requested with respect to the "temporary attorneys," HBD submits that it has prevailed in this litigation and is entitled to be compensated for the fees and expenses incurred in defending its final fee application. As HBD succeeded in preserving over eighty-six percent (86%) of the fees and expenses to which an objection was made (and nearly ninety-five percent (95%) of HBD's total requested fees and expenses), HBD requests that the Court award it fees in the amount of $186,068.31 and expenses in the amount of $44,700.78, which together represent eighty-six percent (86%) of the total fees and expenses that HBD incurred in this fee dispute.

## II.    BACKGROUND

The Debtors filed their chapter 11 cases on January 19, 1999, and this Court approved HBD's retention as the Debtors' counsel by an order entered on January 21, 1999. From the petition date through the effective date of the Plan on June 30, 2001, HBD played a major role in every development and accomplishment in the case. HBD's services and major accomplishments are summarized in the HBR Reply and will not be repeated here. HBD merely notes that the Court has now overruled each and every objection of the Trust relating to the substance, merits, and value of HBD's work in this case.

On the Plan's June 30, 2001, effective date, the Trust became vested with the Debtors' remaining assets, charged with fiduciary duties to the estate, and tasked with concluding the case. After obtaining months of extensions, on December 3, 2001, the Trust objected to more than $2.7 million of HBD's requested fees and expenses. That objection, however, contained not one iota of analysis or discussion regarding HBD, its services, or its fees. Rather, the objection merely attached the "draft report" of the auditor and stated that the report "points out many objectionable

---

Application Of Wollmuth Maher Deutsch LLP" [doc. # 3083] (approximately 1/5th of requested fees of $96,881 relate to HBD).

areas and suggests that further documentation and information may be necessary." Obj. at 6
[doc. # 2549]. This was the entirety of the Trust's analysis.

In fact, the Liquidating Trustee later testified that he made no effort to audit or examine
HBD's fees. The Liquidating Trustee did not even review HBD's bills or fee applications, or
even read the entirety of the auditor's report. *See* HBD Reply at 18-19 and deposition testimony
cited therein. Rather, the Trust simply submitted the document to the Court and sought, without
any analysis, to utilize it to justify the forfeiture of nearly forty percent (40%) of HBD's fees.

This, by itself, is unacceptable conduct for a fiduciary of the bankruptcy estates. It is all
the more objectionable in light of the fact that the auditor's report was without substance.
Discovery conducted by HBD revealed, and testimony at the trial later confirmed, that the report
that served as the objection to HBD's fees was not based on an audit and was prepared without
any review of HBD's underlying work product, without any consultation with HBD's clients or
members of the Committee or any other parties in interest, and without any knowledge of the
issues involved in the SmarTalk/Worldwide Direct case. While the report purportedly was
prepared in accordance with "Generally Accepted Legal Auditing Principles (GALAP)," the
auditor later was forced to concede in his testimony that there is no such thing. Op. at 4-5.

Moreover, as the Court has now found, the auditor's report was incomplete and riddled
with errors that served to inflate the amount of fees subject to the objection and obscure the true
nature and value of HBD's services. For example:

- The report's exhibits attributed to HBD over 100 incorrect time entries,
variously overstating the time actually recorded in HBD's invoices, creating duplicate
entries when only a single entry appeared in HBD's invoices, and fabricating time entries
that had no correspondence time entry at all in HBD's invoices.

- The report ignored the fee application narratives and subject matter
categories into which HBD meticulously grouped its fees, thus providing a basis for the
auditor to claim that certain time entries were "vague," where simply referring to the

Ap. 3297

narrative or fee category into which the entries are classified would have provided context and resolved any "vagueness" regarding the entries.

- The report frequently included the same time entries in two or more categories of objection, thus double- or triple-counting a single "objectionable" time entry and thereby increasing the amount of the fees subject to the objection by a like amount.

- The report ignored HBD's prior reductions in photocopy and facsimile charges, and thus asserted objections to tens of thousands of dollars of "expenses" for which HBD never sought reimbursement.

Op. at 3-5.

In sum, HBD was required to dissect and defend against an objection that, before the Trust's eleventh-hour "supplement" was filed, was based solely on a report that the Court found to be erroneous and "not reliable." Given the attack on more than $2.7 million of its fees and expenses, HBD was required to conduct and respond to discovery and otherwise mount a vigorous defense, only to learn on literally the eve of trial that the Trust was abandoning all but four of the twenty-four categories of objections identified in the auditor's draft report. Op. at 2-3. And even then, because the Trust continued to rely on the auditor and to pursue several objections raised in the report (all of which were later overruled in all but immaterial amounts), the hearing on HBD's fees continued for two days. All of this had the effect of demonstrably increasing the fees and expenses incurred by HBD in protecting the fees that it had earned in service of the Debtors and the estates.

## III.    SUMMARY OF HBD'S SERVICES

In this Application, HBD requests an award of reasonable fees and expenses incurred in connection with HBD's defense of the Trust's objection to HBD's final fee application. As HBD succeeded in preserving over eighty-six percent (86%) of the fees and expenses to which an objection was made (and nearly ninety-five percent (95%) of HBD's total requested fees and

457166.v2

-7-

expenses), HBD requests that it be awarded eighty-six percent (86%) of the fees and expenses that it incurred. HBD, however, does not request any fees or expenses associated with the preparation of its final fee application or this Application.

HBD has grouped the services that are the subject of this Application into the following five categories:

- Discovery – Documents
- Discovery – Depositions
- Research and Pleadings
- Hearings
- Correspondence and Miscellaneous[3]

Attached as <u>Exhibit A</u> is a detailed chronological statement of services performed by HBD, grouped by service category. Within each category, the statement includes a listing of the name of the person who rendered a particular service, the date and amount of time expended, and a detailed description of the work performed. Separate summaries of HBD's services, organized by timekeeper and by service category, are included above behind the cover page of this Application. The following is a narrative summary of HBD's services:

A.    **Discovery – Documents.**

The Trust made incredibly broad discovery requests of HBD. The Trust demanded:

- All documents relating to any voluntary "write-offs" . . . including but not limited to, the original time entries for any tasks and any invoices subject to such write-offs;

- All documents relating to the Document Review, Analysis and Management, as identified as category 500 in the Fee Application;

---

[3]    HBD has attempted to place the services performed in the category that best relates to the service provided. However, because certain services may relate to one or more categories, services pertaining to one category in fact may be recorded in other categories.

- *All written or recorded work product of [HBD] for which [HBD] seeks recovery of fees;*

- All communications . . . relating to any fees charged to the Debtors by [HBD];

- All documents relating to the employment of temporary personnel, including but not limited to, copies of all documents relating to payments made to temporary personnel and the resumes of any individual billed by [HBD] as an attorney or paralegal;

- All documents relating to expenses incurred by [HBD] in connection with computer assisted legal research for which it seeks reimbursement;

- All documents relating to payments to third parties; and

- All documents relating to travel and/or transportation expenses incurred by Hennigan for which it seeks reimbursement.

*See* HBD Trial Ex. 21 (emphasis added).

This demand forced HBD to review its entire file of documents generated and received in its two-and-a-half years of service in this case. This was an expensive and time consuming effort, as evidenced by the fact that HBD ultimately culled through, reviewed, and made available to the Trust over *500 boxes* of hard copy documents, plus HBD's electronic files on four CD-Roms (roughly 2 gigabytes of data).[4]

HBD also prepared and served limited discovery requests on the Trust and members of the Trust Board. In contrast to HBD's cooperative approach, however, HBD's modest requests were met with resistance and defiance at every turn. The Trust objected to the majority of

---

[4] Much of the document review was performed by Jason Patty, a former "temporary attorney" whom HBD hired after conclusion of the SmarTalk document review project discussed at length in HBD's reply brief and in Mr. Bennett's testimony. Mr. Patty spent three full weeks, and over 100 hours, reviewing and compiling documents to respond to the Trust's document requests. HBD, however, has voluntarily not elected not to seek compensation for *any* of Mr. Patty's time in this regard.

Ap. 3297

document requests and ultimately produced less than two boxes of documents, while delaying production of additional documents until after HBD had completed the depositions of key witnesses. The Trust refused to answer the majority of interrogatories propounded, most of which sought basic explanation of the confusing objections set forth in the auditor's report, and then failed to verify supplemental responses that provided, at best, a modicum of the requested information. The Trust also refused to accept service and filed motions to quash the subpoenas issued to members of the Trust Board. All of this dramatically increased the expense of this dispute.

In total, HBD expended 58.5 hours performing services attributable to the Discovery – Document category, for a total of $17,070.00 in fees, for which HBD seeks payment of eighty-six percent (86%), or $14,680.20.

**B.     Discovery – Depositions.**

Because the auditor's report was so fundamentally flawed and inaccurate, because the Trust never conducted any sort of dialogue with HBD to attempt to get answers to the various questions posed in the auditor's report, and because the Trust failed to substantively respond to HBD's interrogatories, HBD was compelled to depose representatives of the auditor and the Trust to try to ascertain the basis for the massive objection that had been made to HBD's fees. This also was a time consuming and expensive process.

Ultimately, HBD deposed the principal of the auditor – John Marquess – at his offices in Newark, and Mr. Marquess' associate, Skyler Altland, in Los Angeles. HBD also deposed two representatives of the Trust and the Liquidating Trustee – David Pauker and Mark Slane – in New York. The Trust in turn deposed Mr. Johnston of HBD for a full day.

In total, HBD expended 92.8 hours performing services attributable to the Discovery – Depositions category, for a total of $39,653.50 in fees, for which HBD seeks payment of eighty-six percent (86%), or $34,102.01.

457166.v2

-10-

## C.    Pleadings and Research.

The primary task in the "Pleadings and Research" category was HBD's written response to the Trust's objection to HBD's fees.  Due to the far ranging nature of the objection -- which included dozens of different "categories" of objections and a request to disallow virtually all of HBD's fees incurred during the plan confirmation process and the fees relating to litigation matters (*i.e.*, document productions, damage analyses, expert witness fees and the like), HBD had no choice but to prepare a comprehensive written response to the Trust's many factual and legal errors.  Pursuant to the briefing schedule, HBD prepared and filed a 49-page response brief, together with six supporting declarations, 53 exhibits, and excerpts of deposition testimony.  Then, in an effort to streamline the hearing on the Trust's objection, HBD agreed with the Trust's counsel to draft and submit revised declarations that could be admitted into evidence without objection and thus eliminate the need for live testimony from three witnesses.  Ultimately, in the face of HBD's comprehensive briefing, the Trust abandoned all but four of the "categories" of objections it originally pursued against HBD.

HBD also drafted responses to the Trust's motions in limine and motions to quash HBD's subpoenas, and researched various legal issues regarding temporary personnel and other matters raised in the Trust's pleadings.

In total, HBD expended 234.6 hours performing services attributable to the Pleading and Research category, for a total of $85,744.50 in fees, for which HBD seeks payment of eighty-six percent (86%), or $73,740.27.

## D.    Hearings.

The hearing on the Trust's objection to HBD's fees continued over two days six months apart, commencing on May 16, 2002, and concluding on December 5, 2002. The hearings and associated travel alone thus consumed significant time and generated significant expense.  Preparation for the hearings (including preparing for the hearing that was originally scheduled for September 5, 2002, but continued in the days before to December 5, 2002) also was time

-11-

consuming, involving witness preparation, preparation for cross-examination of witnesses, and preparation of opening statements and closing arguments.

In total, HBD expended 164.1 hours performing services attributable to the Hearings category, for a total of $67,585.00 in fees, for which HBD seeks payment of eighty-six percent (86%), or $58,123.10.

E.    **Correspondence and Miscellaneous.**

As indicated in the attached time records, HBD corresponded with the Trust and opposing counsel on numerous discovery, scheduling, and other matters during the course of this dispute. In total, HBD expended 19.4 hours performing services attributable to the Hearings category, for a total of $6,305.50 in fees, for which HBD seeks payment of eighty-six percent (86%), or $5,422.73.

## IV.    SUMMARY OF HBD'S EXPENSES

HBD incurred a total of $51,977.65 in actual, reasonable, and necessary expenses in connection with its defense of the Trust's objection. HBD seeks reimbursement of eighty-six percent (86%) of this amount, or $44,700.78.

Attached as <u>Exhibit B</u> is an itemization of all expenses incurred by HBD for which reimbursement is sought. A summary of HBD's expenses, by type, is included above behind the cover page of this Application.

HBD made every effort to limit its expenses and to use the most economical means available for accomplishing the tasks requiring expenditures of costs. As it did throughout this case, HBD charged only for the actual expenses incurred, without markup or surcharge (including computer assisted legal research), and HBD did not charge for non-ordinary overhead expenses such as secretarial and other overtime. As indicated in the itemization, HBD requests reimbursement of internal photocopies at the rate of $0.10/page and for outgoing facsimiles at the

457166.v2

Ap. 3297

rate of $1.00/page (with no charge for incoming facsimiles). All airfare has been written down to an approximation of full coach fare.

## V.    ARGUMENT

As noted in the Introduction to this Application, the touchstone of the Bankruptcy Code's provisions for the compensation of professionals is "that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts." *Busy Beaver*, 19 F.3d at 849.

In light of this policy of comparable compensation, courts have held that professionals are entitled to be compensated for the fees and expenses they incur in successfully defending against objections made to their fee applications. *See, e.g., Smith*, 317 F.3d at 928-29; *Burgess v. Klenske (In re Manoa Finance Co.)*, 853 F.2d 687, 692 (9th Cir. 1988); *Big Rivers Electric Corp. v. Schilling (In re Big Rivers Electric Corp.)*, 252 B.R. 670, 675-76 (W.D. Ky. 2000); *Nunley v. Jessee*, 92 B.R. 152, 153-54 (W.D. Va. 1988); *In re Hutter Construction Co.*, 126 B.R. 1005, 1013 (Bankr. E.D. Wis. 1991). The rationale for this is straightforward: "To deny [the professional] reasonable compensation for successfully defending its fee awards would dilute its compensation for 'actual and necessary services'" and thus run afoul of the Bankruptcy Code's policy of equal compensation. *Smith*, 317 F.3d at 929; *see Big Rivers*, 252 B.R. at 675 ("To deny these fees would unnecessarily dilute the Examiner's compensation and force him to bear the costs of defending a fee which was properly awarded to him by the Bankruptcy Court.").[5]

Here, HBD was faced with an objection to more than $2.7 million of its requested fees and expenses. That objection was not based on any review of HBD's work product or services

---

[5]    The Third Circuit has reached this same conclusion in similar contexts. *See, e.g. Pawlak v. Greenawalt*, 713 F.2d 972, 983 (3d Cir. 1983) ("if attorneys are required to litigate for their fees but are not compensated for the time spent on such litigation, their effective rates will be reduced correspondingly") (common benefit action); *Bagby v. Beal*, 606 F.2d 411, 415-16 (3d Cir. 1979) (same) (civil rights action); *Prandini v. National Tea Co.*, 585 F.2d 47, 53-54 (3d Cir. 1978) (same).

rendered in the case. Rather, the objection was premised solely on a trumped-up, preliminary "audit" report that this Court later determined to be inaccurate and unreliable. Even the Trust ultimately abandoned all but four of the twenty-four categories of objections set forth in that report, but only on the eve of trial and only after forcing HBD to incur substantial fees and costs in establishing the myriad of errors made by the auditor.

Under these circumstances, to deny HBD its reasonable fees and expenses incurred in defending against that objection this case would dilute the fee that HBD earned for its services in this case and would open the floodgates to similar meritless objections in the future: "[D]enying . . . fees for defending against Smith's objections, which the bankruptcy court found were 'frivolous,' would serve to encourage debtors to file meritless objections to fee applications. This case evinces one of the 'sets of circumstances' where litigation of a fee application is 'necessary' for the purposes of section 330(a)." *Smith*, 317 F.3d at 929; *see Hutter Construction*, 126 B.R. at 1013 ("Baseless filings in bankruptcy court must be deterred, and the limited resources of the court should be spent on productive matters. This includes baseless fee applications, *and irresponsible objections to fee applications*.") (emphasis added) (citations omitted).[6]

HBD acknowledges that the Court did partially sustain the Trust's objection to the fees that HBD sought with respect to its use of temporary personnel in the case, although not on

---

[6]   In its recently filed Motion to compel payment from HBD, the Trust asserted that HBD is not entitled to any award of fees because the Trust "offered to resolve its objections to Hennigan's fees before litigation for roughly the amount of the Excess Fees." Mtn. at 3. This apparently refers to the Trust's October 1, 2001 memo, sent on a "blast fax" to all professionals in this case, demanding that every professional agree to a flat seven percent (7%) reduction in their requested fees or face a fee audit, which would subject the professional "to the cost and inconvenience of having to address issues raised by a fee audit," and could result in an objection "greater than what is currently proposed." *See* HBD Trial Ex. 18. At that time, however, the Trust conceded that it had not made "a thorough and detailed examination" of the various fee applications, *id.*, and not a single ground for objection to even a dollar of HBD's fees had been identified, so HBD declined to agree to reduce its fees in the absence of any demonstrated reason (other than the threat of a fee auditor) for doing so. In any event, the reduction ultimately ordered by the Court is substantially lower than the "offer" tendered by the Trust before the litigation commenced.

457166.v2

-14-

grounds raised by the auditor or by Trust in its belated supplemental objection. Even in so doing, the Court rejected the Trust's legal arguments and affirmed the basic point that HBD did not violate any bankruptcy or ethical rules in employing the temporary personnel, and that HBD was entitled to "bill and receive compensation for their services from the Debtors' estates." Op. at 22. Nevertheless, in light of the Court's conclusion that HBD did not meet its burden of proving that fees over the amount that HBD paid to the temporary personnel agencies should be borne by the estate, HBD now seeks an award of only eighty-six percent (86%) of the fees and expenses that it incurred in defending against the Trust's objection, which approximates the percentage of HBD's fees subject to objection that ultimately were allowed. *See Hutter Construction*, 126 B.R. at 1019-20 (adopting a similar, percentage-based approach and awarding a professional a fraction of the fees it incurred in successfully defending a portion of the compensation requested in its fee application); *Big Rivers*, 252 B.R. at 675-76 (awarding fees incurred in a successful defense of a portion of a fee request; denying fees incurred in connection with the portion of a fee request that did not result in an award of allowed fees).

## VI.    CONCLUSION

HBD prevailed in protecting over eighty-six percent (86%) of the fees and expenses that were subject to objection by the Trust (and nearly ninety-five percent (95%) of HBD's total requested fees and expenses). Without an award of a comparable percentage of the fees and expenses that HBD incurred in fending off the Trust's largely unfounded attacks, HBD's actual compensation for the valuable services it rendered in this case would be unfairly diluted in violation of "Congress' manifest intent to provide fully competitive income to bankruptcy attorneys." *Busy Beaver*, 19 F.3d at 853.

Ap. 3297

HBD therefore requests that the Court award it fees in the amount of $186,068.31 and expenses in the amount of $44,700.78, which together represent eighty-six percent (86%) of the total fees and expenses that HBD incurred in defending its final fee application.

Dated:  December 30, 2004          HENNIGAN, BENNETT & DORMAN LLP

                                   _____
                                   Bruce Bennett
                                   James O. Johnston
                                   601 South Figueroa Street, Suite 3300
                                   Los Angeles, California  90017
                                   Telephone:  (213) 694-1200
                                   Telecopy:  (213) 694-1234

457166.v2                          -16-

## CERTIFICATION OF JAMES O. JOHNSTON

I, James O. Johnston, hereby declare that:

1.     I am a partner with Hennigan, Bennett & Dorman LLP ("HBD"), formerly the reorganization counsel to the debtors and debtors in possession in these cases.

2.     The order authorizing my pro hac vice admission to practice before this Court in these cases was entered on the docket on January 21, 1999.

3.     I have reviewed the requirements of Local Rule 2016-2. To the best of my knowledge, the foregoing "Application Of Hennigan, Bennett & Dorman LLP For Allowance Of Compensation And For Reimbursement Of Expenses Incurred In Defense Of Objection To The Firm's Final Fee Application" complies with the requirements of Local Rule 2016-2.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 30th day of December, 2004, at Los Angeles, California.

_____
James O. Johnston

457166.v2                        -17-

**Ap. 3297**

# Tab No. 3308

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Case No. 99-00108 (MFW) through
                                    .    Case No. 99-00127 (MFW)
                                    .
WORLDWIDE DIRECT,                   .
INC., et al.,                       .
                                    .    824 Market Street
                                    .    Wilmington, Delaware 19801
                                    .
        Debtors.                    .    February 8, 2005
. . . . . . . . . . . . . ..             11:37 a.m.

TRANSCRIPT OF AGENDA HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Liquidating        Klehr, Harrison, Harvey, Branzburg,
Trustee:                      & Ellers, LLP
                           By:  STEVEN K. KORTANEK, ESQ.
                           919 Market Street
                           Suite 1000
                           Wilmington, DE  19801

                           Munsch, Hardt, Kopf, & Harr, PC
                           By:  MARK H. RALSTON, ESQ.
                           1445 Ross Avenue
                           4000 Fountain Place
                           Dallas, TX  75202
                           (Telephonic Appearance)

                           Wolmuth, Maher, & Deutzsch
                           By:  PAUL R. DEFILLIPO, ESQ.

Audio Operator:            Danielle R. Gadson

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

2

APPEARANCES (Cont'd.):

For Hennigan, Bennett,
and Dorman, LLP:

Hennigan, Bennett, & Dorman, LLP
By:  JAMES O. JOHNSTON, ESQ.
601 South Figueroa Street
Suite 3300
Los Angeles, CA  90017

Young, Conaway, Stargatt,
  & Taylor, LLP
By:  ROBERT S. BRADY, ESQ.
Brandywine Building
1000 West Street
17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

21

1  dollars of our fees, only a fraction of which were sustained.

2        Moreover, the notion that the trust made a good faith
3  settlement offer to HBD is ludicrous.  As we noted before, the
4  offer was made before the trust even reviewed our fee
5  application.  It said so right on its face.

6        The trust merely made a demand to every professional
7  employed in this case, for an across the board seven percent
8  reduction.  And then it threatened to hire a fee auditor if the
9  demand was not acceded to.  That's not a settlement offer,
10 that's a shakedown.

11       In the letter, the trust didn't identify a single
12 ground for objection to HBD's fees, and we welcomed an
13 independent fee auditor in this case, so we didn't agree to
14 what was an unprincipled demand for a reduction.

15       That, then, cannot authorize the trust to turn around
16 and object to 40 percent of all of our fees, and deprive us of
17 the right to recover our costs in defending ourselves.

18       And so, we would submit Your Honor, and respectfully
19 request an award of reasonable fees incurred, in fending off
20 the trust's objection to our final fee application.

21       THE COURT:  Any response?

22       MR. DEFILLIPO:  No, Your Honor.  Thank you.

23              (Pause)

24       THE COURT:  Well, if I were to apply the Computer
25 Learning Center factors, I would agree with Hennigan Bennett,

22

1    in large part, that they meet those.

2        I think that the fee application was largely

3    compliant with the rules, although I do note that the one

4    disallowance I made was based on the temporary employees, and

5    I'm not sure full disclosure was made as to the terms of their

6    retention and the fact that the firm was charging overhead as a

7    basis of their hourly rates.  So, that factor I think is

8    somewhat different.

9        But, the other factors I think, in large part the

10   objection of the trustee, did not have a sound basis in fact,

11   although I don't go so far as to say it was in bad faith.

12       In large part the fees were allowed by the Court for

13   the Hennigan Bennett request.  I don't know whether I'd say the

14   additional work was needed, but certainly it did flesh out the

15   issues for the Court.

16       But, I disagree with the Courts that say, excepting

17   extraordinary circumstances, that a professional would be

18   entitled to compensation for fees incurred in objecting --

19   excuse me, in responding to objections to fees they have

20   requested.

21       I think that the benefit by responding to those

22   objections is for the benefit of the professional, not the

23   estate.  And I think a rule, to that extent, would not be

24   appropriate.

25       I don't think I'm bound by Busy Beaver to hold

**J&J COURT TRANSCRIBERS, INC.**

23

1   otherwise, because <u>Busy Beaver</u> simply said that the fees

2   awarded should be comparable to those of professionals outside

3   of bankruptcy.

4        And under the American Rule, fees in litigating

5   either objections to fees or refusal to pay fees are borne by

6   the party who encouraged them, not by the prevailing party.

7        So, I decline to award any fees in this circumstance.

8   I don't think this would rise to the exceptional circumstance

9   where I may in fact award fees.

10       I think that the fees incurred by Hennigan Bennett

11  were simply to assure that it got itself paid. Although it was

12  unusual, in that there was a two day hearing on it, I think

13  that is simply the cost of doing business.

14       I came to my refusal to permit fees for litigating a

15  retention application, so I'll disallow the fee application.

16       I don't think I need to go forward with the trustee's

17  motion, since I assume Hennigan Bennett will otherwise disgorge

18  the remainder of the fees awarded.

19       MR. MCMICHAEL:  We will tender the check --

20       THE COURT:  Not awarded.

21       MR. MCMICHAEL:  We will tender the check immediately.

22       Your Honor, one request in the trustee's motion was

23  for Your Honor to award prejudgment interest. We continue to

24  object to that request and submit that it's not appropriate.

25       MR. DEFILLIPO:  We withdraw it, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

24

1       THE COURT:  All right.  Thank you.

2       MR. JOHNSTON:  Thank you, Your Honor.

3       MR. DEFILLIPO:  Thank you, Your Honor.

4       MR. KORTANEK:  We have no other matters going

5   forward.

6           THE COURT:  All right.  We'll stand adjourned.  Thank

7   you.

8                       * * * * *

9               C E R T I F I C A T I O N

10          I, MELISSA HYNES, court approved transcriber, certify

11  that the foregoing is a correct transcript from the official

12  electronic sound recording of the proceedings, in the

13  above-entitled matter, to the best of my ability.

14

15  _____

16  MELISSA HYNES

17  J&J COURT TRANSCRIBERS, INC.          DATE:  February 22, 2005

**J&J COURT TRANSCRIBERS, INC.**

# Tab No. 3312

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WORLDWIDE DIRECT, INC., *et al.*, | ) | Case No. 99-00108 (MFW) through |
| | ) | Case No. 99-00127(MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related Docket No. 3297** |

## ORDER REGARDING APPLICATION OF
## HENNIGAN, BENNETT & DORMAN LLP FOR ALLOWANCE
## OF COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES
## INCURRED IN DEFENSE OF OBJECTION TO THE
## FIRM'S FINAL FEE APPLICATION

Upon consideration of the Application Of Hennigan, Bennett & Dorman LLP For

Allowance Of Compensation And For Reimbursement Of Expenses Incurred In Defense Of

Objection To The Firm's Final Fee Application (the "Application"), the objection to the

Application filed by the Liquidating Trustee, and the arguments of counsel at the February 8,

2005 hearing on the Application, and for the reasons stated on the record at said hearing, it is

hereby

ORDERED that the Application is denied.

Dated: March 8, 2005

Mary F. Walrath
The Honorable Mary F. Walrath
Chief United States Bankruptcy Judge

DELI 60596-1

**Ap. 3312**

# Tab No. 3316

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| WORLDWIDE DIRECT, INC., et al., | ) | |
| | ) | Case Nos. 99-108 to -127 (MFW) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## NOTICE OF APPEAL

Hennigan, Bennett & Dorman LLP, fee applicant in the above-captioned proceeding, hereby appeals pursuant to 28 U.S.C. § 158(a) and Rule 8001 of the Federal Rules of Bankruptcy Procedure from the "Order Regarding Application Of Hennigan, Bennett & Dorman LLP For Allowance Of Compensation And For Reimbursement Of Expenses Incurred In Defense Of Objection To The Firm's Final Fee Application" [docket # 3312] (the "Order"), entered in this bankruptcy case on March 9, 2005.

The names of all parties to the Order and their respective attorneys are as follows:

1. **Appellant**: HENNIGAN, BENNETT & DORMAN LLP

   James O. Johnston, Esq.
   HENNIGAN, BENNETT & DORMAN LLP
   601 South Figueroa Street, Suite 3300
   Los Angeles, California 90017
   Phone : (213) 694-1200

   Robert. S. Brady, Esq.
   YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
   The Brandywine Building
   1000 West Street, 17th Floor
   Wilmington, DE 19801
   Phone: (302) 571-6600

2.    **Appellee**: GOLDIN ASSOCIATES, L.L.C., AS LIQUIDATING TRUSTEE FOR THE WORLDWIDE DIRECT LIQUIDATING TRUST

Steven K. Kortanek
KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
Phone:  (302) 426-1189

Paul R. DeFilippo, Esq.
WOLLMUTH, MAHER & DEUTSCH
One Gateway Center, 9th Floor
Newark, NJ 07102
Phone: (973) 733-9200

Dated:  March 16, 2005          HENNIGAN, BENNETT & DORMAN LLP

Bruce Bennett
James O. Johnston
601 South Figueroa Street, Suite 3300
Los Angeles, California  90017
Telephone:  (213) 694-1200
Telecopy:  (213) 694-1234

-and-

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
Robert. S. Brady, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Phone:  (302) 571-6600
Telecopy:  (302) 571-1253

469661.v1          -2-

Ap. 3316